## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHMUEL LEVY, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JASON LUO, JAMES TAYLOR, ALBERT LI, MARSHALL KIEV, DAVID BORIS, and BDO USA, LLP, | ) ) ) ) | |
| Defendants. | ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

## <u>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

FRIEDLANDER & GORRIS, P.A.
Jeffrey M. Gorris (Bar No. 5012)
David Hahn (Bar No. 6417)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3508

ROBBINS GELLER RUDMAN
  & DOWD LLP
Brian E. Cochran
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

ROBBINS GELLER RUDMAN
  & DOWD LLP
Samuel H. Rudman
Mary K. Blasy
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

DATED: June 14, 2023

Plaintiff Shmuel Levy ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of: (i) the U.S. Securities and Exchange Commission ("SEC") filings by Electric Last Mile Solutions, Inc. ("ELMS" or the "Company"), conference call transcripts, Company press releases, and media reports about the Company; and (ii) certain legal proceedings involving ELMS, including *In re Electric Last Mile Solutions Inc. Sec. Litig.*, No. 2:22-cv-00545 (D.N.J.), and *In re Electric Last Mile Solutions Inc.*, No. 1:22-bk-10537 (Bankr. D. Del.).  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities fraud class action on behalf of all purchasers of the common stock of ELMS directly in the private investment in public equity ("PIPE") offering conducted by ELMS on or about December 10, 2020 (the "PIPE Offering"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.     ELMS is a former commercial EV company that was focused on covering the "last mile" of deliveries, which has since filed for bankruptcy and as such is not named as a defendant herein.  Prior to its delisting, ELMS was a publicly traded company created through the June 25, 2021 merger of a privately held company called Electric Last Mile, Inc. ("ELM") and a publicly traded special purpose acquisition company ("SPAC"), then called Forum Merger III Corporation ("FIII"), with FIII serving as the surviving entity and

changing its name to ELMS after the merger (the "Merger").[1]   The PIPE Offering was consummated in June 2021 in connection with the closing of the Merger (indeed it was dependent upon the closing of the Merger) in order to raise additional funds to operate the post-Merger, combined company ELMS and as a backstop to any potential shareholder redemption.   Though the PIPE Offering was marketed only to so-called "accredited investors," it was a widely marketed offering and was fully subscribed.

3.      The PIPE Offering was conducted pursuant to terms laid out in the December 10, 2020 PIPE subscription agreement and offering memorandum ("PIPE Offering Memorandum") that all purchasers in the PIPE Offering were required to sign in order to participate.  The PIPE Offering Memorandum stipulated that purchasers in the PIPE Offering were to wire their payments for the shares they had subscribed to purchase in the PIPE Offering to the Company by 8 a.m. on the closing date of the Merger, and stated that the unregistered shares of ELMS they were purchasing in the PIPE Offering would thereafter be transferred to their accounts.  The PIPE Offering Memorandum further stipulated that the Company had to take specific steps to register the shares of ELMS sold in the PIPE Offering with the SEC soon after the closing of the Merger, so that they would be freely tradeable on the NASDAQ together with other outstanding shares of ELMS common stock.

4.      The PIPE Offering Memorandum expressly stated that purchasers in the PIPE Offering were to rely upon the SEC filings of ELM and FIII (the "SEC Reports") in deciding

---

[1]      A SPAC is a company with no present business operations that is created and taken public for the sole purpose of identifying a business or operating company to acquire using, in part, the proceeds from the SPAC's own initial public stock offering.  A subsidiary of the SPAC typically reverse merges with the target, with the SPAC assuming the name and operations of the target post-closing.  In this way, merging with a SPAC offers a kind of back-door route to a public listing for private companies.  PIPE offerings are often undertaken in connection with SPAC mergers in order to backstop potential shareholder redemptions and provide additional operating funds for the post-merger, combined company.

{FG-W0505165.}

whether to invest in the PIPE Offering and that such documents complied with the federal securities laws and were free from material misrepresentations. The SEC Reports included, among other things, the joint press releases issued by ELM and FIII regarding the Merger and the Merger proxy sent to FIII shareholders to solicit their approval of the Merger.

5.     A December 11, 2020 press release issued by ELM and FIII announced the PIPE Offering and the proposed Merger. According to the release, the "transaction reflect[ed] a pro forma implied equity value for the combined company of approximately $1.4 billion." The SEC Reports that defendants continued filing through the June 25, 2021 closing date of the Merger contained numerous positive representations regarding the Merger and ELM's then-present business metrics and financial prospects, purportedly designed to permit investors to evaluate the value of the post-Merger, combined Company.

6.     However, as defendants knew or recklessly disregarded, defendants' representations regarding ELM and the Merger turned out to be materially false and misleading. In reality, ELM had failed to properly account for massive executive compensation expenses prior to the announcement of the proposed Merger, which had had the effect of substantially inflating ELM's year-end 2020 financial performance and the pro forma year-end 2020 financial performance of the combined Company (*i.e.*, ELMS) and understating the Company's expenses, net losses, and shareholders' deficit by over $700 million. These misstated financials were included in the SEC Reports.

7.     Unbeknownst to investors, on November 25, 2021, the ELMS Board of Directors (the "Board") had formed a Special Committee to investigate certain stock sales by ELM to certain insiders prior to the Merger, including the transactions' compliance with corporate law, disclosure obligations, and applicable tax consequences. In connection with

{FG-W0505165.}

this investigation, the Board eventually confirmed, among other things, that the Company had failed to provide proper and adequate disclosures regarding the transactions.

8.     The truth was revealed on February 1, 2022, when ELMS finally disclosed that its independent investigation had discovered that prior to the PIPE Offering ELM's senior management had secretly acquired ELM shares at "substantial discounts to market value" in certain equity transactions carried out at the end of 2020, and that the difference between the fair market value and the amount actually paid should have been, but was not, recorded as compensation.  As a result, ELM's historical financial statements were required to be restated and could not be relied upon.  ELMS further announced the ouster of both of its co-founders, Jason Luo and James Taylor, who were then serving as the Executive Chairman of the Board and the Chief Executive Officer ("CEO") of ELMS, respectively.

9.     These adverse disclosures shocked the market, causing the price of ELMS common stock to decline by $2.88 per share, or 51%, to close at $2.71 per share on February 2, 2022, on unusually heavy trading volume.

10.     On February 14, 2022, ELMS disclosed that its independent audit firm, BDO USA, LLP ("BDO"), had resigned and that the Company had disagreements with BDO over the Company's legal compliance and reporting obligations and BDO's independence and direct involvement in the events at issue.  The Company simultaneously filed with the SEC two letters on Form 8-K.  In one letter, the Audit Committee of the Board blamed BDO for knowingly helping to structure and audit the compensation scheme and failing to properly analyze BDO's independence from the events at issue.  In a second letter, BDO stated that an "'illegal act . . . has or may have occurred'" in connection with the scheme and that BDO was resigning because of ELMS' failure to take timely or appropriate remedial actions.

- 4 -

11.     On March 11, 2022, ELMS confirmed an ongoing SEC investigation and disclosed both that it was withdrawing its previous financial guidance and that it would need to raise additional capital in order to launch its vehicles.  On this news, the market price of ELMS common stock fell further, trading below $1 per share, a decline of 48%.

12.     Finally, on or about June 13, 2022, ELMS announced that it was planning to liquidate through a Chapter 7 bankruptcy filing.  Meanwhile, the Company had been operating without an independent audit firm since February 2022 and had failed to bring its financial filings current, leaving it out of compliance with NASDAQ listing rules.  As a result, the ELMS stock sold in the PIPE Offering was delisted and became virtually worthless.

13.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class (defined herein) purchased ELMS common stock directly in the PIPE Offering at artificially inflated prices, suffered significant losses, and were damaged thereby.

**JURISDICTION AND VENUE**

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

16.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district.  Moreover, the PIPE Offering specifies that any action arising from the PIPE Offering must be brought in a Delaware court and the related ELMS bankruptcy is proceeding in the U.S. Bankruptcy Court for the District of Delaware.

{FG-W0505165.}

17.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ.

## RELEVANT NON-PARTY

18.     Non-party ELMS was formed on or about June 25, 2021 through a merger of FIII and ELM.  Pursuant to the PIPE Offering, 13 million shares of ELMS common stock were sold to investors at $10 per share, raising $130 million in gross offering proceeds. Pursuant to the PIPE Offering Memorandum, the PIPE purchasers' payments for the shares were due immediately prior to the closing of the Merger; the shares were to be transferred to the purchasers soon after completion of the Merger; and the shares sold in the PIPE Offering were to be immediately registered for resale.  ELMS common stock then traded in an efficient market on the NASDAQ under the ticker symbol "ELMS" between June 25, 2021 and July 19, 2022.  As of November 11, 2021, ELMS had more than 124 million shares issued and outstanding.  But for the automatic bankruptcy stay imposed by §362 of the U.S. Bankruptcy Code, 11 U.S.C. §362, upon commencement of ELMS' bankruptcy proceedings, ELMS would be named as a defendant in this action.

## PARTIES

19.     Plaintiff Shmuel Levy, as set forth in the accompanying certification which is incorporated herein by reference, purchased ELMS common stock directly in the PIPE Offering and was damaged thereby.

20.     Defendant Jason Luo ("Luo") co-founded ELM and served as its President and the Executive Chairman of the Board prior to the Merger.  Thereafter, defendant Luo

{FG-W0505165.}

served as the Executive Chairman of the Board until he was forced to resign from those positions on or about February 1, 2022.

21.    Defendant James Taylor ("Taylor") co-founded ELM and served as its CEO prior to the Merger.  Thereafter, defendant Taylor served as ELMS' CEO, and was a member of the Board until he was forced to resign from those positions on or about February 1, 2022.

22.    Defendant Albert Li ("Li") served as the Chief Financial Officer ("CFO") and Treasurer of ELM prior to the Merger.  Thereafter, defendant Li served as ELMS' CFO and Treasurer until November 2021.

23.    Defendant Marshall Kiev ("Kiev") served as Co-CEO, President, and as a member of the Board prior to the Merger.  Defendant Kiev was the managing member of Forum Capital Management III LLC (the SPAC sponsor's managing partner), which controlled Forum Investors III LLC, the sponsor of FIII (the "Sponsor").[2]  Defendant Kiev also had a beneficial interest in the ELMS shares held by the Sponsor.

24.    Defendant David Boris ("Boris") served as Co-CEO, CFO, and as a member of the Board prior to the Merger.  After the Merger, he continued to serve as a member of the Board.  Defendant Boris was a managing member of the managing partner of the Sponsor and had a beneficial interest in the ELMS shares held by the Sponsor.

25.    Defendants Luo, Taylor, Li, Kiev, and Boris are sometimes referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, materially false and misleading statements that artificially inflated the value of stock sold in the PIPE Offering.  The Individual Defendants, because of their positions with the two pre-Merger companies and the Sponsor, possessed the power and authority to control the

---

[2]    Forum Capital Management III LLC and Forum Investors III LLC were both dissolved in July 2022 and no longer exist.

{FG-W0505165.}

contents of the Company's press releases, financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the pre-Merger companies and the Sponsor and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pled herein.

26.     Defendant BDO is a professional services firm that provides accounting, tax, and consulting services. BDO served as ELMS' auditor since its inception. BDO audited ELM's financial statements for the period from August 20, 2020 (ELM's inception) to December 31, 2020. On July 13, 2021, following the Merger, BDO became the auditor of ELMS. BDO remained ELMS' auditor until its resignation on February 8, 2022.

27.     Defendant BDO and the Individual Defendants are sometimes referred to herein collectively as "defendants."

28.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about ELM and ELMS. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of the stock sold in the PIPE Offering was a success, as it: (i) deceived the investing public regarding ELM's and ELMS' prospects and business; (ii) artificially inflated the price by purchasers of common stock in the PIPE Offering; (iii) permitted defendants to carry out the Merger; (iv) permitted certain insiders to convert their minimal investment in FIII into millions of dollars'

worth of ELMS founders' shares; (v) permitted certain members of the ELM senior management to purchase shares of ELM at significantly discounted prices and to avoid paying income tax on what otherwise would have been taxable compensation; and (vi) caused plaintiff and other members of the Class to purchase the common stock sold in the PIPE Offering at artificially inflated prices.

## BACKGROUND

29.     In August 2020, FIII raised $250 million in its initial public offering.  FIII was a SPAC, also known as a blank-check company, that defendant Kiev created with the sole purpose of finding and merging with a privately held company to enable the private company to go public without the burdens of a traditional initial public offering.  The merger between a SPAC and the privately held company is commonly known as a de-SPAC transaction.

30.     SPAC sponsors face tremendous pressure to find a target company for a merger, because if a SPAC does not merge with a target company within the allotted time frame after a SPAC becomes public (ordinarily two years), then the SPAC usually must return its funds to its public investors and dissolve.  However, if the sponsor successfully completes a de-SPAC transaction, it will be entitled to substantial compensation – generally valued at 20% of the SPAC's equity.  This compensation can be extraordinarily lucrative and often exceeds the underwriting fees that would have been received had the target gone public via a traditional initial public offering.  For example, at the time of the Merger, the founder shares held by the Sponsor of FIII were valued at over $62 million.  These shares would become worthless if no de-SPAC transaction was consummated.

31.     In addition, the target company is also generally highly incentivized to complete a merger, which can provide significant cash and stock consideration to the target's

- 9 -

shareholders, cushy management positions to the target's officers and directors, and allow the target's generally illiquid private shares to be exchanged for publicly tradeable securities.

32.     Following its blank check initial public offering, FIII quickly identified ELM as a target company with which it intended to merge.  On September 18, 2020 – less than a month after FIII went public – FIII executed a letter of intent to merge with ELM.  After the Merger, the combined company would be known as ELMS.  According to the letter of intent, the estimated enterprise value of the combined company was $1.3 billion.  Following the Merger, each share of ELM common stock would be exchanged for 821.17 shares of ELMS common stock.

33.     ELM was itself a new company, created in August 2020 by defendants Luo and Taylor to manufacture electric vans and utility vehicles used to make "last mile" deliveries.

34.     At the time that FIII and ELM executed the letter of intent for their proposed business combination on September 18, 2020, defendant Luo owned 100% of ELM through an entity known as AJ Capital, Inc. ("AJ Capital"), which defendant Luo likewise owned and controlled.[3]

35.     On November 19, 2020, after the letter of intent had been signed and knowing that ELM would soon go public via the merger with FIII, defendants Luo and Taylor caused ELM to issue 99,000 shares of ELM common stock to entities owned by defendants Luo and Taylor, as well as to four unidentified members of ELM senior management, for $10 per share – a price that was substantially below fair market value (the "November 2020 Equity Transaction").

---

[3]     ELM issued 1,000 shares of common stock to AJ Capital on September 11, 2020.

{FG-W0505165.}

36.     Of the 99,000 ELM shares issued in the November 2020 Equity Transaction, 78,016 shares were sold to entities owned and controlled by defendant Luo, 6,461 shares were sold to entities owned and controlled by defendant Taylor, and 14,523 shares were sold to the four unidentified investors.

37.     Then, a month later, on December 8, 2020, defendant Luo sold 1,000 shares of ELM common stock also at $10 per share to an entity owned and controlled by ELM's Chief Operating Officer Hailiang (Jerry) Hu and ELM's General Counsel Benjamin Wu (the "December 2020 Equity Transaction").   Again, these shares were sold at a substantial discount to fair market value.   As ELM's auditor, BDO reviewed and helped structure this transaction.

38.     The November 2020 Equity Transaction and the December 2020 Equity Transaction occurred prior to the PIPE Offering, yet defendants failed to disclose these transactions, their impact on ELM's reporting obligations, or the viability of a post-Merger Company to investors.

39.     Under Generally Accepted Accounting Principles ("GAAP"), ELM was required to perform a valuation to estimate the fair market value of the shares that were sold in the November 2020 Equity Transaction and the December 2020 Equity Transaction and record as compensation expense the difference between (i) the fair market value of ELM shares and (ii) the $10 per share that was paid.   Defendants failed to satisfy these requirements.   The amount of the misstatement was enormous.   While insiders paid only $10 for each ELM share received, these shares were traded for 821.17 ELMS shares each in the Merger with such shares being valued at approximately $10 (or $8,211.70 in total per ELM share).

- 11 -

40.     The failure to record compensation expenses stemming from the November 2020 Equity Transaction and the December 2020 Equity Transaction had the effect of substantially inflating the historical financial performance of ELMS and the pro forma historical financial performance of the combined Company (*i.e.*, ELMS). The undisclosed transactions also impaired the viability of the post-Merger Company and created a substantial risk that the Company would need to restate its financial results and suffer significant reputational and business fallout if the details of the self-dealing transactions were ever publicly revealed.

41.     The proposed business combination moved along quickly. On December 11, 2020, following the execution of the PIPE Offering Memorandum, FIII announced that it and ELM had executed a definitive Merger agreement, subject to approval by their respective shareholders.

42.     According to the PIPE Offering Memorandum, investors had until the closing of the proposed Merger transaction to wire their funds to the Company and the Company had to transfer their shares of ELMS common stock to their accounts following the closing. The PIPE Offering Memorandum further stated that soon after the closing, ELMS would file a registration statement with the SEC to register the shares purchased in the PIPE Offering and work with the SEC to get that registration statement declared effective so that the shares of ELMS common stock sold in the PIPE Offering would be freely tradable.

43.     The PIPE Offering Memorandum expressly stated that PIPE investors were entitled to rely upon the information filed in the Company's SEC Reports when deciding whether to invest in the PIPE Offering. The PIPE Offering Memorandum further represented and warranted that the SEC Reports complied with all applicable SEC and accounting rules and regulations and were not materially misleading, and further, that the

- 12 -

obligation of subscribers to purchase the shares was subject to the SEC Reports being "true and correct in all material respects" up until the "Closing Date."  Thus, investors in the PIPE Offering were entitled to rely on the SEC Reports filed between December 10, 2020 and the closing date for the Merger (June 25, 2021) being materially true, complete, and free from fraud and in compliance with applicable rules and regulations, and were not obligated to purchase shares sold in the PIPE Offering if this condition was not met.

44.     Defendants were required to obtain the approval of FIII shareholders for the Merger.  Furthermore, FIII shareholders could choose to redeem their shares rather than participate in the Merger, which would deplete the cash available to fund the Merger and the post-combination operations of the Company.  The need to secure shareholder approval for the Merger, to prevent shareholder redemptions, and to secure the funds raised in the PIPE Offering provided a strong incentive for defendants to conceal and misrepresent the November 2020 Equity Transaction and the December 2020 Equity Transaction.  On June 9, 2021, FIII issued a proxy statement for the Merger, ahead of the June 24, 2021 special meeting of FIII shareholders to solicit votes on approving the merger with ELM (the "Proxy Statement").

45.     On the basis of the Proxy Statement and the other SEC Reports, on June 24, 2021 FIII shareholders voted to approve the Merger.  The next day, the Merger was consummated.  FIII changed its name to ELMS, and changed the ticker symbol for FIII common stock to "ELMS."  Each share of ELM common stock was exchanged for 821.17 shares of ELMS common stock.

46.     On June 25, 2021, the PIPE Offering was also consummated with 13 million shares of ELMS common stock being sold at $10 per share, for a total of $130 million in gross offering proceeds.

- 13 -

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE PIPE OFFERING MEMORANDUM AND THE SEC REPORTS

47.     The PIPE Offering Memorandum stated, represented, and warranted that FIII's reports filed with the SEC complied with all applicable rules and regulations, were free from any material misrepresentations, and complied in all material respects with applicable accounting requirements, stating in pertinent part as follows:

> As of their respective dates, all reports required to be filed by the Company with the Commission (the "SEC Reports") complied in all material respects with the requirements of the Securities Act and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations of the Commission promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing and fairly present in all material respects the financial position of the Company as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, year-end audit adjustments. A copy of each SEC Report is available to each Subscriber via the Commission's EDGAR system. The Company has timely filed each report, statement, schedule, prospectus, and registration statement that the Company was required to file with the Commission since its initial registration of the Common Stock with the Commission. To the knowledge of the Company, there are no material outstanding or unresolved comments in comment letters from the staff of the Division of Corporation Finance of the Commission with respect to any of the SEC Reports as of the date hereof.

48.     The PIPE Offering Memorandum further stated that PIPE investors were not obligated to purchase PIPE shares **unless** the SEC Reports remained true and correct in all material respects up until the closing date of the Merger, stating in pertinent part as follows:

> e.      The obligation of Subscriber to consummate the Closing shall be subject to the satisfaction or valid waiver by Subscriber of the additional conditions that, on the Closing Date:
>
> (i) all representations and warranties of the Company contained in this Subscription Agreement shall be true and correct in all material respects

{FG-W0505165.}

(other than representations and warranties that are qualified as to materiality or Company Material Adverse Effect (as defined below), which representations and warranties shall be true in all respects) at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date) . . . .

49.     On December 11, 2020, ELM and FIII issued a press release announcing the proposed Merger which was filed with the SEC on Form 8-K.  According to the release, the "transaction reflect[ed] a pro forma implied equity value for the combined company of approximately $1.4 billion."   The release further stated that the "[t]ransaction [was] supported by approximately $155 million in fully committed PIPE and related financing anchored by institutional investors including BNP Paribas Asset Management Energy Transition Fund and Jennison Associates LLC."

50.     Also on December 11, 2020, FIII filed with the SEC a copy of a presentation regarding the Merger on Form 8-K.  The presentation stated that post-Merger ELMS expected to sell 4,000 vehicles in 2021 and generate $122 million in revenue.  The presentation further stated that these vehicle sales were expected to skyrocket to 83,000 vehicles sold in 2025, generating more than $3 billion in expected revenue.

51.     On February 26, 2021, FIII filed with the SEC a copy of a presentation regarding the Merger on Form 8-K.  The presentation stated that post-Merger ELMS expected to sell 4,000 vehicles in 2021 and generate $122 million in revenue.   The presentation further stated that these vehicle sales were expected to skyrocket to 83,000 vehicles sold in 2025, generating more than $3 billion in expected revenue.

52.     On March 16, 2021, ELM issued a press release which was filed with the SEC on Form 8-K by FIII, stating that ELM had received "over 45,000 non-binding pre-orders for its Urban Delivery class 1 commercial EV" and "its intention to begin production of the Urban Delivery at the Mishawaka, Indiana manufacturing facility by the end of the third

quarter of 2021, which would make the Urban Delivery the first class 1 commercial EV officially available in the U.S. market." In the release, defendant Taylor stated:

> The interest we have seen for the Urban Delivery has been overwhelming as fleet managers continue to seek solutions that will reduce their total cost of ownership and help them to achieve aggressive sustainability targets . . . . Our more than 45,000 pre-orders reflect the demand for fleet electrification and our value proposition of low-cost, reliable, connected and customized solutions.

53.     Also on March 16, 2021, FIII filed with the SEC a copy of a presentation regarding the Merger on Form 8-K. The presentation stated that post-Merger ELMS expected to sell 4,000 vehicles in 2021 and generate $122 million in revenue. The presentation further stated that these vehicle sales were expected to skyrocket to 83,000 vehicles sold in 2025, generating more than $3 billion in expected revenue.

54.     On June 9, 2021, FIII filed the Proxy Statement. The Proxy Statement represented the condensed statement of operations of ELM for the three months ended March 31, 2021 as follows:

|  | Three Months Ended March 31, 2021 |
|---|---|
| **Operating expenses** | |
| General and administrative expense | $ 3,124,188 |
| **Total operating expenses** | $ 3,124,188 |
| Interest expense and other income, net | $ 403,866 |
| **Loss before income taxes** | $ (3,528,054) |
| Income tax benefit | — |
| **Net loss and comprehensive loss** | $ (3,528,054) |
| **Basic and diluted loss per share** | $ (35.28) |

55.     The Proxy Statement further represented the condensed statement of operations of ELM for the period from August 20, 2020 (inception) through December 31, 2020 as follows:

| | For the Period from August 20, 2020 (inception) through December 31, 2020 |
|---|---|
| **Operating expenses** | |
| General and administrative expense | $ 7,633,994 |
| **Total operating expenses** | $ 7,633,994 |
| Interest and other expense | $ 94,443 |
| **Loss before income taxes** | $ (7,728,437) |
| Income tax benefit | — |
| **Net loss and comprehensive loss** | $ (7,728,437) |
| **Basic and diluted loss per share** | $ (191.30) |

56.     The Proxy Statement did not disclose the insider compensation or below-market equity sales made in the November 2020 Equity Transaction or the December 2020 Equity Transaction.  To the contrary, the Proxy Statement represented that personnel expense had "decreased by $4,885,591 or 63% from $7,755,825 in 2019 to $2,870,234 in 2020." This purportedly included a "$86,314 reduction in share-based compensation expense" in 2020.

57.     The Proxy Statement represented the unaudited pro forma condensed combined balance sheet of ELM and FIII as of March 31, 2021 as follows:

### Unaudited Pro Forma Condensed Combined Balance Sheet
### as of March 31, 2021

| | ELM Historical | EVAP Operations Historical | ELM Pro Forma Adjustments | | Pro Forma ELM | Forum III Historical | Pro Forma Adjustments (Assuming No Redemptions) | | Pro Forma Combined (Assuming No Redemptions) | Pro Forma Adjustments (Assuming Maximum Redemptions) | | Pro Forma Combined (Assuming Maximum Redemptions) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | |
| **Current assets** | | | | | | | | | | | | |
| Cash and cash equivalents | 16,388,316 | — | (35,000,000) | (A) | (18,611,684) | 1,038,353 | 250,004,042 | (H) | 336,480,724 | (250,004,042) | (J) | 86,476,682 |
| | | | | | | | 130,000,000 | (D) | | | | |
| | | | | | | | (25,949,987) | (F) | | | | |
| Prepaid expenses and other current assets | 491,365 | 23,932 | (23,932) | (A) | 491,365 | 174,124 | | | 665,489 | | | 665,489 |
| Total current assets | 16,879,681 | 23,932 | (35,023,932) | | (18,120,319) | 1,212,477 | 354,054,055 | | 337,146,213 | (250,004,042) | | 87,142,171 |
| Property, Plant, and Equipment, net | 196,692 | 131,895,779 | (131,895,779) | (A) | 145,516,692 | — | | | 145,516,692 | | | 145,516,692 |
| | | | 145,320,000 | (A) | | | | | | | | |
| **Other assets:** | | | | | | | | | | | | |
| Cash and investments held in trust account | — | — | | | — | 250,004,042 | (250,004,042) | (H) | — | | | — |
| Other long-term assets | 73,724 | — | 50,779,000 | (A) | 50,852,724 | — | | | 50,852,724 | | | 50,852,724 |
| Total other assets | 73,724 | — | 50,779,000 | | 50,852,724 | 250,004,042 | (250,004,042) | | 50,852,724 | | | 50,852,724 |
| Total assets | 17,150,097 | 131,919,711 | 29,179,289 | | 178,249,097 | 251,216,519 | 104,050,013 | | 533,515,629 | (250,004,042) | | 283,511,587 |
| **Liabilities and Shareholders' Equity** | | | | | | | | | | | | |
| **Current liabilities** | | | | | | | | | | | | |
| Accounts payable | 1,395,799 | 39,949 | (39,949) | (A) | 1,395,799 | — | | | 1,395,799 | | | 1,395,799 |
| Accrued expenses | 508,586 | 1,009,793 | (1,009,793) | (A) | 508,586 | 3,815,030 | | | 4,323,616 | | | 4,323,616 |
| Current portion of debt | — | — | 60,000,000 | (A) | 60,000,000 | — | | | 60,000,000 | | | 60,000,000 |
| Total current liabilities | 1,904,385 | 1,049,742 | 58,950,258 | | 61,904,385 | 3,815,030 | | | 65,719,415 | | | 65,719,415 |
| **Other liabilities** | | | | | | | | | | | | |
| Long term debt, net of deferred financing costs | — | — | 51,190,000 | (A) | 51,190,000 | — | | | 51,190,000 | | | 51,190,000 |
| Warrant liabilities | — | — | — | | — | 16,325,028 | | | 16,325,028 | | | 16,325,028 |
| Deferred underwriting fee payable | — | — | | | — | 8,750,000 | (8,750,000) | (F) | — | | | — |
| Convertible promissory notes | 25,500,832 | — | | | 25,500,832 | — | (25,500,832) | (E) | — | | | — |
| Pension benefit obligations | — | 118,393 | | | 118,393 | — | | | 118,393 | | | 118,393 |
| Other long-term liabilities | 1,371 | — | — | | 1,371 | — | | | 1,371 | — | | 1,371 |
| Total other liabilities | 25,502,203 | 118,393 | 51,190,000 | | 76,810,596 | 25,075,028 | (34,250,832) | | 67,634,792 | — | | 67,634,792 |
| Common stock subject to possible redemption | — | — | | | — | 217,326,460 | (217,326,460) | (C) | — | | | — |
| **Shareholders' equity** | | | | | | | | | | | | |
| Class A Common stock | 10 | — | 500 | (A) | 510 | 401 | 2,099 | (C) | 12,840 | (2,500) | (J) | 10,340 |
| | | | | | | | 1,300 | (D) | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 275 | (E) | | | |
| | | | | | | | 13 | (F) | | | |
| | | | | | | | 7,555 | (G) | | | |
| | | | | | | | 687 | (H) | | | |
| Class B Common stock | — | — | | | | 625 | (625) | (H) | | | — |
| Paid-in capital | 999,990 | 130,751,576 | (80,961,469) | (A) | 50,790,097 | 21,875,691 | 217,324,361 | (C) | 411,405,073 | (250,001,542) (J) | 161,403,531 |
| | | | | | | | 129,998,700 | (D) | | | |
| | | | | | | | 25,500,557 | (E) | | | |
| | | | | | | | (17,200,000) | (F) | | | |
| | | | | | | | (7,555) | (G) | | | |
| | | | | | | | (62) | (H) | | | |
| | | | | | | | (16,876,716) | (I) | | | |
| Retained earnings | (11,256,491) | — | | | (11,256,491) | (16,876,716) | 16,876,716 | (I) | (11,256,491) | | (11,256,491) |
| Total shareholders' equity | (10,256,491) | 130,751,576 | (80,960,969) | | 39,534,116 | 5,000,001 | 355,627,305 | | 400,161,422 | (250,004,042) | 150,157,380 |
| Total liabilities and shareholders' equity | 17,150,097 | 131,919,711 | 29,179,289 | | 178,249,097 | 251,216,519 | 104,050,013 | | 533,515,629 | (250,004,042) | 283,511,587 |

58.    The Proxy Statement represented the unaudited pro forma condensed combined statement of operations of ELM and FIII for the year ended December 31, 2020 as follows:

**Unaudited Pro Forma Condensed Combined Statement of Operations
for the Year Ended December 31, 2020**

| | ELM Historical | EVAP Operations Historical | ELM Pro Forma Adjustments | | Pro Forma ELM | Forum III Historical | Pro Forma Adjustment (Assuming No Redemptions) | Pro Forma Combined (Assuming No Redemption) | Pro Forma Adjustment (Assuming Maximum Redemptions) | Pro Forma Combined (Assuming Maximum Redemption) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Formation and operating costs | — | — | | | | 3,617,022 | | 3,617,022 | | 3,617,022 | |
| Personnel expense | — | 2,870,234 | 210,485 | (FF) | 3,080,719 | — | | 3,080,719 | | 3,080,719 | |
| General and administrative expense | 7,633,994 | 4,758,663 | 176,040 | (GG) | 31,227,675 | — | | 31,227,675 | | 31,227,675 | |
| | | | (1,600,000) | (HH) | | | | | | | |
| | | | 10,150,600 | (II) | | | | | | | |
| | | | 10,108,378 | (JJ) | | | | | | | |
| Total operating expense | 7,633,994 | 7,628,897 | 19,045,503 | | 34,308,394 | 3,617,022 | | 37,925,416 | — | 37,925,416 | |
| Operating income (loss) | (7,633,994) | (7,628,897) | (19,045,503) | | (34,308,394) | (3,617,022) | | (37,925,416) | — | (37,925,416) | |
| Change in fair value of warrant liability | — | — | — | | — | (25,574,581) | | (25,574,581) | | (25,574,581) | |
| Transaction costs warrants | — | — | — | | — | (236,212) | | (236,212) | | (236,212) | |
| Interest income (expense) | (94,088) | — | (1,987,826) | (KK) | (2,081,914) | 66,590 | (66,590) | (LL) | (2,081,914) | | (2,081,914) | |
| Investment loss | (355) | | | | (355) | | | (355) | | (355) | |
| Other income (expense), net | — | (24,695) | | | (24,695) | — | — | (24,695) | | (24,695) | |
| Net loss | (7,728,437) | (7,653,592) | (21,033,329) | | (36,415,358) | (29,361,225) | (66,590) | (65,843,173) | — | (65,843,173) | |
| Net earnings: | | | | | | | | | | | |
| Weighted average shares outstanding of Class A redeemable common stock | | | | | | 25,000,000 | | | | | |
| Basic and diluted loss per share Class A redeemable common stock | | | | | | (1.17) | | | | | |
| Weighted average shares outstanding of Class A and Class B non-redeemable common stock | | | | | | 6,518,068 | | | | | |
| Basic and diluted loss per share Class A and Class B non-redeemable common stock | | | | | | (4.50) | | | | | |
| Weighted average shares outstanding of Class A common stock | 40,400 | | | | | | | 128,291,250 | (MM) | 103,291,250 | (MM) |
| Basic and diluted loss per share Class A common stock | (191.30) | | | | | | | (0.51) | (MM) | (0.64) | (MM) |

59.     The Proxy Statement also stated that the "historical financial statements" contained therein "have been prepared in accordance with GAAP."

60.     The Proxy Statement stated that, during Merger negotiations, ELM revenue was "projected to reach approximately $3.046 billion and EBITDA was projected to reach approximately $791 million by the end of 2025 based on transaction multiples of pro forma enterprise value over 2025 estimated revenue of 0.4x and pro forma enterprise value over 2025 estimated EBITDA of 1.5x, respectively."  The Proxy Statement further stated that "ELM plans to launch its first vehicle, the Urban Delivery, by the end of the third quarter of 2021."

61.     The Proxy Statement provided the following expected growth trajectory for ELM products and revenue, which stated that vehicle sales were expected to generate $122 million in revenue in 2021 and grow to over $3 billion in revenue by 2025, as follows:

| | | Forecast | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Year Ended December 31, | | | | | | | | | |
| (in millions) | | 2020 | | 2021E | | 2022E | | 2023E | | 2024E | | 2025E |
| Total Units Sold[(1)] | | 0 | | 4,000 | | 19,100 | | 35,000 | | 55,000 | | 83,000 |
| Revenue[(2)] | $ | 0 | $ | 122 | $ | 613 | $ | 1,177 | $ | 1,906 | $ | 3,046 |
| % Growth | | — | | — | | 401% | | 92% | | 62% | | 60% |
| Cost of Goods Sold | $ | 0 | $ | (96) | $ | (477) | $ | (849) | $ | (1,351) | $ | (2,145) |
| Gross Profit[(3)] | $ | 0 | $ | 26 | $ | 137 | $ | 328 | $ | 555 | $ | 891 |
| % Margin | | n/a | | 21% | | 22% | | 28% | | 29% | | 29% |
| EBITDA[(4)] | $ | 0 | $ | (101) | $ | 15 | $ | 248 | $ | 465 | $ | 791 |
| % Margin | | n/a | | (82)% | | 2% | | 21% | | 24% | | 26% |
| Capital Expenditures[(5)] | $ | 0 | $ | (45) | $ | (30) | $ | (27) | $ | (75) | $ | (25) |
| % Revenue | | n/a | | 37% | | 5% | | 2% | | 4% | | 1% |

62.     The Proxy Statement provided the following audit opinion of BDO, who validated the purported accuracy of the historical ELM financial results provided in the Proxy Statement:

- 21 -

We have audited the accompanying balance sheet of Electric Last Mile, Inc. (the "Company") as of December 31, 2020, the related statements of operations and comprehensive loss, shareholders' deficit, and cash flows for the period from August 20, 2020 (inception) through December 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020, and the results of its operations and its cash flows for the period from August 20, 2020 (inception) through December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

63.    In the Proxy Statement, BDO also stated that it had audited ELM in accordance with applicable laws, rules and regulations regarding auditor independence, stating in pertinent part as follows:

We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud.

64.    The statements referenced above in ¶¶47-63 were materially false and misleading when made because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them as follows:

(a)    that defendants Luo, Taylor, and other senior members of ELM's management had acquired ELM common stock at substantial discounts to market value in the November 2020 Equity Transaction and the December 2020 Equity Transaction;

(b)    that the difference between the fair market value of the ELM common stock sold in the November 2020 Equity Transaction and the December 2020 Equity Transaction and the amount actually paid (*i.e.*, $10 per share) had not been properly recorded as compensation expense by ELM;

- 22 -

(c)     that the failure to record compensation expenses stemming from the November 2020 Equity Transaction and the December 2020 Equity Transaction had the effect of substantially inflating ELM's year-end 2020 financial performance and the pro forma year-end 2020 financial performance of the combined Company (*i.e.*, ELMS), thereby understating expenses, net loss, and shareholders' deficit;

(d)     that as a result of the failure to properly treat the November 2020 Equity Transaction and the December 2020 Equity Transaction as compensation, ELM's historical financial statements could no longer be relied upon and would need to be restated;

(e)     that the ELM historical financial statements provided in the Proxy Statement were not prepared in accordance with GAAP;

(f)     that BDO had failed to follow applicable laws, rules, and regulations regarding auditor independence in auditing the ELM historical financials provided in the Proxy Statement; and

(g)     that as a result of the foregoing, defendants' positive statements in the lead up to the Merger about the business metrics and financial prospects of ELM and the combined Company were materially false and misleading and/or lacked a reasonable basis in fact.

65.     The truth began to be revealed on February 1, 2022.  On that date, ELMS disclosed that an investigation by a special committee of the Board had discovered that ELM's senior management had acquired ELM shares at "substantial discounts to market value" in certain equity transactions carried out at the end of 2020, and that the difference between the fair market value and the amount actually paid (*i.e.*, $10) should have been, but was not, recorded as compensation.  The Company stated that it further had failed to "disclose any compensation associated with those transactions; or withhold or pay taxes in

- 23 -

connection with that compensation." As a result, the historical financial statements of ELM and the post-Merger Company should not be relied upon and would need to be restated. The Company also stated that it expected to determine that material weaknesses existed in its internal controls over financial reporting and disclosure controls and procedures.

66.     ELMS also disclosed that both Luo and Taylor were leaving the Company in connection with the pre-Merger stock sales to them and the failure to properly recognize those sales as compensation expenses by ELMS. ELMS further indicated that defendants Luo and Taylor had not been forthright with the Board, stating that "in connection with the Special Committee investigation, Messrs. Luo and Taylor provided responses to the Special Committee that are believed to be inconsistent with documents reviewed by the Special Committee and its counsel."

67.     These adverse disclosures shocked the market, causing the market price of ELMS common stock to decline by $2.88 per share, or 51%, to close at down at $2.71 per share on February 2, 2022, on unusually heavy trading volume.

68.     Thereafter, on February 14, 2022, ELMS disclosed that BDO had resigned and that the Company had disagreements with BDO over the Company's legal compliance and reporting obligations and BDO's independence and direct involvement in the events at issue. The Company simultaneously filed with the SEC two letters on Form 8-K. In one letter, the Audit Committee of the Board blamed BDO for knowingly helping to structure and audit the compensation scheme and failing to properly analyze BDO's independence from the events at issue. In a second letter, BDO stated that an "'illegal act . . . has or may have occurred'" in connection with the scheme and that BDO was resigning because of ELMS' failure to take timely or appropriate remedial actions.

69.     On March 3, 2022, ELMS filed with the SEC an amended current report on Form 8-K, which accused BDO of continuing its failure to provide an independence analysis or effectively refute the allegations levied by the Board against it.  ELMS also filed a letter from BDO wherein BDO denied the allegations against it and alleged that ELMS had failed to take timely remedial actions regarding the potentially illegal activities identified by the audit firm.

70.     On March 11, 2022, the Company confirmed an ongoing SEC investigation and disclosed that it was withdrawing its previous financial guidance, was suffering production and launch delays for its vehicles, and that it would need to raise additional capital in order to continue its launch plans.  On this news, the market price of ELMS common stock fell further, trading below $1 per share, a decline of another 48%.

71.     On March 15, 2022, ELMS filed with the SEC an amended current report on Form 8-K, stating that it planned to reduce headcount by 24% as part of an overall plan to focus the Company on its core business and streamline its cost structure.

72.     On April 1, 2022, ELMS disclosed that it would be unable to timely file its Form 10-K annual report for 2021.

73.     On May 24, 2022, ELMS disclosed that it had received a notice from NASDAQ that the Company was out of compliance with exchange listing requirements.

74.     Finally, on or about June 13, 2022, ELMS announced that it was planning to liquidate through a Chapter 7 bankruptcy filing.  Meanwhile, the Company had been operating without an independent audit firm since February 2022 and had failed to bring its financial filings current, leaving it out of compliance with NASDAQ listing rules, and the

stock was delisted.  As a result of the bankruptcy, the ELMS stock sold in the PIPE Offering became virtually worthless.[4]

75.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased ELMS common stock in the PIPE Offering at artificially inflated prices, suffered significant losses, and were damaged thereby.

## ADDITIONAL SCIENTER ALLEGATIONS

76.     As alleged herein, the Individual Defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of ELM and the Company pre-Merger were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding ELM and/or the Company, their control over, and/or receipt and/or modification of the allegedly materially misleading statements and/or their associations with ELM and/or the Company which made them privy to confidential proprietary information, participated in the fraudulent scheme alleged herein.

77.     Meanwhile, with the perceived value of ELMS post-Merger stock artificially inflated, defendants undertook the PIPE Offering, selling $130 million of ELMS shares at fraud-inflated prices.

78.     The swift and severe punishment levied on defendants Luo and Taylor for their role in the November 2020 Equity Transaction and the December 2020 Equity

---

[4]     ELMS filed for Chapter 7 bankruptcy before any restatement was issued.  Hence no restatement was ever filed.

{FG-W0505165.}

Transaction provide strong evidence that their actions were not mere innocent mistakes. Indeed, upon learning of their self-dealing and accounting fraud, the Board quickly ousted both defendants Luo and Taylor from all their positions at ELMS as of February 1, 2022. In a settlement agreement between defendants Luo and ELMS, Luo also agreed to surrender 6 million shares of ELMS common stock back to the Company, and pay an additional $10 million (in cash and stock) to ELMS. Similarly, defendant Taylor's settlement agreement called for him to surrender 1.8 million shares of ELMS common stock, and pay an additional $3.3 million (in cash and stock) to ELMS. The severe punishment levied on defendants Luo and Taylor indicate that their misconduct was intentional.

79.    ELMS would not have forced out defendants Luo and Taylor if their misconduct was nothing more than a careless oversight. The Proxy Statement stated that "[e]xcept for Messrs. Luo and Taylor, none of the Company's executive officers have direct experience in the management of a publicly traded company." Defendants Luo and Taylor were critical to the success of the Company given their significant experience and background in the automotive industry. FIII's investor presentation included in its December 11, 2020 Form 8-K also touted ELM's management led by defendants Luo and Taylor as "World-Class" and a key strength of the combined Company. Moreover, defendant Luo's connections in China were instrumental to ELMS, who would be relying on suppliers and contractors from China to manufacture its vehicles.

80.    The February 1, 2022 Form 8-K also indicated that defendants Luo and Taylor lied to the special committee during the course of its investigation, stating that "in connection with the Special Committee investigation, Messrs. Luo and Taylor provided responses to the Special Committee that are believed to be inconsistent with documents reviewed by the Special Committee and its counsel." The only credible inference is that they

- 27 -

lied because they knew they had engaged in intentional wrongdoing.  Notably, ELMS later charged defendant Taylor with violating this settlement agreement by refusing to surrender certain transfer shares to the Company, further confirming his knowing or reckless intent to violate his legal obligations.

81.     Moreover, BDO's finding that an illegal act has or may have been committed at the Company further supports a finding of scienter.

82.     Defendants Kiev and Boris, as senior members of the SPAC Sponsor, were highly motivated to consummate the Merger.  If the Proxy Statement had shown the truth, FIII shareholders would have been less inclined to vote for the Merger, or they might have sought to redeem their shares instead.  Failure to obtain shareholder approval for the Merger would have been disastrous for the Sponsor.  Indeed, defendants Kiev and Boris would have lost their entire investment in FIII if a business combination was not consummated by August 21, 2022.

83.     On the other hand, defendant Kiev stood to profit handsomely if the Merger was consummated.  The Sponsor Managing Member, which defendant Kiev controlled, paid just $25,000 for 6.25 million founder shares, which if unrestricted and freely tradable, would be valued at approximately $64 million at the time of the Merger based on the price of $10.19 per share for ELMS stock on June 25, 2021.  Thus, even if ELMS stock were to crash to $1 per share after the Merger and public shareholders lost approximately 90% of their investment, the Sponsor Managing Member could nevertheless rake in a profit of more than $6 million.

84.     Therefore, even though both defendants Kiev and Boris knew or were reckless in not knowing that, prior to the Merger, defendants Luo and Taylor had acquired a significant number of ELM shares at a substantial discount to fair value, neither of them

- 28 -

disclosed this fact, even though defendants Kiev and Boris claimed to have conducted due diligence on ELM prior to recommending the Merger. These defendants had every incentive to turn a blind eye to anything that might make shareholders disinclined to approve the Merger or redeem their shares.

85.     Furthermore, on March 11, 2022, ELMS announced that the SEC had launched an investigation into the November 2020 Equity Transaction and the December 2020 Equity Transaction and the associated accounting violations. It is unlikely that the SEC would have chosen to open this investigation and devote resources to it if the conduct involved simply innocent mistakes.

### BDO IS LIABLE

86.     BDO provided a "clean" audit opinion on ELM's historical financial statements provided in the Proxy Statement, and in doing so, represented that it had conducted its audit in accordance with the standard of the Public Company Accounting Oversight Board ("PCAOB"). In actuality, BDO had failed to comply with the PCAOB's independence requirements and violated PCAOB auditing standards during its audit of ELM.

87.     PCAOB Rule 3520 requires a registered public accounting firm and its associated persons to be independent of the firm's audit client throughout the audit and professional engagement period  Additionally, PCAOB Rule 3526 requires a registered public accounting firm to describe to the audit committee of the potential audit client in writing "all relationships between the registered public accounting firm or any affiliates of the firm and the potential audit client or persons in financial reporting oversight roles at the potential audit client that, as of the date of the communication, may reasonably be thought to bear on independence." This written communication must be made prior to accepting an audit assignment, and also at least once a year after that.

88.     According to ELMS, during the course of its investigation of the November 2020 Equity Transaction and the December 2020 Equity Transaction, the special committee of the Board "identified that BDO's Tax Advisory Group ('BDO Tax') had helped to create and structure the [November 2020 and December 2020 Equity] Transactions that ultimately resulted in the resignations of [defendants Luo and Taylor]."

89.     In a letter from ELMS to BDO dated February 9, 2022, ELMS stated:

> To the extent that you claim that you were only recently made aware of the equity transactions described in the Form 8-K, ***we remind you that BDO Tax was involved in structuring such transactions and that, as you have confirmed to us, <u>BDO USA was aware of those transactions well in advance of and in connection with completion of the audit. The transactions were contemporaneously discussed with multiple professional advisors, including representatives of BDO</u>***.

Emphasis added.

90.     BDO attempted to deny ELMS' contention, responding in a letter to ELMS that "BDO does not have a group named the 'Tax Advisory Group', BDO did not help create and structure the Transactions nor does BDO have any basis of knowing what facts or circumstances resulted in the resignations of Mr. Luo or Mr. Taylor."

91.     BDO's refutation is unconvincing and appears to be based on semantics. BDO is a full-service accounting firm that delivers assurance, tax, and financial advisory services to its corporate clients.  Thus, even if BDO does not have a practice precisely named "Tax Advisory Group," that does not mean BDO does not provide tax advisory services. Indeed, its website shows that BDO has a tax practice comprised of numerous professionals.

92.     Moreover, while BDO denied that it helped to "create and structure" the November 2020 Equity Transaction and the December 2020 Equity Transaction, it did not dispute that BDO provided services and advice to defendant Luo and his affiliates, or that BDO was aware of the November 2020 Equity Transaction and the December 2020 Equity

- 30 -

Transaction.  BDO's failure to effectively refute or even meaningfully respond to the charges

levied by ELMS was noted in an amended Form 8-K current report filed with the SEC by

ELMS on March 3, 2022, which stated in pertinent part as follows:

> The BDO Letter does not address the concerns we have previously raised in the February 14 Current Report regarding BDO's compliance with applicable auditor independence requirements of the SEC and the Public Company Accounting Oversight Board.  In particular, we note the following:
>
> - BDO continues to refuse to provide the analysis in support of its independence determination despite having provided advice to Mr. Luo and his affiliates.
>
> - BDO does not dispute the fact that BDO did provide advice to Mr. Luo and his affiliates, a fact that bears on its independence status (although BDO disputes the characterization of that advice and the name of the BDO group that provided the advice).
>
> - BDO does not dispute that BDO failed to disclose this engagement in its letter to the Audit Committee of the Board of Directors of the Company, dated July 15, 2021, in which BDO purported to list relationships between the Company and BDO and its affiliates that may reasonably be thought to bear on its independence.
>
> - BDO agrees that it had a legal obligation to include in its audit "procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure therein" and that the Company did in fact bring these transactions to BDO's attention.

93.     ELMS also stated that it did not receive written communications from BDO

providing analysis in support of BDO's independence determination despite BDO having

provided advice to defendants Luo and his affiliates.  This violates PCAOB Rule 3526.

94.     Not only did BDO violate PCAOB rules regarding independence, BDO also

failed to properly perform appropriate audit procedures in response to known and significant

risks that were present in its audit of ELM's historical financial statements.  Instead, as

discussed below, BDO ignored those risks and red flags.

- 31 -

95.     According to PCAOB auditing standards ("AS"), an auditor is required to identify and appropriately assess the risks of material misstatement, including fraud risk, to be able to develop appropriate responses to these risks.  AS 2110.04; AS 2110.65.  This includes assessing the risks of material misstatement associated with related parties and relationships and transactions with related parties, including whether the company has properly identified, accounted for, and disclosed its related parties and relationships and transactions with related parties.  AS 2410.10.

96.     PCAOB auditing standards specifically require the auditor to assess the risk of material misstatement associated with transactions with executive officers of the company as follows:

> To assist in obtaining information for identifying and assessing risks of material misstatement of the financial statements associated with a company's financial relationships and transactions with its ***executive officers*** (*e.g.*, executive compensation, including perquisites, and any other arrangements), the auditor should perform procedures to obtain an understanding of the company's financial relationships and transactions with its executive officers.  The procedures should be designed to identify risks of material misstatement and should include, but not be limited to (1) reading the employment and compensation contracts between the company and its executive officers and (2) reading the proxy statements and other relevant company filings with the Securities and Exchange Commission and other regulatory agencies that relate to the company's financial relationships and transactions with its executive officers.

AS 2110.10A (emphasis in original).

97.     BDO itself publishes a guide titled "BDO Knows: Going Public" that lists share-based compensation as one of nine high-risk areas as follows:

SHARE-BASED COMPENSATION

> Registrants are required to measure and report all share-based compensation at fair market value.  The calculations necessary to measure this compensation include assumptions about the company's share price volatility, interest rates, future dividends, and option life.  As a result, many registrants are using appraisal advisors to calculate the value of the stock compensation grants.

- 32 -

98.    The BDO guide also highlights issuance of cheap stock as one of the issues to look out for with regards to companies going public as follows:

> Cheap stock – common stock sold before a public offering at a price which is less than the public offering price.  Often, the stock is sold to company insiders.

99.    BDO was engaged to audit ELM's historical financial statements since that company's inception.  By early 2021, ELM and FIII had already executed the agreement for the Merger.  Thus, BDO knew, at the time it audited ELM's 2020 financial statements, that ELM planned to go public through a de-SPAC transaction with FIII, and should have identified share-based compensation and potential issuance of the company stock to company insiders as a significant risk requiring appropriate audit response.

100.    BDO was aware of the November 2020 Equity Transaction and the December 2020 Equity Transaction.  Thus, in accordance with PCAOB auditing standards, BDO should have assessed as significant risk ELM's 2020 financial statements associated with share-based awards to ELM's executives.  PCAOB standards required BDO to develop appropriate audit procedures, including tests of details, to respond to this risk.  Such procedures would have entailed examining ELM's stock ledgers and ensuring that it accounted for share-based transactions in accordance with GAAP by measuring and reporting all share-based compensation at fair market value.[5]

---

[5]    "The auditor must design and implement audit responses that address the identified and assessed risks of material misstatement . . . ."  AS 2301.03.  "The auditor should design and perform audit procedures in a manner that addresses the assessed risks of material misstatement for each relevant assertion of each significant account and disclosure. . . .  In designing the audit procedures to be performed, the auditor should . . . [t]ake into account the types of potential misstatements that could result from the identified risks and the likelihood and magnitude of potential misstatement."  AS 2301.08-09.  For significant risks (*i.e.*, risks requiring special audit consideration, including fraud risks) the auditor should perform substantive procedures, including tests of details, that are specifically responsive to the assessed risks.  AS 2110.70-71; AS 2301.11, .13, .36.  The auditor must design and perform audit procedures in a manner that addresses the risks of material misstatement associated

101.    Had BDO performed such procedures, it would have discovered that ELM's 2020 financial statements materially understated compensation expense as a result of ELM's failure to properly account for the issuance of stock in the November 2020 Equity Transaction and the December 2020 Equity Transaction.  Indeed, it would be impossible for BDO to audit ELM's accounting for share-based awards without inquiring about and requesting ELM to provide BDO with valuations of ELM's stock performed in connection with the November 2020 Equity Transaction and the December 2020 Equity Transaction. Such inquiries would have made BDO aware that ELM had not performed valuations of ELM stock, thus requiring an appropriate audit response to the risk that ELM's share-based awards were recorded improperly.

102.    Thus, contrary to the representation contained in its audit opinion, BDO failed to perform an audit of ELM's historical financial statements  provided in the Proxy Statement in accordance with PCAOB standards and, therefore, did not have any reasonable basis to express an unqualified (*i.e.*, clean) opinion on those financial statements.  PCAOB standards required BDO to either decline to issue an opinion on ELM's 2020 financial statements or express an adverse opinion thereon.

## NO SAFE HARBOR

103.    The "Safe Harbor" warnings accompanying defendants' reportedly forward-looking statements ("FLS") were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports

---

with related parties and relationships and transactions with related parties.  AS 2410.11. Also, "the auditor must evaluate whether related party transactions have been properly accounted for and disclosed in the financial statements.  This includes evaluating whether the financial statements contain the information regarding relationships and transactions with related parties essential for a fair presentation in conformity with the applicable financial reporting framework."  AS 2410.17.

prepared in accordance with GAAP, including those filed with the SEC, they are excluded

from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

104.    Defendants are also liable for any false or misleading FLS pled because, at the

time each FLS was made, the speaker knew the FLS was false or misleading and the FLS

was authorized and/or approved by an executive officer of ELM or the Company who knew

that the FLS was false.  None of the historic or present tense statements made by defendants

were assumptions underlying or relating to any plan, projection, or statement of future

economic performance, as they were not stated to be such assumptions underlying or relating

to any projection or statement of future economic performance when made, nor were any of

the projections or forecasts made by defendants expressly related to or stated to be dependent

on those historic or present tense statements when made.

## LOSS CAUSATION AND ECONOMIC LOSS

105.    In connection with the PIPE Offering, as detailed herein, defendants engaged

in a scheme to deceive the market and a course of conduct that artificially inflated the

perceived value of the ELMS stock sold in the PIPE Offering and operated as a fraud or

deceit on purchasers of the ELMS common stock sold in the PIPE Offering.  As detailed

above, when the truth about defendants' misconduct was revealed, the price of ELMS

common stock declined precipitously as the prior artificial inflation no longer propped up the

price.  The decline in the price of ELMS common stock was the direct result of the nature

and extent of fraud finally being revealed to investors and the market.  The timing and

magnitude of the share price declines negate any inference that the losses suffered by

plaintiff and other members of the Class were caused by changed market conditions,

macroeconomic or industry factors, or Company-specific facts unrelated to defendants'

fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class

members was a direct result of defendants' fraudulent scheme to artificially inflate the price of the ELMS common stock sold to Class members in the PIPE Offering, and the subsequent significant decline in the value of ELMS common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

106.    At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of ELM and the post-Merger Company's business, operations, and financial results as alleged herein.  In the Company's SEC filings, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of the ELMS common stock sold to Class members in the PIPE Offering to be artificially inflated. Plaintiff and other Class members purchased ELMS common stock in the PIPE Offering at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

107.    Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), to the extent that the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

108.    Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because there was an efficient market for ELMS common stock by virtue of the following factors, among others:

- 36 -

(a)     ELMS common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market, until the stock was subsequently delisted as a result of the events detailed herein;

(b)     defendants regularly communicated with public investors about ELM, FIII, and the post-Merger Company via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)     FIII (later known as ELMS) was followed by a number of securities analysts employed by major brokerage firms who wrote reports about the anticipated Merger with ELM which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

109.    As a result of the foregoing, the market for the ELMS stock sold in the PIPE Offering promptly incorporated current information regarding the Company and the anticipated Merger with ELM from publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all those who purchased ELMS common stock in the PIPE Offering suffered similar injury through their transactions in ELMS stock at artificially inflated prices and a presumption of reliance applies.

110.    Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market price for the ELMS stock sold in the PIPE Offering, and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions in connection with the PIPE Offering.

## CLASS ACTION ALLEGATIONS

111.    Plaintiff brings this action on behalf of all purchasers of ELMS common stock directly in the PIPE Offering who were damaged thereby (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which any of the defendants have or had a controlling interest.

112.    The members of the Class are so numerous that joinder of all members is impracticable.  There were 13 million shares of ELMS common stock sold in the PIPE Offering.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are many members in the proposed Class.  Purchasers in the PIPE Offering, and thus members of the Class, may be identified from records maintained by ELMS or its placement agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon information and belief, these shares were purchased by many individuals located geographically throughout the country.  Joinder would be highly impracticable.

113.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.  Indeed, the PIPE Offering Memorandum, which was signed by each purchaser in the PIPE Offering, expressly characterized plaintiff and the other members of the Class collectively as the "Subscribers" and the shares of ELMS common stock they were purchasing in the PIPE Offering as the "Collective Subscribed Shares," stating in pertinent part as follows:

> WHEREAS, concurrently with the execution of this Subscription Agreement, the Company is entering into subscription agreements (the

"Other Subscription Agreements" and together with this Subscription Agreement, the "Subscription Agreements") with certain other investors (the "Other Subscribers" and together with Subscriber, the "Subscribers") substantially similar to this Subscription Agreement, pursuant to which such investors have agreed to purchase on the closing date of the Transaction (the "Closing Date"), inclusive of the Subscribed Shares, an aggregate amount of up to 13,000,000 shares of Common Stock, at the Per Share Price (the shares of the Other Subscribers, the "Other Subscribed Shares" and together with the Subscribed Shares, the "Collective Subscribed Shares").

114. The PIPE Offering Memorandum also expressly directed all purchasers in the

PIPE Offering to rely upon the integrity and accuracy of the Company's pre-Merger filings

with the SEC, stating in pertinent part at Part 3(f) that:

> As of their respective dates, all reports required to be filed by the Company with the Commission (the "SEC Reports") complied in all material respects with the requirements of the Securities Act and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations of the Commission promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing and fairly present in all material respects the financial position of the Company as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, year-end audit adjustments. A copy of each SEC Report is available to each Subscriber via the Commission's EDGAR system. The Company has timely filed each report, statement, schedule, prospectus, and registration statement that the Company was required to file with the Commission since its initial registration of the Common Stock with the Commission. To the knowledge of the Company, there are no material outstanding or unresolved comments in comment letters from the staff of the Division of Corporation Finance of the Commission with respect to any of the SEC Reports as of the date hereof.

115. Moreover, the PIPE Offering Memorandum expressly limited the

representations that purchasers in the PIPE Offering could rely upon in making their

investment decisions to just the SEC Reports, stating in pertinent part at Part 9 as follows:

> ***Non-Reliance and Exculpation***. ***Subscriber acknowledges that it is not relying upon, and has not relied upon, any statement, representation or***

{FG-W0505165.}

*warranty made by any person, firm or corporation (including, without limitation, the Placement Agent, any of its affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing), other than the statements, representations and warranties of the Company expressly contained in Section 3 of this Subscription Agreement, in making its investment or decision to invest in the Company*.

116.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

117.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c)    whether the prices of ELMS common stock sold to purchasers in the PIPE Offering were artificially inflated because of defendants' conduct complained of herein; and

(d)    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

118.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

{FG-W0505165.}

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants Except Kiev and Boris

119.    Plaintiff incorporates ¶¶1-118 by reference.

120.    In connection with the PIPE Offering, all defendants other than Kiev and Boris disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

121.    All defendants named in this Count violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

> (a)    employed devices, schemes, and artifices to defraud;

> (b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the ELMS common stock sold in the PIPE Offering.

122.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market for ELMS common stock, they paid artificially inflated prices for the ELMS common stock sold in the PIPE Offering.  Plaintiff and the Class would not have purchased ELMS common stock at the prices they paid in the PIPE Offering, or at all, if they had been aware that the price had been artificially and falsely inflated by these defendants' misleading statements.

- 41 -

123.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of ELMS common stock in the PIPE Offering.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants Except BDO

124.     Plaintiff incorporates ¶¶1-123 by reference.

125.     In connection with the PIPE Offering, all defendants except BDO acted as controlling persons of ELM and/or ELMS within the meaning of §20(a) of the 1934 Act. By virtue of their stock holdings, their positions, and their power to control public statements about ELMS and ELM, the Individual Defendants had the power and ability to control the actions of ELMS and/or ELM and their employees.   By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

{FG-W0505165.}

## JURY DEMAND

Plaintiff demands a trial by jury.

FRIEDLANDER & GORRIS, P.A.

*/s/ Jeffrey M. Gorris*

OF COUNSEL:

ROBBINS GELLER RUDMAN
  & DOWD LLP
Samuel H. Rudman
Mary K. Blasy
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100
(631) 367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
Brian E. Cochran
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058
(619) 231-7423 (fax)

DATED:  June 14, 2023

Jeffrey M. Gorris (Bar No. 5012)
David Hahn (Bar No. 6417)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3508
(302) 573-3501 (fax)
jgorris@friedlandergorris.com
dhahn@friedlandergorris.com

*Attorneys for Plaintiff*

- 43 -