**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SHMUEL LEVY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>JASON LUO, JAMES TAYLOR, ALBERT LI, MARSHALL KIEV, DAVID BORIS, and BDO USA, LLP,<br><br>Defendants. | ) | Civil Action No. 1:23-cv-00653 (GBW)<br><br><u>CLASS ACTION</u><br><br><u>DEMAND FOR JURY TRIAL</u> |

**AMENDED CLASS ACTION COMPLAINT**

Lead Plaintiffs Izac Ben-Shmuel as Trustee of the ILS Trust FBO Izac Ben-Shmuel, Robert Green as Trustee of both the Robert Green Revocable Trust and the Green Children's Trust, Shmuel Levy, and Isidore H. Mayrock (together "Plaintiffs"), by and through their counsel, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, including the investigation of Plaintiffs' counsel, which included, among other things, a review of: (i) the U.S. Securities and Exchange Commission ("SEC") filings by Electric Last Mile Solutions, Inc. ("ELMS" or the "Company"), conference call transcripts, Company press releases, analyst reports, and media reports about the Company; and (ii) certain legal proceedings involving ELMS, including *In re Electric Last Mile Solutions Inc. Sec. Litigation*, No. 2:22-cv-00545 (D.N.J.), *Electric Last Mile Solutions, Inc. Stockholder Litigation*, C.A. No. 2022-0630-KSJM (Del. Ch.), and *In re Electric Last Mile Solutions Inc.*, No. 1:22-BK-10537 (Bankr. D. Del.). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities fraud class action asserting claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") on behalf of all direct purchasers of the common stock of ELMS in the private investment in public equity ("PIPE") offering (the "PIPE Offering") described herein. The PIPE Offering was conducted in connection with the June 25, 2021 merger (the "Merger") of a publicly traded special purpose acquisition company ("SPAC") called Forum Merger III Corporation ("FIII") with a privately held electric vehicle company called Electric Last Mile, Inc. ("ELM") to form the publicly traded company renamed Electric Last Mile Solutions, Inc. ("ELMS" or the "Company"). ELMS has since filed for bankruptcy and is therefore not named as a defendant.

2. The PIPE Offering was a private placement of $130 million in unregistered common stock conducted pursuant to a PIPE subscription agreement and offering memorandum (the "Offering Memorandum"). The Offering Memorandum was executed on December 10, 2020, the same date as the definitive Merger agreement, and the PIPE Offering closed on June 24 2021, the day before the Merger closed.

3. The Offering Memorandum expressly stated that investors in the PIPE Offering were to rely only on FIII's filings with the SEC in making their investment. The Offering Memorandum represented and warranted that these SEC filings complied with the federal securities laws and were true, correct, and accurate in all material respects, and provided that investors in the PIPE Offering had no obligation to complete the transaction unless these representations remained true at the time of closing. The relevant SEC filings included, among other things, the joint press releases issued by ELM and FIII regarding the Merger and the June 9, 2021 Merger proxy (the "Proxy") soliciting stockholder approval of the Merger.

4. These SEC filings were materially false and misleading because they concealed and disguised massive compensation to insiders and related expenses, and overstated ELM's financial performance by hundreds of millions of dollars as a result. As is now known, shortly before announcing the Merger and PIPE Offering, ELM issued at least 99,000 shares of common stock (mostly to ELM insiders) for $10 per share, which was drastically below fair market value. The difference between the $10 per share ELM received and the fair value of the shares ELM issued in return was an expenditure by ELM that was required to be treated as an expense under Generally Accepted Accounting Principles ("GAAP"). After the closing of the Merger, each of these ELM shares could be – and almost all would be – exchanged for over 800 shares of ELMS common stock, themselves each worth $10 per share. Thus, the reasonable fair value of the 99,000 ELM

common shares sold for only $10 per share was over $8000 per share, representing expenditures by ELM of approximately $800 million that were never disclosed before the Merger.

5. Of these 99,000 ELM shares, 84,477 went to ELM's senior executives (or entities they controlled). ELM's co-founders – defendants Jason Luo and James Taylor, who were then serving respectively as the Executive Chairman and the Chief Executive Officer ("CEO") of ELM – received undisclosed stock-based compensation worth over $700 million dollars as a result. The remaining 14,523 ELM shares went to four unidentified purchasers, representing further undisclosed expenses of over $100 million.

6. The Proxy and FIII's other SEC filings materially misrepresented this reality. The Proxy stated that ELM's senior executives received zero or *de minimis* compensation in 2020, when in fact these executives had received hundreds of millions dollars in stock-based compensation. The Proxy likewise concealed the massive expense associated with ELM's sale of 99,000 shares at prices well below fair market value, materially overstating ELM's 2020 financial performance by understating the Company's expenses and operating losses by over $800 million, all in violation of GAAP. The Proxy disclosed only the issuance of 99,000 shares at $10 per share, with no disclosure concerning the far-higher value of those shares. The Proxy also failed to disclose that this "sale" below fair value to defendants Luo and Taylor was in fact a massive compensation award, and it did not disclose any associated expense by ELM. Nor did the Proxy disclose defendant Luo's further sale of 1,000 shares at $10 per share to two members of ELM's senior management in December 2020.

7. The Proxy also included materially false and misleading audited financial statements for ELM for 2020, as well as a materially false and misleading audit opinion from BDO USA, LLP ("BDO") stating falsely that the financial statements complied with GAAP and that

BDO's audit had otherwise been conducted in accordance with the relevant auditing standards. The Proxy and other SEC filings likewise touted the value to the business of ELM's senior executives – particularly defendants' Luo and Taylor – without disclosing their involvement in and receipt of hundreds of millions of dollars in secret compensation from ELM, which threatened to, and ultimately did, force these executives out of the Company.

8. Investors began to learn the truth on February 1, 2022, when ELMS first disclosed that a special committee of the Company's board of directors (the "Special Committee") had been conducting an internal investigation since November 25, 2021 concerning "certain sales of equity securities made by and to individuals associated with the Company." According to the Company, the investigation concluded that "shortly before the December 10, 2020 entry into definitive documentation for" the Merger, "certain [ELM] executives directly or indirectly purchased equity in [ELM] at substantial discounts to market value."

9. As the Company explained, ELM had "issued and sold 99,000 shares of common stock for $990,000 to seven investors," ELM "does not appear to have obtained an independent valuation to determine the fair market value per share of its common stock as of or contemporaneous with the date of those transactions," and "[w]hen the business combination was consummated on June 25, 2021, each [ELM] share, for which such executives had paid $10 per share, was exchanged for approximately 800 shares of [ELMS]."

10. ELMS also announced that, as a result of the foregoing, the "consolidated financial statements of [ELM] as of December 31, 2020 and the period from August 20, 2020 (inception) through December 31, 2020 . . . should be restated and, therefore, should no longer be relied upon." ELMS further announced the removal of both of its co-founders, defendants Luo and Taylor, who were then serving respectively as the Executive Chairman and the CEO of ELMS. In connection

with their ouster, the Company specified that "Messrs. Luo and Taylor provided responses to the Special Committee that are believed to be inconsistent with documents reviewed by the Special Committee and its counsel."

11. These disclosures shocked the market, causing the price of ELMS common stock to decline by $2.88 per share, or 51%, to close at $2.71 per share on February 2, 2022, on unusually heavy trading volume. The February 1, 2022 announcement precipitated a fundamental loss of faith in the Company – what one analyst described as "potentially back breaking news to the ELMS story" – causing a continued decline in the Company's stock price and driving the Company into bankruptcy.

12. On February 14, 2022, ELMS disclosed that BDO had resigned over disagreements concerning the Company's legal compliance with its reporting obligations, as well as BDO's direct involvement in the events at issue and resultant lack of independence. The Company simultaneously filed with the SEC two letters on Form 8-K. In one letter, BDO stated that an "'illegal act . . . has or may have occurred'" in connection with the scheme and that BDO was resigning because of ELMS's failure to take timely or appropriate remedial actions. In the other letter, the Company's Audit Committee responded by blaming BDO, stating that BDO "was involved in structuring such transactions and that, as you have confirmed to us, BDO USA was aware of those transactions well in advance of and in connection with completion of the audit."

13. On March 11, 2022, ELMS confirmed an ongoing SEC investigation and disclosed both that it was withdrawing its previous financial guidance and that it would need to raise additional capital in order to launch its vehicles. On this news, the market price of ELMS common stock fell below $1 per share.

14. Finally, on or about June 13, 2022, ELMS announced that it was planning to liquidate through a Chapter 7 bankruptcy filing. The ELMS stock that had been sold in the PIPE Offering was delisted and became virtually worthless.

15. As a result of defendants' wrongful acts and omissions, Plaintiffs and the Class (defined herein) purchased ELMS common stock directly in the PIPE Offering at artificially inflated prices, suffered significant losses, and were damaged thereby. By the express terms of the Offering Memorandum, the PIPE Offering could not close if FIII's SEC filings were not truthful and accurate as warranted, and PIPE Offering investors were therefore not obligated to and would never have purchased any of the $130 million of ELMS shares in the PIPE Offering at closing but for the material misrepresentations alleged herein. Moreover, because PIPE Offering investors were subject to trading restrictions applicable to private placements, PIPE Offering investors could not mitigate their damages and protect themselves by selling the shares on the market once the Company began to disclose the truth, forcing these investors to lose the entire value of their investment as the Company collapsed into bankruptcy. This action seeks damages on their behalf.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

18. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Moreover, the Offering Memorandum specifies that any action "arising out of or

related to" the Offering Memorandum must be brought in a Delaware court. The ELMS bankruptcy is proceeding in the U.S. Bankruptcy Court for the District of Delaware.

19. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ.

## RELEVANT NON-PARTY

20. Non-party ELMS was formed on or about June 25, 2021 through the Merger of FIII (a publicly traded SPAC) and ELM (a privately held electric vehicle company created in August 2020). After the Merger, FIII changed its name to ELMS and its shares continued trading on the NASDAQ under the ticker symbol "ELMS." On June 14, 2022, ELMS filed for Chapter 7 bankruptcy. But for the automatic bankruptcy stay imposed by §362 of the U.S. Bankruptcy Code, 11 U.S.C. §362, upon commencement of ELMS's bankruptcy proceedings, ELMS would be named as a defendant in this action.

## PARTIES

21. Plaintiffs, as set forth in the certifications, loss estimates, and joint declaration filed in support of their motion for appointment as lead plaintiff (ECF No. 12-1, Exhibits B-D) and incorporated by reference herein, purchased ELMS common stock directly in the PIPE Offering and were damaged thereby.

22. Defendant Jason Luo ("Luo") co-founded ELM and served as its President and the Executive Chairman of the Board prior to the Merger. Thereafter, defendant Luo served as the Executive Chairman of the Board and President of ELMS until he was forced to resign from those positions on or about February 1, 2022.

23. Defendant James Taylor ("Taylor") co-founded ELM and served as its CEO prior to the Merger. Thereafter, defendant Taylor served as ELMS's CEO, and was a member of the Board until he was forced to resign from those positions on or about February 1, 2022.

24. Defendant Albert Li ("Li") served as the Chief Financial Officer ("CFO") and Treasurer of ELM prior to the Merger. Thereafter, defendant Li served as ELMS's CFO and Treasurer until November 2021.

25. Defendant Marshall Kiev ("Kiev") served as Co-CEO, President, and as a member of the FIII Board prior to the Merger. Defendant Kiev was the managing member of Forum Capital Management III LLC (the SPAC sponsor's managing partner), which controlled Forum Investors III LLC, the sponsor of FIII (the "Sponsor").[1] Defendant Kiev also had a beneficial interest in the ELMS shares held by the Sponsor.

26. Defendant David Boris ("Boris") served as Co-CEO, CFO, and as a member of the FIII Board prior to the Merger. After the Merger, he continued to serve as a member of the ELMS Board. Defendant Boris was a managing member of the managing partner of the Sponsor and had a beneficial interest in the ELMS shares held by the Sponsor.

27. Defendants Luo, Taylor, Li, Kiev, and Boris are sometimes referred to herein as the "Individual Defendants."

28. Defendant BDO is a professional services firm that provides accounting, tax, and consulting services. BDO audited ELM's financial statements for the period from August 20, 2020 (ELM's inception) to December 31, 2020. On July 13, 2021, following the Merger, BDO became the auditor of ELMS. BDO served as ELMS's auditor from its inception until February 8, 2022.

---

[1] Forum Capital Management III LLC and Forum Investors III LLC were both dissolved in July 2022 and no longer exist.

29. Defendant BDO and the Individual Defendants are sometimes referred to herein collectively as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Merger and PIPE Offering

30. In August 2020, FIII raised $250 million in its initial public offering. FIII was a SPAC, also known as a blank-check company, that defendant Kiev created with the sole purpose of identifying and merging with a privately held business.

31. A SPAC is a company with no existing business operations that is created and taken public for the sole purpose of identifying a business or operating company to acquire using the proceeds from the SPAC's own initial public stock offering. A subsidiary of a SPAC typically merges with the target, with the SPAC assuming the name and operations of the target post-closing. In this way, merging with a SPAC offers a back-door route to a public listing for private companies. The merger between a SPAC and a privately held company is commonly known as a "de-SPAC" transaction. When a de-SPAC occurs, public stockholders of the SPAC typically have the right to redeem their shares and recover the funds they invested. SPACs frequently conduct PIPE offerings in connection with de-SPAC transactions in order to backstop potential shareholder redemptions and provide additional operating funds for the post-merger company.

32. Following its initial public offering, FIII quickly identified ELM as a target company with which it intended to merge. ELM was itself a new company, created in August 2020 by Defendants Luo and Taylor to manufacture electric vans and utility vehicles used to make "last mile" deliveries.

33. On September 18, 2020 – less than a month after FIII went public – FIII executed a letter of intent to merge with ELM. After the Merger, the combined company would be known as ELMS. At the time that FIII and ELM executed the letter of intent, Defendant Luo owned 100%

of ELM through an entity called AJ Capital, Inc. ("AJ Capital"), which Defendant Luo owned and controlled.[2]

34. On December 10, 2020, ELM and FIII entered into a definitive Merger agreement (the "Merger Agreement"). Among other things, the Merger Agreement provided:

> [ELM] shall ensure that none of the information supplied by or on its behalf for inclusion or incorporation by reference in the Proxy Statement will . . . contain any untrue statement of a material fact or omit to state any material fact. . . . If . . . ELM . . . discovers any information . . . relating to [ELM], its . . . officers, directors or employees that should be set forth in an amendment or a supplement to the Proxy Statement so that the Proxy Statement would not include any misstatement of a material fact or omit to state any material fact . . . then [ELM] shall promptly inform Parent of such information . . . and shall promptly provide all information required. . . .

35. Also on December 10, 2020, FIII and the PIPE Offering investors executed the Offering Memorandum. As FIII explained in a December 11, 2020 SEC filing on Form 8-K:

> In connection with the transactions contemplated by the Merger Agreement, [FIII] has entered into subscription agreements, each dated December 10, 2020 (collectively, the "[Offering Memorandum]") with certain third-party investors (the "PIPE Investors"), pursuant to which [FIII] agreed to issue and sell to the PIPE Investors in private placements to close immediately prior to the Closing [of the Merger], an aggregate of 13.0 million shares of Common Stock at $10.00 per share, for an aggregate purchase price of $130,000,000 (the "PIPE Investment"). Pursuant to the [Offering Memorandum], [FIII] has agreed to provide registration rights to the PIPE Investors relating to the sale and issuance of Common Stock. At the Closing, the PIPE Investors and [FIII] shall consummate the PIPE Investment pursuant to and in accordance with the terms of the [Offering Memorandum].

36. The Offering Memorandum provided that "[t]he consummation of the [PIPE Offering] contemplated hereby (the "Closing") shall occur on the Closing Date immediately prior to the consummation of the [Merger] and is contingent upon the subsequent occurrence of the closing of the [Merger]." The Offering Memorandum provided further that investors in the PIPE Offering would "deliver to the Company, on or prior to 8:00 a.m. (Eastern time) . . . on the Closing

---

2 ELM issued 1,000 shares of common stock to AJ Capital on September 11, 2020.

Date, the Purchase Price in cash via wire transfer . . . against (and concurrently with) delivery by the Company to Subscriber of (i) the Subscribed Shares in book entry form" along with written notice of same.

37. The Offering Memorandum, as discussed *infra* at ¶52, expressly represented and warranted that FIII's reports filed with the SEC complied with all applicable rules and regulations, were free from any material misrepresentations, and complied in all material respects with applicable accounting requirements.

38. The Offering Memorandum likewise expressly acknowledged that PIPE Investors were to rely on – and only on – such representations and warranties. The Offering Memorandum stated that "[t]he Company acknowledges that Subscriber . . . will rely on the acknowledgments, understandings, agreements, representations and warranties of the Company contained in this [Offering Memorandum.]" Similarly, the Offering Memorandum required PIPE Investors to agree that they were "not relying on, any representations, warranties, covenants or agreements . . . other than those representations, warranties, covenants and agreements of the Company set forth in this [Offering Memorandum]." The Offering Memorandum likewise required PIPE Investors to acknowledge that each of them were "not relying upon, and has not relied upon, any statement, representation or warranty . . . other than the statements, representations and warranties of the Company expressly contained in . . . this [Offering Memorandum], in making its investment or decision to invest in the Company."

39. The Offering Memorandum expressly stated that the accuracy of FIII's SEC filings at the time of closing was a closing condition of the PIPE Offering, and PIPE investors were not obligated to purchase shares in the PIPE Offering unless FIII's SEC filings remained true and correct in all material respects up until the closing, stating in pertinent part as follows:

The obligation of Subscriber to consummate the Closing shall be subject to the satisfaction or valid waiver by Subscriber of the additional conditions that, on the Closing Date:

(i) all representations and warranties of the Company contained in this Subscription Agreement shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Company Material Adverse Effect (as defined below), which representations and warranties shall be true in all respects) at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date)[.]

40. Moreover, the Offering Memorandum required FIII to inform PIPE Offering investors if the representations and warranties contained in the Offering Memorandum were no longer true at the time of closing, stating in pertinent part that "[p]rior to the Closing, the Company agrees to promptly notify Subscriber . . . if it becomes aware that any of the acknowledgments, understandings, agreements, representations and warranties of the Company set forth herein are no longer accurate in all material respects." The Offering Memorandum provided further that the agreement would automatically terminate if its closing conditions – including the condition that FIII's SEC filings must remain true and correct in all material respects at the time of closing – were not satisfied, specifying that the agreement would "terminate and be void and of no further force and effect . . . if, on the Closing Date of the Transaction, any of the conditions to Closing . . . of this Subscription Agreement have not been satisfied as of the time required hereunder[.]"

41. The PIPE Offering contemplated by the Offering Memorandum was a private placement of unregistered common stock conducted pursuant to SEC Rule 144. The terms of the Offering Memorandum required FIII to register the shares issued in the PIPE Offering shortly after the PIPE Offering and Merger closed. Thereafter, the newly registered shares would be subject to resale and trading restrictions under Rule 144 applicable to the securities of former shell companies

– and therefore could not be freely traded along with other ELMS publicly traded common stock until at least 12 months after the shares were registered.[3]

42. On December 11, 2020, following the execution of the PIPE Offering Memorandum, FIII announced that it and ELM had executed a definitive Merger agreement, subject to approval by their respective shareholders. FIII also announced the PIPE Offering.

43. On June 9, 2021, FIII issued the Proxy concerning the Merger, in advance of the June 24, 2021 special meeting of FIII's public shareholders, to solicit votes on approving the merger with ELM.

44. On June 24, 2021, FIII shareholders voted to approve the Merger. Also on June 24, 2021, the PIPE Offering closed (subject to the Merger closing on the following day) with 13 million shares of ELMS common stock being sold at $10 per share, for a total of $130 million in gross offering proceeds.

45. The Merger closed on June 25, 2021, whereupon FIII changed its name to ELMS, and changed the ticker symbol for FIII common stock to "ELMS."

### B. ELM'S 2020 Equity Transactions

46. Shortly before the Merger was announced in December 2020, ELM granted massive equity compensation to Defendants Luo and Taylor (among others).

47. On September 18, 2020, ELM and FIII executed a letter of intent concerning the Merger between ELM and FIII, estimating the total enterprise value of the combined company at $1.3 billion. Less than three months later, on December 11, 2020, FIII and ELM announced entry into the Merger Agreement implying a pro forma equity value of the combined company of

---

[3] ELMS would ultimately register the PIPE Offering shares with the SEC approximately one month after the Merger, filing a Form F-1 with the SEC on July 23, 2021 and an amended Form F-1/A filed on July 30, 2021.

approximately $1.4 billion, based on a per share value of ELMS stock of $10. As a result, after the Merger closed, each outstanding share of ELM common stock could be exchanged for 821.17 shares of ELMS.

48. On November 19, 2020, after the letter of intent had been signed and knowing that ELM would soon go public via the merger with FIII, Defendants Luo and Taylor caused ELM to issue 99,000 shares of ELM common stock to entities owned by Defendants Luo and Taylor, as well as to four unidentified purchasers, for $10 per share (the "November 2020 Equity Transaction"). Because each of these ELM shares could be traded for 821.17 shares of ELMS worth $10 per share once the Merger closed, and because the Merger Agreement was executed just weeks after the November 2020 Equity Transaction, the most reasonable estimate of the fair value of each ELM share issued in the November 2020 Equity Transaction is $8,211.70, with the difference between the $10 received per share and the $8,211.70 value of each of those shares constituting an expenditure by ELM.[4]

[4] Academic research has shown that only a small percentage of mergers and acquisitions fail to close. *See, e.g.*, Muhammad Farooq Ahmad, *et al.*, Does Bilateral Trust Matter During Mergers and Acquisitions Negotiations?, Brit. J. of Mgmt. 1, 1 (2022) ("[T]he proportion of agreed and publicly announced transactions that fail to close is between 8% and 15%."); Fred Bereskin, *et al.*, The effect of cultural similarity on mergers and acquisitions: Evidence from corporate social responsibility, 53 J. of Fin. and Quantitative Analysis 1995, 2012 (2018) ("In large samples, the failure rate for an M&A bid for a publicly traded target . . . is around 10% – 15%[.]"); Robert J. Campbell, *et al.*, Once Bitten, Twice Shy: Failed Deals and Subsequent M&A Cautiousness, Ctr. for Fin. Research Working Paper, No. 22-09, 2022, at 2 ("about 10 percent of all large mergers and acquisitions are canceled") (cleaned up). Indeed, in September 2020, contemporaneous with the ELM/FIII letter of intent, a McKinsey & Co. analysis concluded that "[m]ore than 90 percent of recent SPACs have successfully consummated mergers[.]" Kurt Chauviere and Tao Tan, Earning the premium: A recipe for long-term SPAC success, McKinsey & Co. (Sept. 2020) (https://www.mckinsey.com/~/media/McKinsey/Industries/Private%20Equity%20and%20Principal%20Investors/Our%20Insights/Earning%20the%20premium%20A%20recipe%20for%20long%20term%20SPAC%20success/Earning-the-premium-A-recipe-for-long-term-SPAC-success.pdf). Accordingly, no discount (or only a minimal one) would be appropriate for the possibility that the Merger would not close. In any event, even an exaggerated discount would

49. Of the 99,000 ELM shares issued in the November 2020 Equity Transaction, 78,016 shares went to entities owned and controlled by Defendant Luo, 6,461 shares went to entities owned and controlled by defendant Taylor, and 14,523 shares were sold to four unidentified purchasers.

50. Less than a month later, on December 8, 2020, Defendant Luo sold 1,000 shares of ELM common stock also at $10 per share to an entity owned and controlled by ELM's Chief Operating Officer Hailiang (Jerry) Hu and ELM's General Counsel Benjamin Wu (the "December 2020 Equity Transaction" and, with the November 2020 Equity Transaction, the "2020 Equity Transactions"). Again, the $10 per share price of the shares exchanged in the December 2020 Equity Transaction was a substantial discount to the true $8,211.70 fair market value of each of these shares.

### C. Defendants' Material Misrepresentations and Omissions

51. In connection with the PIPE Offering, Defendants concealed and disguised the massive equity compensation that Defendants Luo and Taylor (among others) were granted by ELM.

52. The Offering Memorandum represented and warranted that FIII's filings with the SEC complied with all applicable rules and regulations, were free from any material misrepresentations, and complied in all material respects with applicable accounting requirements, stating in pertinent part as follows:

> The Company represents and warrants to subscriber that[:]
>
> As of their respective dates, all reports required to be filed by the Company with the Commission (the "SEC Reports") complied in all material respects with the requirements of the Securities Act and the Securities Exchange Act of 1934, as

continue to yield a fair value of ELM shares far above the unreasonable $10 per share Defendants ascribed to those shares.

amended (the "Exchange Act"), and the rules and regulations of the Commission promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing and fairly present in all material respects the financial position of the Company as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, year-end audit adjustments.

53. The Offering Memorandum further stated, as discussed *supra* at ¶¶39-40, that FIII's SEC filings would remain "true and correct in all material respects . . . at and as of the" closing of the PIPE Offering, which was expressly contingent on the truthfulness and accuracy of FIII's SEC filings at and as of that time.

54. The foregoing statements from the Offering Memorandum were materially false and misleading because, among other things, and as detailed *infra* at ¶¶55-88, FIII's SEC filings did not comply with the federal securities laws, contained numerous materially false and misleading statements and omissions concerning the 2020 Equity Transactions, and included financial statements that violated applicable accounting requirements and rules.

55. The Proxy falsely stated that Defendants Luo and Taylor received either no or minimal compensation from ELM in 2020, representing the compensation paid to ELM executives in 2020 in the following chart:

| Name and Principal Position | Year | Base Salary ($) | Total ($) |
|---|---|---|---|
| Jason Luo, Executive Chairman | 2020 | $ 0 | $ 0 |
| James Taylor, Chief Executive Officer | 2020 | $ 32,000 | $ 32,000 |
| Albert Li, Chief Financial Officer and Treasurer | 2020 | $ 0 | $ 0 |

56. This statement was materially false and misleading because, in reality, Defendants Luo and Taylor received hundreds of millions of dollars in stock-based compensation in 2020

when they purchased over 84,000 shares of ELM common stock worth over $8,000 per share for only $10 per share.

57. Further, in connection with the foregoing disclosure regarding ELM's executive compensation, the Proxy directed investors to ELM's financial statements and related notes, stating:

> *[t]he following discussion and analysis of compensation arrangements of ELM's named executive officers for the fiscal year ended December 31, 2020 (i.e., pre-business combination) should be read together with the compensation tables and related disclosures provided below and in conjunction with ELM's financial statements and related notes appearing elsewhere in this proxy statement, along with the section entitled, "Certain Relationships and Related Transactions.* (emphasis in original).

58. The notes to the ELM financial statements included in the Proxy stated: "On November 19, 2020, ELM issued an additional 84,477 shares of common stock, in the aggregate, to two entities controlled by one of the founders of ELM (Jason Luo) and a third entity controlled by the other founder of ELM (James Taylor) for $10 per share."

59. This statement was materially false and misleading because it mischaracterized transactions that were, in reality, massive awards of compensation to senior ELM insiders as mere sales of ELM common stock for $10 per share, and failed to disclose that each of those ELM shares was in fact sold at well below its fair market value of over $8,000 per share. This statement was also materially false and misleading because it failed to disclose the December 2020 Equity Transaction in which Defendant Luo conveyed 1,000 shares to other ELM executives for $10 per share.

60. The Proxy also contained materially false and misleading ELM financial statements that failed to disclose any expenses associated with the sale of at least 99,000 shares of ELM common stock in the 2020 Equity Transactions. In the aggregate, the issuance of these 99,000 shares in return for $10 per share despite their fair market value being over $8,000 per share

constituted a payout of over $800 million of ELM's capital in return for only $990,000. The economic realities and GAAP (as detailed *infra* at ¶¶74-82) required that the difference between the miniscule value received and the massive value conveyed be treated as an expense of ELM.

61. ELM's financial statements failed to disclose any expenses associated with the 2020 Equity Transactions, materially overstating ELM's 2020 financial performance by hundreds of millions of dollars. The Proxy represented the historical financial performance of ELM for the period from August 20, 2020 (when ELM was founded) through December 31, 2020 as follows:[5]

[5] Counsel has supplied all highlighting in this complaint for ease of review.

| | Three Months Ended March 31, 2021 | For the period from August 20, 2020 (inception) through December 31, 2020 |
|---|---|---|
| **Statement of Operations Data:** | | |
| **Operating expense** | | |
| General and administrative expense | 3,124,188 | 7,633,994 |
| Total operating expense | 3,124,188 | 7,633,994 |
| Interest expense and other (income) expense, net | 403,866 | 94,443 |
| **Loss before income taxes** | (3,528,054) | (7,728,437) |
| Income tax benefit | — | — |
| **Net loss and comprehensive loss** | $ (3,528,054) | $ (7,728,437) |
| **Basic and diluted loss per share** | $ (35.28) | $ (191.30) |

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| **Balance Sheet Data:** | | |
| Cash and cash equivalents | $ 16,388,316 | $ 25,204,728 |
| Total assets | 17,150,097 | 25,242,949 |
| Convertible promissory notes | 25,500,832 | 25,094,088 |
| Total liabilities | 27,406,588 | 31,971,386 |
| Total shareholders' deficit | (10,256,491) | (6,728,437) |

62. These representations concerning ELM's 2020 financial information were materially false and misleading because they understated ELM's expenses and losses by an enormous amount. The foregoing financial statements in the Proxy disclosed total expenses of approximately $7.6 million in 2020, when the true figure was approximately $800 million greater. The foregoing financial statements likewise represented that ELM had losses of approximately $7.7 million in 2020, understating ELM's losses by approximately $800 million during that period. These highly material misrepresentations are summarized in the following table, based on the

exchange ratio of 821.17 ELMS shares for every one share of ELM – *i.e.*, the actual exchange ratio that applied in the Merger:

| Item Reported | Amount Reported | Correct Amount | Understated Amount ($) |
|---|---|---|---|
| General and Administrative Expense | $7,633,994 | $819,602,294 | $811,968,300 |
| Total Operating Expense | $7,633,994 | $819,602,294 | $811,968,300 |
| Loss Before Income Taxes | ($7,633,994) | ($819,602,294) | ($811,968,300) |
| Net Loss and Comprehensive Loss | ($7,728,437) | ($819,696,737) | ($811,968,300) |

63. The Proxy also falsely stated that the "historical financial statements" contained therein "have been prepared in accordance with GAAP." As described above and detailed *infra* at ¶¶77-82, ELM's historical financial statements for 2020 were not prepared in accordance with GAAP, including because they failed to account properly for and disclose hundreds of millions in expenses.

64. The Proxy also contained BDO's "Report of Independent Registered Public Accounting Firm," setting forth BDO's materially false and misleading "clean" audit opinion validating the purported accuracy of the historical ELM financial results provided in the Proxy:

> We have audited the accompanying balance sheet of Electric Last Mile, Inc. (the "Company") as of December 31, 2020, the related statements of operations and comprehensive loss, shareholders' deficit, and cash flows for the period from August 20, 2020 (inception) through December 31, 2020, and the related notes

> (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020, and the results of its operations and its cash flows for the period from August 20, 2020 (inception) through December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

65. This statement was materially false and misleading, including because it omitted to disclose multiple GAAP violations known or recklessly disregarded by BDO, as detailed *infra* at ¶¶77-82. This statement was also materially false and misleading because it failed to disclose numerous objective facts contrary to its "clean" audit opinion, including the fact that the 2020 Equity Transactions involved sales at prices materially below fair market value and that the associated expenses and losses were omitted from ELM's financial statements.

66. In the Proxy, BDO also stated that it had audited ELM in accordance with applicable laws, rules and regulations regarding auditor independence, stating in pertinent part as follows:

> We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.
>
> We conducted our audit in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud.

67. This statement was materially false and misleading, including because BDO's audit in fact violated multiple PCAOB audit standards, as detailed *infra* at ¶¶117-118, 124-128, and 132.

68. The BDO audit opinion was accompanied by the following audited ELM financial statements, which set forth the same materially false and misleading expense and loss representations discussed *supra* at ¶61-62, as follows:

**ELECTRIC LAST MILE, INC.**
**BALANCE SHEET**
**AS OF DECEMBER 31, 2020**

| | |
|---|---|
| **ASSETS** | |
| | |
| Cash and cash equivalents | $ 25,204,728 |
| Total current assets | 25,204,728 |
| Intangible assets | 38,221 |
| TOTAL ASSETS | $ 25,242,949 |
| | |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | |
| | |
| Accounts payable | 1,345,780 |
| Accrued expenses | 5,531,518 |
| Total current liabilities | 6,877,298 |
| Convertible promissory notes | 25,094,088 |
| Total liabilities | 31,971,386 |
| | |
| **COMMITMENTS AND CONTINGENCIES** | |
| | |
| Common stock, $0.0001 par value; 200,000 shares authorized; 100,000 issued and outstanding at December 31, 2020 | 10 |
| Additional paid-in capital | 999,990 |
| Accumulated deficit | (7,728,437) |
| Total shareholders' deficit | (6,728,437) |
| | |
| TOTAL LIABILITIES AND SHAREHOLDERS' DEFICIT | $ 25,242,949 |

**ELECTRIC LAST MILE, INC.**
**STATEMENT OF OPERATIONS AND COMPREHENSIVE LOSS**
**FOR THE PERIOD FROM AUGUST 20, 2020 (INCEPTION) THROUGH DECEMBER 31, 2020**

| | | |
|---|---|---|
| OPERATING EXPENSES: | | |
| General and administrative expense | $ | 7,633,994 |
| Total operating expense | | 7,633,994 |
| OPERATING LOSS | | (7,633,994) |
| Interest expense | | (94,088) |
| Investment loss | | (355) |
| LOSS BEFORE INCOME TAXES | | (7,728,437) |
| Income tax benefit | | — |
| NET LOSS AND COMPREHENSIVE LOSS | $ | (7,728,437) |
| | | |
| LOSS PER SHARE: | | |
| Basic and diluted loss per share | $ | (191.30) |
| Basic and diluted weighted shares outstanding | | 40,400 |

**ELECTRIC LAST MILE, INC.**
**STATEMENT OF CHANGES IN SHAREHOLDERS' DEFICIT**
**FOR THE PERIOD FROM AUGUST 20, 2020 (INCEPTION) THROUGH DECEMBER 31, 2020**

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Total Shareholders' Deficit |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balances – August 20, 2020 (inception) | — | $ — | $ — | $ — | $ — |
| Issuance of common stock | 100,000 | 10 | 999,990 | | 1,000,000 |
| Net loss | | | | (7,728,437) | (7,728,437) |
| BALANCE – December 31, 2020 | 100,000 | $ 10 | $ 999,990 | $ (7,728,437) | $ (6,728,437) |

69. The foregoing Statement of Changes in Shareholders' Deficit was also materially false and misleading in that it represented that ELM had sold 100,000 shares for $10 per share during the period from August 20, 2020 through December 31, 2020, without disclosing that 99,000 of these shares were sold at prices well below fair value, without disclosing the true, far-higher fair value of the shares, and without recognizing any expense related to these transactions

– thus fundamentally mischaracterizing as capital paid into ELM what was, in reality, a massive outflow of capital. The foregoing disclosure also materially misrepresented ELM's accumulated deficit by excluding more than $800 million from this figure.

70. The Proxy also included a "Risk Factor" concerning the Company's dependence on ELM's key personnel, which was materially false and misleading because it failed to disclose Defendants Luo and Taylor's participation in and receipt of hundreds of millions of dollars in secret compensation, which threatened to, and ultimately did, force them out of the Company. The Proxy stated:

> ***Our ability to effect the business combination successfully and to be successful thereafter will depend on the efforts of our key personnel, including the key personnel of ELM whom we expect to stay with ELM following the business combination. The loss of key personnel could negatively impact the operations and profitability of our post-combination business and its financial condition could suffer as a result.*** (emphasis in original).
>
> Our ability to effectuate our business combination successfully is dependent upon the efforts of our key personnel, including the key personnel of ELM. It is possible that we will lose some key personnel, the loss of which could negatively impact the operations and profitability of our post-combination business.
>
> ELM's success depends to a significant degree upon the continued contributions of senior management, certain of whom would be difficult to replace. Departure by certain of ELM's officers could adversely effect ELM's business, financial condition, and operating results. ELM does not maintain key-man life insurance on any of its officers.

71. This "Risk Factor" was materially false and misleading because it described in generic and non-specific terms the possibility that the Company might lose key ELM personnel without disclosing material then-existing facts – *i.e.*, the involvement by ELM's co-founders and senior-most executives in the 2020 Equity Transactions – that significantly increased the likelihood that the Company would in fact lose such employees.

72. Along similar lines, SEC filings issued in the lead up to the Merger contained numerous statements touting the experience of ELM's management team and the extent to which

the post-Merger combined Company's success depended on the continued employment of members of ELM's management team, including Defendants Luo and Taylor, without disclosing their involvement in and receipt of undisclosed compensation through the 2020 Equity Transactions. For example:

(a) On December 11, 2020, ELM and FIII issued a press release announcing the proposed Merger which was filed with the SEC on Form 8-K. The press release stated: "[t]he ELMS management team, led by CEO and co-founder James Taylor, combines executive experience from GM, Workhorse, FCA, BMW, Key Safety Systems, and other OEMs[Original Equipment Manufacturers] and Tier 1 manufacturers, to focus on delivering on the company's execution and growth strategy[.]"

(b) During an investor call, the transcript of which FIII filed with the SEC on a Form 8-K on December 11, 2020, defendant Boris stated: "At Forum III, we set out to find a private company with an experienced management team and a proven market-fit product line in a high growth industry that would benefit from our investment and strategic support. We believe ELMS squarely fits these criteria."

(c) During the same investor call, Defendant Taylor stated that "[o]ur team collectively has decades of experience launching vehicles for global OEMs," and also stated:

> To begin, I co-founded Electric Last Mile, which we refer to as ELMS, with our chairman, Jason Luo. Jason has an extensive history of leadership in the automotive industry, including as CEO of Key Safety Systems, Ford China, and Accuride. I had a 30-year career at General Motors, ending as President of Cadillac and CEO of Hummer, after which I helped launch the electric truck company Workhorse Group, where I was Chairman and CEO. We also have a senior leadership team with tremendous experience in engineering and sales across some of the world's largest auto and EV companies.

(d) Also on December 11, 2020, FIII filed with the SEC a copy of an investor presentation regarding the Merger on Form 8-K. The presentation highlighted the extensive

experience of ELM's management team and stated that FIII viewed ELMS as having "A Proven Management Team." In a slide titled "World-Class Proven Leadership Team," the presentation touted: (a) Defendant Luo's over 25 years of experience, including as CEO of Key Safety Systems, Ford China and Accuride, (b) Defendant Taylor's over 35 years of experience, including as CEO of Workhorse, President of Cadillac, and CEO of Hummer, and (c) Defendant Li's over 20 years of experience, including as CFO of Electric Vehicle startup Byton and Ford China. Similar information was included in investor and analyst presentations that FIII filed with the SEC on Form 8-K on February 26, 2021 and March 16, 2021.

(e) The Proxy likewise touted that "ELM's executive team has over 150 years of collective experience in the automotive industry, including with prominent global automotive OEMs, Tier-1 suppliers, and early-stage electric vehicle companies[.]"

73. These statements emphasizing the credentials of ELM management and the key roles they would play in the post-Merger business were materially false and misleading because they omitted critical information – *i.e.*, the material facts concerning the 2020 Equity Transactions and the involvement of ELM's senior executives in those transactions – that would have been necessary to make the numerous positive statements about ELM management not materially false and misleading.

**D. Applicable GAAP and SEC Rules**

74. ELM's financial statements for 2020 did not comply with GAAP.

75. GAAP comprises the standards that the accounting profession recognizes as the conventions, rules and procedures that define generally accepted accounting practices.

76. The SEC has statutory authority to promulgate GAAP for public companies. The SEC has generally delegated that authority to the Financial Accounting Standards Board

("FASB"). The standards promulgated by FASB are set forth in the FASB Accounting Standards Codification ("ASC").

**(i) ASC 718**

77. ASC 718 governs the accounting for share-based transactions involving employees and non-employees. (718-10-05-2). ASC 718 requires a company to determine the fair value of stock at the time of issuance or sale. (718-10-10-1; 718-10-10-2; 718-10-30-6). A company's fair market value determination should be based upon "information that is (or would be) available" and should not "represent the biases of a particular party." (ASC 718-10-55-13). Under ASC 718, a company is required to recognize as a compensation expense the difference between: (a) the fair market value of the stock issued or sold to the persons or entities providing services, and (b) the price paid by the recipient of the stock.

78. In addition, ASC 718 requires the financial statements in the Proxy to disclose information that enables users of the financial statements to understand all of the following:

(a) the nature and terms of such arrangements that existed during the period and the potential effects of those arrangements on shareholders;

(b) the effect of compensation cost arising from share-based payment arrangements on the income statement;

(c) the method of estimating the fair value of the equity instruments granted (or offered to grant), during the period; and

(d) the cash flow effects resulting from share-based payment arrangements.

79. Under ASC 718, ELM was required to determine the fair value of the shares sold in the 2020 Equity Transactions and to record as a compensation expense any difference between the fair value of the shares sold in those transactions and the price paid by the recipients of those

shares. In violation of GAAP, ELM did not assess the fair market value of the shares sold in those transactions and did not record or recognize any compensation expense associated with those transactions. As a result, ELM overstated its 2020 financial performance by grossly understating the Company's expenses and losses.

**(ii) ASC 850**

80. Under ASC 850, financial statements are required to include detailed disclosures regarding related-party transactions. ASC 850 provides that these disclosures are to include, among other things, "the nature of the relationship(s) involved[,] [a] description of the transaction[,] . . . such other information deemed necessary to an understanding of the effects of the transactions on the financial statements[,]" and "[t]he dollar amounts of transactions." (ASC 850-10-50-1).

81. Concerning the 2020 Equity Transactions, the Proxy (in the notes to ELM's financial statements) stated only: "On November 19, 2020, ELM issued an additional 84,477 shares of common stock, in the aggregate, to two entities controlled by one of the founders of ELM (Jason Luo) and a third entity controlled by the other founder of ELM (James Taylor) for $10 per share." This description failed to disclose material information necessary to understand the true nature and effects of the transaction – *i.e.*, it failed to disclose that the transaction was far below market prices and thus prevented investors from understanding that this apparent sale of shares to insiders was in reality a massive compensation award.

82. The Proxy also represented that ELM had sold 100,000 shares for $10 per share at some point between August 20, 2020 through December 31, 2020, without disclosing that 99,000 of these shares were sold at prices well below fair value, without disclosing the true far-higher fair value of those shares, without disclosing the date of these transactions (which would have indicated

that they occurred after the September 18, 2020 letter of intent and shortly before the Merger agreement was executed and announced), and without recognizing any expense related to these transactions – again fundamentally preventing investors from understanding the true nature of this transfer as a massive expenditure of ELM. The Proxy also did not disclose the December 2020 Equity Transaction, preventing investors from understanding that other ELM executives, in addition to Defendants Luo and Taylor, were receiving significant compensation through the 2020 Equity Transactions. The failure to provide information necessary to understand the true nature, scope, and effects of these transactions violated ASC 850.

**(iii) SEC Regulation S-X**

83. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states: "financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate." Under Regulation S-X, interim financial statements and pro forma financial statements for domestic companies must comply with GAAP. 17 C.F.R. §210.10-01(a); 17 C.F.R. §211.10-02(a).

84. SEC Regulation S-X (17 C.F.R. §210.4-08(k) provides that the "amounts of related party transactions should be stated on the face of the balance sheet, statement of comprehensive income, or statement of cash flows." The 2020 Equity Transactions were not recorded on the "face of" the audited financial statements for ELM for 2020 that were included in the Proxy. By way of example, the Proxy included the following Statement of Operations and Comprehensive Loss for ELM for 2020, which did not disclose the amounts of the related party transactions involving Defendants Luo and Taylor and other members of senior management:

**ELECTRIC LAST MILE, INC.**
**STATEMENT OF OPERATIONS AND COMPREHENSIVE LOSS**
**FOR THE PERIOD FROM AUGUST 20, 2020 (INCEPTION) THROUGH DECEMBER 31, 2020**

| | | |
|---|---|---|
| OPERATING EXPENSES: | | |
| General and administrative expense | $ | 7,633,994 |
| Total operating expense | | 7,633,994 |
| OPERATING LOSS | | (7,633,994) |
| Interest expense | | (94,088) |
| Investment loss | | (355) |
| LOSS BEFORE INCOME TAXES | | (7,728,437) |
| Income tax benefit | | — |
| NET LOSS AND COMPREHENSIVE LOSS | $ | (7,728,437) |
| | | |
| LOSS PER SHARE: | | |
| Basic and diluted loss per share | $ | (191.30) |
| Basic and diluted weighted shares outstanding | | 40,400 |

85. Regulation S-X Rule 11-01(a) requires a public company acquiring the significant business operations of a target company to provide historical financial information for that company and related pro forma financial information. The Proxy's disclosure of historical and related pro forma financial information for ELM, violated Regulation S-X Rule 11-01(a) by failing to account for and disclose massive compensation expenses that had the effect of overstating ELM's financial performance in violation of GAAP. *See e.g., supra* at ¶61.

**(iv) SEC Regulation S-K**

86. **Item 404**: 17 C.F.R. §229.404 ("Item 404") requires the disclosure of related-party transactions exceeding $120,000, including the disclosure of "information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction." The Proxy violated Item 404 by failing to disclose material information concerning the 2020 Equity Transactions, concealing compensation to insiders (or entities they controlled) well in excess of $120,000.

87. **Item 303**: 17 C.F.R. §229.303 ("Item 303") requires disclosure of information relevant to assessing a registrant's "financial condition . . . and results of operations." Item 303, among other things, requires the disclosure of "significant components of revenues or expenses that . . . would be material to an understanding of the registrant's results of operations." The Proxy violated Item 303 by failing to disclose over $800 million in expenses and thereby distorting and misrepresenting ELM's reported results of operations (by understating expenses and operating losses).

88. **Item 402**: 17 C.F.R. §229.402 ("Item 402") requires detailed disclosures regarding the compensation of an entity's principal executive officers. The Proxy violated Item 402 by materially misrepresenting the compensation paid to ELM executives in 2020, failing to disclose hundreds of millions of dollars in stock-based compensation during that year.

### E. The Truth Is Revealed Precipitating ELMS's Collapse into Bankruptcy

89. The truth began to be revealed on February 1, 2022. On that date, ELMS disclosed that an investigation by a special committee of the Board had discovered that ELM's senior management had acquired ELM shares at "substantial discounts to market value" in certain equity transactions carried out at the end of 2020, and that the difference between the fair market value and the amount actually paid (*i.e.*, $10) should have been, but was not, recorded as compensation. The Company stated that it further had failed to "disclose any compensation associated with those transactions; or withhold or pay taxes in connection with that compensation." As a result, the Company disclosed that the historical financial statements of ELM and the post-Merger Company should not be relied upon and would need to be restated. The Company also stated that it expected to determine that material weaknesses existed in its internal controls over financial reporting and disclosure controls and procedures.

90. ELMS also disclosed that Defendants Luo and Taylor were leaving the Company in connection with the pre-Merger stock sales to them and the failure to properly recognize those sales as compensation expenses by ELM. ELMS further indicated that Defendants Luo and Taylor had not been forthright with the Board, stating that "in connection with the Special Committee investigation, Messrs. Luo and Taylor provided responses to the Special Committee that are believed to be inconsistent with documents reviewed by the Special Committee and its counsel."

91. These adverse disclosures shocked the market, causing the market price of ELMS common stock to decline by $2.88 per share, or 51%, to close at down at $2.71 per share on February 2, 2022, on unusually heavy trading volume.

92. In the wake of these disclosures, several analysts downgraded their ratings and price targets for ELMS. For example, on February 1, 2022, a Wedbush analyst reported: "We are downgrading shares of ELMS to a NEUTRAL rating (from OUTPERFORM) and a $4 price target following tonight's very disappointing news. . . . With investors already skeptical of many unproven EV startups, this is potentially back breaking news to the ELMS story and we clearly cannot stay on board with a positive bias." Similarly, on February 2, 2022, a Cowen Equity Research analyst reported: "We are downgrading ELMS to a Market Perform rating from an Outperform rating and are lowering our price target" on "news of the leadership transition."

93. Likewise, on February 2, 2022, Jefferies Research Service LLC, an affiliate of Jefferies LLC, which served as a placement agent for the PIPE Offering and FIII's financial advisor for the Merger, downgraded its rating from Buy to Hold and reduced its priced target to $2.50.

94. Thereafter, on February 14, 2022, ELMS disclosed that BDO had resigned and that the Company had disagreements with BDO over the Company's legal compliance and reporting obligations and BDO's independence and direct involvement in the events at issue. The Company

simultaneously filed with the SEC two letters on Form 8-K. In one letter, the Audit Committee of the Board blamed BDO for knowingly helping to structure and audit the compensation scheme and failing to properly analyze BDO's independence. In a second letter, BDO stated that an "'illegal act . . . has or may have occurred'" in connection with the scheme and that BDO was resigning because of ELMS's failure to take timely or appropriate remedial actions.

95. On March 3, 2022, ELMS filed with the SEC an amended current report on Form 8-K, which accused BDO of continuing its failure to provide an independence analysis or effectively refute the allegations levied by the Board against it. ELMS also filed a letter from BDO wherein BDO denied the allegations against it and alleged that ELMS had failed to take timely remedial actions regarding the potentially illegal activities identified by the audit firm.

96. On March 11, 2022, the Company confirmed an ongoing SEC investigation and disclosed that it was withdrawing its previous financial guidance, was suffering production and launch delays for its vehicles, and that it would need to raise additional capital in order to continue its launch plans. On this news, the market price of ELMS common stock fell further, trading below $1 per share, a decline of another 48%.

97. Several analysts downgraded their price targets for ELMS on this news. For example, on March 13, 2022, a Cowen Equity Research analyst stated: "The string of bad news continues for ELMS following the insider trading activities of the 2 founders . . . a 24% layoff announced . . . and last week's 8K that divulges an SEC investigation, pulls guidance and notes 5 to 7 months of cash remains. We see the stock selling off 40-60% or more, but in our view should find support around ~$100-150mn market cap, or to $0.75-1.15 per share." Cowen reduced it price target from $6.00 to $1.50 and stated: "[t]he delay in commercializing the Urban Delivery van to

late 2022 or early 2023 coupled with the liquidity crunch at ELMS is more severe than we anticipated."

98. Similarly, on March 14, 2022, a Davidson analyst reported: *"We are reducing our estimates and price target on ELMS (to $3 from $7) following Friday's disclosure of potential funding difficulties in mid-2022 as well as a stretched-out timeline for the launch of the Urban Delivery vehicle."* Davidson further stated: *"The expense and distraction of the SEC investigation, accounting restatements, and change in strategy are additional reasons to stay on the sidelines, in our view.*" (emphasis in original).

99. On March 15, 2022, ELMS filed with the SEC an amended current report on Form 8-K, stating that it planned to reduce headcount by 24% as part of an overall plan to focus the Company on its core business and streamline its cost structure.

100. On April 1, 2022, ELMS disclosed that it would be unable to timely file its Form 10-K annual report for 2021.

101. On May 24, 2022, ELMS disclosed that it had received a notice from NASDAQ that the Company was out of compliance with exchange listing requirements.

102. In a May 27, 2022 Form 8-K, ELMS disclosed that Defendant Taylor had failed to comply with the terms of a settlement agreement that required him to transfer to the Company shares of common stock valued at approximately $3.3 million (based on a Volume-Weighted Average Price calculation). ELMS also disclosed that "[t]he Company expect that, without obtaining additional financing, it has sufficient cash to continue operations into June 2022." In response, on June 3, 2022, Cowen Equity Research discontinued its coverage of ELMS.

103. Finally, on or about June 13, 2022, ELMS announced its delisting from NASDAQ and its plan to liquidate through a Chapter 7 bankruptcy filing. ELMS stock became virtually

worthless as a result. In announcing its bankruptcy, the Company emphasized the direct relationship between Luo's and Taylor's misconduct and the calamity that befell the Company, summarizing as follows:

> Based on the findings of the same Board-initiated investigation that led to the resignations of Mr. Taylor and Mr. Luo, ELMS was forced to withdraw financial guidance and declare the Company's past financial statements unreliable. The compound effect of these events, along with a pending SEC investigation initiated this year, made it extremely challenging to secure a new auditor and attract additional funding.

104. As a result of Defendants' wrongful acts and omissions, Plaintiffs and the Class purchased ELMS common stock in the PIPE Offering at artificially inflated prices, suffered significant losses, and were damaged thereby.

### F. The Individual Defendants Acted with Scienter

105. As alleged herein, the Individual Defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of ELM and the Company pre-Merger were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding ELM and the Company, their control over, and/or receipt or modification of the allegedly materially misleading statements, and their associations with ELM and/or the Company which made them privy to confidential proprietary information, participated in the fraudulent scheme alleged herein.

106. The Individual Defendants had actual knowledge of all the facts and circumstances concerning the 2020 Equity Transactions. As the senior managers and controllers of ELM and FIII, each of the Individual Defendants was necessarily aware of the September 18, 2020 letter of

intent between ELM and FIII and therefore knew that each of the shares issued in the 2020 Equity Transactions could be exchanged for a substantially greater number of ELMS shares once the Merger closed. The Merger Agreement – implying a pro forma equity value of the combined company of approximately $1.4 billion – was executed and announced just weeks after the November 2020 Equity Transactions and only two days after the December 2020 Equity Transactions – indicating that the agreement was in an advanced state at the time of the 2020 Equity Transactions and further demonstrating the Individual Defendants' contemporaneous knowledge that each of the shares issued in the 2020 Equity Transactions could be exchanged for a substantially greater number of ELMS shares once the Merger closed. Each of the Individual Defendants was likewise aware that those shares of ELMS were valued at $10 per share, and therefore knew and was on notice that each of the ELM shares at issue could be exchanged for over $8,000 of ELMS shares. All of the Individual Defendants were likewise aware that ELM had sold 99,000 shares for $10 per share and they were also aware that 84,477 of those shares were granted to Defendants Luo and Taylor for $10 per share. Defendants Luo, Taylor, and Li were also necessarily aware of the issuance of the remaining 14,523 ELM shares to four unidentified purchasers for $10 per share because these Defendants were the senior-most managers and controllers of ELM and used that authority to cause ELM to issue those shares. It is also reasonable to infer that Defendants Kiev and Boris were aware of the issuance of these shares, including because FIII stated in the Proxy that FIII management conducted due diligence concerning ELM and specified that this diligence was ongoing and continued after the 2020 Equity Transactions occurred.

107. The Individual Defendants also had material financial motives for their misconduct alleged herein, as these Defendants stood to profit significantly from the Merger. Defendant Luo

paid only approximately $780,000 to receive 78,016 ELM shares worth over $640 million. Defendant Taylor paid only approximately $64,000 to receive 6,461 ELM shares worth over $53 million. Defendants Luo and Taylor had every incentive to conceal these transactions because their revelation would have prevented the Merger from closing.

108. Defendants Kiev and Boris, as senior members of the SPAC Sponsor, were likewise highly motivated to consummate the Merger. If the Proxy had revealed the truth, FIII shareholders would have been less inclined or not inclined to vote for the Merger, or they may have sought to redeem their shares instead. Failure to obtain shareholder approval for the Merger would have been disastrous for the Sponsor. Indeed, Defendants Kiev and Boris would have lost their entire investment in FIII if a business combination was not consummated by August 21, 2022.

109. On the other hand, Defendants Kiev and Boris stood to profit handsomely if the Merger was consummated. The Sponsor Managing Member, which Defendants Kiev and Boris controlled, invested only $25,000 to acquire 6.25 million founder shares, which if unrestricted and freely tradable, would be valued at approximately $64 million at the time of the Merger based on the price of $10.19 per share for ELMS stock on June 25, 2021. Even if ELMS stock were to crash to $1 per share after the Merger and public shareholders lost approximately 90% of their investment, the Sponsor Managing Member could nevertheless rake in a profit of more than $6 million.

110. Both Defendants Kiev and Boris knew or were reckless in not knowing that, prior to the Merger, Defendants Luo and Taylor had acquired a significant number of ELM shares at a substantial discount to fair value, neither of them disclosed this fact, even though Defendants Kiev and Boris claimed to have conducted due diligence on ELM prior to recommending the Merger.

Defendants Kiev and Boris had every incentive to turn a blind eye to anything that might make shareholders reject the Merger or redeem their shares.

111. The swift and severe punishment of Defendants Luo and Taylor by ELMS for their role in the 2020 Equity Transactions provides strong additional evidence that their actions were based on intentional misconduct rather than innocent mistakes. Indeed, upon learning of their self-dealing and accounting fraud, the ELMS board of directors quickly ousted both Defendants Luo and Taylor from all their positions at ELMS as of February 1, 2022. In a settlement agreement between Defendant Luo and ELMS, Luo also agreed to surrender 6 million shares of ELMS common stock back to the Company, and pay an additional $10 million (in cash and stock) to ELMS. Similarly, Defendant Taylor's settlement agreement called for him to surrender 1.8 million shares of ELMS common stock, and pay an additional $3.3 million (in cash and stock) to ELMS. This punishment imposed on Defendants Luo and Taylor indicates that their misconduct was intentional.

112. ELMS would not have forced out Defendants Luo and Taylor if their misconduct had been nothing more than a careless oversight. The Proxy stated that "[e]xcept for Messrs. Luo and Taylor, none of the Company's executive officers have direct experience in the management of a publicly traded company." Defendants Luo and Taylor were critical to the success of the Company given their significant experience and background in the automotive industry. FIII's investor presentation included in its December 11, 2020 Form 8-K also touted ELM's management led by Defendants Luo and Taylor as "World-Class" and a key strength of the combined Company. Moreover, Defendant Luo's connections in China were instrumental to ELMS, which would be relying on suppliers and contractors in China to manufacture its vehicles. ELMS and its board of directors had every incentive to maintain Defendants Luo and Taylor as senior executives of

ELMS and only serious misconduct by these individuals would have resulted in their ouster from the Company.

113. The February 1, 2022 Form 8-K also indicated that Defendants Luo and Taylor lied to the special committee during the course of its investigation. The filing states that "in connection with the Special Committee investigation, Messrs. Luo and Taylor provided responses to the Special Committee that are believed to be inconsistent with documents reviewed by the Special Committee and its counsel." The only credible inference is that they lied because they knew they had engaged in intentional wrongdoing. Notably, ELMS later accused Defendant Taylor of violating this settlement agreement by refusing to surrender certain shares to the Company, further confirming his knowing or reckless intent to violate his legal obligations.

114. Moreover, BDO's finding that an illegal act has or may have been committed at the Company supports a finding of scienter.

115. Furthermore, on March 11, 2022, ELMS announced that the SEC had launched an investigation into the 2020 Equity Transactions and the associated accounting violations. It is unlikely that the SEC would have chosen to open this investigation and devote resources to it if the conduct at issue involved only innocent mistakes.

### G. BDO Is Liable

116. BDO issued a "clean" audit opinion in which it stated: "the financial statements present fairly, in all material respects, the financial position of [ELM] at December 31, 2020, and the results of its operations and its cash flows for the period from August 20, 2020 (inception) through December 31, 2020, in conformity with accounting principles generally accepted in the United States of America." As detailed, *supra* at ¶¶64-68, and 77-82, this statement was materially false and misleading, because ELM's financial statements in fact violated GAAP. Further, the

statement omitted material facts contradicting BDO's "clean" audit opinion, including the fact that the 2020 Equity Transactions involved sales at prices materially below fair market value that were not accounted for on ELM's financial statements.

117. BDO also represented that it had conducted its audit in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB"). In actuality, BDO had failed to comply with the PCAOB's independence requirements and violated several PCAOB auditing standards in its audit of ELM.

118. PCAOB Rule 3520 requires a registered public accounting firm and its associated persons to be independent of the firm's audit client throughout the audit and professional engagement period. Additionally, PCAOB Rule 3526 requires a registered public accounting firm to describe to the audit committee of the potential audit client in writing "all relationships between the registered public accounting firm or any affiliates of the firm and the potential audit client or persons in financial reporting oversight roles at the potential audit client that, as of the date of the communication, may reasonably be thought to bear on independence." This written communication must be made prior to accepting an audit assignment, and repeated annually thereafter.

119. According to ELMS, during the course of its investigation of the 2020 Equity Transactions, the special committee of the Board "identified that BDO's Tax Advisory Group ('BDO Tax') had helped to create and structure the [2020 Equity] Transactions that ultimately resulted in the resignations of [Defendants Luo and Taylor]."

120. In a letter from ELMS to BDO dated February 9, 2022, ELMS stated:

> To the extent that you claim that you were only recently made aware of the equity transactions described in the Form 8-K, we remind you that BDO Tax was involved in structuring such transactions and that, as you have confirmed to us, BDO USA was aware of those transactions well in advance of and in connection with

> completion of the audit. The transactions were contemporaneously discussed with multiple professional advisors, including representatives of BDO.

121. BDO attempted to deny ELMS's contention, responding in a letter to ELMS that "BDO does not have a group named the 'Tax Advisory Group', BDO did not help create and structure the Transactions nor does BDO have any basis of knowing what facts or circumstances resulted in the resignations of Mr. Luo or Mr. Taylor[.]"

122. BDO's denials are unconvincing, as BDO is a full-service accounting firm that delivers assurance, tax, and financial advisory services to its corporate clients. Thus, even if BDO does not have a practice precisely named "Tax Advisory Group," that does not mean that BDO does not provide tax advisory services. Indeed, its website shows that BDO has a tax practice comprised of numerous professionals.

123. Moreover, although BDO denied that it helped to "create and structure" the 2020 Equity Transactions, it did not dispute that BDO provided services and advice to Defendant Luo and his affiliates, or that BDO was aware of the 2020 Equity Transactions. BDO's failure to refute or even meaningfully respond to the charges leveled by ELMS was noted in an amended Form 8-K current report filed with the SEC by ELMS on March 3, 2022, which stated in pertinent part as follows:

> The BDO Letter does not address the concerns we have previously raised in the February 14 Current Report regarding BDO's compliance with applicable auditor independence requirements of the SEC and the Public Company Accounting Oversight Board. In particular, we note the following:
>
> - BDO continues to refuse to provide the analysis in support of its independence determination despite having provided advice to Mr. Luo and his affiliates.
> - BDO does not dispute the fact that BDO did provide advice to Mr. Luo and his affiliates, a fact that bears on its independence status (although BDO disputes the characterization of that advice and the name of the BDO group that provided the advice).

- BDO does not dispute that BDO failed to disclose this engagement in its letter to the Audit Committee of the Board of Directors of the Company, dated July 15, 2021, in which BDO purported to list relationships between the Company and BDO and its affiliates that may reasonably be thought to bear on its independence.

- BDO agrees that it had a legal obligation to include in its audit "procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure therein" and that the Company did in fact bring these transactions to BDO's attention.

124. ELMS also stated that it did not receive written communications from BDO providing analysis in support of BDO's independence determination despite BDO having provided advice to Defendants Luo and his affiliates. This violates PCAOB Rule 3526.

125. In addition to violating PCAOB rules regarding independence, BDO failed to comply with auditing standards regarding audit risk, the exercise of due professional care, and the performance of appropriate audit procedures in response to known and significant risks that were present in its audit of ELM's historical financial statements. Instead, as discussed below, BDO ignored those risks and red flags.

126. According to PCAOB auditing standards ("AS"), in order to form a proper basis for an audit opinion, an auditor must plan and perform an audit to obtain reasonable assurances regarding whether financial statements are free of material misstatements. AS 1101.03. An auditor can obtain reasonable assurances "by reducing audit risk to an appropriately low level through applying due professional care, including obtaining sufficient appropriate audit evidence." AS 1101.04. An auditor exercises due professional care by employing professional skepticism in the performance of its audit. AS 1015.07-09.

127. An auditor is also required to identify and appropriately assess the risks of material misstatement, including fraud risk, to be able to develop appropriate responses to these risks. AS 2110.04; AS 2110.65. This includes assessing the risks of material misstatement associated with

related parties and relationships and transactions with related parties, including whether the company has properly identified, accounted for, and disclosed its related parties and relationships and transactions with related parties. AS 2410.10.

128. PCAOB auditing standards specifically require the auditor to assess the risk of material misstatement associated with transactions with executive officers of the company as follows:

> To assist in obtaining information for identifying and assessing risks of material misstatement of the financial statements associated with a company's financial relationships and transactions with its *executive officers* (*e.g.*, executive compensation, including perquisites, and any other arrangements), the auditor should perform procedures to obtain an understanding of the company's financial relationships and transactions with its executive officers. The procedures should be designed to identify risks of material misstatement and should include, but not be limited to (1) reading the employment and compensation contracts between the company and its executive officers and (2) reading the proxy statements and other relevant company filings with the Securities and Exchange Commission and other regulatory agencies that relate to the company's financial relationships and transactions with its executive officers.

AS 2110.10A (emphasis in original).

129. BDO itself publishes a guide titled "BDO Knows: Going Public" that lists share-based compensation as one of nine high-risk areas as follows:

> SHARE-BASED COMPENSATION
>
> Registrants are required to measure and report all share-based compensation at fair market value. The calculations necessary to measure this compensation include assumptions about the company's share price volatility, interest rates, future dividends, and option life. As a result, many registrants are using appraisal advisors to calculate the value of the stock compensation grants.

130. The BDO guide also highlights issuance of cheap stock as one of the issues to look out for with regard to companies going public as follows:

> Cheap stock – common stock sold before a public offering at a price which is less than the public offering price. Often, the stock is sold to company insiders.

131. BDO signed its audit opinion concerning ELM's financial statements on May 6, 2021. Thus, BDO knew when it conducted its audit of ELM that ELM planned to go public through a de-SPAC transaction with FIII, and BDO should have identified share-based compensation and potential issuance of the company stock to company insiders as a significant risk requiring an appropriate audit response.

132. BDO was also aware of the 2020 Equity Transactions. Thus, in accordance with PCAOB auditing standards, BDO should have understood that ELM's 2020 financial statements presented a significant audit risk due to large share-based awards to ELM's executives. PCAOB standards required BDO to develop appropriate audit procedures, including tests of details, to respond to this risk. Such procedures would have entailed examining ELM's stock ledgers and ensuring that it accounted for share-based transactions in accordance with GAAP by measuring and reporting all share-based compensation at fair market value.[6]

133. Had BDO performed such procedures, it would have discovered that ELM's 2020 financial statements materially understated compensation expense as a result of ELM's failure to

6 "[T]he auditor must design and implement audit responses that address the risk of material misstatement that are identified . . . ." AS 2301.03. "The auditor should design and perform audit procedures in a manner that addresses the assessed risks of material misstatement for each relevant assertion of each significant account and disclosure. . . . In designing the audit procedures to be performed, the auditor should . . . [t]ake into account the types of potential misstatements that could result from the identified risks and the likelihood and magnitude of potential misstatement." AS 2301.08-09. For significant risks (*i.e.*, risks requiring special audit consideration, including fraud risks) the auditor should perform substantive procedures, including tests of details, that are specifically responsive to the assessed risks. AS 2110.70-71; AS 2301.11, .13, .36. The auditor must design and perform audit procedures in a manner that addresses the risks of material misstatement associated with related parties and relationships and transactions with related parties. AS 2410.11. Also, "the auditor must evaluate whether related party transactions have been properly accounted for and disclosed in the financial statements. This includes evaluating whether the financial statements contain the information regarding relationships and transactions with related parties essential for a fair presentation in conformity with the applicable financial reporting framework." AS 2410.17.

properly account for the issuance of stock in the 2020 Equity Transactions. Indeed, it would be impossible for BDO to audit ELM's accounting for share-based awards without inquiring about and requesting ELM to provide BDO with valuations of ELM's stock performed in connection with the 2020 Equity Transactions. Such inquiries would have made BDO aware that ELM had not performed valuations of ELM stock in connection with the 2020 Equity Transactions – let alone obtained an independent fair market valuation as required – necessitating an appropriate audit response to the risk that ELM's share-based awards were recorded improperly.

134. As ELM's auditor, BDO was also likely aware of an inquiry from the SEC regarding the accounting treatment for certain shares being issued (for services) in connection with the Merger. On May 20, 2021, the SEC's Division of Corporation Finance sent a comment letter to defendant Boris regarding the preliminary proxy's disclosure that 5,000,000 shares of common stock would be issued, at closing, to SF Motors Inc. (d/b/a SERES) ("SERES")[7] as compensation for services provided to ELM prior to the Merger. Specifically, the Division of Corporation Finance asked FIII to explain why this share-based payment was not "accounted for as compensation expense for services rendered by SERES."

135. The SEC letter should have caused BDO to assess, consistent with PCAOB standards, whether it had obtained sufficient audit evidence regarding ELM's share-based transaction activities and whether it had planned and performed its audit to obtain reasonable assurances regarding whether ELM's financial statements were free of material misstatements.

136. Thus, contrary to the representation contained in its audit opinion, BDO failed to perform an audit of ELM's historical financial statements provided in the Proxy in accordance

[7] Prior to the close of the Merger, ELM and SERES entered into a purchase agreement whereby ELM agreed to purchase SERES's manufacturing facility in Indiana.

with PCAOB standards and, therefore, did not have any reasonable basis to express an unqualified (*i.e.*, clean) opinion on those financial statements. PCAOB standards required BDO to either issue a disclaimer of opinion or an adverse opinion regarding ELM's 2020 financial statements. *See* AS 3105.14; AS 3105.18; AS 3105.44.

**NO SAFE HARBOR**

137. The statutory safe harbor for forward-looking statements does not apply to the allegedly false statements and omissions pled in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by a person with ultimate authority for the statement who knew that it was false and misleading when made.

**LOSS CAUSATION AND ECONOMIC LOSS**

138. In connection with the PIPE Offering, as detailed herein, Defendants made material misrepresentations and omissions and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the perceived value of the ELMS stock sold in the PIPE Offering and operated as a fraud or deceit on purchasers of the ELMS common stock sold in the PIPE Offering. As detailed above, when the truth about Defendants' misconduct was revealed, the price

of ELMS common stock declined precipitously as the prior artificial inflation was removed from the price. The decline in the price of ELMS common stock was the direct result of the nature and extent of fraud finally being revealed to investors and the market. The timing and magnitude of the share price declines negate any inference that the losses suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the ELMS common stock sold to Class members in the PIPE Offering, and the subsequent significant decline in the value of ELMS common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

139. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiffs and other Class members. In the Company's SEC filings, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of the ELMS common stock sold to Class members in the PIPE Offering to be artificially inflated. Plaintiffs and other Class members purchased ELMS common stock in the PIPE Offering at those artificially inflated prices, causing them to suffer damages as complained of herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

140. The Offering Memorandum expressly acknowledged that PIPE Offering investors "will rely on the acknowledgments, understandings, agreements, representations and warranties of the Company contained in this [Offering Memorandum]."

141. In addition, Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), to the extent that the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

142. Plaintiffs and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because there was an efficient market for ELMS common stock by virtue of the following factors, among others:

(a) ELMS common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market, until the stock was subsequently delisted as a result of the events detailed herein;

(b) Defendants regularly communicated with public investors about ELM, FIII, and the post-Merger Company via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c) FIII (later known as ELMS) was followed by a number of securities analysts employed by major brokerage firms who wrote reports about the anticipated Merger with ELM, which reports were publicly available and entered the public marketplace.

143. As a result of the foregoing, the market for the ELMS stock promptly incorporated current information regarding the Company and the anticipated Merger with ELM from publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all those who purchased ELMS common stock in the PIPE Offering suffered

similar injury through their transactions in ELMS stock at artificially inflated prices and a presumption of reliance applies.

144. Accordingly, Plaintiffs and other Class members relied, and are entitled to have relied, upon the integrity of the market price for the ELMS stock sold in the PIPE Offering, and are entitled to a presumption of reliance with respect to Defendants' materially false and misleading statements and omissions in connection with the PIPE Offering.

**CLASS ACTION ALLEGATIONS**

145. Plaintiffs bring this action on behalf of all purchasers of ELMS common stock directly in the PIPE Offering who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants have or had a controlling interest.

146. The members of the Class are so numerous that joinder of all members is impracticable. There were 13 million shares of ELMS common stock sold in the PIPE Offering. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are numerous members in the proposed Class. Purchasers in the PIPE Offering, and thus members of the Class, may be identified from records maintained by ELMS or its placement agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares were purchased by many individuals and institutions located geographically throughout the country and the world. Joinder would be highly impracticable.

147. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the

federal laws complained of herein. Indeed, the Offering Memorandum, which was signed by each purchaser in the PIPE Offering, expressly characterized Plaintiffs and the other members of the Class collectively as the "Subscribers" and the shares of ELMS common stock they were purchasing in the PIPE Offering as the "Collective Subscribed Shares," stating in pertinent part as follows:

> WHEREAS, concurrently with the execution of this Subscription Agreement, the Company is entering into subscription agreements (the "Other Subscription Agreements" and together with this Subscription Agreement, the "Subscription Agreements") with certain other investors (the "Other Subscribers" and together with Subscriber, the "Subscribers") substantially similar to this Subscription Agreement, pursuant to which such investors have agreed to purchase on the closing date of the Transaction (the "Closing Date"), inclusive of the Subscribed Shares, an aggregate amount of up to 13,000,000 shares of Common Stock, at the Per Share Price (the shares of the Other Subscribers, the "Other Subscribed Shares" and together with the Subscribed Shares, the "Collective Subscribed Shares").

148. The Offering Memorandum also expressly directed all purchasers in the PIPE Offering to rely upon the integrity and accuracy of the Company's pre-Merger filings with the SEC, stating in pertinent part at Part 3(f) that:

> As of their respective dates, all reports required to be filed by the Company with the Commission (the "SEC Reports") complied in all material respects with the requirements of the Securities Act and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations of the Commission promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing and fairly present in all material respects the financial position of the Company as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, year-end audit adjustments. A copy of each SEC Report is available to each Subscriber via the Commission's EDGAR system. The Company has timely filed each report, statement, schedule, prospectus, and registration statement that the Company was required to file with the Commission since its initial registration of the Common Stock with the Commission. To the knowledge of the Company, there are no

> material outstanding or unresolved comments in comment letters from the staff of the Division of Corporation Finance of the Commission with respect to any of the SEC Reports as of the date hereof.

149. The Offering Memorandum also expressly affirmed that Plaintiffs and other Class members would rely on its representations, specifying that "[t]he Company acknowledges that Subscriber . . . will rely on the acknowledgments, understandings, agreements, representations and warranties of the Company contained in this [Offering Memorandum.]"

150. Moreover, the Offering Memorandum expressly limited the representations that purchasers in the PIPE Offering could rely upon in making their investment decisions to just the SEC Reports, stating in pertinent part at Part 9 as follows:

> Non-Reliance and Exculpation. Subscriber acknowledges that it is not relying upon, and has not relied upon, any statement, representation or warranty made by any person, firm or corporation (including, without limitation, the Placement Agent, any of its affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing), other than the statements, representations and warranties of the Company expressly contained in Section 3 of this Subscription Agreement, in making its investment or decision to invest in the Company.

151. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

152. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c) whether the prices of ELMS common stock sold to purchasers in the PIPE Offering were artificially inflated because of Defendants' conduct complained of herein; and

(d) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

153. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

154. Plaintiffs incorporate and reallege each allegation set forth above as if it were set forth herein.

155. In connection with the PIPE Offering, all Defendants made, disseminated, issued, and/or approved the false or misleading statements set forth herein, as and to the extent alleged herein, which they knew or recklessly disregarded were misleading in that they contained material misrepresentations and misstatements of material fact and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

156. All Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, as and to the extent alleged herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

157. All Defendants named in this Count violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the ELMS common stock sold in the PIPE Offering.

158. Plaintiffs and the Class have suffered damages in that, in reliance on the material misrepresentations and omissions set forth herein and/or on the integrity of the market for ELMS common stock, they paid artificially inflated prices for the ELMS common stock sold in the PIPE Offering. Plaintiffs and the Class would not have purchased ELMS common stock at the prices they paid in the PIPE Offering, or at all, if they had been aware that the price had been artificially and falsely inflated by Defendants' misleading statements.

159. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of ELMS common stock in the PIPE Offering.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against the Individual Defendants

160. Plaintiffs incorporate and reallege each allegation set forth above as if it were set forth herein.

161. In connection with the PIPE Offering, the Individual Defendants acted as controlling persons of ELM and/or ELMS within the meaning of §20(a) of the 1934 Act. By virtue of their stock holdings, their positions, and their power to control public statements about ELM and ELMS, the Individual Defendants had the power and ability to control the actions of ELM and/or ELMS and their employees. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding damages in favor of Plaintiffs and other members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and members of the Class their costs of suit, including reasonable attorneys' fees and expenses and expert fees; and

D. Directing such further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: November 14, 2023

**FRIEDLANDER & GORRIS, P.A**

*/s/ Jeffrey M. Gorris*

Jeffrey M. Gorris (Bar No. 5012)
David Hahn (Bar No. 6417)
1201 North Market Street, Suite 2200
Wilmington, DE 19801
Telephone: (302) 573-3500
jgorris@friedlandergorris.com
dhahn@friedlandergorris.com

*Liaison Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**

Chad Johnson (*pro hac vice*)
Noam Mandel (*pro hac vice*)
Desiree Cummings (*pro hac vice*)
Jonathan Zweig (*pro hac vice*)
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: (212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
dcumming@rgrdlaw.com
jzweig@rgrdlaw.com

*Lead Counsel for the Class*