# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHMUEL LEVY, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. 1:23-cv-00653-GBW |
| v. | ) ) | <u>CLASS ACTION</u> |
| JASON LUO, JAMES TAYLOR, ALBERT LI, MARSHALL KIEV, DAVID BORIS, and BDO USA, LLP, | ) ) ) ) | |
| Defendants. | ) ) ) | |

### DEFENDANTS DAVID BORIS AND MARSHALL KIEV'S OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS <u>THE AMENDED CLASS ACTION COMPLAINT</u>

SCHINDLER COHEN & HOCHMAN LLP
Jonathan L. Hochman
Karen M. Steel
Jenny C. Gu
100 Wall Street, 15th Floor
New York, NY 10005
(212) 277-6300
jhochman@schlaw.com
ksteel@schlaw.com
jgu@schlaw.com

YOUNG CONAWAY STARGATT
 & TAYLOR, LLP
Tammy L. Mercer (No. 4957)
Lakshmi A. Muthu (No. 5786)
M. Paige Valeski (No. 6336)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
tmercer@ycst.com
lmuthu@ycst.com
pvaleski@ycst.com

*Attorneys for Defendants David Boris and Marshall Kiev*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS .................................................................... 1

SUMMARY OF ARGUMENT .................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................................... 3

    I.    Boris and Kiev Were Officers Of FIII, A SPAC
        That Sought To Merge With ELM ...................................................................................... 3

    II.   Plaintiffs—PIPE Investors In FIII—Acknowledge The Risks
        Of Their Investment ............................................................................................................ 4

    III.  The Proxy Includes ELM's Financial Statements That Were
        Provided By *ELM* And That Expressly Disclosed The Lion's
        Share Of The Equity Transactions ...................................................................................... 4

    IV.  BDO Issues A Clean Audit Opinion Of ELM's Financial Statements ............................... 5

    V.   The Proxy Warns Investors Of Numerous Significant Risks ............................................. 5

    VI.  FIII's Management Team Buys Additional Shares Before The Merger Closes .................. 6

    VII. In February 2022, ELMS Announces Luo's And Taylor's
        Resignations And That It Was Evaluating ELM's Pre-Merger Accounting ...................... 6

    VIII.Plaintiffs Assert Violations Of The Act Against Boris And Kiev
        Without Any Allegation Of Their Knowledge Of Or Involvement
        In ELM's Accounting Errors .............................................................................................. 7

ARGUMENT ................................................................................................................................ 7

    I.    Legal Standard .................................................................................................................... 7

    II.   The Court Should Dismiss The Section 10(b) Claims Against Boris And Kiev ................ 7

       A.    Plaintiffs Lack Standing To Bring Claims Under Section 10(b) .................................. 8

       B.    Plaintiffs Fail To Allege Scienter ............................................................................... 10

           1.    Plaintiffs' Group Pleading Does Not Establish Scienter ........................................ 11

           2.    Allegations Of Inadequate Due Diligence Are Insufficient To
               Establish Reckless Or Conscious Behavior ............................................................. 12

3.    Plaintiffs' Generic Allegations Of Motive And Opportunity Fail To Plead Scienter ............................................................................. 14

4.    Important Factors Weigh Against An Inference Of Scienter ................................... 16

C.    Plaintiffs Do Not Allege That Boris Or Kiev Were  The "Makers" Of The Alleged Misstatements ..................................................................... 18

III.  Plaintiffs' Section 20(a) Claim Against Boris And Kiev Should Be Dismissed .............. 19

A.    Plaintiffs Fail To Allege Control By Kiev Or Boris Over Any Entity That Could Have Committed a Primary Violation ......................................................... 19

B.    Plaintiffs Fail To Allege Culpable Participation ............................................................. 20

CONCLUSION ................................................................................................................... 20

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advance Auto Parts, Inc., Sec. Litig.*,
 No. CV 18-212-RGA, 2020 WL 599543 (D. Del. Feb. 7, 2020) .............................................20

*In re Aetna Inc. Secs. Litig.*,
 34 F. Supp. 2d 935 (E.D. Pa. 1999) ...................................................................................16

*In re Alpharma Inc. Sec. Litig.*,
 372 F.3d 137 (3d Cir. 2004)..........................................................................................11–12

*In re Altisource Portfolio Sols., S.A. Sec. Litig.*,
 2015 WL 12001262 (S.D. Fla. Sept. 4, 2015) .........................................................................9

*Bartesch v. Cook*,
 941 F. Supp. 2d 501 (D. Del. 2013).....................................................................2, 11, 12, 13

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007).............................................................................................................7

*Belmont v. MB Inv. Partners, Inc.*,
 708 F.3d 470 (3d Cir. 2013).................................................................................................20

*Blue Chip Stamps v. Manor Drug Stores*,
 421 U.S. 723 (1975)........................................................................................................2, 8

*In re CarLotz, Inc. Securities Litigation*,
 2023 WL 2744064, --- F. Supp. 3d ---- (S.D.N.Y. Mar. 31, 2023) ...................................9, 10

*City of Edinburgh Council v. Pfizer, Inc.*,
 754 F.3d 159 (3d Cir. 2014)...........................................................................................2, 7–8

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc*,
 686 F. Supp. 2d 404, 420 (D. Del. 2009).........................................................................10, 13

*In re Cognizant Tech. Sols. Corp. Secs. Litig.*,
 No. 16-CV-6509, 2020 WL 3026564 (D.N.J. June 5, 2020)................................................19

*In re Danimer Sci., Inc. Secs. Litig.*,
 No. 21-CV-02708, 2023 WL 6385642 (E.D.N.Y. Sept. 30, 2023) ........................................15

*In re Digital Island Sec. Litig.*,
 223 F. Supp. 2d 546 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004) ..........................19, 20

*In re DraftKings Inc. Sec. Litig.*,
   650 F. Supp. 3d 120 (S.D.N.Y. 2023)..................................................................13

*Duane & Virginia Lanier Tr. v. SandRidge Mississippian Tr. I*,
   361 F. Supp. 3d 1162 (W.D. Okla. 2019) .............................................................9

*Fan v. StoneMor Partners LP*,
   927 F.3d 710 (3d Cir. 2019)...............................................................................17

*GSC Partners CDO Fund v. Washington*,
   368 F.3d 228 (3d Cir. 2004)..................................................................2, 14, 15

*In re Hertz Global Holdings Inc.*,
   905 F.3d 106 (3d Cir. 2018).........................................................................12–13

*In re Iconix Brand Grp. Inc.*,
   2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017).......................................................16

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)....................................................................7, 10, 14

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011).......................................................................................8, 18

*Levy v. Gutierrez*,
   No. 14-CV-0443, 2017 WL 2191592 (D.N.H. May 4, 2017)..................................19

*McIntire v. China MediaExpress Holdings, Inc*,
   927 F. Supp. 2d 105, 127 (S.D.N.Y. 2013)..........................................................15

*Mehedi v. View, Inc.*,
   No. 21-CV-06374, 2023 WL 3592098 (N.D. Cal. May 22, 2023)..........................13

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
   54 F.4th 82 (2d Cir. 2022) ..............................................................................8, 9

*Murdeshwar v. Search Media Holdings Ltd.*,
   No. 11-CIV-20549, 2011 WL 7704347 (S.D. Fla. Aug. 8, 2011) ..............13, 14, 17

*Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*,
   369 F.3d 27 (2d Cir. 2004)...............................................................................8, 9

*Ortiz v. Canopy Growth Corp.*,
   537 F. Supp. 3d 621 (D.N.J. 2021) ...................................................................2, 16

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) .............................................................................17

*Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*,
  No. 21-CV-04349, 2023 WL 5748359 (N.D. Ill. Sept. 6, 2023) .............................................15

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018)...............................................................................16

*Starr Investments Cayman II v. China MediaExpress Holdings*,
  Civ. No. 11-233-RGA, 2014 WL 4180331 (D. Del. Aug. 21, 2014) ....................13, 15, 19, 20

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
  552 U.S. 148 (2008).................................................................................................................8

*In re Suprema Specialties Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006).....................................................................................................13

**Statutes**

Fed. R. Civ. P. 9(b) ...................................................................................................................1, 7

Fed. R. Civ. P. 12(b)(1), 12(b)(6) .............................................................................................1, 7

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 *et seq.* ...................1, 2, 7, 10

Section 10(b) of the Securities Exchange Act of 1934 ........................................................ *passim*

Section 20(a) of the Securities Exchange Act of 1934 ........................................................ *passim*

## NATURE AND STAGE OF THE PROCEEDINGS

Defendants David Boris ("Boris") and Marshall Kiev ("Kiev") submit this opening brief in support of their motion to dismiss the Amended Class Action Complaint (D.I. 23, the "FAC") pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), 12(b)(6), and the Private Securities Litigation Reform Act ("PSLRA").

## SUMMARY OF ARGUMENT

The fundamental flaw requiring dismissal of both claims against Boris and Kiev is that Plaintiffs utterly fail to allege any facts suggesting that Boris and Kiev knew about—or even should have known about—some allegedly faulty accounting in the *audited* financial statements of Electric Last Mile, Inc. ("ELM")—a target company that they neither owned nor ran. This is a putative securities fraud class action arising out of a merger (the "Merger") between Forum Merger III Corporation ("FIII"), and its acquisition target, ELM, which resulted in the post-merger entity Electric Last Mile Solutions, Inc. ("ELMS"). Boris and Kiev are the former managers of FIII, a special purpose acquisition company ("SPAC") formed for the purpose of locating and merging with an operating company like ELM. In this Action, Plaintiffs—investors in FIII through a PIPE offering that closed just prior to the Merger—have sued Boris and Kiev, along with others, alleging that a technical accounting error in pre-Merger ELM's financial statements constituted a misrepresentation. That purported error relates to ELM insiders' purchases of ELM shares in November and December 2020 (the "Equity Transactions") and whether ELM's accounting for these transactions comported with generally accepting accounting principles ("GAAP"). In alleging claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, Plaintiffs speculate that Boris and Kiev knew about, and turned a blind eye to, the supposedly improper accounting for the Equity Transactions, even though the ELM financial statements received a clean audit opinion from prominent accounting firm BDO Seidman ("BDO"). With no facts supporting

scienter, Plaintiffs offer only conjecture in derogation of the far more plausible inference: that, like ELM's auditors, Boris and Kiev believed ELM's financial statements comported with GAAP.

Plaintiffs have altogether failed to allege a "strong inference" (or any inference) that Boris or Kiev acted with scienter, as required by the PSLRA. They plead no facts indicating that Boris or Kiev learned about the alleged GAAP error prior to the Merger. Instead, Plaintiffs largely rely on improper group pleading, even though "[t]he Third Circuit has explicitly rejected [] 'group pleading' as incompatible with the PSLRA's requirement that plaintiffs 'specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions.'" *Bartesch v. Cook*, 941 F. Supp. 2d 501, 510 (D. Del. 2013). To the extent the FAC alleges anything specific to Boris and Kiev at all, it is merely that they should have discovered the accounting errors in due diligence or were motivated by a desire for the Merger to close quickly. FAC ¶¶ 106, 108. However, such generic allegations are plainly inadequate. *See GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). Further, important aspects of the Merger negate the inference of scienter. Not only does BDO's clean audit opinion "itself, weigh[] heavily against scienter," *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 678 (D.N.J. 2021), but FIII's management team invested $5 million in the Merger, *see* Ex.[1] 1 at 1—which, presumably, they would not have done had they believed ELM's accounting to be fraudulent.

Plaintiffs' claims against Boris and Kiev also fail because: (1) as a preliminary matter, under the purchaser-seller rule promulgated under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 742 (1975), Plaintiffs—as investors in **_FIII_**—lack standing to assert a claim under Section 10(b) for alleged misrepresentations about pre-merger **_ELM_**, whose securities Plaintiffs

---

[1]    Citations to "Ex." are to the exhibits to the Declaration of Jenny C. Gu filed herewith. On a motion to dismiss, the Court "may consider documents incorporated into the complaint, and take judicial notice of SEC filings." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 163 (3d Cir. 2014) (internal citations omitted).

2

did not purchase; (2) Boris and Kiev were not the makers of the statements in ELM's financial statements; and (3) Plaintiffs have not adequately pleaded control person liability under Section 20(a), *inter alia*, for the same reason they have failed to plead scienter: Plaintiffs fail to allege that Boris or Kiev knew about the purported primary violation of the securities laws.

Accordingly, all claims against Boris and Kiev should be dismissed.

**FACTUAL BACKGROUND**

**I.      Boris And Kiev Were Officers Of FIII, A SPAC That Sought To Merge With ELM**

Boris and Kiev were co-Chief Executive Officers of FIII, a SPAC formed in June 2019. SPACs are "blank check companies" that are created and taken public for the purpose of locating and merging with a private operating company.  FAC ¶ 30.  Once the merger is complete, investors in the SPAC's IPO become investors in the merged public company.  *See id.* ¶¶ 31, 45.  FIII completed its IPO on August 21, 2020, raising approximately $250 million.  Ex. 2 at 1; FAC ¶ 30. Thereafter, FIII had two full years—until August 21, 2022—to complete a business combination. If it did not complete the business combination by that time, FIII would be required to dissolve and return remaining funds to public stockholders.  Ex. 3 at 20–21.

In September 2020, FIII identified ELM as a potential merger target and executed a letter of intent.  Thereafter, FIII conducted due diligence with the aid of Jefferies LLC, an experienced investment bank, and White & Case LLP.  Ex. 3 at 130.  On December 10, 2020, FIII, ELMS Merger Corp. (a wholly owned subsidiary of FIII) ("Merger Sub"), and ELM, along with relevant related parties, entered an Agreement and Plan of Merger ("Merger Agreement").  FAC ¶ 34; Ex. 4 at A-1-1.  Under the Merger Agreement, ELM would merge with and into Merger Sub, surviving the Merger as FIII's wholly owned subsidiary, and FIII would be renamed ELMS.  Ex. 4 at A-1-1; *see* FAC ¶ 31.  ELM was represented in the Merger by Foley & Lardner LLP.  Ex. 3 at 130. There were several contingencies set forth in the Merger Agreement, including that ELM would

provide to FIII year-end 2020 audited financial statements prepared in accordance with GAAP, for inclusion in a forthcoming proxy statement.  Ex. 4 § 5.23.  ELM also committed to "ensure that none of the information supplied by or on its behalf for inclusion or incorporation by reference in the Proxy [] will . . . contain any untrue statement of a material fact or omit to state any material fact."  *Id*. § 5.5(d); FAC ¶ 34.

**II.      Plaintiffs—PIPE[2] Investors In FIII—Acknowledge The Risks Of Their Investment**

Also on December 10, 2020, FIII entered into subscription agreements (collectively, the "Subscription Agreements") with certain third-party investors ("PIPE Investors"), pursuant to which FIII agreed to issue and sell to the PIPE Investors an aggregate of 13 million shares of FIII at $10.00 per share (the "PIPE Investment").  FAC ¶¶ 35, 44; Ex. 4 at A-1-1.  In entering the Subscription Agreements, the PIPE investors—*i.e.*, each member of the putative Plaintiff Class—represented that they had "adequately analyzed and fully considered the risks of an investment" and that they "acknowledge[d] specifically that the possibility of a total loss exists."  Ex. 5 § 4(j).  Furthermore, while FIII represented and warranted in the Subscription Agreements that "[t]he financial statements of the Company [*i.e.*, **FIII**] included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission," *id.* § 3(f), *it made no such representation in connection with ELM's financial statements*.  The Subscription Agreements further make clear that its terms are not enforceable as against the directors, officers, or employees of FIII, like Boris and Kiev.  *Id*. § 8(r).

**III.     The Proxy Includes ELM's Financial Statements That Were Provided By *ELM* And That Expressly Disclosed The Lion's Share Of The Equity Transactions**

On June 9, 2021, FIII filed its definitive proxy statement (the "Proxy") for the proposed

---

[2]      "PIPE" stands for "private investment in public equity."  In a PIPE offering, investors commit to purchase a certain number of restricted shares from a company at a specified price. FAC ¶¶ 1–2.

merger.  FAC ¶ 43.  The Proxy contained ELM's financial information, including, as relevant here, ELM's audited financial statements for the period ended December 31, 2020.  *Id*. ¶ 7.  The Proxy is clear that such financial information "***had been provided by ELM and its management team***." Ex. 3 at 10.  Neither Kiev nor Boris were involved in ELM's preparation of its financial statements, and the FAC does not allege otherwise.

Furthermore, in contrast to the original Complaint in this action, Plaintiffs now admit that ELM's 2020 financial statements in fact disclosed the overwhelming majority (84,477 out of 85,477 shares (*i.e.*, 98.8%)) of the Equity Transactions that the Plaintiffs allege to be problematic. The "Related Party Transactions" note to ELM's audited financial statements expressly states that, in November 2020, "ELM issued an additional 84,477 shares of common stock, in the aggregate, to two entities controlled by one of the founders of ELM (Jason Luo) and a third entity controlled by the other founder of ELM (James Taylor) for $10 per share."  FAC ¶ 58.

## IV.    BDO Issues A Clean Audit Opinion Of ELM's Financial Statements

As the FAC further concedes, BDO issued a clean audit opinion of the ELM financial statements included in the Proxy, concluding that these financial statements "present fairly, in all material respects, the financial position of the Company as of December 31, 2020, and the results of its operations and its cash flows for the period from August 20, 2020 (inception) through December 31, 2020, in conformity" with GAAP.  FAC ¶ 64.

## V.    The Proxy Warns Investors Of Numerous Significant Risks

The Proxy also contained *37 pages* of detailed risk disclosures, including, strikingly, the disclosure of material weaknesses with ELM's internal controls over its financial reporting:

> During the course of preparing the financial statements of ELM and in connection with the audit of its financial statements . . . ELM's management and [BDO] have concluded ***that there are material weaknesses within its internal control over financial reporting as it relates to accounting for complex transactions***. A material

weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that *there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis*.

Ex. 3 at 67 (emphasis added). Seeking the gains that they would accrue if ELMS prospered, Plaintiffs nonetheless chose to invest despite these disclosures.

## VI.    FIII's Management Team Buys Additional Shares Before The Merger Closes

On June 21, 2021, FIII's management team purchased approximately $4.9 million worth of FIII shares in the open market at the then-prevailing market price. Ex. 1 at 1. The press release issued that day explained: "'[t]his additional investment in Forum ahead of our business combination with [ELM] is a testament to our confidence in ELMS' future as a leader in the commercial electric vehicle industry.'" *Id*.

On June 24, 2021, the Merger was approved by the FIII stockholders and the PIPE Offering closed. FAC ¶ 44. The Merger closed the following day. *Id*. ¶ 45.

## VII.   In February 2022, ELMS Announces Luo's And Taylor's Resignations And That It Was Evaluating ELM's Pre-Merger Accounting

On February 1, 2022, ELMS filed a Form 8-K (the "February 2022 8-K") announcing that, in connection with an independent investigation launched by a special committee of ELMS' Board of Directors, Defendants Luo and Taylor (ELMS's two most senior leaders) had resigned. Ex. 6 at 2. It also disclosed that the company had concluded that certain ELM executives had "directly or indirectly purchased equity in [ELM]" at discounted values shortly before the December 10, 2020 Merger Agreement; and certain prior financial statements, including its 2020 audited financial statements, should no longer be relied upon. *Id*. at 3. The February 2022 8-K does not state that FIII—or Boris or Kiev—were involved in, or knew of, these purported accounting issues. Months later, on June 12, 2022, ELMS filed for Chapter 7 bankruptcy. FAC ¶ 14.

**VIII.    Plaintiffs Assert Violations Of The Act Against Boris And Kiev Without Any Allegation Of Their Knowledge Of Or Involvement In ELM's Accounting Errors**

On June 14, 2023, named Plaintiff Shmuel Levy commenced this action on behalf of himself and similarly situated PIPE Investors, alleging only Section 20(a) claims against Boris and Kiev.  D.I. 1 ¶¶ 124–25.  On November 14, 2023, Plaintiffs filed the FAC, which alleged for the first time Section 10(b) claims against Boris and Kiev in connection with ELM's accounting for the Equity Transactions.  D.I. 23 ¶¶ 154–59.  However, as with the original Complaint, the FAC failed to make any substantive allegations that Boris or Kiev participated in, knew about, or even had reason to know of, any problems with ELM's accounting for the Equity Transactions.

## ARGUMENT

### I.    Legal Standard

To survive dismissal under Rule 12(b)(6), the FAC must "plead[] . . . enough facts to state a claim . . . that is plausible on its face."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  A claim brought under Section 10(b) of the Act or Rule 10b–5 must further satisfy the special fraud pleading requirements found in Fed. R. Civ. P. 9(b) and the additional pleading requirements imposed by the PSLRA.  *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).  Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake, and the PSLRA further requires a party to "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  *Id.*

### II.    The Court Should Dismiss The Section 10(b) Claims Against Boris And Kiev

To state a claim for securities fraud under Section 10(b), a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation."  *City of Edinburgh*

*Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). Here, Plaintiffs' claim against Boris and Kiev fails because Plaintiffs do not have standing to pursue these claims and have not alleged: a material misstatement of fact,[3] a strong inference of scienter, or that Boris and Kiev were the "makers" of any actionable statement. The claim should therefore be dismissed.

### A.    Plaintiffs Lack Standing To Bring Claims Under Section 10(b)

The FAC suffers from a fundamental and uncorrectable flaw: Plaintiffs lack standing under Section 10(b) to sue Defendants for statements made about pre-Merger ELM's business because Plaintiffs did not purchase, sell, or even hold ELM stock during the putative class period. They were not "purchasers or sellers of the *stock in question*." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 742 (1975) (emphasis added). As recognized by the Second Circuit—the only Circuit-level court to address this standing issue—"[s]tockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004). Instead, under the purchaser-seller rule, such standing is "limited to purchasers or sellers of securities *about which* a misstatement was made." *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 84 (2d Cir. 2022), citing *Blue Chip Stamps*, 421 U.S. at 730 (emphasis added).[4] Thus, the FAC's allegations that Defendants' statements about ***pre-merger***

---

[3]    To avoid duplicative briefing, Boris and Kiev join the argument of Defendant Luo that Plaintiffs have failed to allege any material misrepresentations or omissions by Defendants. *See* Defendant Jason Luo's Opening Brief in Support of his Motion to Dismiss the Amended Class Action Complaint §§ I(A)(1)–(3).

[4]    The private cause of action under Section 10(b) is a "judicial construct that Congress did not enact in the text of the relevant statutes," which "caution[s] against its expansion." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 164–65 (2008). Thus, courts "must give 'narrow dimensions'" to Section 10(b)'s scope. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (quoting *Stoneridge*, 552 U.S. at 167). And, as the Second Circuit held,

***ELM***, all of which were derived from ELM's own financial statements, inflated the price of Plaintiffs' shares in ***FIII***—a different company—do not and cannot establish their standing to sue Defendants under Section 10(b).

Courts have repeatedly applied the rule set forth in *Nortel*, including in mergers and acquisitions contexts such as these. *See, e.g.*, *Frutarom*, 54 F.4th at 84 (investors in acquiror entity lacked standing to sue the merger target (Frutarom) because they "never bought or sold shares of Frutarom"); *see also Duane & Virginia Lanier Tr. v. SandRidge Mississippian Tr. I*, 361 F. Supp. 3d 1162, 1171 (W.D. Okla. 2019) ("shareholders of one public company" are not entitled "to bring suit against another public company that neither issued nor sold stock to them"); *In re Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 12001262, at *4 (S.D. Fla. Sept. 4, 2015) (same).

In fact, *In re CarLotz, Inc. Securities Litigation*, 2023 WL 2744064, at *4, --- F. Supp. 3d ---- (S.D.N.Y. Mar. 31, 2023) held that plaintiffs lacked standing in connection with a de-SPAC transaction—*i.e.*, the ***exact*** circumstances as here. The plaintiffs in *CarLotz* were investors in a pre-merger SPAC entity (Acamar) and the post-merger entity (Carlotz) and brought a claim under Section 10(b) in connection with alleged misstatements by and regarding the privately-held pre-merger target entity (Pre-Merger Carlotz), many of which were included in the proxy statement filed by Acamar. The Court held that "*Frutarom* forecloses Plaintiffs' challenge to any statements made by Pre-Merger CarLotz about Pre-Merger CarLotz" because, "[a]s in *Frutarom*, neither of the named Plaintiffs purchased shares of Pre-Merger CarLotz—a privately held entity," and instead invested only in the pre-merger SPAC entity Acamar and/or post-merger Carlotz, which the Court recognized to be distinct from Pre-Merger CarLotz. *Id*. at *4. For the same reason as in

---

Section 10(b) standing "does not depend on the significance or directness of the relationship between two companies" because such a rule would embroil courts in "endless case-by-case erosion" through "shifting and highly fact-oriented" inquiries. *Frutarom*, 54 F.4th at 87–88.

*CarLotz*, Plaintiffs' Section 10(b) claims based on pre-Merger statements about ELM fail for lack of standing and should be dismissed.

### B.    Plaintiffs Fail To Allege Scienter

The PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference" that the defendants acted with fraudulent intent. 15 U.S.C. § 78u–4(b)(2)(A). To meet this standard, Plaintiffs must "allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'" *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 420 (D. Del. 2009). Statements are reckless when they indicate "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42 (internal quotation marks omitted). In determining whether Plaintiffs adequately pleaded scienter, "courts [must] weigh the plausible nonculpable explanations for the defendant's conduct against the inferences favoring plaintiff" to determine whether the "inference of scienter is one that is cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 267 (internal quotation marks and citations omitted).

The FAC fails to allege that Boris or Kiev intentionally or recklessly defrauded investors about ELM's financial accounting for the 2020 Equity Transactions. Rather, the FAC attempts to meet the scienter hurdle primarily by lumping Boris and Kiev—who were managers and directors at *FIII*—with a group of *ELM* officers who supposedly should have known about ELM's alleged improper accounting in *its* financial statements based on their positions. As set forth, *infra* Section II(B)(1), this constitutes impermissible group pleading. Beyond group pleading, the FAC's allegations specific to Boris and Kiev state only that: (1) they should have known about ELM's purportedly improper accounting from their due diligence, FAC ¶¶ 106, 110; and (2) they were motivated to defraud investors in order to close the merger, *id.* ¶¶ 108–09. These generic

10

allegations are insufficient as a matter of law.

Plaintiffs' allegations of scienter are also undermined by several factors, including, *inter alia*, that: (1) as Plaintiffs admit, ELM's auditor, BDO, issued a clean audit concerning ELM's financials, *id*. ¶¶ 64, 116; and (2) SEC filings show that FIII's management team purchased additional FIII stock on the open market at market prices, Ex. 1 at 1—reflecting their sincere belief that the deal was a good one. The most compelling inference is thus not that Boris or Kiev acted with fraudulent intent, but, rather, that they were not aware of any accounting violations.

### 1.    Plaintiffs' Group Pleading Does Not Establish Scienter

"The Third Circuit has explicitly rejected [] 'group pleading' as incompatible with the PSLRA's requirement that plaintiffs 'specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions.'" *Bartesch v. Cook*, 941 F. Supp. 2d 501, 510 (D. Del. 2013) (quoting *Winer Family Trust v. Queen*, 503 F.3d 319, 335–37 (3d Cir. 2007)). Thus, allegations against a corporation's officers and directors based only on "defendants' positions at [the company]" are "insufficient to plead scienter." *Id*. at 510–11. Of course, Boris and Kiev did not even *have* positions at the company that issued the financial statements: ELM.

Rather, Plaintiffs impermissibly group Boris and Kiev with the ELM officers in alleging that they all had "actual knowledge of all facts and circumstances concerning the 2020 Equity Transactions," based solely on their positions as "the senior managers and controllers of ELM and FIII." FAC ¶ 106. These undifferentiated allegations—which do not explain why Boris and Kiev, as principals of *FIII*, would have the same knowledge as the principals of ELM about *ELM's* accounting of the 2020 Equity Transactions—are clearly insufficient to establish scienter.

Plaintiffs make no attempt to bolster their generic group pleading with allegations specifying Boris and Kiev's individual involvement in misstatements and omissions concerning ELM's purported accounting violations. *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 150 (3d

11

Cir. 2004) (dismissing claim where plaintiffs failed to allege how defendants were involved with GAAP violation). For example, Plaintiffs do not—and cannot—allege that Boris or Kiev were involved in preparing ELM's financial statements incorporated in the Proxy. Rather, the Proxy makes clear that "all information in relation to ELM has been provided by ELM and its management team." Ex. 3 at 10. Plaintiffs also do not allege that Boris or Kiev had access to any information that alerted them to the alleged accounting violations, or that anyone told them about such violations. To the contrary, Plaintiffs admit that BDO "issued a 'clean' audit opinion" of ELM's financials, indicating that Boris and Kiev had good reason to believe that the accounting for the Equity Transactions was proper. FAC ¶ 116; *see infra* Section II(B)(4).

Finally, allegations that Boris and Kiev signed some of the public filings do not salvage Plaintiffs' generic pleadings. The Third Circuit has explained that such allegations "do[] not add to the scienter puzzle in the absence of any allegation that the defendant[s] knew [t]he[y] w[ere] signing a false SEC filing or recklessly disregarded inaccuracies contained in an SEC filing." *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018); *Bartesch*, 941 F. Supp. 2d at 510–11 (defendant's signing of SEC filings insufficient for scienter).

Thus, Plaintiffs' conclusory allegations that Boris and Kiev had "actual knowledge" of ELM's alleged accounting errors are insufficient to plead scienter.

### 2.     Allegations Of Inadequate Due Diligence Are Insufficient To Establish Reckless Or Conscious Behavior

Plaintiffs likewise fail to plead scienter based on bare-bones allegations that Boris and Kiev "knew or were reckless in not knowing" of ELM's alleged accounting violations, because they "claimed to have conducted due diligence on ELM prior to recommending the Merger." FAC ¶ 110. Courts in this Circuit have routinely held such allegations are insufficient as a matter of law, particularly where there are no allegations that defendants "had access to information [in due

12

diligence] which would have allowed them to discover" the alleged fraud. *Roseville,* 686 F. Supp. 2d at 423; *see also In re Suprema Specialties Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006) (allegations that defendants failed to conduct an adequate review were insufficient to allege scienter). Plaintiffs have not identified any information in due diligence that would have alerted Boris and Kiev to potential accounting violations; instead, Plaintiffs acknowledge that Boris and Kiev received ELM financials that BDO audited.[5]

Particularly instructive is *Starr Investments Cayman II v. China MediaExpress Holdings*, Civ. No. 11-233-RGA, 2014 WL 4180331, at *3 (D. Del. Aug. 21, 2014) in which the Delaware District Court dismissed fraud claims in an analogous case against directors of a blank check company that engaged in a SPAC-like merger. As here, the plaintiff in *Starr* alleged that "if [directors of the acquiring company] had performed proper due diligence [into the merger target], they would have uncovered the deception" in the target company's financials. *Id.* The court held that "allegations that [directors] should have known that [target company's] financial information was fraudulent is insufficient to plead recklessness under § 10(b) and Rule 10b-5." *Id.* (internal quotation marks omitted). Other courts have held the same specifically in the SPAC context. *See, e.g.*, *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 178 (S.D.N.Y. 2023) (allegations that SPAC directors "would have learned the truth about a company's fraud through due diligence are

---

[5]     To the extent the FAC suggests that the magnitude of the accounting error should have served as a red flag to Kiev and Boris during due diligence, that is also insufficient as a matter of law. *In re Hertz,* 905 F.3d at 116 ("significant accounting errors [are] insufficient by [themselves] to give rise to a strong inference of scienter") (internal quotation marks omitted). It is further undercut by the fact that ELM's own auditor failed to detect any violation, so the violation could not have been "so basic that a court can infer scienter from the mere fact that [the transaction] was reported improperly." *Mehedi v. View, Inc.*, No. 21-CV-06374, 2023 WL 3592098, at *19 (N.D. Cal. May 22, 2023). Moreover, courts have recognized that irregularities in a target's financials "may compel an inference that [the target's directors] acted with scienter, ***but does not compel an inference that [the SPAC company's directors] did***." *Murdeshwar v. Search Media Holdings Ltd.*, No. 11-CIV-20549, 2011 WL 7704347, at *17 (S.D. Fla. Aug. 8, 2011) (emphasis added).

. . . insufficient to plead scienter," especially if the complaint "does not identify any specific documents, reports, or information in the due diligence" that would reveal target's fraud) (internal quotation marks omitted); *Murdeshwar*, 2011 WL 7704347, at \*17 (SPAC executives' "failure to discover irregularities in due diligence" of target does not constitute recklessness).    Thus, Plaintiffs' allegations concerning Boris and Kiev's insufficient due diligence are inadequate to plead recklessness.

### 3.    Plaintiffs' Generic Allegations Of Motive And Opportunity Fail To Plead Scienter

The Third Circuit has rejected "motive and opportunity" allegations as "an independent means of establishing scienter." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 276 (3d Cir. 2009).  At most, allegations of motive and opportunity "are to be considered along with all other allegations in the complaint," but even then, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *Id*. at 277–78.  As set forth below, Plaintiffs fail to allege "a concrete and personal benefit" to Boris and Kiev.

### (a)    Plaintiffs' Motive Allegations Are Common To All SPAC Directors And Do Not Give Rise To An Inference Of Scienter

Plaintiffs have alleged only generic motives against Boris and Kiev that courts uniformly find insufficient: *i.e.* that Boris and Kiev concealed ELM's accounting violations because they were "highly motivated to consummate the Merger" and FIII shareholders would not have voted for the Merger if they knew the truth.  FAC ¶ 108.  According to Plaintiffs, a failed merger would be "disastrous" because "Kiev and Boris would have lost their entire investment in FIII"; on the other hand, "Kiev and Boris stood to profit handsomely if the Merger were consummated." *Id*. ¶¶ 108–09.  As the Third Circuit explained in *GSC Partners CDO Fund v. Washington*, such allegations "cannot give rise to a strong inference of fraudulent intent," because "[i]n every

corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction." 368 F.3d 228, 237 (3d Cir. 2004) (internal quotation marks omitted).

This District held the same in *Starr* in connection with a similar transaction: the motive of an acquiring company's directors to "cash[] out their stock" from a successful merger "does not cure Plaintiffs' defective [scienter] pleading," because "the Third Circuit does not recognize" the motive and opportunity test. 2014 WL 4180331, at *3. *Starr* also cites to *McIntire v. China MediaExpress Holdings, Inc.*, "an almost identical class action involving the same facts," in which the District Court for the Southern District of New York explicitly rejected allegations that defendants were motivated to consummate the merger, because failure would mean that their "approximately $17.2 million shares in [blank check company] would become worthless." 927 F. Supp. 2d 105, 127 (S.D.N.Y. 2013). Such alleged "desire to keep stock prices high and increase officer compensation is precisely the kind of general motive that fails to support a strong inference of scienter." *Id.* (internal quotation marks omitted).

Other courts have likewise concluded that a SPAC director's alleged incentive "to complete a bad deal" does not give rise to scienter, because plaintiffs "cannot allege that [the specific director defendants] personally had a motive to defraud based on incentives supposedly faced by SPACs generally." *In re Danimer Sci., Inc. Secs. Litig.*, No. 21-CV-02708, 2023 WL 6385642, at *11 (E.D.N.Y. Sept. 30, 2023); *Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, No. 21-CV-04349, 2023 WL 5748359, at *15 (N.D. Ill. Sept. 6, 2023) (finding insufficient allegations that "employees of SPACs generally will have the motivation to defraud in order to ensure the successful acquisition of a target").

The only motive alleged by Plaintiffs here—that Boris and Kiev were incentivized to

15

consummate the merger and profit from their shares—is shared by SPAC directors generally and, accordingly, does not give rise to an inference of scienter.

**(b)   Plaintiffs Do Not Allege That Boris Or Kiev
Had The Opportunity To Commit Fraud**

Plaintiffs also fail to allege that Boris or Kiev had the opportunity to commit fraud. Plaintiffs do not allege that Boris or Kiev worked at ELM, participated in preparing the allegedly faulty financial statements, or somehow influenced BDO to opine that the financial statements were GAAP compliant. Instead, as the Proxy made clear, all of ELM's financial information was provided by ELM. Plaintiffs' failure to plead an opportunity further undermines their allegations of scienter. *See In re Aetna Inc. Secs. Litig.*, 34 F. Supp. 2d 935, 956 (E.D. Pa. 1999) (dismissing claim against outside director who lacked the opportunity to defraud).

**4.    Important Factors Weigh Against An Inference Of Scienter**

Far from giving rise to a strong inference of scienter, several factors weigh against a finding of scienter. First and foremost, Plaintiffs do not dispute—and, in fact, allege—that BDO issued a clean audit. FAC ¶¶ 64, 116. As courts in this Circuit have held, the fact that "an independent auditor evaluated [the] financial statements and approved of them . . . in itself, weighs heavily against scienter." *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 678 (D.N.J. 2021); *see also Roofer's Pension Fund v. Papa*, 2018 WL 3601229 at *20 (D.N.J. July 27, 2018) ("approval of an independent auditor is strongly probative of a lack of scienter"); *In re Iconix Brand Grp. Inc.*, 2017 WL 4898228 at *19 (S.D.N.Y. Oct. 25, 2017) ("that BDO did not detect, observe, or otherwise note any improprieties in Iconix's financial accounting . . . is significant").

Second, FIII's management team purchased 500,000 FIII shares in the open market at then-prevailing market prices. Ex. 1 at 1. Far from supporting Plaintiffs' theory of scienter, this share purchase actually supports the *opposite* inference: that FIII's management team invested their own

16

money in a deal they believed was a good one, and knew nothing about the alleged GAAP violations. *See, e.g.*, *Murdeshwar*, 2011 WL 7704347, at *18 (S.D. Fla. Aug. 8, 2011) (that SPAC director "acquired additional stocks at inflated prices . . . give[s] rise to an inference that the Defendants did not know of [target's] true financial condition until *after* the Merger").

Third, Plaintiffs allege no facts in support of their argument that Boris and Kiev were motivated to consummate the ELMS Merger because the failure to do so would have been "disastrous." FAC ¶ 108. To the contrary, Plaintiffs *admit* that FIII had until August 21, 2022 to complete a merger, *id*., and, given that FIII was able to find ELM as a target within a month of its IPO, FIII clearly had ample time to find another target if the ELMS deal fell through.

Finally, the Proxy itself disclosed risks underpinning the alleged fraud, which further negates an inference of scienter. *See Fan v. StoneMor Partners LP*, 927 F.3d 710, 718 (3d Cir. 2019) ("disclosures [of risk factors] draw a strong inference that the investors were appraised of the relevant information" and, thus, "do not demonstrate an intent to defraud"); *Owens v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015) (disclosure of "red flags" concerning alleged GAAP violations "negates the inference that defendants acted with scienter"). The Proxy expressly disclosed the overwhelming majority of the Equity Transactions, FAC ¶¶ 6, 58, which contradicts any inference that Boris and Kiev knew of any alleged accounting violations concerning those transactions. It also disclosed that "[d]uring the course of preparing the financial statements . . . ELM's management and [BDO] have concluded that there are material weaknesses within its internal control over financial reporting as it relates to accounting for complex transactions" and that "there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis." Ex. 3 at 67. These disclosures negate the inference that Boris and Kiev tried to conceal any alleged accounting deficiencies.

Viewed collectively, the alleged facts do not give rise to a strong inference of scienter. Far more compelling is the opposite inference—that when faced with financial statements prepared by ELM and audited by BDO, Boris and Kiev simply saw no reason to second guess ELM's accounting, blessed by BDO's clean audit opinion. Accordingly, Plaintiffs' Section 10(b) claim against Boris and Kiev should be dismissed for failure to allege scienter.

## C.    Plaintiffs Do Not Allege That Boris Or Kiev Were The "Makers" Of The Alleged Misstatements

Plaintiffs' Section 10(b) claims against Boris and Kiev also should be dismissed because the FAC does not allege they were the "maker" of any alleged misstatements in the Proxy.

For purposes of Rule 10b–5, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The allegedly deficient financial statements included in the Proxy were not "made" by Boris or Kiev, who had no authority to control what the financials said. Indeed, as the Proxy discloses, all ELM-related financial information had "been provided by [ELM] and its management team," Ex. 3 at 10, and ELM had committed to "ensure that none of [such] information . . . contain[ed] any untrue statement of a material fact or omit to state any material fact." Ex. 4 § 5.5(d); FAC ¶ 34. Moreover, in BDO's audit opinion, investors were expressly told that ELM's "financial statements are the responsibility of [ELM's] management." Ex. 3 at F-89. Thus, Boris and Kiev did not have authority over the ELM financial statements sufficient for Section 10(b) liability.

That Boris and Kiev signed the Proxy also does not mean they were the "maker" of ELM's financial statements. To the contrary, "attribution within a statement . . . is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Janus*, 564 U.S. at 142–43. Courts hold that the signers of SEC filings containing or attaching alleged misstatements

18

were not the "makers" where such statements were attributed to others. *See, e.g.*, *In re Cognizant Tech. Sols. Corp. Secs. Litig.*, No. 16-CV-6509, 2020 WL 3026564, at \*15–16 (D.N.J. June 5, 2020) (general counsel not "maker" of statements "attached to [issuer's] Forms 8-K"); *Levy v. Gutierrez*, No. 14-CV-0443, 2017 WL 2191592, at \*12 (D.N.H. May 4, 2017) (same).

## III.   <u>Plaintiffs' Section 20(a) Claim Against Boris And Kiev Should Be Dismissed</u>

To plead a Section 20(a) claim, Plaintiffs must allege with particularity: (1) a primary securities violation by a third party within the ambit of defendant's control; (2) the defendant's control of the primary violator within the meaning of the statute; and (3) culpable participation by the defendant. *Starr*, 2014 WL 4180331, at \*3 (citing *In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006)). Plaintiffs' Section 20(a) claim against Boris and Kiev should be dismissed because Plaintiffs have not alleged their control over any entity that could have been a primary violator or their culpable participation in the alleged primary violation.

### A.   <u>Plaintiffs Fail To Allege Control By Kiev Or Boris Over Any Entity That Could Have Committed a Primary Violation</u>

"In order to establish controlling person liability under [Section 20(a)], a defendant must possess 'actual control over the transactions in question.'" *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004). Plaintiffs' conclusory allegation that all "Individual Defendants acted as controlling persons of **ELM and/or ELMS** . . . [b]y virtue of their stock holdings, their positions, and their power to control," FAC ¶ 161 (emphasis added), fails to establish control person liability against Boris and Kiev for at least two reasons. First, The FAC does not allege expressly a Section 20(a) claim against Boris and Kiev based on their control over FIII. And it does not allege that Boris and Kiev controlled the purported primary violator, ELM. They did not hold director or executive positions at ELM, did not own ELM stocks, and were not involved in ELM's preparation of financial statements. Thus, even if

19

Plaintiffs successfully pled a primary violation against ELM, Plaintiffs cannot plead control person liability against Boris and Kiev based on ELM's violation because Boris and Kiev did not control ELM.  Second, Plaintiffs cannot allege a primary violation against ELM**S** for the simple fact that this post-Merger entity did not even exist until ***after*** the alleged pre-Merger fraud concerning ELM's accounting was complete.[6]

### B.      Plaintiffs Fail To Allege Culpable Participation

Plaintiffs also fail to allege culpable participation by Kiev or Boris.  Culpable participation requires allegations of "***actual knowledge*** of the fraudulent activity . . . reckless inaction is insufficient."  *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 485–86 (3d Cir. 2013) (emphasis added); *In re Advance Auto Parts, Inc., Sec. Litig.*, No. CV 18-212-RGA, 2020 WL 599543, at *10 (D. Del. Feb. 7, 2020) (Section 20(a) claim requires "***knowing and substantial*** participation in the wrongdoing or inaction with the intent to further the fraud") (emphasis added).  Plaintiffs failed to allege even recklessness against Boris or Kiev, much less actual knowledge (*see*, *supra,* Section II(B)(1)), so Plaintiffs' Section 20(a) claim against Boris and Kiev must be dismissed for the same reasons the FAC fails to plead scienter against them.

### CONCLUSION

For the foregoing reasons, Defendants Boris and Kiev respectfully request that the Court dismiss all claims against them with prejudice, and for such other relief the Court deems just.

---

[6]      Even if Plaintiffs could allege a primary violation against post-Merger ELMS, they have not alleged that Kiev or Boris controlled ELMS.  Kiev was not a director or executive of ELMS and, thus, could not have been involved in any of its decision-making. *See Starr* at *3 (dismissing Section 20(a) claim against directors of acquiring company for lack of control over the post-merger entity that was the alleged primary violator).  And while, as alleged, Boris was on the ELMS board of directors, this is not sufficient to establish control person liability.  Plaintiffs must further allege that Boris had "actual control" over the relevant transaction, which is impossible because ELMS was uninvolved in the relevant transaction. *See Digital Island*, 223 F. Supp. 2d at 561 ("mere fact that an individual is a director of a firm" is insufficient for control).

Dated: January 12, 2024

OF COUSEL:

SCHINDLER COHEN & HOCHMAN LLP
Jonathan L. Hochman
Karen M. Steel
Jenny C. Gu
100 Wall Street, 15th Floor
New York, NY 10005
(212) 277-6300
jhochman@schlaw.com
ksteel@schlaw.com
jgu@schlaw.com

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP

/s/Lakshmi A. Muthu
Tammy L. Mercer (No. 4957)
Lakshmi A. Muthu (No. 5786)
M. Paige Valeski (No. 6336)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
tmercer@ycst.com
lmuthu@ycst.com
pvaleski@ycst.com

*Attorneys for Defendants David Boris and Marshall Kiev*

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 12, 2024, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

FRIEDLANDER & GORRIS, P.A.
Jeffrey M. Gorris (Bar No. 5012)
David Hahn (Bar No. 6417)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3508
*jgorris@friedlandergorris.com*
*dhahn@friedlandergorris.com*

ROBBINS GELLER RUDMAN
& DOWD LLP
Brian E. Cochran
655 West Broadway, Suite 1900
San Diego, CA 92101
*bcochran@rgrdlaw.com*

ROBBINS GELLER RUDMAN
& DOWD LLP
Samuel H. Rudman
Mary K. Blasy
58 South Service Road, Suite 200
Melville, NY 11747
*srudman@rgrdlaw.com*
*mblasy@rgrdlaw.com*

ROBBINS GELLER RUDMAN
& DOWD LLP
Desiree Cummings
C. Chad Johnson
Noam Mandel
Jonathan Zweig
420 Lexington Avenue, Suite 1832
New York, NY
*dcummings@rgrdlaw.com*
*chadj@rgrdlaw.com*
*noam@rgrdlaw.com*
*jzweig@rgrdlaw.com*

*Attorneys for Lead Plaintiffs*

 */s/Lakshmi A. Muthu*
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Tammy L. Mercer (No. 4957 )
Lakshmi A. Muthu (No. 5786)

M. Paige Valeski (No. 6336)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
tmercer@ycst.com
lmuthu@ycst.com
pvaleski@ycst.com

*Attorneys for Defendants Marshall Kiev and David Boris*

31176182.1