# Exhibit 1

EX-99.1 2 ea143069ex99-1_forum3.htm PRESS RELEASE, DATED JUNE 21, 2021.

**Exhibit 99.1**





**Forum Merger III Corporation Management Team Purchases $4.9 Million of Forum III Shares on Open Market**

**Delray Beach, FL and Troy, MI** (June 21, 2021) – Forum Merger III Corporation (Nasdaq: FIII, FIIU, FIIW) ("Forum" or the "Company") and Electric Last Mile, Inc. ("ELMS") today announced that Forum's management team purchased approximately $4.9 million, or 500,000 shares, of Forum's common stock on the open market.

"This additional investment in Forum ahead of our business combination with Electric Last Mile, Inc. is a testament to our confidence in ELMS' future as a leader in the commercial electric vehicle industry," said a member of the Forum management team. "With an expected first-mover advantage and seasoned leadership team, we believe ELMS is strongly positioned to redefine the last mile industry and we look forward to supporting their efforts. As we approach the close of the business combination, we continue to be excited for the future of ELMS."

Forum will hold a special meeting of its stockholders on June 24, 2021 to approve its proposed business combination with ELMS. If the business combination is approved, the combined company will be named Electric Last Mile Solutions, Inc. and the common stock of Electric Last Mile Solutions, Inc. will continue to be listed on the Nasdaq Capital Market under the new ticker symbol "ELMS."

**About Forum Merger III Corporation**
Forum Merger III Corporation (NASDAQ: FIII, FIIIU, FIIIW) is a blank check company formed for the purpose of entering into a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. Forum's mandate is to consider an initial business combination target in any business or industry and it focused its search on companies with an aggregate enterprise value of approximately $500 million to $2 billion that are based in the United States. Forum is led by Co-Chief Executive Officers Marshall Kiev and David Boris.

**About Electric Last Mile, Inc.**
ELMS is focused on redefining the last mile with efficient, connected and customizable solutions. ELMS' first vehicle, the Urban Delivery, is anticipated to be the first Class 1 commercial electric vehicle in the U.S. market. The company is headquartered in Troy, Michigan. For more information, please visit www.electriclastmile.com or Twitter @ELMSolutions.





**Forward-Looking Statements**

This press release includes "forward-looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. Forum Merger III Corporation's ("Forum") and ELMS's actual results may differ from their expectations, estimates and projections and consequently, you should not rely on these forward-looking statements as predictions of future events. Words such as "expect," "estimate," "project," "budget," "forecast," "anticipate," "intend," "plan," "may," "will," "could," "should," "believes," "predicts," "potential," "continue," and similar expressions are intended to identify such forward-looking statements. These forward-looking statements include, without limitation, Forum's and ELMS's expectations with respect to future performance and anticipated financial impacts of the previously announced business combination of Forum and ELMS (the "business combination"), the satisfaction of the closing conditions to the business combination, the size, demands and growth potential of the markets for ELMS's products and ELMS's ability to serve those markets, ELMS's ability to develop innovative products and compete with other companies engaged in the commercial delivery vehicle industry and/or the electric vehicle industry, ELMS's ability to attract and retain customers, the estimated go to market timing and cost for ELMS's products, the implied valuation of ELMS and the timing of the completion of the business combination. These forward-looking statements involve significant risks and uncertainties that could cause the actual results to differ materially from the expected results. Most of these factors are outside Forum's and ELMS's control and are difficult to predict. Factors that may cause such differences include, but are not limited to: (1) the occurrence of any event, change or other circumstances that could give rise to the termination of the agreement and plan of merger ("Merger Agreement") relating to the business combination or could otherwise cause the business combination to fail to close; (2) the inability of ELMS to consummate the Carveout Transaction (as defined below); (3) the outcome of any legal proceedings that may be instituted against Forum or ELMS following the announcement of the business combination; (4) the inability to complete the business combination, including due to failure to obtain approval of the stockholders of Forum or other conditions to closing in the Merger Agreement; (5) the receipt of an unsolicited offer from another party for an alternative business transaction that could interfere with the business combination; (6) the inability to obtain the listing of the common stock of the post-acquisition company on the Nasdaq Stock Market or any alternative national securities exchange following the business combination; (7) the risk that the announcement and consummation of the business combination disrupts current plans and operations; (8) the inability to recognize the anticipated benefits of the business combination, which may be affected by, among other things, competition and the ability of the combined company to grow and manage growth profitably and retain its key employees; (9) costs related to the business combination; (10) changes in applicable laws or regulations; (11) the possibility that ELMS may be adversely affected by other economic, business, and/or competitive factors; (12) the impact of COVID-19 on the combined company's business; and (13) other risks and uncertainties indicated from time to time in the proxy statement filed relating to the business combination, including those under the "Risk Factors" section therein, and in Forum's other filings with the SEC. Some of these risks and uncertainties may in the future be amplified by the COVID-19 outbreak and there may be additional risks that Forum and ELMS consider immaterial or which are unknown. Forum and ELMS caution that the foregoing list of factors is not exclusive. Forum and ELMS caution readers not to place undue reliance upon any forward-looking statements, which speak only as of the date made. ELMS is currently engaged in limited operations only and its ability to carry out its business plans and strategies in the future are contingent upon the closing of the business combination. The consummation of the business combination is subject to, among other conditions, (i) the effectiveness of certain agreements between ELMS and SF Motors, Inc. (d/b/a SERES) ("SERES"), (ii) the acquisition by ELMS of a leasehold interest in, or fee simple title to, the Indiana manufacturing facility prior to the business combination (provided that Forum has agreed that this condition will be waived upon delivery by ELMS of evidence of the mutual written agreement of ELMS and SERES as to the date and time of the transfer of possession of the facility to ELMS, which date and time shall be no later than two business days following the closing of the business combination), and (iii) the securing by ELMS of key intellectual property rights related to its proposed business (collectively, the "Carveout Transaction"). All statements herein regarding ELMS's anticipated business assume the completion of the Carveout Transaction. Forum and ELMS do not undertake or accept any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements to reflect any change in their expectations or any change in events, conditions or circumstances on which any such statement is based.

 

**Important Information About the Business Combination and Where to Find It**

In connection with the business combination, Forum filed a definitive proxy statement with the U.S. Securities and Exchange Commission ("SEC"). Forum's stockholders and other interested persons are advised to read the definitive proxy statement in connection with Forum's solicitation of proxies for the Special Meeting to be held to approve, among other things, the business combination, because these documents contain important information about Forum, ELMS and the business combination. The definitive proxy statement for the business combination was mailed to stockholders of Forum as the Record Date. Forum's stockholders may also obtain a copy of the definitive proxy statement, as well as other documents filed with the SEC by Forum, without charge, at the SEC's website located at www.sec.gov or by directing a request to: Forum Merger III Corporation, 1615 South Congress Avenue, Suite 103, Delray Beach, FL 33445. The information contained on, or that may be accessed through, the websites referenced in this press release is not incorporated by reference into, and is not a part of, this press release.

**Participants in the Solicitation**

Forum and its directors and executive officers may be considered participants in the solicitation of proxies with respect to the business combination. Information about the directors and executive officers of Forum and a description of their interests in Forum are set forth in the definitive proxy statement, which was filed with the SEC, in connection with the proposed business combination. These documents can be obtained free of charge from the sources indicated above. ELMS and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of Forum in connection with the business combination. A list of the names of such directors and executive officers and information regarding their interests in the business combination are set forth in the definitive proxy statement, which was filed with the SEC, in connection with the proposed business combination. These documents can be obtained free of charge from the sources indicated above.

**Contacts**

For Forum Merger III Corporation
investors@forummerger.com

For Electric Last Mile, Inc.
Media: elms-svc@sardverb.com
Investors: IR@electriclastmile.com

# Exhibit 2

EX-99.2 12 ea125825ex99-2_forum3.htm PRESS RELEASE, DATED AUGUST 21, 2020

**Exhibit 99.2**

Forum Merger III Corporation Announces Closing of $250,000,000 Initial Public Offering

Delray Beach, FL, Aug. 21, 2020 (GLOBE NEWSWIRE) -- Forum Merger III Corporation (Nasdaq: FIIIU) (the "Company") announced today that it closed its initial public offering of 25,000,000 units at a price of $10.00 per unit.

The Company's units began trading on the Nasdaq Capital Market ("Nasdaq") under the ticker symbol "FIIIU" on August 19, 2020. Each unit consists of one share of the Company's Class A common stock and one-third of one redeemable warrant, with each whole warrant exercisable to purchase one share of Class A common stock at a price of $11.50 per share. Once the securities comprising the units begin separate trading, the Class A common stock and warrants are expected to be listed on Nasdaq under the symbols "FIII" and "FIIIW," respectively.

Forum Merger III Corporation is a blank check company formed for the purpose of entering into a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. While the Company may pursue an initial business combination target in any business or industry, it intends to focus its search on companies with an aggregate enterprise value of approximately $500 million to $2 billion that are based in the United States. The Company is led by Co-Chief Executive Officers Marshall Kiev and David Boris.

Jefferies LLC acted as the sole book running manager for the offering. The Company has granted the underwriters a 45-day option to purchase up to an additional 3,750,000 units at the initial public offering price to cover over-allotments, if any.

The offering is being made only by means of a prospectus. Copies of the prospectus may be obtained from Jefferies LLC, Attention: Equity Syndicate Prospectus Department, 520 Madison Avenue, 2nd Floor, New York, NY 10022, or by telephone at 877-821-7388 or by email at Prospectus_Department@Jefferies.com.

A registration statement relating to these securities has been filed with, and declared effective by, the U.S. Securities and Exchange Commission (the "SEC") on August 18, 2020.  This press release shall not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of these securities in any state or jurisdiction in which such an offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction.

**FORWARD-LOOKING STATEMENTS**

This press release contains statements that constitute "forward-looking statements," including with respect to the search for an initial business combination. No assurance can be given as to the consummation of any business combination or the terms thereof. Forward-looking statements are subject to numerous conditions, many of which are beyond the control of the Company, including those set forth in the Risk Factors section of the Company's registration statement and prospectus for the offering filed with the SEC. Copies are available on the SEC's website, www.sec.gov. The Company undertakes no obligation to update these statements for revisions or changes after the date of this release, except as required by law.

**Contact**
David Boris
(212) 739-7860
david@forummerger.com
www.forummerger.com

# Exhibit 3

DEFM14A 1 defm14a0621_forummerger3.htm DEFM14A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

_____

**SCHEDULE 14A**

_____

**Information Required in Proxy Statement**
**Schedule 14A Information**

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant    ☒

Filed by a Party other than the Registrant    ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material Pursuant to §240.14a-12

# Forum Merger III Corporation

**(Name of Registrant as Specified In Its Charter)**

_____

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☐    No fee required.

☐    Fee computed on table below per Exchange Act Rules 14a-6(i)(l) and 0-11.

    (1)    Title of each class of securities to which transaction applies:

    (2)    Aggregate number of securities to which transaction applies:

    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)    Proposed maximum aggregate value of transaction:

    (5)    Total fee paid:

☒    Fee paid previously with preliminary materials.

☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)    Amount Previously Paid:

    (2)    Form, Schedule or Registration Statement No.:

    (3)    Filing Party:

    (4)    Date Filed:

Table of Contents

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This proxy statement contains forward-looking statements. These forward-looking statements relate to expectations for future financial performance, business strategies or expectations for our or ELM's business, as applicable, and the timing and ability for us to complete the business combination. Our forward-looking statements include, but are not limited to, statements regarding our or our management team's expectations, hopes, beliefs, intentions or strategies regarding the future. The information included in this proxy statement in relation to ELM has been provided by ELM and its management team, and forward-looking statements include statements relating to ELM's management team's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements.

Specifically, forward-looking statements may include statements relating to:

- the benefits of the business combination;

- the future financial performance of the post-combination company following the business combination;

- expansion plans and opportunities; and

- other statements preceded by, followed by or that include the words "may," "can," "should," "will," "estimate," "plan," "project," "forecast," "intend," "expect," "hope," "anticipate," "believe," "seek," "target" or similar expressions.

These forward-looking statements are based on information available as of the date of this proxy statement and our management's current expectations, forecasts and assumptions, and involve a number of judgments, risks and uncertainties. Accordingly, forward-looking statements should not be relied upon as representing our views as of any subsequent date. We do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

You should not place undue reliance on these forward-looking statements in deciding how your vote should be cast or in voting your shares on the proposals set forth in this proxy statement. As a result of a number of known and unknown risks and uncertainties, our actual results or performance may be materially different from those expressed or implied by these forward-looking statements. Some factors that could cause actual results to differ include:

- the occurrence of any event, change or other circumstances that could delay the business combination or give rise to the termination of the Merger Agreement, including the failure by ELM to consummate the Carveout Transaction;

- the outcome of any legal proceedings that may be instituted against ELM or the Company following announcement of the business combination and transactions contemplated thereby;

- the inability to complete the business combination due to the failure to obtain approval of the stockholders of the Company, or other conditions to closing in the Merger Agreement;

- the Company's inability to consummate another initial business combination if it is unable to consummate the business combination;

- the inability to obtain or maintain the listing of the post-combination company's common stock on Nasdaq following the business combination;

- the risk that the business combination disrupts current plans and operations as a result of the announcement and consummation of the transactions described herein;

- the inability to recognize the anticipated benefits of the business combination, which may be affected by, among other things, competition, and the inability of the combined business to grow and manage growth profitably;

- the unpredictability of the effects of COVID-19;

- **Advisory Charter Proposal B** — to provide that the federal district courts of the United States of America will be the sole and exclusive forum for resolving any complaint asserting a cause of action arising under the federal securities laws, including the Securities Act;

- **Advisory Charter Proposal C** — to provide that, subject to the limitations imposed by applicable law, directors may be removed with cause by the affirmative vote of the holders of at least $66^2/_3\%$ of the voting power of all then-outstanding shares of capital stock of the Company entitled to vote generally at an election of directors;

- **Advisory Charter Proposal D** — to change the name of the new public entity to "Electric Last Mile Solutions, Inc." from "Forum Merger III Corporation";

- **Advisory Charter Proposal E** — to, upon completion of the business combination and the conversion of the Company's Class B common stock into the Company's Class A common stock, increase the authorized capital stock from 111,000,000 shares, consisting of 100,000,000 shares of Class A common stock, 10,000,000 shares of Class B common stock and 1,000,000 shares of preferred stock to 1,100,000,000 shares, which would consist of 1,000,000,000 shares of common stock, and 100,000,000 shares of preferred stock, by, on the effective date of the filing of the proposed charter: (i) reclassifying all shares of Class B common stock as Class A common stock; (ii) immediately following the conversion of such Class B common stock into shares of Class A common stock, reclassifying all shares of Class A common stock as common stock; and (iii) creating an additional 890,000,000 shares of common stock and 99,000,000 shares of preferred stock;

- **Advisory Charter Proposal F —** to eliminate various provisions applicable only to blank check companies;

- **Advisory Charter Proposal G** — to change the classification of the Board from two classes to three classes of directors, with each class elected for staggered terms and with each class consisting of one third of the total number of directors constituting the Board as nearly as possible; and

- **Advisory Charter Proposal H** — to provide that the Company renounces, to the fullest extent permitted by law, any interest or expectancy of the Company in, or in being offered an opportunity to participate in, any excluded opportunity pursuant to Section 122(17) of the DGCL;

- **Proposal No. 5 — Incentive Plan Proposal** — To consider and vote upon a proposal to approve the Incentive Plan, substantially in the form attached to this proxy statement as <u>Annex E</u>, including the authorization of the initial share reserve under the Incentive Plan; and

- **Proposal No. 6 — Director Election Proposal** — To consider and vote upon a proposal to elect seven directors to serve staggered terms on the Board until the 2022, 2023 and 2024 annual meetings of our stockholders, as applicable, or until their respective successors are duly elected and qualified, or until their earlier death, resignation, retirement or removal; alternatively, in the event the condition precedent proposals, including the Business Combination Proposal and Charter Proposal, are not approved and our Board continues to have two classes of directors, to elect three directors to serve as Class I directors on the Board for a term of two years expiring at the annual meeting of stockholders to be held in 2023 or until each such director's successor has been duly elected and qualified, or until each such director's earlier death, resignation, retirement or removal; and

- **Proposal No. 7 — Adjournment Proposal** — To consider and vote upon a proposal to approve the adjournment of the special meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if there are insufficient votes for, or otherwise in connection with, the approval of the condition precedent proposals. The Adjournment Proposal will only be presented at the special meeting if there are not sufficient votes to approve the condition precedent proposals.

**Q:    Are the proposals conditioned on one another?**

A:    Yes. The business combination is conditioned on the approval of the condition precedent proposals at the special meeting. The election of seven director nominees under the Director Election Proposal is conditioned on the approval of the other condition precedent proposals, including the Charter Proposal. The Advisory Charter Proposals are not conditioned on the approval of any other proposal set forth in this proxy statement. It is important

Table of Contents

for you to note that if the condition precedent proposals do not receive the requisite vote for approval and are not waived by the parties to the Merger Agreement, then we will not consummate the business combination. If we do not consummate the business combination and fail to complete an initial business combination by August 21, 2022, we will be required to dissolve and liquidate our trust account by returning the then remaining funds in such account to the public stockholders.

**Q:    Why is the Company providing stockholders with the opportunity to vote on the business combination?**

A:    Therefore, we are seeking to obtain the approval of our stockholders of the Business Combination Proposal in order to allow our public stockholders to effectuate redemptions of their public shares in connection with the closing of our business combination. The adoption of the Merger Agreement is required under Delaware law and the approval of the business combination is required under the current charter. In addition, such approval is also a condition to the Closing under the Merger Agreement.

**Q:    What will happen in the business combination?**

A:    Pursuant to the Merger Agreement, subject to the satisfaction or waiver of certain conditions set forth therein, Merger Sub will merge with and into ELM, with ELM surviving the merger in accordance with the DGCL as our wholly owned subsidiary.

**Q:    Following the business combination, will the Company's securities continue to trade on a stock exchange?**

A:    Yes. We have applied to continue the listing of the post-combination company's common stock and warrants on Nasdaq under the symbols "ELMS" and "ELMSW," respectively, upon the Closing. Our units will automatically separate into the component securities upon consummation of the business combination and, as a result, will no longer trade as a separate security.

**Q:    How has the announcement of the business combination affected the trading price of Class A common stock?**

A:    On December 10, 2020, the trading date before the public announcement of the business combination, the Company's units, Class A common stock and warrants closed at $12.45, $11.73 and $2.86, respectively. On June 8, 2021, the trading date immediately prior to the date of this proxy statement, the Company's units, Class A common stock and warrants closed at $10.38, $10.02 and $1.77, respectively.

**Q:    How will the business combination impact the shares of the Company outstanding after the business combination?**

A:    After the business combination, assuming no redemptions, the amount of common stock outstanding will increase to approximately 128,291,250 shares of common stock (assuming that no shares of Class A common stock are redeemed). Additional shares of common stock may be issuable in the future as a result of the issuance of additional shares that are not currently outstanding. The issuance and sale of these shares in the public market could adversely impact the market price of our common stock, even if our business is doing well. The Closing Merger Consideration is required to be paid in the form of common stock, valued at $10.00 per share at the Closing, and the contingent right to receive (1) the Earnout Shares, if any, and (2) the Adjustment Escrow Stock, if any, after the Closing is subject to, and, if payable, will be payable in accordance with, the terms and conditions set forth in the Merger Agreement. Five million shares of common stock are payable after the Closing to the ELM securityholders upon satisfaction, during the 36-month period after the Closing, of the following conditions: (i) if the closing price of the common stock equals or exceeds $14.00 on any 20 trading days in any 30-consecutive day trading period, then 2,500,000 Earnout Shares will be released to the ELM securityholders, and (ii) if the closing price of the common stock equals or exceeds $16.00 on any 20 trading days in any 30-consecutive day trading period, then the remaining 2,500,000 Earnout Shares will be released to the ELM securityholders. Subject to the terms and conditions set forth in the Merger Agreement, if a qualifying Change in Control (as defined in the Merger Agreement) occurs during the Earnout Period, all Earnout Shares not previously released will be released to the ELM securityholders. Any Earnout Shares not released prior to the expiration of the Earnout Period will be forfeited and cancelled. In addition, the Company will place 250,000 shares of common stock into an adjustment escrow account, as described on pages 12-17. Following the date on which the Closing Merger Consideration is finally determined, all or a portion of those shares of common stock will either be released to the ELM securityholders or released to the Company in accordance with the adjustment mechanisms set forth in Section 2.7 of the Merger Agreement.

21

Table of Contents

business strategy if it fails to do so. Furthermore, acquisitions and the subsequent integration of new assets and businesses into the Company require significant attention from the Company's management and could result in a diversion of resources from the Company's existing business, which in turn could have an adverse effect on the Company's operations. Acquired assets or businesses may not generate the financial results the Company expects. Acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the occurrence of significant goodwill impairment charges, amortization expenses for other intangible assets and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant.

***Both the management of EVAP Operations and its independent registered public accounting firm and ELM and its independent registered public accounting firm have identified internal control deficiencies that constitute a material weakness. If the post-combination company fails to establish and maintain effective internal controls over financial reporting in the future, the ability of the post-combination company to timely and accurately report its financial results could be adversely affected.***

As a component of a private company, EVAP Operations has not been required to document and test its internal controls over financial reporting nor has management been required to certify the effectiveness of EVAP Operations' internal controls, and EVAP Operations' auditors have not been required to opine on the effectiveness of EVAP Operations' internal control over financial reporting. In addition, since its formation, ELM has not been required to document and test its internal controls over financial reporting nor has ELM's management been required to certify the effectiveness of ELM's internal controls, and ELM's auditors have not been required to opine on the effectiveness of ELM's internal control over financial reporting. Following the business combination, the post-combination company will become subject to the requirements of Sarbanes-Oxley Section 404 and will become subject to the auditor attestation requirement when it loses its "emerging growth company" status and it is deemed to be an accelerated filer, as defined by the SEC rules.

EVAP Operations has historically not been presented as a standalone entity. During the course of preparing the carve-out financial statements of EVAP Operations and in connection with the audit of the carve-out financial statements as of December 31, 2020 and 2019 and for the years then ended, management of EVAP Operations and its independent registered public accounting firm have concluded that there are material weaknesses within its internal control over financial reporting as it relates to accounting for complex transactions, including carve out adjustments and information technology general controls. During the course of preparing the financial statements of ELM and in connection with the audit of its financial statements as of December 31, 2020 and for the period then ended, ELM's management and its independent registered public accounting firm have concluded that there are material weaknesses within its internal control over financial reporting as it relates to accounting for complex transactions. A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis.

In connection with the business combination, the Company will seek to create an appropriately designed internal control environment to meet the requirements of Sarbanes-Oxley Section 404. The Company currently has limited resources and does not have the necessary business processes and related internal controls formally designed and implemented, coupled with resources with the appropriate level of experience and technical expertise to oversee the Company's business processes and controls surrounding risk assessment, segregation of duties and complex accounting matters. If such limitations are not corrected with the hiring of additional accounting staff and implementation of adequate internal control, the lack of processes, internal control and adequate resources could result in a material misstatement or lack of disclosure within the annual or interim financial statements of the post-combination company not being prevented or detected.

If management is unable to certify the effectiveness of the Company's internal controls, or if the Company's internal controls have a material weakness, the Company may not timely detect errors, its financial statements could be misstated, and it could be subject to regulatory scrutiny and a loss of confidence by stakeholders, which could harm the Company's business, prospects, financial condition and operating results and adversely affect the market price of its common stock.

67

Table of Contents

projected to reach approximately $3.046 billion and EBITDA was projected to reach approximately $791 million by the end of 2025 based on transaction multiples of pro forma enterprise value over 2025 estimated revenue of 0.4x and pro forma enterprise value over 2025 estimated EBITDA of 1.5x, respectively.

From August 27, 2020 through September 13, 2020, we had numerous discussions with Jefferies and our legal advisors at White & Case LLP ("White & Case"). On September 13, 2020, we submitted a Letter of Intent to ELM with respect to a business combination. We discussed the terms of the initial draft with Mr. Luo and Mr. Taylor. Among the issues discussed were the overall valuation of the business, the ability to arrange PIPE financing as part of the business combination and the desirability to have an equity pool for future key employees to allow the company to recruit and retain key talent. From September 14, 2020 through September 17, 2020, the parties revised the Letter of Intent. The Letter of Intent was executed on September 18, 2020. On October 13, 2020, we engaged Jefferies as a financial advisor in connection with the business combination and placement agent in the PIPE Investment. In connection with the business combination, Jefferies will receive its portion of the deferred underwriting fee, a mergers & acquisitions fee and a placement fee for the PIPE Investment, all of which are conditioned on the Closing.

Beginning October 21, 2020, we held investor meetings with certain potential investors in the private placement. Mr. Boris represented us, and Mr. Luo, Mr. Taylor and Mr. Li represented ELM in these meetings.

On October 8, 2020, we arranged for a digital data room to be established to provide certain materials to prospective PIPE Investment investors.

On October 17, 2020, White & Case sent ELM and, its counsel, Foley & Lardner LLP ("Foley"), an initial draft of the Merger Agreement. On October 28, 2020, Foley sent White & Case a revised version of the Merger Agreement. From November 2, 2020 to November 7, 2020, we, ELM, White & Case and Foley discussed open issues in the Merger Agreement, including the working capital adjustment, the post-closing purchase price adjustment, the earnout milestones, earnout amount release, earnout acceleration, company transaction expenses, interim operations and closing conditions. On November 7, 2020, White & Case sent Foley a revised version of the Merger Agreement. On November 18, 2020, Foley sent White & Case a revised version of the Merger Agreement.

On November 19, 2020, we engaged Papamarkou Wellner & Company, Inc. as a placement agent in connection with the PIPE Investment. Papamarkou Wellner & Company, Inc. will receive compensation for placing a portion of the PIPE Investment with its clients.

From November 22, 2020 to November 27, 2020, we, ELM, White & Case and Foley discussed open issues in the Merger Agreement. Among the issues discussed were the convertible note adjustment amount, merger consideration schedule, earnout acceleration, interim operations with respect to employee matters, exclusivity, closing conditions, financial statements and capital structure.

In September 2020, ELM and SERES entered into (i) an agreement of purchase and sale for the purchase of the manufacturing facility in Mishawaka, Indiana, together with all buildings and improvements and all rights, benefits and privileges pertaining to the real property, and certain tangible personal property, (ii) a license agreement pursuant to which ELM agreed to license certain intellectual property related to the manufacture and design of certain electric urban utility and commercial vehicles, including skateboards used for urban utility truck, cargo van and open bed truck vehicles from SERES, and (iii) an exclusive patent license agreement pursuant to which ELM agreed to license certain potential advance technologies related to the manufacture and design of certain electric urban utility and commercial vehicles. In addition, ELM and Sokon, a subsidiary of SERES's majority stockholder, Chongqing Sokon Industry Group Stock Co. Ltd., entered into a supply agreement regarding the supply by Sokon of equipment, goods and components used in the manufacture of electric commercial vehicles. These agreements are collectively referred to as the "SERES Agreements."

From September 18 to December 10, 2020, we had numerous discussions with ELM regarding the SERES Agreements and proposed changes and amendments to the SERES Agreements. To provide additional time for ELM to conduct discussions regarding certain proposed amendments to the SERES Agreements, the parties agreed to include a termination provision in the Merger Agreement providing that, in the event the Key Contracts (which, as of December 10, 2020, meant (i) an exclusive intellectual property license agreement between SERES and ELM, (ii) an exclusive patent license agreement between SERES and ELM, (iii) a capital lease agreement between SERES and ELM, (iv) a supply agreement between SERES and ELM, and (v) a transition services agreement between SERES and ELM) are not executed by ELM, each in form and substance that is acceptable to us by January 31, 2021, we may terminate the Merger Agreement in our sole discretion.

130

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Shareholders and Board of Directors
Electric Last Mile, Inc.
Troy, Michigan

**Opinion on the Financial Statements**

We have audited the accompanying balance sheet of Electric Last Mile, Inc. (the "Company") as of December 31, 2020, the related statements of operations and comprehensive loss, shareholders' deficit, and cash flows for the period from August 20, 2020 (inception) through December 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020, and the results of its operations and its cash flows for the period from August 20, 2020 (inception) through December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

**Going Concern Uncertainty**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As described in Note 3 to the financial statements, the Company has experienced a net loss since its inception and has negative cash flows from operations and working capital deficiency as of December 31, 2020. These matters raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 3. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ BDO USA, LLP

We have served as the Company's auditor since 2020.

Troy, Michigan

May 06, 2021

BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

BDO is the brand name for the BDO network and for each of the BDO Member Firms.

F-89

# Exhibit 4

Table of Contents

**ANNEX A-1**

**AGREEMENT AND PLAN OF MERGER**

Table of Contents

**AGREEMENT AND PLAN OF MERGER**

Table of Contents

**AGREEMENT AND PLAN OF MERGER**

THIS AGREEMENT AND PLAN OF MERGER (including the exhibits and schedules hereto, each as amended or restated from time to time, this "*Agreement*"), dated as of December 10, 2020 (the "*Execution Date*"), is entered into by and among Forum Merger III Corporation, a Delaware corporation ("*Parent*"), ELMS Merger Corp., a Delaware corporation and a wholly owned Subsidiary of Parent ("*Merger Sub*"), Electric Last Mile, Inc., a Delaware corporation (the "*Company*"), and Jason Luo, in the capacity as the initial Stockholder Representative hereto. Each of the signatories to this Agreement referred to herein as a "*Party*" or, collectively, as the "*Parties*".

**RECITALS**

**WHEREAS**, the Parties intend that, on the terms and subject to the conditions set forth in this Agreement, Merger Sub shall merge with and into the Company (the "*Merger*"), with the Company surviving the Merger, pursuant to the provisions of the General Corporation Law of the State of Delaware (the "*DGCL*");

**WHEREAS**, the board of directors of the Company (the "*Company Board*") has unanimously: (a) approved and declared advisable this Agreement and the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party, including the Merger (the "*Transactions*"), on the terms and subject to the conditions set forth in this Agreement; (b) determined that this Agreement and the Transactions, are fair to, and in the best interests of, the Company and the holders of shares of the Company's common stock, par value $0.001 per share (the "*Company Common Stock*"); and (c) resolved to recommend that the holders of shares of Company Common Stock approve the Merger and adopt this Agreement;

**WHEREAS**, the board of directors of Parent (the "*Parent Board*") has unanimously: (a) approved this Agreement and the Transactions on the terms and subject to the conditions set forth in this Agreement; and (b) resolved to recommend that the holders of shares of Parent's Class A common stock, par value $0.0001 per share (the "*Parent Class A Common Stock*"), and Parent's Class B common stock, par value of $0.0001 per share (the "*Parent Class B Common Stock*"), approve the Parent Stockholder Proposals;

**WHEREAS**, as a material inducement to the Company's willingness to enter into this Agreement, concurrently with the execution and delivery of this Agreement, Sponsor is entering into a Sponsor Support Agreement (the "*Sponsor Support Agreement*"), substantially in the form attached hereto as Exhibit B;

**WHEREAS**, as a material inducement to Parent's and Merger Sub's willingness to enter into this Agreement: (a) promptly after the execution and delivery of this Agreement and in any event within twenty-four (24) hours, those certain Stockholders set forth on Schedule A-1 hereto shall ("*Initial Stockholder Consent*"); and (b) prior to the Closing, Stockholders holding 100% of the issued and outstanding Company Common Stock will have, in each case, executed and delivered support agreements in the Agreed Form (collectively, the "*Support Agreements*");

**WHEREAS**, the Support Agreements will constitute the applicable Stockholder's agreement to consent to, and vote to approve and adopt, this Agreement and the Merger, and waive any dissenters' or approval rights under applicable Law;

**WHEREAS**, as a material inducement to Parent's and Merger Sub's willingness to enter into this Agreement, concurrently with the effectiveness of this Agreement, and each effective as of the Closing, those Persons set forth on Schedule A-2 shall enter into an Amended and Restated Registration Rights Agreement (the "*Amended and Restated Registration Rights Agreement*"), substantially in the form attached hereto as Exhibit D;

**WHEREAS**, concurrently with the effectiveness of this Agreement, and each effective as of the Closing, those Persons set forth on Schedule A-2 will have executed and delivered to Parent: (a) a Restrictive Covenant Agreement in the form of Exhibit E (together, the "*Restrictive Covenant Agreements*"); and (b) an Employment Agreement substantially in the form of Exhibit F (together, the "*Employment Agreements*");

**WHEREAS**, in connection with the Transactions, Parent has entered into subscription agreements (collectively, the "*Subscription Agreements*") with certain third-party investors (the "*PIPE Investors*") pursuant to which the PIPE Investors have committed to make a private investment in public equity in the form of Parent Common Stock up to an aggregate amount of $130,000,000;

Annex A-1-1

Table of Contents

**Section 5.4 [RESERVED]**

**Section 5.5 Proxy Filing; Information Supplied.**

(a) As promptly as reasonably practicable after the date of this Agreement, Parent shall prepare and file with the SEC the Proxy Statement. Each of Parent and the Company shall use its commercially reasonable efforts to (i) cause the Proxy Statement to comply in all material respects with the applicable rules and regulations promulgated by the SEC; and (ii) promptly notify the other of, cooperate with each other with respect to and respond promptly to any comments of the SEC or its staff.

(b) After all the comments received from the SEC have been cleared by the SEC staff and all information required to be contained in the Proxy Statement has been included therein by Parent and the Company, Parent shall file the Proxy Statement in definitive form with the SEC in accordance with the rules and regulations under the Exchange Act and mail the Proxy Statement to holders of record of Parent Common Stock, as of the record date to be established by the board of directors of Parent. Each of the Company and Parent shall furnish all information concerning such Party and its Affiliates to the other Party, and provide such other assistance, as may be reasonably requested in connection with the preparation, filing and distribution of the Proxy Statement, and the Proxy Statement shall include all information reasonably requested by such other Party to be included therein. The Parent shall promptly notify the Company of the receipt of all comments (written or oral) from the SEC and of any request (written or oral) by the SEC for any amendment or supplement to the Proxy Statement or for additional information and shall promptly provide to the Company copies of all correspondence between it or any of its Representatives and the SEC with respect to the Proxy Statement. Prior to responding to any comments or requests from the SEC, Parent will make available to the Company drafts of any such response and provide the Company with a reasonable opportunity to comment on such drafts (including the proposed final version of such document or response); provided, that Company shall be required to provide any comments on such drafts reasonably promptly (but in no event later than the end of the fifth (5th) Business Day following the Company's receipt thereof).

(c) Each of Parent and the Company will provide its respective legal counsel with a reasonable opportunity to review and comment on drafts of the Proxy Statement and other documents related to the Parent Special Meeting or the Parent Stockholder Proposals, prior to filing such documents with the applicable Governmental Entity and mailing such documents to the stockholders of Parent. Each Party will include in the Proxy Statement and such other documents related to Parent Special Meeting all comments reasonably and promptly proposed by the other Party or its legal counsel and each agrees that all information relating to Parent and Merger Sub included in the Proxy Statement shall be in form and content satisfactory to Parent, acting reasonably, and all information relating to the Company included in the Proxy Statement shall be in form and content satisfactory to the Company, acting reasonably.

(d) Each of Parent and the Company shall ensure that none of the information supplied by or on its behalf for inclusion or incorporation by reference in the Proxy Statement will, as of the date the Proxy Statement (or any amendment or supplement thereto) is first mailed to the Parent Stockholders, at the time of the Parent Special Meeting, or at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading. If at any time prior to the Parent Special Meeting there shall be discovered any information that should be set forth in an amendment or supplement to the Proxy Statement so that the Proxy Statement would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, Parent shall promptly transmit to its stockholders an amendment or supplement to the Proxy Statement containing such information. If, at any time prior to the Effective Time, the Company discovers any information, event or circumstance relating to the Company, its Subsidiaries or any of their respective Affiliates, officers, directors or employees that should be set forth in an amendment or a supplement to the Proxy Statement so that the Proxy Statement would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, then the Company shall promptly inform Parent of such information, event or circumstance and shall promptly provide all information required for Parent to transmit to the holders of its capital stock an amendment or supplement to the Proxy Statement containing such information.

(e) The Company shall provide Parent, as promptly as reasonably practicable, with all information (including applicable financial statements prepared in accordance with Regulation S-X of the SEC to the extent required by applicable SEC rules and regulations) concerning the Company, its Subsidiaries and the ECV Operations as required

Table of Contents

for all Taxes imposed by any taxing authority or other Governmental Entity, regardless of the period in which such Taxes are imposed, and there shall be no continuing obligation to make any payments under any such Tax Sharing Agreements.

Section 5.23 **Financial Statements and Related Information**. To the extent not provided prior to the Execution Date, the Company shall provide to Parent, as promptly as reasonably practicable following the Execution Date (but, in no event, fewer than five (5) days prior to Parent's filing of the Proxy Statement with the SEC pursuant to Section 5.5(a), provided that, the signed report of the independent registered public accountant to be provided as part of the PCAOB Audited Financial Statements (as defined below) need not be provided until the date on which Parent actually files the Proxy Statement with the SEC pursuant to Section 5.5(a)): (a) the audited combined carve-out financial statements of the ECV Operations, including the audited combined carve-out balance sheets as of December 31, 2019 and December 31, 2018, and the related audited, combined carve-out statements of (i) operations and comprehensive loss, (ii) parent's net investment and (iii) cash flows, in each case, for the years ended December 31, 2019 and December 31, 2018, together with all related notes and schedules thereto, prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby and Regulation S-X, accompanied by a signed report of the independent registered public accountant with respect thereto, which report shall refer to the standards of the PCAOB (the "*PCAOB Audited Financial Statements*"); and (b) the unaudited condensed combined carve-out financial statements of ECV Operations, including condensed combined carve-out balance sheets as of September 30, 2020 and December 31, 2019 and the related condensed combined carve-out statements of (i) operations and comprehensive loss, (ii) parent's net investment and (iii) cash flows, in each case, for the nine months ended September 30, 2020 and September 30, 2019, together with all related notes and schedules thereto, prepared in accordance with GAAP applied on a consistent basis throughout the covered periods and Regulation S-X, and reviewed by the independent auditor in accordance with PCAOB Auditing Standard 4105 (together with the PCAOB Audited Financial Statements, the "*PCAOB Financial Statements*"). Further, to the extent not provided prior to the Execution Date, the Company shall provide to Parent, as promptly as reasonably practicable after Parent's written request: (y) all other audited and unaudited financial statements of the ECV Operations and the Company and its Subsidiaries required under the applicable rules and regulations and guidance of the SEC to be included in the Proxy Statement and/or the Form 8-K to be filed with respect to the Closing of the Transactions; and (z) all financial data of the ECV Operations and the Company and its Subsidiaries required by Regulation S-K, in each case, to be included in the Proxy Statement and/or the Form 8-K to be filed with respect to the Closing of the Transactions. The Company shall provide to Parent: (i) the audited combined financial statements of the ECV Operations, including the audited combined balance sheets, combined statements of operations and comprehensive loss, combined statements of owner's net investment and combined statements of cash flows as of and for the year ended December 31, 2020, together with all related notes and schedules thereto, prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby and Regulation S-X, accompanied by a signed report of the independent auditor with respect thereto, which report shall refer to the standards of the PCAOB, within ninety (90) days following the end of such fiscal year; (ii) unaudited combined financial statements of the ECV Operations, including the unaudited combined balance sheets, combined statements of operations and comprehensive loss, combined statements of owner's net investment and combined statements of cash flows, together with all related notes and schedules thereto, prepared in accordance with GAAP applied on a consistent basis throughout the covered periods and Regulation S-X and reviewed by the independent auditor in accordance with PCAOB Auditing Standard 4105, for each fiscal quarter of the ECV Operations after December 31, 2020 (and the comparable period in the prior year) and at least forty (40) days prior to the Closing Date, in each case within forty (40) days following the end of each such fiscal quarter; and (iii) all other audited and unaudited financial statements of ECV Operations and the Company and its Subsidiaries required under the applicable rules and regulations and guidance of the SEC to be included in the Proxy Statement and/or the Form 8-K to be filed with respect to the Closing of the Transactions within the time periods prescribed, and with the same scope (to the extent applicable), as set forth in (i) above for audited financial statements and (ii) above for unaudited financial statements. The PCAOB Financial Statements shall not materially deviate, or be materially different, from the Financial Statements.

Section 5.24 **Directors' and Officers' Insurance Policy.**

(a) Parent shall cause the Company, as of the Closing, to obtain and fully pay the premium for "tail" insurance policies for the extension of (i) the directors' and officers' liability coverage of the Company's existing directors' and officers' insurance policies, and (ii) the Company's existing fiduciary liability insurance policies, in each case with a claims reporting or discovery period of at least six (6) years from and after the Closing from one or more insurance carriers with the same or better credit rating as the Company's insurance carrier as of the Closing with respect to

# Exhibit 5

EX-10.1 3 ea131352ex10-1_forum3.htm FORM OF SUBSCRIPTION AGREEMENT

**Exhibit 10.1**

**SUBSCRIPTION AGREEMENT**

This SUBSCRIPTION AGREEMENT (this "Subscription Agreement") is entered into on December 10, 2020, by and between Forum Merger III Corporation, a Delaware corporation (the "Company"), and the undersigned subscriber ("Subscriber").

WHEREAS, concurrently with the execution of this Subscription Agreement, the Company is entering into an Agreement and Plan of Merger with Electric Last Mile, Inc., a Delaware corporation ("ELMS"), ELMS Merger Corp., a Delaware corporation, and the other parties thereto, providing for the combination of the Company and ELMS (the "Merger Agreement" and the transactions contemplated by the Merger Agreement, the "Transaction");

WHEREAS, in connection with the Transaction, Subscriber desires to subscribe for and purchase from the Company, immediately prior to the consummation of the Transaction, that number of shares of the Company's Class A common stock, par value $0.0001 per share (the "Common Stock"), set forth on the signature page hereto (the "Subscribed Shares") for a purchase price of $10.00 per share (the "Per Share Price" and the aggregate of such Per Share Price for all Subscribed Shares being referred to herein as the "Purchase Price"), and the Company desires to issue and sell to Subscriber the Subscribed Shares in consideration of the payment of the Purchase Price by or on behalf of Subscriber to the Company; and

WHEREAS, concurrently with the execution of this Subscription Agreement, the Company is entering into subscription agreements (the "Other Subscription Agreements" and together with this Subscription Agreement, the "Subscription Agreements") with certain other investors (the "Other Subscribers" and together with Subscriber, the "Subscribers") substantially similar to this Subscription Agreement, pursuant to which such investors have agreed to purchase on the closing date of the Transaction (the "Closing Date"), inclusive of the Subscribed Shares, an aggregate amount of up to 13,000,000 shares of Common Stock, at the Per Share Price (the shares of the Other Subscribers, the "Other Subscribed Shares" and together with the Subscribed Shares, the "Collective Subscribed Shares").

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties and covenants, and subject to the conditions, herein contained, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1. Subscription. Subject to the terms and conditions hereof, at the Closing (as defined below), Subscriber hereby agrees to subscribe for and purchase, and the Company hereby agrees to issue and sell to Subscriber, upon the payment of the Purchase Price, the Subscribed Shares (such subscription and issuance, the "Subscription").

2. Closing.

a. The consummation of the Subscription contemplated hereby (the "Closing") shall occur on the Closing Date immediately prior to the consummation of the Transaction and is contingent upon the subsequent occurrence of the closing of the Transaction.

b. At least five (5) Business Days before the anticipated Closing Date, the Company shall deliver written notice to Subscriber (the "Closing Notice") specifying (i) the anticipated Closing Date and (ii) the wire instructions for delivery of the Purchase Price to the Company. No later than two (2) Business Days after receiving the Closing Notice, Subscriber shall deliver to the Company such information as is reasonably requested in the Closing Notice in order for the Company to issue the Subscribed Shares to Subscriber. Subscriber shall deliver to the Company, on or prior to 8:00 a.m. (Eastern time) (or as soon as practicable after the Company or its transfer agent delivers evidence of the issuance to Subscriber of the Subscribed Shares on and as of the Closing Date) on the Closing Date, the Purchase Price in cash via wire transfer to the account specified in the Closing Notice against (and concurrently with) delivery by the Company to Subscriber of (i) the Subscribed Shares in book entry form, free and clear of any liens or other restrictions (other than those arising under this Subscription Agreement or state or federal securities laws), in the name of Subscriber (or its nominee in accordance with its delivery instructions) or to a custodian designated by Subscriber, as applicable, and (ii) written notice from the Company or its transfer agent evidencing the issuance to Subscriber of the Subscribed Shares on and as of the Closing Date. In the event that the consummation of the Transaction does not occur within one (1) Business Day after the anticipated Closing Date specified in the Closing Notice, the Company shall promptly (but in no event later than two (2) Business Days after the anticipated Closing Date specified in the Closing Notice) return the funds so delivered by Subscriber to the Company by wire transfer in immediately available funds to the account specified by Subscriber. For the purposes of this Subscription Agreement, "Business Day" means any day other than a Saturday, Sunday or a day on which the Federal Reserve Bank of New York is closed.

c. The Closing shall be subject to the satisfaction or valid waiver by the Company, on the one hand, or Subscriber, on the other, of the conditions that, on the Closing Date:

(i) no suspension of the qualification of the Subscribed Shares for offering or sale or trading in any jurisdiction, or initiation or threatening of any proceedings for any of such purposes, shall have occurred;

(ii) all conditions precedent to the closing of the Transaction set forth in the Merger Agreement, including all necessary approval of the Company's stockholders and regulatory approvals, if any, shall have been satisfied or waived, and the closing of the Transaction shall be scheduled to occur concurrently with or immediately following the Closing; and

(iii) no governmental authority shall have enacted, issued, promulgated, enforced or entered any judgment, order, law, rule or regulation (whether temporary, preliminary or permanent) which is then in effect and has the effect of making consummation of the transactions contemplated hereby illegal or otherwise restraining or prohibiting consummation of the transactions contemplated hereby; and no such governmental authority shall have instituted or threatened in writing a proceeding seeking to impose any such restraint or prohibition.

d. The obligation of the Company to consummate the Closing shall be subject to the satisfaction or valid waiver by the Company of the additional conditions that, on the Closing Date:

(i) all representations and warranties of Subscriber contained in this Subscription Agreement shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Subscriber Material Adverse Effect (as defined below), which representations and warranties shall be true in all respects) at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Subscriber Material Adverse Effect, which representations and warranties shall be true in all respects) as of such earlier date); and

2

(ii) Subscriber shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Subscription Agreement to be performed, satisfied or complied with by it at or prior to the Closing.

e. The obligation of Subscriber to consummate the Closing shall be subject to the satisfaction or valid waiver by Subscriber of the additional conditions that, on the Closing Date:

(i) all representations and warranties of the Company contained in this Subscription Agreement shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Company Material Adverse Effect (as defined below), which representations and warranties shall be true in all respects) at and as of the Closing Date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date);

(ii) the Company shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Subscription Agreement to be performed, satisfied or complied with by it at or prior to the Closing; and

(iii) there shall have been no amendment, waiver or modification to the Merger Agreement that materially and adversely affects the Company, including any amendment or waiver of any representation or covenant of the Company or ELMS relating to the financial position or outstanding indebtedness of the Company or ELMS.

f. Prior to or at the Closing, Subscriber shall deliver to the Company a duly completed and executed Internal Revenue Service Form W-9 or appropriate Form W-8.

3. Company Representations and Warranties. The Company represents and warrants to Subscriber that:

a. The Company (i) is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, (ii) has the requisite power and authority to own, lease and operate its properties, to carry on its business as it is now being conducted and to enter into and perform its obligations under this Subscription Agreement, and (iii) is duly licensed or qualified to conduct its business and, if applicable, is in good standing under the laws of each jurisdiction (other than its jurisdiction of incorporation) in which the conduct of its business or the ownership of its properties or assets requires such license or qualification, except, with respect to the foregoing clause (iii), where the failure to be in good standing would not reasonably be expected to have a Company Material Adverse Effect. For purposes of this Subscription Agreement, a "Company Material Adverse Effect" means an event, change, development, occurrence, condition or effect with respect to the Company and its subsidiaries, taken together as a whole (on a consolidated basis), that, individually or in the aggregate, has a material adverse effect on (i) the business, financial condition or results of operations of the Company and its subsidiaries, taken together as a whole (on a consolidated basis) or (ii) the Company's ability to timely consummate the transactions contemplated hereby, including the issuance and sale of the Subscribed Shares.

3

b. The Subscribed Shares have been duly authorized and, when issued and delivered to Subscriber against full payment therefor in accordance with the terms of this Subscription Agreement, will be validly issued, fully paid and non-assessable and will not have been issued in violation of any preemptive rights created under the Company's organizational documents or the laws of its jurisdiction of incorporation.

c. This Subscription Agreement has been duly authorized, executed and delivered by the Company, and assuming the due authorization, execution and delivery of the same by Subscriber, this Subscription Agreement shall constitute the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors generally and by the availability of equitable remedies.

d. The execution and delivery of this Subscription Agreement, the issuance and sale of the Subscribed Shares and the compliance by the Company with all of the provisions of this Subscription Agreement and the consummation of the transactions contemplated herein will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of the Company pursuant to the terms of (i) any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which the Company is a party or by which the Company is bound or to which any of the property or assets of the Company is subject; (ii) the organizational documents of the Company; or (iii) any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over the Company or any of its properties that, in the case of clauses (i) and (iii), would reasonably be expected to have a Company Material Adverse Effect.

e. Assuming the accuracy of the representations and warranties of Subscriber, the Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority, self-regulatory organization (including The Nasdaq Capital Market) or other person in connection with the execution, delivery and performance of this Subscription Agreement (including, without limitation, the issuance of the Subscribed Shares), other than (i) filings required by applicable state securities laws, (ii) the filing of the Registration Statement pursuant to Section 5 below, (iii) the filing of a Notice of Exempt Offering of Securities on Form D with the United States Securities and Exchange Commission ("Commission") under Regulation D of the Securities Act of 1933, as amended (the "Securities Act"), if applicable, (iv) those required by The Nasdaq Capital Market, including with respect to obtaining shareholder approval, (v) those required to consummate the Transaction as provided under the Merger Agreement, (vi) the filing of notification(s) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, if applicable, and (vii) those the failure of which to obtain would not be reasonably likely to have a Company Material Adverse Effect.

f. As of their respective dates, all reports required to be filed by the Company with the Commission (the "SEC Reports") complied in all material respects with the requirements of the Securities Act and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations of the Commission promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing and fairly present in all material respects the financial position of the Company as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, year-end audit adjustments. A copy of each SEC Report is available to each Subscriber via the Commission's EDGAR system. The Company has timely filed each report, statement, schedule, prospectus, and registration statement that the Company was required to file with the Commission since its initial registration of the Common Stock with the Commission. To the knowledge of the Company, there are no material outstanding or unresolved comments in comment letters from the staff of the Division of Corporation Finance of the Commission with respect to any of the SEC Reports as of the date hereof.

g. As of the date hereof, the authorized share capital of the Company consists of 100,000,000 shares of Common Stock and 1,000,000 preferred shares, par value $0.0001 per share ("Preferred Shares"). As of the Closing Date (and immediately after the consummation of the Transaction), the authorized share capital of the Company will consist of 1,000,000,000 shares of Common Stock and 100,000,000 Preferred Shares. As of the date hereof and immediately prior to the Closing and prior to giving effect to the Transaction: (i) 25,741,250 shares of Common Stock (excluding the Company's Class B common stock, par value $0.0001 per share (the "Class B Common Stock")), 6,250,000 shares of Class B Common Stock (the "Founder Shares") and no Preferred Shares were issued and outstanding; (ii) 8,580,416 warrants, each exercisable to purchase a share of Common Stock at $11.50 per full share, and 247,083 private placement warrants, each exercisable to purchase a share of Common Stock at $11.50 per full share (together "Warrants"), were issued and outstanding; and (iii) no Common Stock was subject to issuance upon exercise of outstanding options. No Warrants are exercisable on or prior to the Closing. All (i) issued and outstanding Common Stock has been duly authorized and validly issued, is fully paid and non-assessable and is not subject to preemptive rights and (ii) outstanding Warrants have been duly authorized and validly issued, are fully paid and are not subject to preemptive rights. As of the date hereof, except as set forth above and pursuant to (i) the Other Subscription Agreements, or (ii) the Merger Agreement, there are no outstanding options, warrants or other rights to subscribe for, purchase or acquire from the Company any Common Stock or other equity interests in the Company (collectively, "Equity Interests") or securities convertible into or exchangeable or exercisable for Equity Interests. As of the date hereof, the Company has no subsidiaries and does not own, directly or indirectly, interests or investments (whether equity or debt) in any person, whether incorporated or unincorporated. There are no stockholder agreements, voting trusts or other agreements or understandings to which the Company is a party or by which it is bound relating to the voting of any Equity Interests, other than (A) the letter agreement entered into by the Company in connection with the Company's initial public offering on August 18, 2020 pursuant to which the Company's sponsor and the Company's executive officers and independent directors agreed to vote in favor of any proposed Business Combination (as defined therein), which includes the Transaction, and (B) as contemplated by the Merger Agreement. Other than the Founder Shares, there are no securities or instruments issued by or to which the Company is a party containing anti-dilution or similar provisions that will be triggered by the issuance of (i) the Subscribed Shares or (ii) the shares to be issued pursuant to any Other Subscription Agreement.

5

h. Except for such matters as have not had and would not be reasonably likely to have a Company Material Adverse Effect, including the issuance and sale of the Subscribed Shares, as of the date hereof, there is no (i) suit, action, proceeding or arbitration before a governmental authority or arbitrator pending, or, to the knowledge of the Company, threatened in writing against the Company or (ii) judgment, decree, injunction, ruling or order of any governmental authority or arbitrator outstanding against the Company.

i. The issued and outstanding shares of Common Stock are registered pursuant to Section 12(b) of the Exchange Act, and are listed for trading on The Nasdaq Capital Market under the symbol "FIII." There is no suit, action, proceeding or investigation pending or, to the knowledge of the Company, threatened against the Company by The Nasdaq Capital Market or the Commission with respect to any intention by such entity to deregister the shares of Common Stock or prohibit or terminate the listing of the shares of Common Stock on The Nasdaq Capital Market. The Company has taken no action that is designed to terminate the registration of the shares of Common Stock under the Exchange Act.

j. Upon consummation of the Transaction, the issued and outstanding shares of Common Stock will continue to be registered pursuant to Section 12(b) of the Exchange Act and will be listed for trading on The Nasdaq Capital Market.

k. Assuming the accuracy of Subscriber's representations and warranties set forth in Section 4 of this Subscription Agreement, no registration under the Securities Act is required for the offer and sale of the Subscribed Shares by the Company to Subscriber.

l. Neither the Company nor any person acting on its behalf has engaged or will engage in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with any offer or sale of the Subscribed Shares.

m. Except for such matters as have not had a Company Material Adverse Effect, the Company is, and has been since its inception, in compliance with all state and federal laws applicable to the conduct of its business. The Company has not received any written, or to its knowledge, other communication from a governmental entity that alleges that the Company is not in compliance with or is in default or violation of any applicable law, except where such non-compliance, default or violation would not be reasonably likely to have, individually or in the aggregate, a Company Material Adverse Effect.

6

n. The Company has not entered into any side letter or similar agreement with any Other Subscriber or any other investor in connection with such Other Subscriber's direct or indirect investment in the Company other than the Other Subscription Agreements and any joinders to Convertible Notes (as defined in the Merger Agreement). The Other Subscription Agreements reflect the same Per Share Price and other terms with respect to the purchase of the Common Stock that are no more favorable to such Other Subscriber thereunder than the terms of this Subscription Agreement. and they shall not be amended after the date hereof to provide for terms with respect to the purchase of the Common Stock that are more favorable to such Other Subscriber thereunder than the terms of this Subscription Agreement, unless such terms are also offered to the Subscriber.

o. The Company acknowledges and agrees that, notwithstanding anything herein to the contrary, the Subscribed Shares may be pledged by Subscriber in connection with a bona fide margin agreement, provided such pledge shall be (i) pursuant to an available exemption from the registration requirements of the Securities Act or (ii) pursuant to, and in accordance with, a registration statement that is effective under the Securities Act at the time of such pledge, and Subscriber effecting a pledge of Subscribed Shares shall not be required to provide the Company with any notice thereof; provided, however, that neither the Company or their counsel shall be required to take any action (or refrain from taking any action) in connection with any such pledge, other than providing any such lender of such margin agreement with an acknowledgment that the Subscribed Shares are not subject to any contractual prohibition on pledging or lock up, the form of such acknowledgment to be subject to review and comment by the Company in all respects.

p. The Company is not, and immediately after receipt of payment for the Subscribed Shares, will not be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

4. Subscriber Representations and Warranties. Subscriber represents and warrants to the Company that:

a. Subscriber (i) is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization (as applicable), and (ii) has the requisite power and authority to enter into and perform its obligations under this Subscription Agreement.

b. This Subscription Agreement has been duly executed and delivered by Subscriber, and assuming the due authorization, execution and delivery of the same by the Company, this Subscription Agreement shall constitute the valid and legally binding obligation of Subscriber, enforceable against Subscriber in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors generally and by the availability of equitable remedies.

c. The execution and delivery of this Subscription Agreement, the purchase of the Subscribed Shares and the compliance by Subscriber with all of the provisions of this Subscription Agreement and the consummation of the transactions contemplated herein will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of Subscriber pursuant to the terms of (i) any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which Subscriber is a party or by which Subscriber is bound or to which any of the property or assets of Subscriber is subject; (ii) the organizational documents of Subscriber; or (iii) any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over Subscriber or any of its properties that, in the case of clauses (i) and (iii), would reasonably be expected to have a Subscriber Material Adverse Effect. For purposes of this Subscription Agreement, a "Subscriber Material Adverse Effect" means an event, change, development, occurrence, condition or effect with respect to Subscriber that would reasonably be expected to have a material adverse effect on Subscriber's ability to consummate the transactions contemplated hereby, including the purchase of the Subscribed Shares.

7

d. Subscriber (i) is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or an "accredited investor" (within the meaning of Rule 501(a) under the Securities Act) satisfying the applicable requirements set forth on Annex A, (ii) is acquiring the Subscribed Shares only for its own account and not for the account of others, or if Subscriber is subscribing for the Subscribed Shares as a fiduciary or agent for one or more investor accounts, each owner of such account is a "qualified institutional buyer" or an "accredited investor" and Subscriber has full investment discretion with respect to each such account, and the full power and authority to make the acknowledgements, representations and agreements herein on behalf of each owner of each such account, and (iii) is not acquiring the Subscribed Shares with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act (and has provided the Company with the requested information on Annex A following the signature page hereto). Subscriber is not an entity formed for the specific purpose of acquiring the Subscribed Shares.

e. Subscriber understands that the Subscribed Shares are being offered in a transaction not involving any public offering within the meaning of the Securities Act and that the Subscribed Shares have not been registered under the Securities Act or any state securities law in reliance on the availability of an exemption from such registration. Subscriber understands that the Subscribed Shares may not be resold, transferred, pledged or otherwise disposed of by Subscriber absent an effective registration statement under the Securities Act, except (i) to the Company or a subsidiary thereof, or (ii) pursuant to an applicable exemption from the registration requirements of the Securities Act, and, in each of cases (i) and (ii), in accordance with any applicable securities laws of the states and other jurisdictions of the United States.

f. Subscriber understands and agrees that Subscriber is purchasing the Subscribed Shares directly from the Company. Subscriber further acknowledges that there have not been, and Subscriber hereby agrees that it is not relying on, any representations, warranties, covenants or agreements made to Subscriber by the Company, the Placement Agent (as defined below), any other party to the Transaction or any other person or entity, expressly or by implication, or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing other than those representations, warranties, covenants and agreements of the Company set forth in this Subscription Agreement. Subscriber acknowledges that certain information provided by the Company was based on projections, and such projections were prepared based on assumptions and estimates that are inherently uncertain and are subject to a wide variety of significant business, economic and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the projections.

g. In making its decision to purchase the Subscribed Shares, Subscriber has relied solely upon independent investigation made by Subscriber. Subscriber acknowledges and agrees that Subscriber has received such information as Subscriber deems necessary in order to make an investment decision with respect to the Subscribed Shares, including with respect to the Company and the Transaction (including ELMS and its subsidiaries (collectively, the "Acquired Companies")). Subscriber represents and agrees that Subscriber and Subscriber's professional advisor(s), if any, have had the full opportunity to ask such questions, receive such answers and obtain such information as Subscriber and its professional advisor(s), if any, have deemed necessary to make an investment decision with respect to the Subscribed Shares. Subscriber acknowledges and agrees that Subscriber has not relied on any statements or other information provided by or on behalf of Jefferies LLC, acting as placement agent to the Company (the "Placement Agent"), or any affiliates of the Placement Agent or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing concerning ELMS, the Company, the Transaction, the Merger Agreement, this Subscription Agreement or the transactions contemplated hereby or thereby, the Subscribed Shares or the offer and sale of the Subscribed Shares. Subscriber acknowledges and agrees that neither the Placement Agent nor any of its affiliates nor any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing has provided Subscriber with any information or advice with respect to the Subscribed Shares nor is such information or advice necessary or desired. Neither the Placement Agent nor any of its affiliates nor any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing has made or makes any representation as to the Company or the Acquired Companies or the quality or value of the Subscribed Shares and the Placement Agent and any of its affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing may have acquired non-public information with respect to the Company or the Acquired Companies which Subscriber agrees need not be provided to it. In connection with the issuance of the Subscribed Shares to Subscriber, neither the Placement Agent nor any of its affiliates nor any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing has acted as a financial advisor or fiduciary to Subscriber.

h. Subscriber became aware of this offering of the Subscribed Shares solely by means of direct contact between Subscriber and the Company or a representative of the Company, or by means of contact from the Placement Agent, and the Subscribed Shares were offered to Subscriber solely by direct contact between Subscriber and the Company or a representative of the Company. Subscriber did not become aware of this offering of the Subscribed Shares, nor were the Subscribed Shares offered to Subscriber, by any other means. Subscriber acknowledges that the Company represents and warrants that the Subscribed Shares (i) were not offered by any form of general solicitation or general advertising and (ii) are not being offered in a manner involving a public offering under, or in a distribution in violation of, the Securities Act, or any state securities laws.

i. Subscriber acknowledges that it is aware that there are substantial risks incident to the purchase and ownership of the Subscribed Shares. Subscriber has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Subscribed Shares, and Subscriber has had an opportunity to seek, and has sought, such accounting, legal, business and tax advice as Subscriber has considered necessary to make an informed investment decision.

9

j. Subscriber has adequately analyzed and fully considered the risks of an investment in the Subscribed Shares and determined that the Subscribed Shares are a suitable investment for Subscriber and that Subscriber is able at this time and in the foreseeable future to bear the economic risk of a total loss of Subscriber's investment in the Company. Subscriber acknowledges specifically that a possibility of total loss exists.

k. Subscriber understands and agrees that no federal or state agency has passed upon or endorsed the merits of the offering of the Subscribed Shares or made any findings or determination as to the fairness of this investment.

l. Subscriber is not (i) a person or entity named on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") or in any Executive Order issued by the President of the United States and administered by OFAC ("OFAC List"), or a person or entity prohibited by any OFAC sanctions program, (ii) a Designated National as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (iii) a non-U.S. shell bank or providing banking services indirectly to a non-U.S. shell bank. Subscriber agrees to provide law enforcement agencies, if requested thereby, such records as required by applicable law, provided that Subscriber is permitted to do so under applicable law. Subscriber represents that if it is a financial institution subject to the Bank Secrecy Act (31 U.S.C. Section 5311 et seq.), as amended by the USA PATRIOT Act of 2001 and its implementing regulations (collectively, the "BSA/PATRIOT Act"), that Subscriber maintains policies and procedures reasonably designed to comply with applicable obligations under the BSA/PATRIOT Act. Subscriber also represents that, to the extent required, it maintains policies and procedures reasonably designed for the screening of its investors against the OFAC sanctions programs, including the OFAC List. Subscriber further represents and warrants that, to the extent required, it maintains policies and procedures reasonably designed to ensure that the funds held by Subscriber and used to purchase the Subscribed Shares were legally derived.

m. If Subscriber is an employee benefit plan that is subject to Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), a plan, an individual retirement account or other arrangement that is subject to section 4975 of the Code (as defined below) or an employee benefit plan that is a governmental plan (as defined in section 3(32) of ERISA), a church plan (as defined in section 3(33) of ERISA), a non-U.S. plan (as described in section 4(b)(4) of ERISA) or other plan that is not subject to the foregoing but may be subject to provisions under any other federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Internal Revenue Code of 1986, as amended (the "Code"), or an entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan") subject to the fiduciary or prohibited transaction provisions of ERISA or section 4975 of the Code, Subscriber represents and warrants that neither the Company, nor any of its respective affiliates (the "Transaction Parties") has acted as the Plan's fiduciary, or has been relied on for advice, with respect to its decision to acquire and hold the Subscribed Shares, and none of the Transaction Parties shall at any time be relied upon as the Plan's fiduciary with respect to any decision to acquire, continue to hold or transfer the Subscribed Shares.

10

n. Subscriber at the Closing will have sufficient funds to pay the Purchase Price pursuant to <u>Section 2</u>.

o. Subscriber acknowledges and agrees that no disclosure or offering document has been prepared by the Placement Agent or any of its affiliates in connection with the offer and sale of the Subscribed Shares.

p. Neither the Placement Agent, nor any of its affiliates nor any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing have made any independent investigation with respect to ELMS, the Company or its subsidiaries or any of their respective businesses, or the Subscribed Shares or the accuracy, completeness or adequacy of any information supplied to Subscriber by the Company.

q. In connection with the issue and purchase of the Subscribed Shares, the Placement Agent has not acted as Subscriber's financial advisor or fiduciary.

r. Subscriber acknowledges and agrees that the purchase and sale of the Subscribed Shares hereunder meets the exemptions from filing under FINRA Rule 5123(b)(1).

s. Subscriber acknowledges and agrees that Placement Agent may have acquired, or during the term of the Subscribed Shares may acquire, non-public information with respect to ELMS, which Subscriber agrees need not be provided to it.

5. <u>Registration of Subscribed Shares</u>.

a. The Company agrees that, within thirty (30) calendar days following the Closing Date, the Company will submit to or file with the Commission (at the Company's sole cost and expense) a registration statement registering the resale of the Subscribed Shares (the "<u>Registration Statement</u>"), and the Company shall use its commercially reasonable efforts to have the Registration Statement declared effective as soon as practicable after the filing thereof,, but in any event no later than the earlier of (1) forty-five (45) calendar days following the Closing Date (or seventy-five (75) calendar days after the Closing Date if the Registration Statement is reviewed by, and comments thereto are provided by, the Commission) and (2) the second (2nd) business day after the date the Company is notified in writing by the Commission that the Registration Statement will not be "reviewed" or will not be subject to further review. The Company will use its commercially reasonable efforts to provide a draft of the Registration Statement to Subscriber for review at least two (2) business days in advance of the filing of the Registration Statement. Notwithstanding the foregoing, if the Commission prevents the Company from including any or all of the shares proposed to be registered under the Registration Statement due to limitations on the use of Rule 415 of the Securities Act for the resale of the Subscribed Shares by the applicable stockholders or otherwise, such Registration Statement shall register for resale such number of Subscribed Shares which is equal to the maximum number of Subscribed Shares as is permitted by the Commission. In such event, the number of Subscribed Shares to be registered for each selling stockholder named in the Registration Statement shall be reduced *pro rata* among all such selling stockholders. The Company agrees that the Company will use its commercially reasonable efforts to cause such Registration Statement to remain effective until the earlier of (i) three years from the issuance of the Subscribed Shares, (ii) the date on which all of the Subscribed Shares shall have been sold, or (iii) the first date on which Subscriber can sell all of its Subscribed Shares (or shares received in exchange therefor) under Rule 144 of the Securities Act ("Rule 144") without limitation as to the manner of sale or the amount of such securities that may be sold, and the Company shall use its commercially reasonable efforts to obtain the withdrawal of any order suspending the effectiveness of any Registration Statement as soon as reasonably practicable. The Company will use its commercially reasonable efforts to (i) cause the removal of all restrictive legends from any Registrable Securities (as defined below) being sold under the Registration Statement or pursuant to Rule 144 at the time of sale of such Registrable Securities and, at the request of a Holder (as defined below), cause the removal of all restrictive legends from any Registrable Securities held by such Holder that may be sold by such Holder without restriction under Rule 144, including without limitation, any volume and manner of sale restrictions, and (ii) cause its legal counsel to deliver the necessary legal opinions, if any, to the transfer agent in connection with the instruction under subclause (i) upon the receipt of such supporting documentation, if any, as reasonably requested by such counsel. The Company will use commercially reasonable efforts to file all reports, and provide all customary and reasonable cooperation, reasonably necessary to enable Holder to resell Registrable Securities pursuant to the Registration Statement or Rule 144, as applicable, qualify the Registrable Securities for listing on the applicable stock exchange and update or amend the Registration Statement as necessary to include Registrable Securities. "Registrable Securities" shall mean, as of any date of determination, the Subscribed Shares and any other equity security issued or issuable with respect to the Subscribed Shares by way of share split, dividend, distribution, recapitalization, merger, exchange, replacement or similar event, provided, however, that such securities shall cease to be Registrable Securities at the earliest of (A) four (4) years, (B) the date all Subscribed Shares held by a Holder may be sold by such Holder without volume or manner of sale limitations pursuant to Rule 144 and without the requirement for the Company to be in compliance with the current public information required under Rule 144(c)(1) (or Rule 144(i)(2), if applicable), (C) the date on which such securities have actually been sold by a Holder, or (D) when such securities shall have ceased to be outstanding. "Holder" shall mean the Subscriber or any affiliate of the Subscriber to which the rights under this Section 5 shall have been assigned. Subscriber agrees to disclose its beneficial ownership, as determined in accordance with Rule 13d-3 of the Exchange Act, of Subscribed Shares to the Company (or its successor) upon reasonable request to assist the Company in making the determination described above. The Company's obligations to include the Subscribed Shares in the Registration Statement are contingent upon Subscriber furnishing in writing to the Company such information regarding Subscriber, the securities of the Company held by Subscriber and the intended method of disposition of the Subscribed Shares as shall be reasonably requested by the Company to effect the registration of the Subscribed Shares, and shall execute such documents in connection with such registration as the Company may reasonably request that are customary of a selling stockholder in similar situations provided that Subscriber shall not in connection with the foregoing be required to execute any lock-up or similar agreement or otherwise be subject to any contractual restriction on the ability to transfer the Subscribed Shares. Subscriber shall not be entitled to use the Registration Statement for an underwritten offering of Subscribed Shares. Notwithstanding anything to the contrary in this Subscription Agreement, the Company may delay filing, postpone effectiveness or suspend the use of the Registration Statement if it determines that, in order for the Registration Statement to not contain a material misstatement or omission, an amendment thereto would be needed, to include information that would at that time not otherwise be required in a current, quarterly or annual report under the Exchange Act, or if such filing, effectiveness or use would materially affect a bona fide business or financing transaction of the Company or would require premature disclosure of information that would materially adversely affect the Company (each such circumstance, a "<u>Suspension Event</u>"); provided, that, (i) the Company shall not so delay filing, postpone effectiveness, or suspend the use of the Registration Statement for a period of more than forty-five (45) consecutive days or more than two (2) times in any three hundred sixty (360) day period and (ii) the Company shall use commercially reasonable efforts to make the Registration Statement available for the sale by Subscriber of its Subscribed Shares as soon as practicable thereafter. Upon receipt of any written notice from the Company (which notice shall not contain any material non-public

information regarding the Company and which notice shall not be subject to any duty of confidentiality) of the happening of any Suspension Event during the period that the Registration Statement is effective or if as a result of a Suspension Event the Registration Statement or related prospectus contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made (in the case of the prospectus) not misleading, Subscriber agrees that (i) it will promptly discontinue offers and sales of the Subscribed Shares under the Registration Statement (excluding, for the avoidance of doubt, sales conducted pursuant to Rule 144) until Subscriber receives copies of a supplemental or amended prospectus (which the Company agrees to promptly prepare) that corrects the misstatement(s) or omission(s) referred to above and receives notice that any post-effective amendment has become effective or unless otherwise notified by the Company that it may resume such offers and sales, and (ii) it will maintain the confidentiality of any information included in such written notice delivered by the Company unless otherwise required by law or subpoena. If so directed by the Company, Subscriber will deliver to the Company or, in Subscriber's sole discretion destroy, all copies of the prospectus covering the Subscribed Shares in Subscriber's possession; provided, however, that this obligation to deliver or destroy all copies of the prospectus covering the Subscribed Shares shall not apply (i) to the extent Subscriber is required to retain a copy of such prospectus (a) in order to comply with applicable legal, regulatory, self-regulatory or professional requirements or (b) in accordance with a bona fide pre-existing document retention policy or (ii) to copies stored electronically on archival servers as a result of automatic data back-up. For as long as the Subscriber holds Subscribed Shares, the Company shall file all reports for so long as the condition in Rule 144(c)(1) (or Rule 144(i)(2), if applicable) is required to be satisfied, and provide all customary and reasonable cooperation, necessary to enable the Subscriber to resell the Subscribed Shares pursuant to Rule 144 of the Securities Act (in each case, when Rule 144 of the Securities Act becomes available to the Subscribers).

12

b. The Company shall indemnify and hold harmless Subscriber (to the extent a seller under the Registration Statement), the officers, directors, agents and employees of Subscriber, each person who controls Subscriber (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, agents and employees of each such controlling person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable attorneys' fees) and expenses (collectively, "Losses") that arise out of or are based upon any untrue or alleged untrue statement of a material fact contained in the Registration Statement, any prospectus included in the Registration Statement or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus or form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading, except to the extent that such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding Subscriber furnished in writing to the Company by Subscriber expressly for use therein or that Subscriber has omitted a material fact from such information. The Company shall notify Subscriber promptly of the institution, threat or assertion of any proceeding arising from or in connection with the transactions contemplated by this Section 5 of which the Company is aware. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an indemnified party and shall survive the transfer of the Subscribed Shares by Subscriber. Notwithstanding the forgoing, the Company's indemnification obligations shall not apply to amounts paid in settlement of any Losses or action if such settlement is effected without the prior written consent of the Company (which consent shall not be unreasonably withheld or delayed).

c. Subscriber shall, severally and not jointly with any Other Subscriber in the offering contemplated by this Subscription Agreement, indemnify and hold harmless the Company, its directors, officers, agents and employees, each person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling persons, to the fullest extent permitted by applicable law, from and against all Losses arising out of or based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any prospectus included in the Registration Statement, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus, or any form of prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading to the extent, but only to the extent, that such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding Subscriber furnished in writing to the Company by Subscriber expressly for use therein. In no event shall the liability of Subscriber be greater in amount than the dollar amount of the net proceeds received by Subscriber upon the sale of the Subscribed Shares giving rise to such indemnification obligation. Notwithstanding the forgoing, Subscriber indemnification obligations shall not apply to amounts paid in settlement of any Losses or action if such settlement is effected without the prior written consent of Subscriber (which consent shall not be unreasonably withheld or delayed).

13

d. Any person or entity entitled to indemnification herein shall (A) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any person's or entity's right to indemnification hereunder to the extent such failure has not prejudiced the indemnifying party) and (B) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld, conditioned or delayed). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement) or which settlement includes a statement or admission of fault and culpability on the part of such indemnified party or which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

e. The indemnification provided for under this Subscription Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling person or entity of such indemnified party and shall survive the transfer of securities.

f. If the indemnification provided under this Section 5 from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities and expenses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages, liabilities and expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations; provided, however, the liability of the Investor shall be limited the net proceeds received by such Subscriber from the sale of Subscribed Shares giving rise to such indemnification obligation. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by (or not made by, in the case of an omission), or relates to information supplied by (or not supplied by, in the case of an omission), such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action. The amount paid or payable by a party as a result of the losses or other liabilities referred to above shall be deemed to include, subject to the limitations set forth in this Section 5, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this Section 5(f) from any person or entity who was not guilty of such fraudulent misrepresentation.

14

6. Termination. This Subscription Agreement shall terminate and be void and of no further force and effect, and all rights and obligations of the parties hereunder shall terminate without any further liability on the part of any party in respect thereof, upon the earliest to occur of (a) such date and time as the Merger Agreement is terminated in accordance with its terms, (b) upon the mutual written agreement of the Company and Subscriber to terminate this Subscription Agreement, (c) if, on the Closing Date of the Transaction, any of the conditions to Closing set forth in Section 2 of this Subscription Agreement have not been satisfied as of the time required hereunder to be so satisfied or waived by the party entitled to grant such waiver and, as a result thereof, the transactions contemplated by this Subscription Agreement are not consummated, or (d) June 30, 2021 (the "Outside Date"), if the Closing has not occurred by such date; provided, that nothing herein will relieve any Party from liability for any willful breach hereof prior to the time of termination, and each Party will be entitled to any remedies at law or in equity to recover losses, liabilities or damages arising from such breach. The Company shall notify Subscriber of the termination of the Merger Agreement promptly after the termination thereof.

7. Trust Account Waiver. Subscriber hereby acknowledges that the Company has established a trust account (the "Trust Account") containing the proceeds of its initial public offering (the "IPO") and from certain private placements occurring simultaneously with the IPO (including interest accrued from time to time thereon) for the benefit of the Company's public stockholders and certain other parties (including the underwriters of the IPO). For and in consideration of the Company entering into this Subscription Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Subscriber hereby (a) agrees that it does not now and shall not at any time hereafter have any right, title, interest or claim of any kind in or to any assets held in the Trust Account, and shall not make any claim against the Trust Account, regardless of whether such claim arises as a result of, in connection with or relating in any way to this Subscription Agreement or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (any and all such claims are collectively referred to hereafter as the "Released Claims"), (b) irrevocably waives any Released Claims that it may have against the Trust Account now or in the future as a result of, or arising out of, any negotiations, contracts or agreements with the Company, and (c) will not seek recourse against the Trust Account for any reason whatsoever; provided however, that nothing in this Section 7 shall be deemed to limit any Subscriber's right, title, interest or claim to the Trust Account by virtue of such Subscriber's record or beneficial ownership of securities of the Company acquired by any means other than pursuant to this Subscription Agreement, including but not limited to any redemption right with respect to any such securities of the Company or any Subscriber's right to distributions from the Trust Account in accordance with the Company's amended and restated certificate of incorporation in respect of Common Stock of the Company acquired by any means other than pursuant to this Subscription Agreement.

8. Miscellaneous.

a. All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) when sent by electronic mail, on the date of transmission to such recipient if sent during normal business hours of the recipient and, if not sent during normal business hours, then on the recipient's next Business Day, (iii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iv) four (4) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and, in each case, addressed to the intended recipient at its address specified on the signature page hereof or to such electronic mail address or address as subsequently modified by written notice given in accordance with this Section 8(a).

15

b. Subscriber acknowledges that the Company, the Placement Agent and others will rely on the acknowledgments, understandings, agreements, representations and warranties of Subscriber contained in this Subscription Agreement. Prior to the Closing, Subscriber agrees to promptly notify the Company and the Placement Agent if it becomes aware that any of the acknowledgments, understandings, agreements, representations and warranties of Subscriber set forth herein are no longer accurate in all material respects. The Company acknowledges that Subscriber, the Placement Agent and others will rely on the acknowledgments, understandings, agreements, representations and warranties of the Company contained in this Subscription Agreement. Prior to the Closing, the Company agrees to promptly notify Subscriber and the Placement Agent if it becomes aware that any of the acknowledgments, understandings, agreements, representations and warranties of the Company set forth herein are no longer accurate in all material respects.

c. Each of the Company, the Placement Agent and Subscriber is irrevocably authorized to produce this Subscription Agreement or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

d. Each Party shall pay all of its own expenses in connection with this Subscription Agreement and the transactions contemplated herein.

e. Neither this Subscription Agreement nor any rights that may accrue to Subscriber hereunder (other than the Subscribed Shares acquired hereunder, if any, and the rights set forth in Section 5) may be transferred or assigned. Neither this Subscription Agreement nor any rights that may accrue to the Company hereunder may be transferred or assigned (provided, that, for the avoidance of doubt, the Company may transfer the Subscription Agreement and its rights hereunder in connection with the consummation of the Transaction). Notwithstanding the foregoing, Subscriber may assign its rights and obligations under this Subscription Agreement to one or more of its affiliates or, with the Company's prior written consent, to another person, provided that no such assignment shall relieve Subscriber of its obligations hereunder if any such assignee fails to perform such obligations.

f. All the agreements, representations and warranties made by each party hereto in this Subscription Agreement shall survive the Closing.

g. The Company may request from Subscriber such additional information as the Company may reasonably deem necessary to evaluate the eligibility of Subscriber to acquire the Subscribed Shares, and Subscriber shall promptly provide such information as may be reasonably requested, to the extent readily available and to the extent consistent with its internal policies and procedures; *provided*, that the Company agrees to keep any such information provided by Subscriber confidential.

h. This Subscription Agreement may not be amended, modified, or waived except by an instrument in writing, signed by the party against whom enforcement of such amendment, modification or waiver is sought.

i. This Subscription Agreement constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof. Except as set forth herein, this Subscription Agreement shall not confer any rights or remedies upon any person other than the parties hereto and their respective permitted successors and assigns.

j. Except as otherwise provided herein, this Subscription Agreement shall be binding upon, and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns, and the agreements, representations, warranties, covenants and acknowledgments contained herein shall be deemed to be made by, and be binding upon, such heirs, executors, administrators, successors, legal representatives and permitted assigns.

16

k. If any provision of this Subscription Agreement shall be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Subscription Agreement shall not in any way be affected or impaired thereby and shall continue in full force and effect.

l. This Subscription Agreement may be executed and delivered in one or more counterparts (including by facsimile or electronic mail or in .pdf) and by different parties in separate counterparts, with the same effect as if all parties hereto had signed the same document. All counterparts so executed and delivered shall be construed together and shall constitute one and the same agreement.

m. This Subscription Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person; provided, however, that the Placement Agent shall be an intended third party beneficiary of the representations and warranties of the Company in Section 3 hereof and of the Subscriber in Section 4 hereof and, with respect thereto, shall be entitled to the rights and benefits hereunder and may enforce the provisions hereof as if it were a party hereto.

n. The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Subscription Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties hereto shall be entitled to an injunction or injunctions to prevent breaches of this Subscription Agreement and to enforce specifically the terms and provisions of this Subscription Agreement, this being in addition to any other remedy to which such party is entitled at law, in equity, in contract, in tort or otherwise.

o. This Subscription Agreement and all disputes, legal actions, suits and proceedings arising out of or relating to this Subscription Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the principles of conflicts of laws that would otherwise require the application of the law of any other state.

p. **EACH PARTY HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS SUBSCRIPTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY OR ANY AFFILIATE OF ANY OTHER SUCH PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. THE PARTIES AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS SUBSCRIPTION AGREEMENT OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS SUBSCRIPTION AGREEMENT.**

17

q. The parties agree that all disputes, legal actions, suits and proceedings arising out of or relating to this Subscription Agreement must be brought exclusively in the Court of Chancery of the State of Delaware and any state appellate court therefrom within the State of Delaware (or, if the Court of Chancery of the State of Delaware declines to accept jurisdiction over a particular matter, any federal court within the State of Delaware or, in the event each federal court within the State of Delaware declines to accept jurisdiction over a particular matter, any state court within the State of Delaware) (collectively the "Designated Courts"). Each party hereby consents and submits to the exclusive jurisdiction of the Designated Courts. No legal action, suit or proceeding with respect to this Subscription Agreement may be brought in any other forum. Each party hereto hereby irrevocably waives all claims of immunity from jurisdiction and any objection which such party may now or hereafter have to the laying of venue of any suit, action or proceeding in any Designated Court, including any right to object on the basis that any dispute, action, suit or proceeding brought in the Designated Courts has been brought in an improper or inconvenient forum or venue. Each of the parties hereto also agrees that delivery of any process, summons, notice or document to a party hereof in compliance with Section 8(a) of this Subscription Agreement shall be effective service of process for any action, suit or proceeding in a Designated Court with respect to any matters to which the parties have submitted to jurisdiction as set forth above.

r. This Subscription Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Subscription Agreement, or the negotiation, execution or performance of this Subscription Agreement, may only be brought against the entities that are expressly named as parties hereto (each, a "Party") and then only with respect to the specific obligations set forth herein with respect to such Party. Any obligations and/or restrictions applicable to a Party pursuant to this Subscription Agreement shall not apply to any of such Party's parent companies or any affiliate. No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, affiliate, agent, attorney or other representative of any Party or of any affiliate of any Party, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any Party under this Subscription Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

18

s. The Company shall, by 9:00 a.m., New York City time, on the first (1st) Business Day immediately following the date of this Subscription Agreement, issue one or more press releases or file with the Commission a Current Report on Form 8-K (collectively, the "Disclosure Document") disclosing, to the extent not previously publicly disclosed, all material terms of the transactions contemplated hereby (and by the Other Subscription Agreements), the Transaction and any other material, nonpublic information that the Company has provided to Subscriber at any time prior to the filing of the Disclosure Document. From and after the issuance of the Disclosure Document, Subscriber shall not be in possession of any material, non-public information received from the Company or any of its officers, directors or employees or agents, and Subscriber shall no longer be subject to any confidentiality or similar obligations under any current agreement, whether written or oral with Company, the Placement Agent, or any of their affiliates in connection with the Transaction. The Company understands and confirms that the Subscriber and its affiliates will rely on the foregoing representations in effecting transactions in securities of the Company. Notwithstanding the foregoing, the Company shall not publicly disclose the name of Subscriber or any affiliate or investment adviser of Subscriber, or include the name of Subscriber or any affiliate or investment adviser of Subscriber in any press release or in any filing with the Commission or any regulatory agency or trading market, without the prior written consent (including by e-mail) of Subscriber, except in the Registration Statement contemplated by Section 5 of this Subscription Agreement, as required by the federal securities laws, rules or regulations and/or to the extent such disclosure is required by other laws, rules or regulations, at the request of the staff of the Commission or any regulatory agency or under the rules and regulations of The Nasdaq Stock Market, in which case the Company shall provide Subscriber with prior written notice (including by e-mail) of such permitted disclosure, and shall reasonably consult with Subscriber regarding such disclosure.

t. The obligations of Subscriber under this Subscription Agreement are several and not joint with the obligations of any Other Subscriber or any other investor under the Other Subscription Agreements, and Subscriber shall not be responsible in any way for the performance of the obligations of any Other Subscriber or any other investor under the Other Subscription Agreements. The decision of Subscriber to purchase Subscribed Shares pursuant to this Subscription Agreement has been made by Subscriber independently of any Other Subscriber or any other investor and independently of any information, materials, statements or opinions as to the business, affairs, operations, assets, properties, liabilities, results of operations, condition (financial or otherwise) or prospects of the Company or any of its subsidiaries which may have been made or given by any Other Subscriber or investor or by any agent or employee of any Other Subscriber or investor, and neither Subscriber nor any of its agents or employees shall have any liability to any Other Subscriber or investor (or any other person) relating to or arising from any such information, materials, statements or opinions. Nothing contained herein or in any Other Subscription Agreement, and no action taken by Subscriber or any Other Subscriber or investor pursuant hereto or thereto, shall be deemed to constitute Subscriber and any Other Subscribers or other investors as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that Subscriber and any Other Subscribers or other investors are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Subscription Agreement and the Other Subscription Agreements. Subscriber acknowledges that no Other Subscriber has acted as agent for Subscriber in connection with making its investment hereunder and no Other Subscriber will be acting as agent of Subscriber in connection with monitoring its investment in the Subscribed Shares or enforcing its rights under this Subscription Agreement. Subscriber shall be entitled to independently protect and enforce its rights, including without limitation the rights arising out of this Subscription Agreement, and it shall not be necessary for any Other Subscriber or investor to be joined as an additional party in any proceeding for such purpose.

19

9. <u>Non-Reliance and Exculpation</u>. Subscriber acknowledges that it is not relying upon, and has not relied upon, any statement, representation or warranty made by any person, firm or corporation (including, without limitation, the Placement Agent, any of its affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing), other than the statements, representations and warranties of the Company expressly contained in <u>Section 3</u> of this Subscription Agreement, in making its investment or decision to invest in the Company. Subscriber acknowledges and agrees that none of the Placement Agent, its affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing, shall have any liability to Subscriber, or to any Other Subscriber or any other investor, pursuant to, arising out of or relating to this Subscription Agreement or any Other Subscription Agreement related to the private placement of the Collective Subscribed Shares, the negotiation hereof or thereof or its subject matter, or the transactions contemplated hereby or thereby, for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Collectively Subscribed Shares.

[Signature pages follow.]

20

**IN WITNESS WHEREOF**, each of the Company and Subscriber has executed or caused this Subscription Agreement to be executed by its duly authorized representative as of the date first set forth above.

FORUM MERGER III CORPORATION

By: _____
    Name:
    Title:

Address for Notices:

1615 South Congress Avenue, Suite 103, Delray Beach, Florida 33445

21

SUBSCRIBER:

Print Name: _____

By: _____

      Name:
      Title:

Address for Notices:

_____

_____

Name in which shares are to be registered:

_____

Number of Subscribed Shares subscribed for: _____

Price Per Subscribed Share:           $10.00

Aggregate Purchase Price:      $ _____

      You must pay the Purchase Price by wire transfer of United States dollars in immediately available funds to the account of the Company specified by the Company in the Closing Notice.

22

**ANNEX A**

**ELIGIBILITY REPRESENTATIONS OF SUBSCRIBER**

This Annex A should be completed and signed by Subscriber
and constitutes a part of the Subscription Agreement.

A.    QUALIFIED INSTITUTIONAL BUYER STATUS (Please check the box, if applicable)

☐    Subscriber is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act).

B.    ACCREDITED INVESTOR STATUS (Please check the box)

☐    Subscriber is an "accredited investor" (within the meaning of Rule 501(a) under the Securities Act) and has marked and initialed the appropriate box below indicating the provision under which it qualifies as an "accredited investor."

C.    AFFILIATE STATUS
(Please check the applicable box)

SUBSCRIBER:

☐    is:

☐    is not:

an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company or acting on behalf of an affiliate of the Company.

Rule 501(a), in relevant part, states that an "accredited investor" shall mean any person who comes within any of the below listed categories, or who the issuer reasonably believes comes within any of the below listed categories, at the time of the sale of the securities to that person. Subscriber has indicated, by marking and initialing the appropriate box below, the provision(s) below which apply to Subscriber and under which Subscriber accordingly qualifies as an "accredited investor."

☐    Any bank, registered broker or dealer, insurance company, registered investment company, business development company, or small business investment company (in each case as defined in Rule 501(a));

☐    Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000;

☐    Any employee benefit plan, within the meaning of the Employee Retirement Income Security Act of 1974, if a bank, insurance company, or registered investment adviser makes the investment decisions, or if the plan has total assets in excess of $5,000,000;

☐    Any corporation, Massachusetts or similar business trust, partnership or any organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

23

☐ Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

☐ Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000. For purposes of calculating a natural person's net worth: (a) the person's primary residence must not be included as an asset; (b) indebtedness secured by the person's primary residence up to the estimated fair market value of the primary residence must not be included as a liability (except that if the amount of such indebtedness outstanding at the time of calculation exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess must be included as a liability); and (c) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the residence must be included as a liability;

☐ Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

☐ Any trust with assets in excess of $5,000,000, not formed to acquire the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Securities Act; or

☐ Any entity in which all of the equity owners are accredited investors meeting one or more of the above tests or one of the following tests.

[Specify which tests:                    ]

SUBSCRIBER:
Print Name:

By: _____
Name:
Title:

24

# Exhibit 6

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

---

**FORM 8-K**

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**January 26, 2022**
Date of Report (Date of earliest event reported)

---

**ELECTRIC LAST MILE SOLUTIONS, INC.**
(Exact Name of Registrant as Specified in its Charter)

| **Delaware** | **001-39457** | **84-2308711** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1055 W. Square Lake Road**
**Troy, Michigan 48098**
(Address of Principal Executive Offices) (Zip Code)

**(888) 825-9111**
(Registrant's telephone number, including area code)

**N/A**
(Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.0001 par value per share | ELMS | The Nasdaq Stock Market LLC |
| Redeemable warrants, each whole warrant exercisable for one share of common stock, each at an exercise price of $11.50 per share | ELMSW | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02     Results of Operations and Financial Condition.**

Electric Last Mile Solutions, Inc. (the "Company") expects to report that it had approximately $132.0 to $142.0 million in cash and cash equivalents, which includes $25.0 to 30.0 million of restricted cash, as of December 31, 2021. These estimates are unaudited and preliminary and do not present all information necessary for an understanding of the Company's financial condition as of December 31, 2021 and its results of operations for the three months and year ended December 31, 2021. The completion of the Company's year-end accounting procedures, including execution of the Company's internal control over financial reporting, and audit of the Company's financial statements for the year ended December 31, 2021 is ongoing and could result in changes to the information set forth above.

**Item 3.01     Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

*Audit Committee Independence*

On February 1, 2022, the Company notified The Nasdaq Stock Market LLC ("Nasdaq") of the Company's non-compliance with Nasdaq's audit committee composition requirements set forth in Nasdaq Listing Rule 5605(c)(2)(A), which require, among other things, an audit committee to consist of at least three members, each of whom is independent. The non-compliance was a result of David Boris, a member of the Audit Committee, not qualifying as independent pursuant to Nasdaq Listing Rule 5605(c)(2)(A)(ii).

In order to address this matter, the Board removed Mr. Boris as a member of the Audit Committee, and appointed Brian Krzanich, a member of the Board who meets all audit committee independence and other eligibility requirements identified in Nasdaq Listing Rule 5605(c)(2)(A), to serve as a member of the Audit Committee, such that the Audit Committee consists of Richard Peretz, as chair, Neil Goldberg and Brian Krzanich. Following such actions, the Company believes it has regained compliance with the audit committee composition requirements set forth in Nasdaq Listing Rule 5605(c)(2)(A).

**Item 4.02.     Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On January 26, 2022, on the basis of the Special Committee investigation discussed in Item 8.01 below which is incorporated by reference into this Item 4.02, the Board concluded that the previously issued consolidated financial statements of Electric Last Mile, Inc. as of December 31, 2020 and the period from August 20, 2020 (inception) through December 31, 2020 included in the Company's Registration Statement on Form S-1 (File No. 333-258146) (the "Audited Financial Statements") should be restated and, therefore, should no longer be relied upon. In addition, the Board concluded that the Company's financial statements as of and for the six months ended June 30, 2021 included in its Quarterly Report on Form 10-Q (File No. 001-39357) filed on August 13, 2021 and the Company's financial results as of and for the nine months ended September 30, 2021 included in its Quarterly Report on Form 10-Q (File No. 001-39357) filed on November 12, 2021 should no longer be relied upon (together with the Audited Financial Statements, the "Non-Reliance Periods").

In connection with this conclusion, the Company, together with its advisors, is evaluating the accounting and treatment of certain equity issuances to executive officers discussed in Item 8.01 of this Current Report on Form 8-K. The Company has engaged legal counsel and an accounting adviser with respect to this matter. Although the Company cannot, at this time, estimate when it will file its restated financial statements for the Non-Reliance Periods, it is diligently pursuing completion of the restatement, including with respect to an evaluation of the Company's financial statement reserves for tax payments and contingencies.

The Company has undertaken an assessment of the accuracy of the Company's historical financial statements and related disclosures that were contained in the aforementioned Registration Statement on Form S-1 and Quarterly Reports on Form 10-Q. In light of the foregoing, the Company also expects to determine that material weaknesses exist in the Company's internal control over financial reporting and that disclosure controls and procedures were ineffective during the Non-Reliance Period. The Company will amend any disclosures pertaining to its evaluation of such controls and procedures as appropriate in connection with our anticipated restated filings.

**Item 5.02    Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangement of Certain Officers.**

In connection with the findings of the Special Committee investigation and related discussions between Jason Luo and James Taylor and members of the Company's Board of Directors (the "Board") described under Item 8.01 herein, on February 1, 2022, Mr. Luo resigned from his positions as Executive Chairman and Chairman of the Board, and Mr. Taylor resigned from his positions as President and Chief Executive Officer and as a member of the Board, both effective immediately. Each of Mr. Luo and Mr. Taylor have agreed to enter into consulting arrangements with the Company, as further described below.

In connection with Mr. Taylor's resignation, he and the Company agreed to settlement terms, pursuant to which the Company and Mr. Taylor agreed to a mutual release of claims (including payment by the Company of certain specified taxes that may result from Mr. Taylor's equity purchase referred to above), as well as non-competition and non-solicitation covenants for up to 18 months. As part of this arrangement, Mr. Taylor will serve as a consultant to the Company for a period of two years, on terms to be commercially agreed upon, for an annual wage of $300,000. Mr. Taylor will retain his 2021 cash bonus, 2021 performance RSUs and health benefits. The consulting agreement will be terminable at the option of either the Company or Mr. Taylor with 60 days' notice. Pursuant to the settlement, Mr. Taylor will surrender 1.8 million shares of the Company's common stock to the Company and, no later than April 11, an additional number of shares of Company common stock with a value of approximately $3.3 million based on a VWAP calculation. Mr. Taylor will be subject to a standstill for 18 months, during which he is precluded from taking any action in connection with Company's board or shareholders. Mr. Taylor will retain his existing indemnification and advancement rights. Mr. Taylor has agreed to a six month lockup from the date hereof and has surrendered his existing registration rights. The final settlement agreement, which the Company and Mr. Taylor expect to enter into as soon as practicable, will contain customary restrictive covenants, social media restrictions, mutual non-disparagement clauses, and standard representations and warranties.

In connection with Mr. Luo's resignation, he and the Company agreed to settlement terms, pursuant to which the Company and Mr. Luo agreed to a mutual release of claims, as well as non-competition and non-solicitation covenants for at least 18 months. As part of this arrangement, Mr. Luo will serve as a consultant to the Company for a period of two years for which he will receive no additional compensation. The consulting agreement will be terminable at the option of either the Company or Mr. Luo with 60 days' notice. Mr. Luo will also become a limited observer to the Company's Board of Directors for a period of two years. Pursuant to the settlement, Mr. Luo will promptly surrender 6.0 million shares of the Company's common stock to the Company. In addition, no later than 120 days after the date hereof, Mr. Luo will pay an additional amount of cash and stock, at his option, totaling $10 million in value, with any stock value based on a VWAP calculation. Mr. Luo will retain his health benefits. Mr. Luo will be subject to a standstill for eighteen months, during which he is precluded from taking any action in connection with Company's board or shareholders. Mr. Luo will retain his existing indemnification and advancement rights. Mr. Luo has agreed to a six month lockup (with limited carveouts) from the date hereof and has surrendered his existing registration rights. The final settlement agreement, which the Company and Mr. Luo expect to enter into as soon as practicable, will contain customary restrictive covenants, social media restrictions, mutual non-disparagement clauses, and standard representations and warranties.

On February 1, 2022, the Board appointed Shauna McIntyre as Interim Chief Executive Officer and principal executive officer, effective immediately. On the same date, the Company entered into an employment agreement with Ms. McIntyre (the "Employment Agreement"), the material terms and conditions of which are summarized below. The Company has commenced a search for a permanent President and Chief Executive Officer.

Shauna McIntyre, age 50, was the President, Automotive of Ouster, Inc. from October 2021 to January 2022. Prior to that, she served as the Chief Executive Officer of Sense Photonics, an automated LiDAR, from April 2020 until October 2021. Ms. McIntyre served as Program Lead and in other roles at Google Automotive Services from October 2016 to April 2020. Prior to that, she held integral roles at Google Automotive Services, Egon Zehnder International, Achates Power, Inc., Honeywell International, Inc., and Ford Motor Company. Ms. McIntyre serves on the Board of Directors for Lithia Motors, Inc. (NYSE: LAD), the Los Altos Educational Foundation and was also a co-founding board member for the North American Council for Freight Efficiency. Ms. McIntyre holds a B.S. from the University of California, Los Angeles, an M.S. from the University of California, Berkeley, and an M.B.A. from Harvard.

In connection with her appointment, the Company entered into a binding employment term sheet setting forth the principal terms of an employment agreement (the "Employment Agreement") with Ms. McIntyre.  The initial term of Ms. McIntyre's employment is 90 days.  Ms. McIntyre's employment will be terminable at will by the Company or her at any time (for any reason or no reason).  Except with respect to a termination by the Company for "cause", as that term will be defined in the Employment Agreement, the Company or Ms. McIntyre shall give the other party at least 30 days' written notice to terminate her employment.  Ms. McIntyre will receive an annual base salary of $550,000, pro-rated for any partial year of employment.  She will be entitled to participate in any annual incentive program maintained by the Company from time to time in which its similarly-situated executives participate, with a target bonus opportunity equal to 100% of her salary paid with respect to the applicable performance year.  The payment of any bonus pursuant to such program will be subject to Ms. McIntyre's continued employment through the bonus payment date.  Ms. McIntyre will be entitled to receive an amount equal to $300,000, payable in cash and/or common stock of the Company (determined by the Board in its sole discretion) upon expiration of the initial term (including in connection with Ms. McIntrye's appointment as the Company's President and Chief Executive Officer, but excluding in connection with a termination of employment by the Company for "cause" or by Ms. McIntyre without "good reason", as those terms will be defined in the Employment Agreement). In addition, if she is appointed as the Company's President and Chief Executive Officer, she will receive a restricted stock unit award with an aggregate value of $12,000,000.

If the Company terminates Ms. McIntyre's employment without "cause" or terminates her employment for "good reason", then Ms. McIntyre shall receive: (i) an amount equal to her annual base salary, payable in substantially equal installments over the 12-month period following the termination date; (ii) 12 months' Company-subsidized COBRA; (iii) pro-rated target annual bonus (based on time employed for the year of termination), payable in a lump sum within 60 days following the termination date; and (iv) any earned, but not yet paid, annual bonus with respect to a prior performance year, payable when bonuses are paid to the Company's executives (but no later than March 15 of the year following the year in which the termination date occurs). If either such termination occurs within three months prior to, on or within 12 months following a "change in control" (as defined in the Company's 2020 Incentive Plan), then Ms. McIntyre instead shall receive: (i) an amount equal to 1.5 times the sum of her annual base salary and target annual bonus, payable in substantially equal installments over the 18-month period following the termination date or, to the extent permitted in accordance with Internal Revenue Code Section 409A, in a lump sum within 60 days following the termination date; (ii) 18 months' Company-subsidized COBRA; (iii) pro-rated target annual bonus (based on time employed for the year of termination), payable in a lump sum within 60 days following the termination date; and (iv) any earned, but not yet paid, annual bonus with respect to a prior performance year, payable when bonuses are paid to the Company's executives (but no later than March 15 of the year following the year in which the termination date occurs). Receipt of severance subject to Ms. McIntyre's execution within 21 days (or 45 days, if required by law) following the termination date, and non-revocation, of a general release of claims against the Company, and ongoing compliance with applicable restrictive covenants. The Employment Agreement will contain customary restrictive covenants related to confidentiality, intellectual property assignment, non-competition, employee non-solicitation, and mutual non-disparagement.

Ms. McIntyre has entered into the Company's standard form indemnification agreement.

On February 1, 2022, the Board appointed Brian Krzanich as Chair of the Board, effective immediately. On February 1. the Board appointed Richard Peretz as chair of the Compensation Committee of the Board (the "Compensation Committee"), replacing Brian Krzanich, such that the Compensation Committee consists of Richard Peretz, as chair, and Neil Goldberg.

**Item 8.01    Other Events.**

*Special Committee Investigation*

On November 25, 2021, the Company's Board formed an independent committee of the Board (the "Special Committee") to conduct and direct an investigation, review and analysis of certain sales of equity securities made by and to individuals associated with the Company, the corporate law, disclosure and tax consequences of those transactions, and other issues that arise in connection therewith (such sales of equity securities, the "Transactions"). The Special Committee was also authorized at that time to report the resulting advice, findings and conclusions, and proposed actions to the Board. The Special Committee was assisted in its investigation by Brown Rudnick LLP ("Brown Rudnick"), and an outside consultant working at Brown Rudnick's direction, FTI Consulting, Inc. ("FTI").

Based on the information obtained during the investigation, as reported to our Board, the Company has concluded that in November and December 2020, shortly before the December 10, 2020 entry into definitive documentation for a business combination (the "Business Combination") between our accounting predecessor, Electric Last Mile, Inc. ("ELMI"), and Forum Merger III Corporation ("Forum"), certain ELMI executives directly or indirectly purchased equity in ELMI at substantial discounts to market value. The Company is further evaluating whether it properly disclosed the equity purchases entered into by certain ELMI executives, whether it properly assessed the accounting treatment and compensation expense associated with such purchases, and whether it properly paid and withheld the taxes associated with such purchases. James Taylor purchased equity in these transactions. Jason Luo participated in these and other transactions and directly or indirectly purchased and sold equity in such transactions.

The Company is basing its evaluation on the basis of the following background: In August and September 2020, Mr. Luo founded and funded ELMI by causing ELMI to issue 1,000 shares of common stock to Mr. Luo's entity, AJ Capital, Inc., at $10 per share. Subsequently, on September 18, 2020, Forum, on the one hand, and ELMI and Messrs. Luo and Taylor, on the other hand, executed a letter of intent for a proposed business combination transaction between Forum and ELMI, estimating the total enterprise value ascribed to the combined company at $1.3 billion. At that time, Mr. Luo owned, through AJ Capital, Inc., 100% of the issued shares of ELMI. Thereafter, on November 19, 2020, ELMI issued and sold 99,000 shares of common stock for $990,000 to seven investors (the "November 2020 Equity Transaction"). As described in the Company's S-1 and Proxy Statement, those seven investors included an entity affiliated with Mr. Taylor, called The JET Group, LLC, which purchased 6,461 shares of ELMI common stock at $10 per share, for a total of $64,610 and two entities affiliated with Mr. Luo, which purchased 78,016 shares of ELMI common stock at $10 per share, for a total of $780,160. Specifically, Luo Pan Investment II, LLC purchased 20,000 shares of ELMI common stock for $200,000, and AJ Capital Investment, LLC purchased 58,016 shares of ELMI common stock for $580,160. In addition, on December 8, 2020, Mr. Luo through AJ Capital, Inc. sold 1,000 shares of ELMI common stock for $10 per share for a total of $10,000 directly or indirectly to other members of senior management (the "December 2020 Equity Transaction").

Prior to the November 2020 Equity Transaction and the December 2020 Equity Transaction, ELMI does not appear to have obtained an independent valuation to determine the fair market value per share of its common stock as of or contemporaneous with the date of those transactions. Because Mr. Taylor may have been seen as providing services to ELMI at the time he participated in the November 2020 Equity Transaction, the Company is evaluating whether ELMI should have treated as compensation to Mr. Taylor any difference between (a) the fair market value of the shares sold by ELMI to The JET Group, LLC and (b) the $10 per share Mr. Taylor paid or caused to be paid. The Company is further evaluating whether a compensation expense should have been recorded and taxes paid in connection with the December 2020 Equity Transaction.

In announcing the Business Combination on December 11, 2020, the Company disclosed an implied equity value for the combined company of approximately $1.4 billion. When the business combination was consummated on June 25, 2021, each ELMI share, for which such executives had paid $10 per share, was exchanged for approximately 800 shares of Electric Last Mile Solutions, Inc.

The Company did not, however, recognize any compensation associated with Mr. Taylor's participation in the November 2020 Equity Transaction, or in connection with the December 2020 Equity Transaction; disclose any compensation associated with those transactions; or withhold or pay taxes in connection with that compensation. Other senior members of management also participated in such transactions in November and December 2020. Furthermore, in connection with the Special Committee investigation, Messrs. Luo and Taylor provided responses to the Special Committee that are believed to be inconsistent with documents reviewed by the Special Committee and its counsel.

In light of the foregoing, the Company expects to determine that material weakness exists in the Company's internal control over financial reporting and that disclosure controls and procedures were ineffective during the Non-Reliance Period. The Company will amend any disclosures pertaining to its evaluation of such controls and procedures as appropriate in connection with our anticipated restated filings.

**Forward-Looking Statements**

This report contains forward-looking statements, and any statements other than statements of historical fact could be deemed to be forward-looking statements. These forward-looking statements include, among other things, statements regarding the Company's cash and cash equivalents and restricted cash of December 31, 2021, and its understanding of its financial condition as of December 31, 2021 and its results of operations for the three months and year ended December 31, 2021; execution of the Company's internal control over financial reporting; compliance with the audit committee composition requirements set forth in the Nasdaq rules; the Company's intention to restate its prior consolidated financial statements; the evaluation of the accounting and treatment of certain equity issuances to executive officers; an evaluation of the Company's financial statement reserves for tax payments and contingencies; the determination that material weaknesses exist in the Company's internal controls over financial reporting; certain terms contained in the settlement agreements with each of Mr. Taylor and Mr. Luo; certain terms contained in the employment agreement with Ms. McIntyre; the Special Committee's investigation and other surrounding the Company's expectations with respect to its evaluation of the transactions related thereto. These statements are subject to risks and uncertainties, including the risk that the preparation of the restated consolidated financial statements or other subsequent events may require the Company to make additional adjustments to its financial statements or may delay future filings, and actual results may differ materially from these statements. You should not place undue reliance on these forward-looking statements, which speak only as of the date of this report. The Company undertakes no obligation to revise or update any forward-looking statements to reflect events or circumstances after the date hereof.

**Item 9.01 Financial Statements and Exhibits.**

**(d) Exhibits**

The following exhibits are filed herewith:

| Exhibit Number | Description |
|---|---|
| 10.1 | Binding Employment Agreement Term Sheet, by and between the Company and Shauna McIntyre, dated February 1, 2022 |
| 99.1 | Press Release, dated February 1, 2022 |
| 104 | Cover Page Interactive Data File (the cover page XBRL tags are embedded within the Inline XBRL document) |

4

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: February 1, 2022

**ELECTRIC LAST MILE SOLUTIONS, INC.**

By: /s/ Robert Song

Robert Song
Chief Financial Officer and Treasurer

5

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 12, 2024, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

FRIEDLANDER & GORRIS, P.A.
Jeffrey M. Gorris (Bar No. 5012)
David Hahn (Bar No. 6417)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3508
*jgorris@friedlandergorris.com*
*dhahn@friedlandergorris.com*

ROBBINS GELLER RUDMAN
& DOWD LLP
Brian E. Cochran
655 West Broadway, Suite 1900
San Diego, CA 92101
*bcochran@rgrdlaw.com*

ROBBINS GELLER RUDMAN
& DOWD LLP
Samuel H. Rudman
Mary K. Blasy
58 South Service Road, Suite 200
Melville, NY 11747
*srudman@rgrdlaw.com*
*mblasy@rgrdlaw.com*

ROBBINS GELLER RUDMAN
& DOWD LLP
Desiree Cummings
C. Chad Johnson
Noam Mandel
Jonathan Zweig
420 Lexington Avenue, Suite 1832
New York, NY
*dcummings@rgrdlaw.com*
*chadj@rgrdlaw.com*
*noam@rgrdlaw.com*
*jzweig@rgrdlaw.com*

*Attorneys for Lead Plaintiffs*

   */s/Lakshmi A. Muthu*
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Tammy L. Mercer (No. 4957 )
Lakshmi A. Muthu (No. 5786)

M. Paige Valeski (No. 6336)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
tmercer@ycst.com
lmuthu@ycst.com
pvaleski@ycst.com

*Attorneys for Defendants Marshall Kiev and David Boris*

31176182.1