## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

SHMUEL LEVY, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

        vs.

JASON LUO, JAMES TAYLOR, ALBERT
LI, MARSHALL KIEV, DAVID BORIS,
and BDO USA, LLP,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 23-cv-653 (GBW)

<u>CLASS ACTION</u>

### MEMORANDUM OF LAW IN SUPPORT OF BDO USA LLP'S<br><u>MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT (CORRECTED)</u>

**MCDERMOTT, WILL & EMERY LLP**

OF COUNSEL:

Joel C. Haims
Kierstin S. Fowler
One Vanderbilt Avenue
New York, NY 10017
Tel:  212.547.5589
jhaims@mwe.com
ksfowler@mwe.com

Ethan H. Townsend (#5813)
Daniel T. Menken (#6309)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, DE 19801
Tel: (302) 485-3900
ehtownsend@mwe.com
dmenken@mwe.com

*Attorneys for Defendant BDO USA, LLP*

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDINGS .........................................................1

SUMMARY OF THE ARGUMENT ..............................................................................1

STATEMENT OF RELEVANT FACTS ..........................................................................2

    I.  THE DE-SPAC TRANSACTION AND THE PIPE OFFERING ........................................2

    II.  BDO'S ROLE.............................................................................................3

ARGUMENT ...............................................................................................................5

    I.  PLAINTIFFS DO NOT PLEAD A MISSTATEMENT OF FACT BY BDO......................6

        A.  BDO's Statements Are Statements of Opinion..................................................7

        B.  Plaintiffs Fail to Plead Falsity Under Omnicare ............................................8

            1.  Plaintiffs Do Not Allege BDO Did Not Honestly Believe Its Statement ...............8

            2.  The ELM Audit Opinion Does Not Contain Embedded Statements of Fact ..........9

            3.  The ELM Audit Opinion Does Not Imply Untrue Facts or Omit Appropriate Qualifying Language ....................................................................................11

    II.  PLAINTIFFS FAIL TO PLEAD SCIENTER AGAINST BDO.......................................11

        A.  Plaintiffs Fail to Allege Motive and Opportunity .........................................12

        B.  Plaintiffs Fail to Plead Evidence of Conscious Recklessness.....................12

            1.  Plaintiffs' Allegations of Professional Standards Violations Do Not Establish Scienter ...............................................................................................13

            2.  Plaintiffs' "Red Flags" Theory Fails to Allege Scienter.......................................14

    III.  PLAINTIFFS HAVE NOT PLEAD RELIANCE ON THE ELM AUDIT OPINION .......17

        A.  Plaintiffs Do Not Plead a Basis for Presumed Reliance ............................18

CONCLUSION..........................................................................................................21

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
  2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012)................................................................12, 15, 16

*AES Corp. v. Dow Chem. Co.*,
  325 F.3d 174 (3d Cir. 2003)................................................................................................20

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972).............................................................................................................18

*In re Atlas Mining Co., Sec. Litig.*,
  670 F. Supp. 2d 1128 (D. Idaho 2009) ...............................................................................13

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).............................................................................................................18

*In re Beacon Assoc. Litig.*,
  745 F.Supp.2d 386 (S.D.N.Y. 2010)....................................................................................17

*Buttonwood Tree Value Partners, LP v. Sweeney*,
  910 F. Supp. 2d 1199 (C.D. Cal. 2012) ..............................................................................11

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)................................................................................................17

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) ..................................................................................................8

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  129 F. Supp. 3d 48 (S.D.N.Y. 2015).....................................................................................8

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  2016 WL 6652731 (S.D.N.Y. Nov. 10, 2016).......................................................................9

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) ..............................................................................................11

*In re Grand Canyon Educ., Inc. Sec. Litig.*,
  2021 WL 3491779 (D. Del. Aug. 9, 2021) ............................................................................6

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
  2017 WL 1536223 (D.N.J. Apr. 27, 2017) ............................................................................9

*In re Ikon Off. Sols., Inc.*,
    277 F.3d 658 (3d Cir. 2002)...................................................................................................7

*In re Initial Pub. Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006)...................................................................................................18

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009).................................................................................................11

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ................................................................................14, 17

*Johnson v. CBD Energy Ltd.*,
    2016 WL 3654657 (S.D. Tex. July 6, 2016)....................................................................10, 11

*Kennilworth Partners L.P. v. Cendant Corp.*,
    59 F. Supp. 2d 417 (D.N.J. 1999) .......................................................................................14

*Keystone Assocs. LLC v. Barclays Bank PLC*,
    2020 WL 109008 (D. Del. Jan. 9, 2020)..............................................................................12

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
    2020 WL 5026553 (D. Del. Aug. 25, 2020) .........................................................................18

*Lord Abbett Inv. Tr.-Lord Abbett Short Duration Income Fund v. Valeant Pharms. Int'l, Inc.*,
    2018 WL 3637514 (D.N.J. July 31, 2018)............................................................................11

*Martin v. GNC Holdings, Inc.*,
    757 F. App'x 151 (3d Cir. 2018) .........................................................................................12

*McCabe v. Ernst & Young, LLP.*,
    494 F.3d 418 (3d Cir. 2007)..................................................................................................5

*McLean v. Alexander*,
    599 F.2d 1190 (3d Cir. 1979).......................................................................................6, 12, 13

*Mehedi v. View, Inc.*,
    2023 WL 3592098 (N.D. Cal. May 22, 2023) ......................................................................10

*Nappier v. Pricewaterhouse Coopers LLP*,
    227 F. Supp. 2d 263 (D.N.J. 2002) ......................................................................................13

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015).............................................................................................7, 8, 9, 11

*Querub v. Hong Kong*,
    649 F. App'x 55 (2d Cir. 2016) .............................................................................................7

*In re Robinhood Ord. Flow Litig.*,
  2023 WL 4543574 (N.D. Cal. Jan. 18, 2023) ...........................................................................18

*In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*,
  311 F.3d 198 (3d Cir. 2002).....................................................................................................6

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000).....................................................................................................17

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
  96 F. Supp. 3d 325 (S.D.N.Y. 2015).........................................................................................9

*Stephenson v. Citco Grp. Ltd.*,
  700 F. Supp. 2d 599 (S.D.N.Y. 2010).......................................................................................11

*In re Synchronoss Techs., Inc. Sec. Litig.*,
  2019 WL 2849933 (D.N.J. July 2, 2019)...................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..................................................................................................................5

*W. Virginia Inv. Mgmt. Bd. v. Doral Fin. Corp.*,
  344 F. Appx 717 (2d Cir. 2009)................................................................................................14

*Wynne v. Equilease Corp.*,
  1995 WL 764236 (S.D.N.Y. Dec. 27, 1995) ...........................................................................16

*Yu-Sze Yen v. Landwin Grp., LLC*,
  2010 WL 11549679 (C.D. Cal. Dec. 8, 2010) ..........................................................................19

*Zech Cap. LLC v. Ernst & Young Hua Ming*,
  636 F. App'x 582 (2d Cir. 2016)...............................................................................................11

**Statute**

15 U.S.C. § 78u-4(b)(2) ...........................................................................................................1, 5, 11

iv

## NATURE AND STAGE OF THE PROCEEDINGS

Defendant BDO USA, LLP ("BDO")[1] submits this Memorandum of Law in Support of its Motion to Dismiss the Amended Class Action Complaint (the "AC") filed by plaintiffs Shmuel Levy, Isidore H. Mayrock, Izac Ben-Shmuel, and Robert Green (collectively, the "Plaintiffs") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and Section 10(b) of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) (the "PSLRA").

## SUMMARY OF THE ARGUMENT

Plaintiffs bring this federal securities class action on behalf of purchasers of Electric Last Mile Solutions, Inc. ("ELMS") (f/k/a Forum Merger III Corporation ("FIII")) stock in a private investment in public equity ("PIPE") offering (the "PIPE Offering"). In the AC, Plaintiffs allege that Electric Last Mile, Inc. ("ELM"), the operating entity that merged with FIII on June 25, 2021, to become ELMS, failed to record non-cash compensation expenses from stock sales in November and December 2020, thereby inflating ELM's 2020 financial performance. ELM's financial statements were included in a filing made by FIII with the Securities and Exchange Commission ("SEC") on June 9, 2021. ELMS disclosed that it was evaluating its accounting treatment for the November and December 2020 stock sales the following year.

Plaintiffs allege that BDO, ELM's auditor, did not perform sufficient audit procedures to detect a purported misapplication by ELM of generally accepted accounting principles ("GAAP"), and therefore its audit opinion issued in connection with ELM's 2020 financial statements (the "ELM Audit Opinion") was false and misleading. However, the AC falls short of alleging facts to meet the pleading requirements for securities fraud claims against an independent auditor such as BDO.

---

[1] In July 2023, BDO USA, LLP changed its name to BDO USA, P.C. in connection with its conversion to an employee stock ownership plan.

*First*, Plaintiffs fail to allege that BDO made a material misstatement. The only "statement" attributable to BDO, the ELM Audit Opinion, is an opinion and the AC does not plead facts suggesting that BDO did not honestly believe or lacked a reasonable basis for its opinion.

*Second*, Plaintiffs fail to allege that BDO had the requisite scienter—that it intended to defraud FIII's PIPE investors. Plaintiffs focus their allegations on the theory that BDO acted with conscious recklessness by raising questions as to what BDO "should have assessed" and "should have identified" had it not supposedly (1) "violated several PCAOB auditing standards" (AC ¶ 117) and (2) ignored "red flags," including a letter from the SEC to FIII's CEO (the "SEC Comment Letter") (*id.* ¶¶ 125, 131-34), when reviewing ELM's subjective determination of the value of the stock issued in the November and December 2020 transactions. Plaintiffs' allegations do not come close to satisfying the heightened pleading standards that apply to securities fraud claims against independent auditors—*i.e.*, that BDO acted so recklessly that its audit of ELM was a sham.

*Third*, Plaintiffs fail to plead reliance. The PIPE Offering investors *committed* to purchase FIII stock in the PIPE Offering at a set price on December 10, 2020, *five months* before the ELM Audit Opinion was issued. This timing refutes contrary allegations of reliance on the ELM Audit Opinion in deciding to purchase FIII stock.

For these reasons, BDO respectfully requests that the Court grant its motion to dismiss.

## STATEMENT OF RELEVANT FACTS

### I.    THE DE-SPAC TRANSACTION AND THE PIPE OFFERING

ELMS was formed on June 25, 2021, as the result of a merger between FIII and ELM (the "Merger"). (AC ¶ 1.) FIII was a special purpose acquisition company that had its initial public offering in August 2020. (*Id.* ¶¶ 1, 30.) ELM was formed in August 2020, and was a privately held electric vehicle company. (*Id.* ¶ 20.) FIII and ELM executed a letter of intent to merge on

September 18, 2020. (*Id.* ¶¶ 33.) At the time, Defendant Luo owned 100% of ELM through an entity known as AJ Capital, Inc. (*Id.*)

On November 19, 2020, "Defendants Luo and Taylor caused ELM to issue 99,000 shares of ELM common stock to entities owned by Defendants Luo and Taylor, as well as to four unidentified purchasers, for $10 per share" (the "November 2020 Equity Transaction"). (*Id.* ¶ 48.) On December 8, 2020, "Defendant Luo sold 1,000 shares of ELM common stock also at $10 per share to an entity owned and controlled by ELM's Chief Operating Officer Hailiang (Jerry) Hu and ELM's General Counsel Benjamin Wu" (the "December 2020 Equity Transaction" and, together with the November 2020 Equity Transaction, the "Equity Transactions"). (*Id.* ¶ 50.) On December 11, 2020, FIII and ELM executed a definitive merger agreement. (*Id.* ¶ 42.)

On that same day, FIII also announced an agreement with investors (the "PIPE Investors") to issue and sell to the PIPE Investors, pursuant to a subscription agreement (the "Subscription Agreement"), "an aggregate of 13.0 million shares of [FIII] Common Stock at $10.00 per share[.]" (*Id.*) The PIPE Offering "was a private placement of unregistered common stock" (*Id.* ¶ 41) and its closing was "contingent upon the…occurrence of the closing of the [Merger]." (*Id.* ¶ 36.)

On June 9, 2021, FIII issued a Proxy Statement (the "Proxy") to solicit votes on approving the Merger. (*Id.* ¶ 43.) On June 24, 2021, FIII shareholders approved the Merger. (*Id.* ¶ 44.) The PIPE Offering closed the same day. (*Id.* ¶ 2.) The Merger closed on June 25, 2021. (*Id.* ¶ 45.)

## II.    BDO'S ROLE

BDO was engaged to audit, and issue an opinion on, ELM's financial statements (the "ELM Financials") for the period from August 20, 2020 to December 31, 2020. (*Id.* ¶¶ 7, 28.) The ELM Audit Opinion, dated May 6, 2021, provides in part:

3

*Opinion* **on the Financial Statements**

> We have audited the accompanying balance sheet of Electric Last Mile, Inc. (the "Company") as of December 31, 2020, the related statements of operations and comprehensive loss, shareholders' deficit, and cash flows for the period from August 20, 2020 (inception) through December 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our *opinion*, the financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020, and the results of its operations and its cash flows for the period from August 20, 2020 (inception) through December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

(Proxy Statement F-89 (emphasis added).)    ELM's Financials and the ELM Audit Opinion were included in the Proxy FIII used to solicit votes for the Merger. (AC ¶ 7.)

On February 1, 2022, ELMS disclosed that it had determined that Defendants Luo, Taylor, and other senior members of ELM's management purchased ELM common stock in the Equity Transactions "at substantial discounts to market value without obtaining an independent valuation." (Feb. 1, 2022 Form 8-K, Ex. 99.1; AC ¶ 89.) ELMS also disclosed that it was "evaluating the accounting and treatment" of the Equity Transactions in ELM's 2020 financial statements. (Feb. 1, 2022 Form 8-K, Ex. 99.1.)

The accounting issue at the heart of Plaintiffs' allegations is the supposed "issuance of cheap stock."[2] (*Id.* ¶ 130.) Plaintiffs allege that under GAAP, "ELM was required to determine the fair value of the shares sold in the 2020 Equity Transactions and to record as a compensation

---

[2] The Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") is the source of authoritative generally accepted accounting principles. ASC 718 governs accounting for share-based transactions with employees and non-employees. (AC ¶ 77.) Under ASC 718, when shares are issued or sold to persons providing services to the company, the company is required to recognize as compensation expense the difference between: (a) the fair market value of the shares issued or sold to the persons or entities providing services, and (b) the price paid for those shares by the recipient. (*Id.*) ASC 718-10-30-6 requires compensation expense to be based on the value of the compensation awards at grant date. (*Id.*) Under ASC 718-10-15-4, if a related party or other economic interest holder of the company grants an employee of the company an instrument that falls within the scope of ASC 718, that transaction should also be accounted for by the company as stock-based compensation. (*Id.* ¶ 79.)

expense any difference between the fair value of the shares sold in those transactions and the price paid by the recipients of those shares." (*Id.* ¶ 79.) Plaintiffs allege that the failure to properly record "share-based compensation at fair market value" (*id.* ¶ 132) resulted in Plaintiffs purchasing "ELMS common stock directly in the PIPE Offering at artificially inflated prices" (*id.* ¶ 15).

Plaintiffs allege that "BDO knew when it conducted its audit of ELM that ELM planned to go public through a de-SPAC transaction with FIII, and BDO should have identified share-based compensation and potential issuance of the company stock to company insiders as a significant risk requiring an appropriate audit response." (*Id.* ¶ 131.) Plaintiffs also allege that, in accordance with Public Company Accounting Oversight Board ("PCAOB") audit standards, BDO should have developed appropriate audit procedures to respond to this risk. (*Id.* ¶ 132.) Had BDO done so, Plaintiffs allege, it "would have made BDO aware that ELM had not performed valuations of ELM stock in connection with the 2020 Equity Transactions" and BDO "would have discovered that ELM's 2020 financial statements materially understated compensation expense[.]" (*Id.* ¶ 133.) Plaintiffs further allege that BDO "was also likely aware of an inquiry from the SEC [to FIII's CEO] regarding the accounting treatment for certain shares being issued (for services) in connection with the Merger."(*Id.* ¶ 134.) Plaintiffs allege that the SEC Comment Letter "should have caused BDO to assess, consistent with PCAOB standards, whether it had obtained sufficient audit evidence regarding ELM's share-based transaction activities[.]" (*Id.* ¶ 135.)

## ARGUMENT

To state a claim for relief under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must allege: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 424 (3d Cir. 2007).

5

Because Plaintiffs are private litigants, they must satisfy the "exacting pleading requirements" of the PSLRA to survive a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA "requires plaintiffs to specify each statement alleged to have been misleading [and] the reasons or reasons why the statement is misleading." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002). Moreover, "a plaintiff alleging fraud under the Exchange Act must also comply with the heightened pleading requirement of Rule 9(b)." *In re Grand Canyon Educ., Inc. Sec. Litig.*, 2021 WL 3491779, at *14 (D. Del. Aug. 9, 2021) (internal citations omitted). Rule 9(b) requires Plaintiffs to "support [their] allegations of securities fraud with all of the essential factual background…of the events at issue." *In re Rockefeller*, 311 F.3d at 217. The pleading requirements for a securities fraud claim against an independent auditor are even more stringent. Plaintiffs must allege "shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief back of it." *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir. 1979) (internal citations omitted).

Plaintiffs here fall short of alleging facts that satisfy these stringent pleading requirements as to BDO. Specifically, Plaintiffs fail to allege that the ELM Audit Opinion contained a material misrepresentation (or omission) when issued, that BDO had the requisite scienter—that BDO *intended* to defraud investors, or that the PIPE Investors relied on the ELM Audit Opinion in deciding to purchase FIII stock in the PIPE Offering.

## I.    PLAINTIFFS DO NOT PLEAD A MISSTATEMENT OF FACT BY BDO

Plaintiffs' claim against BDO fails because the only alleged "misstatement" attributable to BDO, the ELM Audit Opinion, is a non-actionable opinion. Plaintiffs allege that the ELM Audit Opinion is false and misleading because it (1) did not disclose "multiple GAAP violations" and "numerous objective facts contrary" to the audit opinion" (AC ¶¶ 64-65), (2) falsely stated that

6

BDO "conducted [its] audit in accordance with the standards of the PCAOB" (*Id.* ¶¶ 66-67), and (3) set forth "materially false and misleading expense and loss representations" (*Id.* ¶ 68). However, the AC does not plead any facts suggesting that BDO did not honestly believe the statements in the ELM Audit Opinion or lacked a reasonable basis for its opinion. As such, BDO's statement of opinion cannot support a claim for securities fraud.

### A.    BDO's Statements Are Statements of Opinion

BDO's ELM Audit Opinion, and the representations therein, are statements of opinion, not fact. As explained by the Third Circuit, "in issuing an opinion, the auditor certifies only that it exercised appropriate, not flawless, levels of professional care and judgment." *In re Ikon Off. Sols., Inc.*, 277 F.3d 658, 673 (3d Cir. 2002). Thus, "the ordinary examination of financial statements by the independent auditor is the *expression of an opinion* on the fairness with which they present financial position…" (*Id.* (emphasis added.)) Courts also routinely find that audit opinions are "labeled 'opinions'" for a reason—they involve "considerable subjective judgment" and, therefore, "are statements of opinion." *Querub v. Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016).

The PCAOB standards make clear that "the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her *opinion* on them." AS § 1001.03 (emphasis added). An audit is designed to "obtain reasonable assurance about whether the financial statements are free of material misstatement." AS § 1001.02. "Because of the nature of audit evidence," an auditor has the responsibility "to obtain reasonable, but not absolute, assurance that material misstatements are detected." *Id.*

The ELM Audit Opinion is expressly a statement of opinion and is titled as such: "Opinion on the Financial Statements." (Proxy Statement F-89.) The ELM Audit Opinion clearly states, "[i]n our opinion, the financial statements present fairly, in all material respects, the financial position of the Company." (*Id.*) As the Supreme Court emphasized in *Omnicare, Inc. v. Laborers*

*Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015), a statement of opinion "does not allow investors to second-guess inherently subjective and uncertain assessments." Thus, the ELM Audit Opinion plainly reflects BDO's opinion, and is therefore an opinion statement under the framework established in *Omnicare*.

**B.      Plaintiffs Fail to Plead Falsity Under *Omnicare***

In the wake of *Omnicare* and its progeny, "it is substantially more difficult for a securities plaintiff to allege adequately (or, ultimately, to prove) that . . . a statement [of opinion] is false than it is to allege adequately (or prove) that a statement of pure fact is false." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 69 (S.D.N.Y. 2015). An opinion statement is misleading "if it: (i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023). Plaintiffs fail to adequately allege liability under any of these three circumstances.

1.      Plaintiffs Do Not Allege BDO Did Not Honestly Believe Its Statement

Plaintiffs do not allege any facts that BDO disbelieved its ELM Audit Opinion—or any statement alleged to be false therein—when made. Instead, Plaintiffs ask the Court to draw an inference that BDO disbelieved the ELM Audit Opinion based on its purported knowledge of the Equity Transactions and the Merger. (AC ¶¶ 131-33.) Plaintiffs allege that if BDO had complied with professional auditing standards, BDO "*should have* identified share-based compensation and potential issuance of company stock" and "*should have* understood that ELM's 2020 financial statements presented a significant audit risk[.]" (*Id.* (emphasis added).)

Plaintiffs further extrapolate that the SEC Comment Letter "regarding the accounting treatment for certain shares being issued" "*should have* caused BDO to assess, consistent with PCAOB standards, whether it had obtained sufficient audit evidence regarding ELM's share-based

8

transaction activities." (*Id.* ¶¶ 134-35 (emphasis added).) But Plaintiffs plead no facts supporting how or why BDO "likely" saw a letter sent to FIII, letter, which was not BDO's client, concerning FIII's financials. (*See id.*)

In any event, neither BDO's alleged knowledge of the Equity Transactions and Merger, nor the SEC Comment Letter to FIII, address the fundamental issue here: whether BDO actually disbelieved the ELM Audit Opinion. Plaintiffs' equivocations concerning what BDO "should have" known, rather than what BDO *actually* knew at the time of its audit, falls far short of what *Omnicare* requires to sustain a material misstatement claim – allegations that the speaker's opinion "falsely describe[d its] state of mind[.]" *Omnicare*, 575 U.S. at 184. Because there are no allegations that BDO "did not hold the belief it professed," Plaintiffs cannot establish liability by BDO under the first scenario provided for in *Omnicare*. *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2016 WL 6652731, at 8 (S.D.N.Y. Nov. 10, 2016); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 96 F. Supp. 3d 325, 344 (S.D.N.Y. 2015) (plaintiff failed to allege that auditor "did not in fact hold its opinions" despite allegations of purported knowledge of wrongdoing) (internal brackets omitted).

## 2. The ELM Audit Opinion Does Not Contain Embedded Statements of Fact

The ELM Audit Opinion also does not contain any embedded factual assertions that are untrue. Plaintiffs allege that BDO issued a "materially false and misleading" audit opinion, falsely stating that it conducted its audit in accordance with GAAP and PCAOB standards. (AC ¶¶ 64-67.) These statements express BDO's *opinion* on the ELM audit; they are not factual assertions. *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017) (statements concerning auditing compliance are opinions). As set forth in the auditing standards, "the auditor's responsibility is to express an *opinion* on the financial statements" as "[t]he financial statements are *management's* responsibility." AS § 1001.03 (emphasis added). Unlike

9

management, "[t]he auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility." AS § 1001.03.

Here, BDO expressed an opinion on ELM's financial statements, which included ELM management's, not BDO's, valuation of stock issued in the November 2020 Equity Transaction. ELM valued the shares, not BDO, and BDO found management's conclusion to be reasonable. (*See* AC ¶ 7); *see also* ASC 718-10-30-20D ("The determination of whether a valuation method is reasonable, or whether an application of a valuation method is reasonable, shall be made based on the facts and circumstances as of the measurement date."). The purported error in recording non-cash compensation expenses only came to light when ELMS disclosed that it was evaluating its accounting and treatment of the Equity Transactions the following year. (*See* AC ¶¶ 8-9.) BDO's expression of opinion on management's initial determination, does not make its opinion a statement of fact. *See Mehedi v. View, Inc.,* 2023 WL 3592098, at *10 (N.D. Cal. May 22, 2023) (holding that "similar statements about PCAOB, GAAS, and GAAP do not include any embedded statements of fact."); *Johnson v. CBD Energy Ltd.,* 2016 WL 3654657, at *12 (S.D. Tex. July 6, 2016) (holding statement "we conducted our audit of these statements in accordance with the standards of the [PCAOB]" "does not contain embedded statements of fact that are untrue").

Plaintiffs also allege that the ELM audited financial statements set forth "materially false and misleading expense and loss representations." (AC ¶ 68.) However, Plaintiffs' assertion that these figures "*accompanied*" the ELM Audit Opinion, and therefore are somehow attributable to BDO, misses the mark. (*Id.* (emphasis added.)) "[T]he numbers in [company's] financial statements, *on which [the auditor] expressed an opinion*, do not appear in the audit report and are

10

not 'embedded' in a subordinate clause in any of [the auditor's] sentences in the way the *Omnicare*

Court set out." *Johnson,* 2016 WL 3654657, at *12 (emphasis added).

              3.      <u>The ELM Audit Opinion Does Not Imply Untrue Facts or Omit Appropriate Qualifying Language</u>

Plaintiffs do not identify implied untrue facts in the ELM Audit Opinion, or allege that

BDO excluded qualifying language regarding such facts. In the absence of any such allegations,

Plaintiffs cannot allege liability under the third *Omnicare* scenario.

## II.     PLAINTIFFS FAIL TO PLEAD SCIENTER AGAINST BDO

To plead scienter under the PSLRA, a plaintiff must "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §

78u-4(b)(2)(A) To meet this standard, Plaintiffs must plead that BDO acted with scienter by

alleging facts "giving rise to a strong inference of either reckless or conscious behavior."

*Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009) (internal citations omitted).

Although allegations of motive and opportunity  "are to be considered along with other allegations

in the complaint," they are insufficient as "an independent means of establishing scienter." *Id.* at

276-78. Moreover, "pleading scienter against an outside auditor is 'particularly demanding.'" *Lord*

*Abbett Inv. Tr.-Lord Abbett Short Duration Income Fund v. Valeant Pharms. Int'l, Inc.*, 2018 WL

3637514, at *3 (D.N.J. July 31, 2018).[3]  Considering Plaintiffs' allegations as a whole, the facts

pled do not come close to sufficiently alleging that BDO consciously or recklessly issued the ELM

Audit Opinion.

---

[3] Courts routinely dismiss claims against auditors for failure to plead scienter. *See, e.g., DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990) (holding plaintiff "utterly fails to allege duty and scienter on the part of [auditor]"); *Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199, 1207 (C.D. Cal. 2012), *aff'd sub nom.* 667 F. App'x 238 (9th Cir. 2016); *Zech Cap. LLC v. Ernst & Young Hua Ming*, 636 F. App'x 582, 585 (2d Cir. 2016); *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 624 (S.D.N.Y. 2010).

### A.      Plaintiffs Fail to Allege Motive and Opportunity

"Ordinarily, independent outside auditors will have no motive to commit fraud." *In re Advanced Battery Techs., Inc. Sec. Litig.*, 2012 WL 3758085, at *15 (S.D.N.Y. Aug. 29, 2012). Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *Keystone Assocs. LLC v. Barclays Bank PLC*, 2020 WL 109008, at *4 (D. Del. Jan. 9, 2020). Here, Plaintiffs' allegations of BDO's ostensible "lack of independence" because of its supposed "direct involvement in the events at issue" are insufficient to show motive and opportunity. (AC ¶¶ 12, 94.) Plaintiffs do not, for example, allege that BDO had a financial interest in ELM, FIII, ELMS, or the Merger, nor that revenue generated from its ELM engagement was material to BDO. Because Plaintiffs do not allege that BDO benefitted from the purported fraud, Plaintiffs do not sufficiently plead motive and opportunity. *See Keystone Assocs. LLC*, 2020 WL 109008, at *4.

### B.      Plaintiffs Fail to Plead Evidence of Conscious Recklessness

Plaintiffs fail to allege that BDO acted with conscious recklessness, which involves "an extreme departure from the standards of ordinary care." *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 153-54 (3d Cir. 2018). To plead conscious recklessness as to an outside auditor, Plaintiffs must make a "showing of shoddy accounting practices amounting at best to a 'pretended audit,' or of grounds supporting a representation 'so flimsy as to lead to the conclusion that there was no genuine belief back of it.'" *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir. 1979).

There is no allegation here that BDO's audit of ELM was anything resembling a shoddy audit. Instead, Plaintiffs allege that BDO (1) "violated several PCAOB auditing standards" (AC ¶ 117) and (2) ignored "red flags," including the SEC Comment Letter, in its review of ELM's

12

accounting for the Equity Transactions. (*Id.* ¶¶ 125, 131-34.) These allegations are insufficient to satisfy the PSLRA's stringent scienter requirement.

          1.        <u>Plaintiffs' Allegations of Professional Standards Violations Do Not Establish Scienter</u>

Plaintiffs allege that had BDO complied with certain professional standards (AC ¶¶ 126-28, 132) and BDO's self-published guidelines (*id.* ¶¶ 129-30), it "should have understood that ELM's 2020 financial statements presented a significant audit risk due to large share-based awards," and it "would have discovered that ELM's 2020 financial statements materially understated compensation expense." (*Id.* ¶¶ 132-33.) But none of these allegations, either individually or collectively, lead to a reasonable inference that BDO's audit work constituted "shoddy accounting practices," *McLean*, 599 F.2d at 1198, or amounted to "an extreme departure from the standards of ordinary care" such that it could be inferred that BDO had "actual intent to aid in the fraud being perpetrated by the audited company." *Nappier v. Pricewaterhouse Coopers LLP,* 227 F. Supp. 2d 263, 275 (D.N.J. 2002).

Plaintiffs fail to allege any facts to support that BDO *knew* of any purported violations of accounting standards and disregarded them. Nor do Plaintiffs allege that BDO failed to conduct its audit. Rather, Plaintiffs contests *one line item* in ELM's financial statements—the treatment of non-cash compensation expense—based on ELMS disclosing that it was evaluating its accounting treatment a year later. (AC ¶¶ 7, 9.) Plaintiffs cannot support an inference of fraud on this basis. *See In re Atlas Mining Co., Sec. Litig.*, 670 F. Supp. 2d 1128, 1142 n.2 (D. Idaho 2009) ("This is not a case where Plaintiffs can argue that [auditor's] analysis was the equivalent of no audit at all…The [line item] was just one of the hundreds of line items encompassed by the audit.").

Instead, Plaintiffs ask the Court to infer that BDO must have failed to comply with professional auditing standards, otherwise BDO would not have issued "an unqualified, (i.e.,

13

clean) opinion." (AC ¶ 136.) This is insufficient. *See Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417, 429 (D.N.J. 1999) (no strong inference of scienter where allegations "start with the undenied proposition that [company's] financial statements did not accurately present the company's financial condition and results of operations, then seek to conclude that the audits and representations by [auditor] were not conducted according to GAAS and GAAP."); *see In re Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at *12 n.6 (D.N.J. July 2, 2019) ("the mere violation of an accounting firm guideline" insufficient to support scienter).

In short, Plaintiffs' allegations that BDO violated professional standards in issuing its ELM Audit Opinion—accusations that arose because ELMS later disclosed it was evaluating its accounting for the Equity Transactions—do not indicate fraud. (AC ¶ 8.) Such allegations fail as a matter of law to show fraudulent intent and are insufficient to infer scienter. *See W. Virginia Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 F. Appx 717, 720-21 (2d Cir. 2009) (finding that allegations that an independent auditor violated GAAP and GAAS *may* be sufficient to establish scienter *only* when "coupled with evidence of 'corresponding fraudulent intent'").

### 2.    Plaintiffs' "Red Flags" Theory Fails to Allege Scienter

Plaintiffs also allege that BDO ignored three "red flags": (i) its alleged knowledge "that ELM planned to go public through a de-SPAC transaction with FIII"; (ii) its alleged knowledge "of the 2020 Equity Transactions"; and (iii) its alleged knowledge "of an inquiry from the SEC regarding the accounting treatment for certain shares being issued (for services) in connection with the Merger." (AC ¶¶ 131-34.) These red flag allegations fail, as red flags can establish scienter only where there exists a "panoply of such facts which could sufficiently indicate that defendants *had clear reasons to doubt the validity* of the issuer's financials but, nonetheless, kept turning a blind eye to all such factual 'red flags.'" *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 287 (D.N.J. 2007) (emphasis added). Plaintiffs allege no such panoply of facts here.

14

With respect to the Plaintiffs' first red flag, Plaintiffs allege that "BDO knew when it conducted its audit of ELM that ELM planned to go public through a de-SPAC transaction with FIII, and BDO should have identified share-based compensation and potential issuance of the company stock to company insiders as a significant risk requiring an appropriate audit response." (AC ¶ 131.) But, even if share-based compensation and potential issuance of stock to company insiders was a significant risk, the closing of the Merger was months away and subject to a variety of closing conditions, such as due diligence, the negotiation and execution of various contracts, including the definitive merger agreement, the PIPE Offering, and shareholder approval for the Merger. Because consummation of the de-SPAC transaction was sufficiently uncertain, BDO reasonably concurred with ELM's accounting of the Equity Transactions at the time of its audit. *See In re Advanced Battery*, 2012 WL 3758085, at \*19 ("Plaintiffs' reliance on the suspicious circumstances of the [transaction] … is misplaced for a more fundamental reason: that transaction closed … more than a year after the last period audited by [the auditor]").

Plaintiffs cherry-pick quotations from four articles to argue that "only a small percentage of mergers and acquisitions fail to close." (AC ¶ 48 n.4.) Plaintiffs therefore claim that "no discount (or only a minimal one) would be appropriate" in this case for this possibility (*id.*), and BDO should have more closely scrutinized ELM's valuation of the issued shares. However, these articles are inapposite. Indeed, when read in their entirety, these articles indicate that a significant percentage of mergers and acquisitions actually fail to close, especially de-SPAC transactions. *See, e.g.,* Robert J. Campbell, *et al.*, Once Bitten, Twice Shy: Failed Deals and Subsequent M&A Cautiousness, Ctr. for Fin. Research Working Paper, No. 22-09, 2022, at 2 ("about 10 percent of

all large mergers and acquisitions are canceled – a significant number when you consider that about 450 such deals are announced each year").[4]

Plaintiffs' allegation concerning BDO's knowledge of the Equity Transactions[5]—the second alleged red flag—fails for similar reasons. The relevance of BDO's purported knowledge of the Equity Transactions and whether the "accounting for share-based awards" required "an appropriate audit response" (AC ¶ 133), is linked to the timing of the Equity Transactions vis-à-vis the status of the Merger. However, as discussed *supra*, at the time of the Equity Transactions, there were myriad closing conditions to the Merger. Thus, given the many months between the Equity Transactions and the closing of the Merger, the mere fact that BDO is alleged to have known of the Equity Transactions does not mean that BDO "had clear reasons to doubt the validity of the issuer's financials" and "should have" made different assessments in the ELM Audit

---

[4] *See also* Muhammad Farooq Ahmad, *et al.*, Does Bilateral Trust Matter During Mergers and Acquisitions Negotiations?, Brit. J. of Mgmt. 1, 1 (2022) ("not all announced agreements are completed…a typical bidder fails to close 29% of the processes that have entered the negotiation/due diligence phase"); Evidence from corporate social responsibility, 53 J. of Fin. and Quantitative Analysis 1995, 2012 (2018) ("failure rate for an M&A bid for a publicly traded target … is around 10-15%"). The sole reference to de-SPAC transactions indicates that "[p]rior to 2015, at least 20 percent of SPACs had to liquidate and return capital to investors" and, even as of 2020, 10% of "recent SPACs" failed to consummate mergers. Kurt Chauviere and Tao Tan, Earning the premium: A recipe for long-term SPAC success, McKinsey & Co. (Sept. 2020) (https://www.mckinsey.com/~/media/McKinsey/Industries/Private%20Equity%20and%20Princi pal%20Investors/Our%20Insights/Earning%20the%20premium%20A%20recipe%20for%20long %20term%20SPAC%20success/Earning-the-premium-A-recipe-for-long-term-SPAC-success.pdf).

[5] The Proxy Statement disclosed the November 2020 Equity Transaction to stockholders. (Proxy Statement F-99 ("ELM issued an additional 84,477 shares of common stock…for $10 per share."); *see also* AC ¶ 58.) Therefore, to the extent it was a red flag for Defendants, it should have also been a red flag for the sophisticated investors that subscribed to the PIPE Offering (*i.e.*, Plaintiffs and the Class), who had access to publicly available information regarding the November 2020 Equity Transaction. *See Wynne v. Equilease Corp.*, 1995 WL 764236, at *5 (S.D.N.Y. Dec. 27, 1995) ("The sophistication of the investors is relevant in determining whether or not they were on notice that further investigation was required.").

Opinion. *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d at 288. *See In re Advanced Battery*, 2012 WL 3758085, at \*20.

Plaintiffs' third alleged red flag—the SEC Comment Letter requesting FIII to "explain why [the] share-based payment was not 'accounted for as compensation expense'"—also fails to support an inference of scienter against BDO. (AC ¶ 134.) Although Plaintiffs allege that it was "likely" BDO saw the SEC Comment Letter (*id.*), Plaintiffs allege no facts supporting the basis for this supposed likelihood. Indeed, the SEC Comment Letter was not sent to BDO or addressed to a BDO client, and did not involve the Equity Transactions.[6] (*Id.*) Therefore, the SEC Comment Letter cannot support a strong inference of scienter against BDO. *See In re Beacon Assoc. Litig.,* 745 F.Supp.2d 386, 416 (S.D.N.Y. 2010) ("Plaintiffs allege a litany of red flags, but fail to allege sufficiently that [the auditor] ever became aware of them…Such allegations do not support a strong inference that [the auditor] was aware of red flags and acted with scienter.").

In short, Plaintiffs' allegations of what BDO "*should have* identified" and "*should have* understood" based on speculative facts (*see, e.g.*, AC ¶¶ 131-32 (emphasis added)) are exactly the type of allegations that are rejected as sufficient to plead scienter. *See California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004) (noting that the Third Circuit has "long rejected attempts to plead fraud by hindsight"). The same result is compelled here.

## III.     PLAINTIFFS HAVE NOT PLEAD RELIANCE ON THE ELM AUDIT OPINION

"It is axiomatic that a private action for securities fraud must be dismissed when a plaintiff fails to plead that he or she reasonably and justifiably relied on an alleged misrepresentation." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000). Here, Plaintiffs have not pled reliance on the ELM Audit Opinion by the proposed Class—*i.e.*, "all purchasers of ELMS common

---

[6] The issue flagged by the SEC involved a share issuance to SF Motors Inc. (AC ¶ 134.)

stock directly in the PIPE Offering who were damaged thereby" (AC ¶ 145). As explained below, the PIPE Offering investors *committed* to purchase FIII stock when they executed the Subscription Agreement on December 10, 2020, *five months* before the ELM Audit Opinion was issued. This timing refutes any contrary allegation by Plaintiffs of reliance on the ELM Audit Opinion in deciding to purchase FIII stock in the PIPE Offering.

Plaintiffs makes a two-fold argument regarding reliance: *First*, Plaintiffs argue that the Court should presume reliance under the Supreme Court's decisions in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)[7] and *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). (AC ¶¶ 141-42.) *Second*, Plaintiffs point to language in the Subscription Agreement to argue that the PIPE Investors could "rely on the acknowledgments, understandings, agreements, representations and warranties of the Company contained in this [Subscription Agreement]," which incorporate "the Company's pre-Merger filings with the SEC." (AC ¶¶ 140, 148.) Both of these bases for reliance are deficient.

### A.      Plaintiffs Do Not Plead a Basis for Presumed Reliance

"The fraud-on-the-market doctrine, as described by the Supreme Court in *Basic v. Levinson,* creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006). Here, there is no basis to invoke the *Basic* presumption of reliance because the PIPE Investors did not purchase their FIII stock in the PIPE Offering at a price set by the open market, but rather pursuant to private contracts between FIII and each subscribing stockholder

---

[7] Plaintiffs do not allege any "material omissions" by BDO such that the *Affiliated Ute* could apply. *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.,* 2020 WL 5026553, at *5 (D. Del. Aug. 25, 2020) ("In *Affiliated Ute*, the Supreme Court held that reliance may be presumed where plaintiffs' claims are based on material omissions.").

(*i.e.*, the Subscription Agreement). (Ex. A, Preamble.) That is the very nature of a PIPE transaction. "PIPE" "refers to 'private investment in public equity,' because the[] newly issued shares [are] *privately placed with sophisticated investors, rather than sold publicly.*" *In re Robinhood Ord. Flow Litig.*, 2023 WL 4543574, at *4 (N.D. Cal. Jan. 18, 2023) (emphasis added). The AC confirms this point—"Defendants made material misrepresentations and omissions … that artificially inflated the *perceived* value of the ELMS stock sold in the PIPE Offering." (AC ¶ 138 (emphasis added).) Perceived value is not actual value.

Without allegations sufficient to support a presumption of reliance, Plaintiffs must allege that *each* Class member relied on the ELM Audit Opinion to plead reliance. *See Yu-Sze Yen v. Landwin Grp., LLC*, 2010 WL 11549679, at *8 (C.D. Cal. Dec. 8, 2010) (in the absence of rebuttable presumption, "Plaintiffs must identify a casual chain between a particular misrepresentation and *each individual's* decision to invest") (emphasis added). Plaintiffs makes no attempt to do so. Moreover, Plaintiffs and the Class disclaimed reliance on representations "other than those representations, warranties, covenants, and agreements of the Company set forth in this Subscription Agreement" (Ex. A § 4(f)) and "other than the statements, representations and warranties of the Company expressly contained in Section 3 of this Subscription Agreement" (*id.* § 9):

> Subscriber understands and agrees that Subscriber is purchasing the Subscribed Shares directly from the Company. Subscriber further acknowledges that there have not been, and *Subscriber hereby agrees that it is not relying on, any representations, warranties, covenants or agreements made to Subscriber* by the Company, the Placement Agent (as defined below), any other party to the Transaction or any other person or entity, expressly or by implication, or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing *other than those representations, warranties, covenants and agreements of the Company set forth in this Subscription Agreement.*

(*Id.* § 4(f) (emphasis added).)

19

> *Subscriber acknowledges that it is not relying upon, and has not relied upon, any statement, representation or warranty* made by any person, firm or corporation (including, without limitation, the Placement Agent, any of its affiliates or any control persons, officers, directors, employees, partners, agents or representatives of any of the foregoing), *other than the statements, representations and warranties of the Company expressly contained in Section 3 of this Subscription Agreement, in making its investment or decision to invest in the Company.*

(*Id.* § 9 (emphasis added).)

Plaintiffs point to Section 3(f) of the Subscription Agreement as a basis to assert a claim against BDO, but Section 3(f) is a representation *by FIII, not BDO*, and the representation *concerns FIII's financial statements, not ELM's financial statements*. Indeed, FIII's representation and warranty to PIPE Offering subscribers in Section 3(f) of the Subscription Agreement reads in relevant part:

> The financial statements *of the Company included* in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing and fairly present in all material respects the financial position *of the Company* …

(Ex. A § 3(f) (emphasis added).) The "Company" referred to in Section 3(f) is FIII. No mention is made at all in the Subscription Agreement about ELM's financial statements or BDO's audit of ELM's financials. Thus, the very section that Plaintiffs point to for reliance disproves the Class's purported reliance on the ELM Audit Opinion. The non-reliance clauses in the Subscription Agreement require dismissal against BDO. *See AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 180 (3d Cir. 2003) (noting that "a plaintiff's declaration in a contract of an intent not to rely on …, alone or in conjunction with other evidence of non-reliance, may establish an absence of reliance").

Thus, Plaintiffs' claim against BDO should be dismissed for lack of reliance.

20

**CONCLUSION**

For the reasons set forth herein, BDO respectfully requests that the Court grant its motion to dismiss.

**MCDERMOTT WILL & EMERY LLP**

OF COUNSEL:

Joel C. Haims
Kierstin S. Fowler
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017-3852

/s/ *Ethan H. Townsend*
Ethan H. Townsend (#5813)
Daniel T. Menken (#6309)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, DE 19801
Tel: (302) 485-3900
ehtownsend@mwe.com
dmenken@mwe.com

Dated:  February 15, 2024

*Attorneys for Defendant*
*BDO USA, LLP*

21