**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| SHMUEL LEVY, Individually and on Behalf of All Others Similarly Situated,        Plaintiff, <br><br> vs. <br><br> JASON LUO, JAMES TAYLOR, ALBERT LI, MARSHALL KIEV, DAVID BORIS, and BDO USA, LLP, <br><br>        Defendants. | Civil Action No. 1:23-cv-00653-GBW <br><br> <u>CLASS ACTION</u> |

## <u>LEAD PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS</u>

FRIEDLANDER & GORRIS, P.A.
JEFFREY M. GORRIS (Bar No. 5012)
DAVID HAHN (Bar No. 6417)
1201 N. Market Street, Suite 2200
Wilmington, DE  19801
(302) 573-3500
jgorris@friedlandergorris.com
dhahn@friedlandergorris.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON (admitted pro hac vice)
NOAM MANDEL (admitted pro hac vice)
DESIREE CUMMINGS (admitted pro hac vice)
JONATHAN ZWEIG (admitted pro hac vice)
420 Lexington Avenue, Suite 1832
New York, NY 10170
(212) 432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
dcumming@rgrdlaw.com
jzweig@rgrdlaw.com

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND..................................................................5

    A.    FIII Identifies and Merges with ELM.................................................................5

    B.    Defendants Luo and Taylor Issue Themselves and Others Massive Amounts of ELM's Stock at a Substantial Discount .............................................6

    C.    The Offering Memorandum .................................................................................7

    D.    Defendants' Materially False and Misleading Statements and Omissions ............................................................................................................7

    E.    The Truth about ELM's Disguised Sales Transactions Is Revealed ....................9

    F.    Other Pending Litigation...................................................................................11

ARGUMENT............................................................................................................................12

    A.    Defendants Made Material Misrepresentations and Omissions ..........................12

        1.    Defendants' Material Misrepresentations and Omissions ......................12

        2.    Defendants Made the Statements at Issue...............................................19

        3.    The Statements Are Not "Inactionable Opinions" .................................23

    B.    Defendants Acted with Scienter ........................................................................27

        1.    The Individual Defendants Acted with Scienter .....................................28

            a.    Evidence of Conscious Misbehavior or Recklessness.................28

            b.    The Individual Defendants' Powerful Financial Motives.............33

        1.    BDO Acted with Scienter .....................................................................36

    B.    PIPE Investors Have Standing...........................................................................39

    C.    The Complaint Pleads Reliance..........................................................................43

    D.    Defendants' Control Person Liability .................................................................48

CONCLUSION.........................................................................................................................50

{FG-W0511971.}

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. Klein*,
2021 WL 4439658
(D. Del. Sept. 28, 2021), *aff'd*, 2022 WL 1658700 (3d Cir. May 25, 2022)..........................43

*AES Corp. v. Dow Chem. Co.*,
325 F.3d 174 (3d Cir. 2003) ...............................................................................................44

*Affiliated Ute Citizens of Utah v. U.S.*,
406 U.S. 128 (1972) ............................................................................................................48

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)..................................................................................................36

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021)............................................................................. 18, 20

*Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*,
315 F. Supp. 2d 666 (E.D. Pa. 2004)....................................................................................47

*Birnbaum v. Newport Steel Corp.*,
193 F.2d 461 (2d Cir. 1952) ................................................................................................40

*Blattman v. Siebel*,
2016 WL 1450946
(D. Del. Apr. 12, 2016).......................................................................................................44

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) .....................................................................................................*passim*

*City of Warren Police & Fire Retirement System v. Prudential Financial, Inc.*,
70 F.4th 668 (3d. Cir. 2023) .........................................................................................*passim*

*Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*,
606 F. Supp. 3d 124 (E.D. Pa. 2022)............................................................................. 18, 50

*Deutschman v. Beneficial Corp.*,
841 F.2d 502 (3d Cir. 1988) ......................................................................................... 4, 40, 41

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)........................................................................... 14, 16, 24

*Garner v. Glob. Plasma Sols. Inc.*,
590 F. Supp. 3d 738 (D. Del. 2022)......................................................................................17

- ii -

**Page**

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ................................................................... 20, 21

*Hacker v. Electric Last Mile Solutions Inc.*,
2023 WL 5266357
(D.N.J. Aug. 15, 2023) ........................................................................... *passim*

*Hall v. The Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008) ................................................................ 32

*Hayes v. Gross*,
982 F.2d 104 (3d Cir. 1992) ................................................................................ 48

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ............................................................................................ 40

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ............................................................................ 21

*Hull v. Glob. Digit. Sols., Inc.*,
2018 WL 4380999
(D.N.J. Sept. 14, 2018) ...................................................................................... 47

*In re Advance Auto Parts, Inc., Sec. Litig.*,
2020 WL 599543
(D. Del. Feb. 7, 2020) .................................................................................. 35, 48

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021) ................................................................ 26

*In re Aetna Inc. Sec. Litig.*,
34 F. Supp. 2d 935 (E.D. Pa. 1999) .................................................................... 15

*In re Bio-Tech. Gen. Corp. Sec. Litig.*,
380 F. Supp. 2d 574 (D.N.J. 2005) .................................................................... 14

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008) ................................................................ 23

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) .............................................................................. 14

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) .................................................................... 29

**Page**

*In re Cannavest Corp. Sec. Litig.*,
   307 F. Supp. 3d 222 (S.D.N.Y. 2018) .................................................................24

*In re CCIV/Lucid Motors Sec. Litig.*,
   2023 WL 325251
   (N.D. Cal. Jan. 11, 2023) ...................................................................................43

*In re Chemours Co. Sec. Litig.*,
   587 F. Supp. 3d 143 (D. Del. 2022) ...................................................................49

*In re CitiGroup Inc. Bond Litig.*,
   723 F. Supp. 2d 568 (S.D.N.Y. 2010) ................................................................24

*In re DVI, Inc. Sec. Litig.*,
   639 F.3d 623 (3d Cir. 2011) ...............................................................................47

*In re EQT Corp. Sec. Litig.*,
   504 F. Supp. 3d 474 (W.D. Pa. 2020) ................................................................15

*In re Fannie Mae 2008 Sec. Litig.*,
   2011 WL 13267340
   (S.D.N.Y. Apr. 11, 2011) ...................................................................................35

*In re Grand Canyon Educ., Inc. Sec. Litig.*,
   2023 WL 2072227
   (D. Del. Feb. 17, 2023) ......................................................................................29

*In re Great Atl. & Pac. Tea Co.*, *Inc. Sec. Litig.*,
   103 F. App'x 465 (3d Cir. 2004) ........................................................................29

*In re Heckmann Corp. Sec. Litig.*,
   869 F. Supp. 2d 519 (D. Del. 2012) ..............................................................49, 50

*In re Hertz Global Holdings, Inc. Securities Litigation*
   2017 WL 1536223
   (D.N.J. Apr. 27, 2017) ...................................................................................16, 24

*In re Ikon Off. Sols., Inc.*,
   277 F.3d 658 (3d Cir. 2002) ...............................................................................41

*In re Ikon Off. Sols., Inc. Sec. Litig.*,
   66 F. Supp. 2d 622 (E.D. Pa. 1999) ...................................................................29

– iv –

**Page**

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ..................................................................................48

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
   2020 WL 1479128
   (E.D. Pa. Mar. 25, 2020)................................................................. 28, 29, 41, 44

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ....................................................................30

*In re Interpool, Inc. Sec. Litig.*,
   2005 WL 2000237
   (D.N.J. Aug. 17, 2005) ........................................................................................33

*In re ITT Educ. Servs. Inc. Sec. Litig.*,
   34 F. Supp. 3d 298 (S.D.N.Y. 2014)...................................................................32

*In re Lehman Brothers Sec. & Erisa Litig.*,
   131 F. Supp. 3d 241 (S.D.N.Y. 2015)...........................................................26, 27

*In re Lottery.com, Inc. Sec. Litig.*,
   2024 WL 454298
   (S.D.N.Y. Feb. 6, 2024).......................................................................................23

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
   2011 WL 3444199
   (D.N.J. Aug. 8, 2011) .....................................................................................22, 50

*In re Metro. Sec. Litig.*,
   532 F. Supp. 2d 1260 (E.D. Wash. 2007)............................................................46

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)............................................................35, 36

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000)...................................................................33

*In re Mullen Automotive Securities Litigation*,
   2023 WL 8125447
   (C.D. Cal. Sept. 28, 2023) ...................................................................................42

*In re NUI Sec. Litig.*,
   314 F. Supp. 2d 388 (D.N.J. 2004) ......................................................................15

- v –

**Page**

*In re Petrobras Sec. Litig.*,
2016 WL 1533553
(S.D.N.Y. Feb. 19, 2016)..................................................................................26

*In re Reliance Sec. Litig.*,
135 F. Supp. 2d 480 (D. Del. 2001) ....................................................................21

*In re Robinhood Order Flow Litigation*,
2023 WL 4543574
(N.D. Cal. Jan. 18, 2023)............................................................ 42, 43, 44, 47

*In re Shanda Games Ltd. Sec. Litig.*,
2022 WL 992794
(S.D.N.Y. Mar. 31, 2022) ..................................................................................48

*In re Stillwater Cap. Partners Inc. Litig.*,
858 F. Supp. 2d 277 (S.D.N.Y. 2012) .................................................................20

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ...........................................................................37, 48

*In re Tyco Int'l, Ltd.*,
2004 WL 2348315 (D.N.H. Oct. 14, 2004) .........................................................16

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
2017 WL 1658822
(D.N.J. Apr. 28, 2017)........................................................................................27

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
2023 WL 3993740
(D.N.J. June 14, 2023)........................................................................................37

*In re Viropharma Inc. Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014) ...............................................................34, 35

*In re Wilmington Tr. Sec. Litig.*,
29 F. Supp. 3d 432 (D. Del. 2014)......................................................................18

*In re Winstar Commc'ns*,
2006 WL 473885
(S.D.N.Y. Feb. 27, 2006)....................................................................................36

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ...................................................... 12, 27, 28, 40

{FG-W0511971.}

**Page**

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ...................................................................................*passim*

*JPmorgan Chase Bank, N.A. v. Javice*,
    2023 WL 4546409
    (D. Del. July 13, 2023) ..............................................................................*passim*

*Kennedy v. Tallant*,
    710 F.2d 711 (11th Cir. 1983) ...........................................................................17

*Loc. 731 I.B. v. Swanson*,
    2011 WL 2444675
    (D. Del. June 14, 2011) ...............................................................................33, 35

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007) ...............................................................................44

*McCullough v. Advest, Inc.*,
    754 F. App'x 109 (3d Cir. 2018) .........................................................................29

*Menora Mivtachim Insurance Ltd. v. Frutarom Industries Ltd.*,
    54 F.4th 82, 84 (2d Cir. 2022) .......................................................................42, 43

*New England Carpenters Guaranteed Annuity & Pension v. DeCarlo*,
    80 F.4th 158 (2d Cir. 2023) ................................................................................26

*New Oriental Educ. & Tech. Grp. Sec. Litig.*,
    988 F. Supp. 2d 406 (S.D.N.Y. 2013)..................................................................36

*Okla. Firefighters Pension & Ret. Sys. v. IXIA*,
    50 F. Supp. 3d 1328 (C.D. Cal. 2014)..................................................................36

*Omanoff v. Patrizio & Zhao LLC*,
    2015 WL 1472566
    (D.N.J. Mar. 31, 2015) ................................................................................24, 25

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015) ....................................................................................*passim*

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
    142 F. Supp. 2d 589 (D.N.J. 2001) ......................................................................33

{FG-W0511971.}

**Page**

*Palladin Partners v. Gaon*,
   2006 WL 2460650
   (D.N.J. Aug. 22, 2006) ...................................................................................................36

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013) ...........................................................................................33

*Rheault v. Halma Holdings Inc.*,
   2023 WL 8005318
   (D. Del. Nov. 7, 2023)............................................................................................... 44, 45

*Rochez Brothers, Inc. v. Rhoades*,
   527 F.2d 880 (3d Cir. 1975) ...........................................................................................49

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*,
   2005 WL 1365465
   (D.N.J. June 7, 2005)......................................................................................................36

*Roofer's Pension Fund v. Papa*,
   2018 WL 3601229
   (D.N.J. July 27, 2018) ................................................................................ 17, 27, 28, 36

*Rowinski v. Salomon Smith Barney Inc.*,
   398 F.3d 294 (3d Cir. 2005) ...........................................................................................41

*S.E.C. v. Brown*,
   878 F. Supp. 2d 109 (D.D.C. 2012) ...............................................................................23

*S.E.C. v. Desai*,
   145 F. Supp. 3d 329 (D.N.J. 2015), *aff'd*, 672 F. App'x 201 (3d Cir. 2016) .........................31

*S.E.C. v. Winemaster*,
   529 F. Supp. 3d 880 (N.D. Ill. 2021)..............................................................................14

*Se. Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
   2022 WL 3572474
   (M.D. Pa. Aug. 18, 2022) ...............................................................................................27

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000) ...................................................................................... 41, 42

*Skeway v. China Nat. Gas, Inc.*,
   2012 WL 2877645 (D. Del. July 6, 2012).......................................................................49

{FG-W0511971.}

**Page**

*Skeway v. China Nat. Gas, Inc.*,
  304 F.R.D. 467 (D. Del. 2014) ........................................................................................49

*Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*,
  739 F. Supp. 2d 686 (D. Del. 2010) ................................................................................34

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
  243 F. Supp. 3d 1109 (E.D. Cal. 2017) ..........................................................................26

*Starr Invs. Cayman II, Inc. v. China MediaExpress Holdings, Inc.*,
  2014 WL 4180331
  (D. Del. Aug. 21, 2014) ..................................................................................................35

*Steamfitters Loc. 449 Pension Fund v. Alter*,
  2011 WL 4528385
  (E.D. Pa. Sept. 30, 2011) ................................................................................................20

*Sun v. Han*,
  2015 WL 9304542
  (D.N.J. Dec. 21, 2015) ...................................................................................... 18, 25, 31

*Takata v. Riot Blockchain, Inc.*,
  2020 WL 7640924
  (D.N.J. Dec. 23, 2020) ....................................................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..................................................................................................28, 33

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
  176 F. Supp. 3d 387 (D. Del. 2016) ........................................................................*passim*

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
  61 F. Supp. 3d 391 (D. Del. 2014) ..................................................................................47

*Vanderhoef v. China Auto Logistics Inc.*,
  2021 WL 3260849
  (D.N.J. July 30, 2021) .....................................................................................................31

*Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*,
  2019 WL 4597518
  (N.D. Ill. Sept. 23, 2019) ................................................................................................22

{FG-W0511971.}

**Page**

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2016 WL 4138613
  (E.D. Pa. Aug. 4, 2016) ...............................................................................................47

*Werner v. Werner*,
  267 F.3d 288 (3d Cir. 2001) .......................................................................................17

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) .......................................................................................18

*Yang v. Tibet Pharms., Inc.*,
  2015 WL 730036
  (D.N.J. Feb. 20, 2015) ................................................................................................25

*Zelman v. JDS Uniphase Corp.*,
  376 F. Supp. 2d 956 (N.D. Cal. 2005)........................................................................48

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
  §78j(b) .........................................................................................1, 19, 40, 41, 49
  §78t(a)......................................................................................................... 1, 49

17 C.F.R.
  §240.10b-5(b)..............................................................................................19

Public Company Accounting Oversight Board
  Rule 3520.....................................................................................................19
  Rule 3526.....................................................................................................19

- x –

## PRELIMINARY STATEMENT

This action arises from Defendants' concealment and material misrepresentation of over $800 million in stock-based payments to insiders and other individuals in connection with the Merger of ELM and FIII.[1]

Prior to the Merger, FIII was a shell company and SPAC that was publicly traded on the NASDAQ; ELM was a privately held electric vehicle company. FIII and ELM merged in June 2021. FIII was the surviving corporation, the merged company was renamed ELMS, and FIII's publicly-traded common stock continued trading under the new ticker symbol "ELMS" until its bankruptcy and ultimate delisting in June 2022.

This action asserts claims under Sections 10(b) and 20(a) of the 1934 Act on behalf of investors who purchased the common stock of FIII/ELMS in the PIPE Offering, a private placement of common stock that was carried out in connection with the Merger. The PIPE Offering was conducted by means of the December 10, 2020 Offering Memorandum – an agreement to purchase FIII common stock at the time of the Merger – and closed approximately six months later, when PIPE investors actually purchased the shares contemporaneous with the Merger.

---

[1]  The "Complaint" and "¶" refer to the Amended Class Action Complaint (D.I. 23). All references to "Ex. __" are to the Declaration of Jeffrey M. Gorris, filed herewith. All emphasis is added and internal quotation marks are omitted unless otherwise specified. All capitalized terms not defined have the same meanings ascribed to them in the Complaint. "Tay. Br." refers to Defendant James Taylor's Opening Brief in Support of his Motion to Dismiss the Amended Class Action Complaint (D.I. 34); "Li Br." refers to Defendant Albert Li's Memorandum of Points and Authorities in Support of his Motion to Dismiss the Amended Class Action Complaint (D.I. 37); "BDO Br." refers to the Memorandum of Law in Support of BDO USA LLP's Motion to Dismiss Amended Class Action Complaint (D.I. 39); "B&K Br." refers to Defendants David Boris and Marshall Kiev's Opening Brief in Support of their Motion to Dismiss the Amended Class Action Complaint (D.I. 42); "Luo Br." refers to Defendant Jason Luo's Opening Brief in Support of his Motion to Dismiss the Amended Class Action Complaint (D.I.. 45).

The Offering Memorandum expressly represented and warranted that FIII's SEC filings were true, correct, and accurate in all material respects, and that these filings would remain so at the time of closing. The Offering Memorandum provided further that the truthfulness of these SEC filings at the time of closing was a condition to closing, specified that the agreement would automatically terminate and be void if the SEC filings were untrue at the time of closing, and required FIII to inform PIPE investors prior to the closing if any of its SEC filings were no longer accurate in all material respects. The Offering Memorandum also made clear that PIPE investors were to rely on the representations and warranties in the Offering Memorandum, including as to the truthfulness of the SEC filings.

As detailed in the Complaint, the Offering Memorandum and the SEC filings that it warranted were materially false and misleading in violation of the federal securities laws. As investors would later learn, in advance of announcing the Merger and PIPE Offering, ELM carried out the 2020 Equity Transactions, which transferred more than $800 million worth of stock to insiders and other individuals in return for *de minimis* sums, representing massive expenditures that were never disclosed before the Merger.

The Proxy concealed hundreds of millions of dollars in compensation granted principally to Defendants Luo and Taylor, who were, respectively, the Executive Chairman and CEO of both pre-Merger ELM and post-Merger ELMS (until both were fired when the misconduct at issue in this case came to light). The Proxy stated falsely that Defendants Luo and Taylor received total compensation in 2020 of $0.00 and $32,000, respectively, when in reality they received approximately $700 million dollars-worth of stock between them. The Proxy materially misrepresented and disguised these compensation grants as mere sales, failing to disclose that the transactions were at prices drastically below fair value and in reality represented surreptitious

- 2 -

payments to these defendants.  The Proxy disclosed materially false financial statements that, in clear violation of GAAP, failed to disclose any expenses related to these transactions.  At the same time, the Proxy and other SEC filings concerning the Merger placed significant emphasis on the resumes, industry experience, and supposed value to the business of both Defendants Luo and Taylor while making no disclosure concerning their fraudulent transfer of hundreds of millions of dollars to themselves.  The Proxy also included a materially false and misleading report from ELM's supposedly independent auditor, Defendant BDO, misrepresenting that BDO had conducted an audit in accordance with PCAOB standards and concluded that ELM's financial statements complied with GAAP.

Defendants raise a series of meritless arguments.  The Court should deny their motions.

Material Misrepresentation:  There is little doubt that the Complaint pleads material misrepresentations and omissions, including hundreds of millions of dollars in undisclosed expenses on false financial statements that the Company announced required restatement.  The Individual Defendants attempt to evade responsibility as the "makers" of their misstatements, pointing at each other as the true source of the misrepresentations.  But all the Individual Defendants "made" statements under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) and *City of Warren Police & Fire Retirement System v. Prudential Financial, Inc.*, 70 F.4th 668 (3d. Cir. 2023).  The Court should also reject any argument that this case arises from statements of "inactionable opinion" because this case arises from misrepresentations of objective fact, such as compensation and expense figures.  BDO likewise made statements of objective fact – such as its representation that it conducted a PCAOB compliant audit – but to the extent the Court treats any of BDO's statements as an "opinion" under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), the statements readily

- 3 -

fit within all three categories of liability for opinion statements articulated in *Omincare* and its progeny.

Scienter:    The Complaint also raises a strong inference of scienter.    The Individual Defendants each had knowledge of and access to critical facts contrary to their disclosures and rendering them materially false or misleading.    The Complaint also pleads significant circumstantial evidence demonstrating fraudulent intent (more than sufficient to show recklessness), and demonstrates that the Individual Defendants had overwhelming financial motives to conceal the 2020 Equity Transactions and consummate the Merger.    Defendant BDO also clearly had scienter, as the Complaint details material GAAP violations and major red flags that BDO ignored.    Indeed, in *Hacker v. Electric Last Mile Solutions Inc.*, 2023 WL 5266357, at *15 (D.N.J. Aug. 15, 2023) – a case on behalf of open-market purchasers of ELMS common stock arising from the same facts concerning BDO's scienter – the District of New Jersey recently rejected the same scienter arguments BDO advances here.

Standing:    PIPE investors have standing to assert their claims because this action arises from material misrepresentations "in connection with the purchase or the sale of a security." *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir. 1988).    The Court should adhere to this long-standing Third Circuit authority.

Reliance:    Defendant BDO raises a reliance defense, ignoring that the Offering Memorandum expressly acknowledged that PIPE Investors "will rely" on FIII's SEC filings, which included BDO's fraudulent audit report.    BDO's principal support for this argument is a misreading of the timeline of events alleged in the Complaint (PIPE investors in fact purchased their shares after BDO issued its fraudulent report) and a misreading of the Offering Memorandum

- 4 -

(which expressly excluded its representations and warranties from the supposed "non-reliance" clause BDO cites).

Control Person: Finally, the Complaint is more than sufficient to plead control person liability. Defendants Boris and Kiev controlled FIII, which issued the materially false and misleading Offering Memorandum and SEC filings. Defendants Taylor, Luo, and Li controlled ELM, which provided the materially false and misleading statements that were included in FIII's Proxy.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    FIII Identifies and Merges with ELM

FIII was a special purpose acquisition company (or "SPAC") created for the sole purpose of identifying and merging with a privately held business. ¶30. Following an initial public offering in August 2020, FIII quickly identified ELM, a new privately held company created by Defendants Luo and Taylor to manufacture electric vans and utility vehicles for "last mile" deliveries, as a potential merger target. ¶¶30, 32. Less than a month later, on September 18, 2020, FIII and ELM executed a letter of intent concerning the merger of the two companies. ¶¶33, 47. The letter of intent estimated the total enterprise value of the combined company at $1.3 billion. ¶47. On December 11, 2020, FIII announced that FIII and ELM had executed a definitive Merger Agreement, subject to shareholder approval. ¶42. The Merger Agreement provided: "[ELM] shall ensure that none of the information supplied by or on its behalf for inclusion or incorporation . . . in the Proxy Statement will . . . contain any untrue statements of a material fact or omit to state any material fact." ¶34. On June 9, 2021, FIII issued a Proxy to solicit votes in favor of the Merger with ELM. ¶43. On June 24, 2021, FIII shareholders voted to approve the Merger and the PIPE Offering closed. ¶44.

- 5 -

**B.      Defendants Luo and Taylor Issue Themselves and Others Massive Amounts of ELM's Stock at a Substantial Discount**

On November 19, 2020, Defendants Luo and Taylor, well aware of the $1.3 billion post-combination value of ELMS, caused ELM to issue 99,000 shares of ELM common stock for $10 per share to entities they controlled and to four other unidentified purchasers (the "November 2020 Equity Transaction"). ¶48. The vast majority of these shares (84,477 of the 99,000 shares or approximately 94%) went to entities owned and controlled by Defendants Luo and Taylor. *See* ¶¶5, 49. The remaining 14,523 shares were sold to four unidentified purchasers. *Id.*

The $10 per share price paid for the $99,000 shares of ELM common stock was significantly below the fair market value for each of those shares. ¶¶4, 48. Because the 99,000 shares could each be exchanged for over 800 shares of ELMS common stock at the close of the Merger and because those shares were issued just weeks before execution of the Merger Agreement, the most reasonable fair value for those shares was over $8,000. *Id.* The difference between the $10 per share price paid for these shares and the over $8,000 fair market value represented an approximately $800 million expenditure by ELM. ¶¶4, 60.

On December 8, 2020, less than a month later and just two days before ELM and FIII executed the definitive Merger Agreement, Defendant Luo sold 1,000 shares of ELM common stock also at $10 per share to an entity owned and controlled by ELM's Chief Operating Officer Hailiang (Jerry) Hu and ELM's General Counsel Benjamin Wu (the "December 2020 Equity Transaction" and, with the November 2020 Equity Transaction, the "2020 Equity Transactions"). ¶50. The $10 per share price paid for the 1,000 shares of ELM's common stock was also significantly below the fair market value of over $8,000 per share. *Id.* The Proxy did not disclose the December 2020 Equity Transaction. ¶59.

### C.  The Offering Memorandum

On December 10, 2020, FIII and the PIPE investors executed the Offering Memorandum in connection with the PIPE Offering.  ¶2.  The PIPE Offering was a private placement of $130 million worth of shares of unregistered common stock of FIII.  ¶¶2, 35.  The Offering Memorandum expressly stated that PIPE Investors were to rely exclusively on FIII's SEC's filings and that the closing of the PIPE Offering was contingent on the accuracy and truthfulness of FIII's SEC filings.  ¶¶38-40.  The Offering Memorandum also expressly represented and warranted that FIII's SEC filings "complied in all material respects with the requirements of the Securities Act and the Securities Exchange Act of 1934 . . . and none . . . contained any untrue statement of a material fact or omitted to state a material fact . . . ."  ¶¶37, 52.  The Offering Memorandum also provided that the agreement with PIPE investors was subject to automatic termination if certain closing conditions were not satisfied, including the condition that FIII's SEC filings would remain true and correct in all material respects up until the time of closing.  ¶¶39-40.  The Offering Memorandum further provided that FIII was to notify PIPE investors if the representations and warranties contained in the Offering Memorandum were no longer accurate.  ¶40.

### D.  Defendants' Materially False and Misleading Statements and Omissions

Contrary to the assurances contained in the Offering Memorandum, the Proxy and FIII's other SEC filings contained numerous materially false and misleading statements.  The Proxy misrepresented that ELM's senior executives received zero or *de minimis* compensation in 2020 when, in actuality, they received hundreds of millions of dollars in equity compensation.  ¶¶6, 55-56.  The Proxy misrepresented and mischaracterized the November 2020 Equity Transaction as sales of stock, and concealed hundreds of millions of dollars in expenses tied to the November 2020 Equity Transaction.  The Proxy further failed to disclose that the $10 per share price that was

- 7 -

paid for the shares sold in the 2020 Equity Transactions was substantially below market value, failed to disclose the fair market value of the shares sold, and altogether failed to disclose the December 2020 Equity Transaction.  ¶¶55-62.

The Proxy also included materially false and misleading audited financial statements for ELM for 2020, and a materially false and misleading audit opinion from BDO.  ¶¶7, 54, 60-69. The BDO audit opinion stated:  "We have audited the accompanying balance sheet of E[LM] . . . as of December 31, 2020, the related statements of operations and comprehensive loss . . . for the period from August 20, 2020 (inception) through December 31, 2020, and the related notes" and have determined that "the financial statements present fairly, in all material respects . . . the financial position of [ELM] at December 31, 2020 . . . in conformity with accounting principles generally accepted in the United States." ¶64.  BDO further stated that it had conducted its audit "in conformity with accounting principles generally accepted" and "in accordance with the standards of the PCAOB."  ¶¶64-65.  These statements misrepresented that ELM's financials complied with GAAP and that BDO's audit was conducted in compliance with GAAP and PCAOB.  ¶¶63-65, 74-88, 116-136.

The Proxy and other FIII SEC filings also touted the collective experience of ELM's management team and included a risk factor disclosure regarding the success of the combined company being dependent on the continued efforts and contributions of ELM's management team, including Defendants Luo and Taylor.  ¶70.  These statements were materially false and misleading because they emphasized the significant value that Defendants Luo and Taylor supposedly brought to the business, while failing to disclose material facts concerning Defendants Luo and Taylor's involvement in the issuance of below market value shares of ELM's common stock and receipt of

- 8 -

hundreds of millions of dollars in hidden compensation which could, and ultimately did, jeopardize their continued employment.  ¶¶71-72.

E.        The Truth About ELM's Disguised Sales Transactions Is Revealed

The truth began to be revealed on February 1, 2022, when ELMS announced the results of a Special Committee investigation into "certain sales of equity securities made by and to individuals associated with the Company."  ¶¶8, 89.  The investigation concluded that certain ELM executives had acquired ELM shares at "substantial discounts to market value" in equity transactions performed at the end of 2020.  *Id*.  In announcing the results of its investigation, ELMS disclosed that the Company "does not appear to have obtained an independent valuation to determine the fair market value per share of its common stock as of or contemporaneous with the date of those transactions," and that "[w]hen the business combination was consummated on June 25, 2021, each [ELM] share, for which such executives had paid $10 per share, was exchanged for approximately 800 shares of [ELMS]."  ¶9.  The Company further revealed that it had failed to "disclose any compensation associated with those transactions; or withhold or pay taxes in connection with that compensation."  ¶89.  As a result, the Company disclosed that the previously issued financial statements for ELM for 2020 should not be relied upon and required restatement.  ¶¶9, 89.

ELMS further disclosed that Defendants Luo and Taylor were resigning from the Company and that Defendants Luo and Taylor had "provided responses to the Special Committee that are believed to be inconsistent with documents reviewed by the Special Committee."  ¶¶10, 90, 113.  In connection with their ouster, Defendants Luo and Taylor executed settlement agreements with ELMS whereby they agreed to surrender to the Company material amounts of ELMS common stock and to pay tens of millions of dollars in cash and stock.  ¶111.  Defendant Luo agreed to surrender 6 million shares of ELMS common stock to the Company and to pay an additional $10

million (in cash and stock). *Id.* Defendant Taylor agreed to surrender 1.8 million shares of ELMS common to the Company and to pay an additional $3.3 million (in cash and stock). *Id.* The Company later disclosed that Defendant Taylor had violated the terms of his settlement agreement. ¶¶101-102.

In the wake of the February 1, 2022 disclosures, ELMS common stock plummeted, declining by $2.88 per share, or 51%, to close at $2.71 per share on February 2, 2022. ¶¶11, 91. Analysts reacted to the news by downgrading their ratings and price targets for ELMS. ¶¶91-93.

The Company made further revelations in the ensuing weeks/months. On February 14, 2022, ELMS disclosed that BDO was resigning as the Company's auditor and that the Company and BDO were in disagreement over the Company's legal compliance and reporting obligations and BDO's independence and participation in the events at issue. ¶¶12, 94. On the same day, the Company filed two letters with the SEC: (1) a letter from its Audit Committee blaming BDO and stating that BDO "was involved in structuring" the transactions at issue and had confirmed that "BDO USA was aware of those transactions well in advance of and in connection with completion of the audit"; and (2) a letter from BDO stating that an "illegal act . . . has or may have occurred . . ." and that it was resigning due to ELMS's failure to take timely and appropriate remedial actions. *Id.* On March 3, 2022, ELMS filed an amended current report on Form 8-K accusing BDO of continuing to refuse to provide the Company with an independence analysis. ¶¶13, 95, 124. ELMS also filed a letter from BDO denying certain of the Company's allegations against it and alleging that ELMS had failed to take timely remedial actions regarding the potentially illegal acts identified by BDO. ¶¶95, 123. In its letter, BDO did not dispute ELMS's assertions that BDO had provided advice to Defendant Luo and his affiliates and had failed to disclose these relationships. ¶123. On March 11, 2022, ELMS announced that the SEC was

{FG-W0511971.}

investigating the 2020 Equity Transactions and the associated accounting violations and disclosed, among other things, that the Company was withdrawing its previous financial guidance and needed to raise additional capital to continue its launch plan.  ¶¶13, 96, 115.  ELMS's stock price fell to $1 per share, representing a decline of another 48%, on this news.  *Id.*  In the wake of the March 11 disclosure, analysts also reduced their price targets for ELMS.  ¶¶97-98.  On April 1, 2022, ELMS revealed that it was unable to file its Form 10-K for 2021.  ¶100.  On May 24, 2022, ELMS disclosed that it had received a notice from NASDAQ that the Company was no longer in compliance with listing requirements.  ¶101.  Finally, on June 13, 2022, ELMS announced its delisting from NASDAQ and that it would file for Chapter 7 bankruptcy.  ¶103.

### F.    Other Pending Litigation

Two other courts have had occasion to address motions to dismiss filed by certain of the Defendants in this action.  On August 15, 2023, the court in *Hacker v. Electric Last Mile Solutions Inc.*, No. 2:22-cv-00545-MEF-LDW (D.N.J.), a securities class action brought on behalf of purchasers of publicly-traded shares of ELMS common stock and holders of FIII common stock (who were eligible to vote at FIII's June 24, 2021 special meeting), denied BDO's motion to dismiss the complaint filed in that action for failure to allege scienter.[2]  The individual defendants in the *Hacker* case, who are the same individual defendants named in this action, did not move to dismiss the complaint filed in that action.  Instead, the individual defendants and the plaintiffs in *Hacker* moved for preliminary approval of a settlement.[3]

---

[2]   The *Hacker* court requested and received additional briefing from the parties on the issue of the falsity of BDO's audit opinion.  BDO's motion to dismiss the complaint for failure to plead falsity is still pending with that court.

[3]   This motion is still pending with that court.

- 11 -

On January 22, 2024, the court in *Electric Last Mile Solutions, Inc. Stockholder Litigation*, C.A. No. 2022-0630-KSJM (Del. Ch.) (the "ELMS *Stockholder Litigation*") denied defendants' Luo and Taylor's motion to dismiss claims that they aided and abetted in the other defendants' breaches of their fiduciary duty. The complaint filed in that action also asserts breach of fiduciary duty claims arising out the merger between FIII and ELM. The other defendants in the ELMS *Stockholder Litigation*, which include defendant Kiev, answered the complaint filed in that action.

## ARGUMENT

### A.    Defendants Made Material Misrepresentations and Omissions

The Complaint pleads Defendants' material misrepresentations in detail, including the concealment of over $800 million in compensation, the filing of false financial statements and related disclosures concealing hundreds of millions of dollars in expenses associated with those payments, and numerous material violations of GAAP, as well as a fraudulent audit report that falsely claimed BDO had conducted its audit in accordance with PCAOB standards (when it clearly had not) and materially misrepresented that the financials were accurate and GAAP-compliant.

### 1.    Defendants' Material Misrepresentations and Omissions

The Complaint pleads falsity with "specificity." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023). To plead falsity, a complaint must allege "the who, what, when, where and how" of the misstatements at issue, identifying "each statement alleged to have been misleading" and specifying "the reason or reasons why the statement is misleading." *Id.* (citing *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 259 (3d Cir. 2009)). The Complaint readily satisfies this standard.

As detailed in the Complaint: The Offering Memorandum expressly represented and warranted that FIII's SEC filings were accurate and free of material misstatements and omissions.

- 12 -

¶¶52-53. In reality, FIII's SEC filings were materially false and misleading and contained material misrepresentations and omissions, including materially false financial statements and related disclosures concealing hundreds of millions of dollars in compensation and related expenses. ¶¶54-73. ELMS has admitted that the ELM financial statements disclosed in the Proxy required restatement (*i.e.*, that these financial statements were materially false) (¶89), and the Complaint details how those financial statements relied on improper and misleading accounting practices to conceal over $800 million in expenses for the 2020 Equity Transactions (¶¶60-62, 68-69), in violation of GAAP and SEC rules (¶¶74-88). The Proxy mischaracterized the 2020 Equity Transactions as sales (¶¶57-58), when in reality they were massive awards of compensation to Defendants Luo and Taylor (and others) (¶59). The Proxy also claimed that Defendants Luo and Taylor received *de minimis* compensation in 2020 (¶55), omitting the hundreds of millions of dollars in stock-based payments they received through the 2020 Equity Transactions (¶56). At the same time, FIII's SEC filings touted Luo and Taylor's resumes, expertise, and experience in the industry as key to ELMS's success (¶¶70-72), while failing to disclose that they were secretly paying themselves hundreds of millions of dollars-worth of stock and concealing it from investors (¶¶70-73). Despite the Proxy's many GAAP violations, both the Proxy and BDO's audit report within it falsely stated that ELM's financial statements were accurate and GAAP compliant (¶¶65-66). They also falsely stated that BDO – which structured the 2020 Equity Transactions in violation of PCAOB independence standards and then conducted a sham audit that disregarded these transactions – had conducted an audit in accordance with PCAOB standards. *Id*.

The Offering Memorandum represented and warranted to PIPE investors – as an express condition of the PIPE Offering – that the reports filed with the SEC "complied in all material respects" with the federal securities laws, and that "none of the SEC reports, when filed, contained

- 13 -

any untrue statement of a material fact or omitted to state a material fact required to be stated therein. . . ."[4]  ¶52.  As detailed in the Complaint, and for the reasons outlined below, these representations and warranties were materially false and misleading, as the relevant SEC filings contained numerous material misstatements and omissions concerning the 2020 Equity Transactions and their financial impact.

ELMS has admitted that the Proxy contained financial statements which "should be restated and, therefore, should no longer be relied upon," and that the Company failed to "disclose any compensation associated" with the 2020 Equity Transactions.  ¶¶10, 89.  This admission alone establishes falsity.  *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 586 (D.N.J. 2005) ("a restatement . . . in itself establishes the falsity of the original statements for purposes of surviving a motion to dismiss."); *S.E.C. v. Winemaster*, 529 F. Supp. 3d 880, 908 (N.D. Ill. 2021) (same); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017) ("there can be no dispute" over falsity where a company "admi[ts] that it must restate its financial statements").

The Complaint alleges with particularity that the ELM financial statements disclosed in the Proxy were based on improper accounting practices that concealed the expenses associated with the 2020 Equity Transactions.  In pleading the falsity of these financial statements, the Complaint details "what the unreasonable [accounting] practices were and how they distorted the disclosed [financial] data."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417-18, 1422 (3d Cir. 1997) (falsity where defendants "failed to account properly for expenses . . . and thereby

---

[4]  Defendants Boris and Kiev attempt to escape this misleading representation by cherry-picking language warranting the accuracy of "[t]he financial statements of the Company," (B&K Br. at 4), but the full statement in the Offering Memorandum is much broader, certifying that "none of the SEC Reports, when filed, contained any untrue statement of a material fact . . . ."  ¶52.

- 14 -

violated a specific accounting concept"). Here, ELM's financial statements improperly accounted for the 2020 Equity Transactions in violation of GAAP, understating ELM's expenses by over $811 million. *See* ¶62. Plaintiff has thus "sufficiently pled what the unreasonable accounting processes were, . . . described why those processes were not consistent with [GAAP], and [] identified the amount that the unreasonable processes distorted the data disclosed to the public[.]" *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 496 (W.D. Pa. 2020) (accounting misstatement where defendants "improperly capitalized" costs and "understat[ed]" guidance "through the omission of [] costs" in violation of GAAP).[5]

The Complaint pleads in considerable detail the specific GAAP provisions and SEC rules that Defendants violated. ASC 718 governs accounting for share-based transactions, and requires a company "to determine the fair value of stock at the time of issuance or sale" and recognize as a compensation expense the difference between (a) the fair market value of the stock issued and (b) the price paid by the recipient of the stock. ¶¶77-78. The Complaint pleads with particularity that neither occurred: Defendants did not determine the fair value of the shares issued or recognize an expense associated with the transactions. *See* ¶¶61, 68. Indeed, the Company has admitted that ELM "does not appear to have obtained an independent valuation to determine the fair market value per share of its common stock as of or contemporaneous with the date of those transactions" – meaning that Defendants did not even comply with the threshold requirements of ASC 718. ¶9. ELMS has likewise admitted that ELM's senior executives received shares "at substantial discounts to market value" but that the Company had failed to "disclose any compensation

---

[5]    *See also In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 402 (D.N.J. 2004) (falsity alleged where defendants mischaracterized accounts to avoid recording bad debt in violation of GAAP); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 956 (E.D. Pa. 1999) (falsity alleged where defendants understated "Medical Claims expenses" in violation of GAAP).

{FG-W0511971.}

associated with those transactions." ¶¶8, 89. Accordingly, Defendants altogether bypassed proper accounting for over $800 million in expenses, and the financial statements for ELM were thus objectively false and misleading. *comScore*, 268 F. Supp. 3d at 547 ("plaintiffs have sufficiently alleged that the 10(b) defendants bypassed the asserted accounting methodology in perpetrating the alleged fraud").[6]

Further, ASC 850 governs disclosures of related party transactions, and instructs that they should include, among other things, "information deemed necessary to an understanding of the effects of the transactions on the financial statements" and "[t]he dollar amounts of transactions." ¶80. SEC's Regulation S-X states that the "amounts of related party transactions should be stated on the face of" financial statements. ¶84. And, SEC Regulation S-K Items 404, 303, and 402 each respectively require disclosure of material information related to: related party transactions exceeding $120,000, significant components of an entity's expenses, and compensation of principal executive officers. ¶¶86-88. ELM's financial statements omitted key information required by these rules – including the dollar value of the shares conveyed in the 2020 Equity Transactions, stated on the face of ELM's financial statements – and were thus materially misleading. *Takata v. Riot Blockchain, Inc.*, 2020 WL 7640924, at *6 (D.N.J. Dec. 23, 2020) ("Defendants filed a false or misleading statement . . . by leaving out specific details . . . in their Item 404 of Regulation S-K forms."); *In re Tyco Int'l, Ltd.*, 2004 WL 2348315, at *4 (D.N.H. Oct. 14, 2004) (failure to disclose "the transfer of hundreds of millions of dollars from Tyco to the individual defendants in unauthorized compensation . . ." actionable under Item 402). In light of

---

[6]   *In re Hertz Global Holdings, Inc. Securities Litigation* (Tay Br. at 12-13; Luo Br. at 10-11) is inapplicable because, unlike this case, the plaintiff did "not allege that [the defendant-company] bypassed a methodology or metric, but that [it] applied its methodologies incorrectly." 2017 WL 1536223, at *12 (D.N.J. Apr. 27, 2017); *see also comScore*, 268 F. Supp. 3d at 546 (distinguishing *Hertz*).

these rules, Defendant Luo's argument that investors "had access to" the truth over a series of public disclosures rings hollow. Luo Br. at 9; *see Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *10 (D.N.J. July 27, 2018) ("A company may not avoid GAAP requirements by disclosing underlying data to the market.").

Moreover, the Proxy mischaracterized the 2020 Equity Transactions as sales, concealing the fact that they were in reality massive awards of stock compensation to Defendants Luo and Taylor at huge expense to ELM. The Proxy explained that ELM "issued . . . 84,477 shares of common stock . . . for $10 per share," (¶58) as though it were a fair exchange, when in reality the value received by ELM was a minuscule fraction – about 0.122% – of the value of the shares issued to Defendants Luo and Taylor. Defendant Luo argues that "the total merger consideration, and the method by which ELM shares would be converted into ELMS shares" was discernable from the Merger Agreement, suggesting investors "had access to information reflecting" the true value of the 2020 Equity Transactions. Luo Br. at 9. However, a disclosure is inadequate when done "in a piecemeal fashion which prevents a reasonable shareholder from realizing the 'correlation and overall import of the various facts interspersed throughout' the document[s]." *Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001); *Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir. 1983) ("fair disclosure cannot be achieved through piecemeal release of subsidiary facts which if stated together might provide a sufficient statement of the ultimate fact"); *Garner v. Glob. Plasma Sols. Inc.*, 590 F. Supp. 3d 738, 745 (D. Del. 2022) (misrepresentation pled where "some disclosures are buried; others, nonexistent").

The Proxy also falsely claimed that Defendant Luo received no compensation from ELM in 2020, and that Defendant Taylor received only $32,000 in base salary (¶55), failing to disclose hundreds of millions of dollars in stock compensation received through the 2020 Equity

- 17 -

Transactions.  These representations were affirmatively false in their own right, and misleading by omission because once the Proxy chose to "speak on" their compensation, it could not lawfully "omit material facts related to that issue so as to make [their] disclosure misleading." *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 222 (E.D. Pa. 2021) (quoting *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017)).

Additionally, the Proxy and other SEC filings touted Defendants Luo and Taylor's executive experience as crucial to ELMS's success, failing to disclose that Defendants Luo and Taylor were concealing hundreds of millions of dollars in stock-based compensation from investors.  The "laudatory statements" "highlight[ing]" Luo and Taylor as "key to the company's success" "triggered a duty to disclose any fact which would make them not misleading." *Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, 606 F. Supp. 3d 124, 135 (E.D. Pa. 2022).  Moreover, the Proxy's risk disclosure that losing "key personnel" "could negatively impact . . . our post-combination business" (¶70) failed to disclose that the key personnel at issue were involved in a scheme to conceal stock-based compensation.  ¶71; *see AdaptHealth*, 606 F. Supp. 3d at 135 (executive's "ties to a major tax fraud scheme" rendered "statements about how integral he was to the company misleading as they did not disclose that his future at the company was in jeopardy").

The Proxy, including BDO's audit opinion, also falsely assured investors that ELM's financial statements presented ELM's financial position fairly and in accordance with GAAP. ¶¶63-64.  In reality, ELM's financial statements understated expenses by over $800 million dollars in violation of numerous GAAP rules, as detailed in the Complaint and discussed *supra* at 15-17. *See, e.g., Sun v. Han*, 2015 WL 9304542, at *9 (D.N.J. Dec. 21, 2015) (GAAP compliance statements false where company "misrepresented its financial status to [] investors"); *In re*

- 18 -

*Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 446 (D. Del. 2014) (plaintiff "identifie[d] the Financial Accounting Standards" and "explain[ed] how defendants violated these" standards).

Finally, the Proxy falsely represented that BDO conducted a proper audit of ELM's financial statements under PCAOB standards.  In truth, as detailed in the Complaint, BDO's audit violated PCAOB auditing standards.  PCAOB Rule 3520 requires firms to be independent of the client throughout the audit and professional engagement period.  ¶118.  BDO, which structured and advised Defendant Luo concerning the 2020 Equity Transactions, was not independent.  ¶124.  PCAOB Rule 3526 requires an auditor to describe to the client's audit committee all relationships between the auditor and the client.  ¶118.  According to FIII's audit committee, BDO did not do so.  ¶123.  Additionally, BDO failed to "obtain reasonable assurances" as to the accuracy of the financial statements (¶126 (citing AS 1101.03)), including by "obtaining sufficient appropriate audit evidence" (*id.* (citing AS 1101.04)) or by "employing professional skepticism" (*id.* (citing AS 1015.07-09)).  As explained in more detail below, BDO ignored a number of glaring red flags evincing a failure to comply with PCAOB standards rendering BDO's statements materially false and misleading.

### 2.    Defendants Made the Statements at Issue

Defendants were the "makers" of misstatements alleged in the Complaint.  Rule 10b-5 makes it unlawful for "any person, directly or indirectly . . . [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities.  17 C.F.R. §240.10b-5(b).  A person or entity makes a statement if they have "ultimate authority over the statement, including its content and whether and how to communicate it." *JPmorgan Chase Bank, N.A. v. Javice*, 2023 WL 4546409, at *4 (D. Del. July 13, 2023) (quoting *Janus*, 564 U.S. at 142 (2011).  "The evidence that someone is a statement's maker may be implicit from surrounding circumstances." *Id.*; *see also City of Warren*, 70 F.4th at 688 ("surrounding context of the statement" may permit a

- 19 -

"reasonable inference" of ultimate authority).  A single statement may have multiple makers. *Javice*, 2023 WL 4546409, at *4; *see also Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 393 (D. Del.  2016) ("Nothing in *Janus* precludes a single statement from having multiple makers.") (quoting *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015)).

Defendants Boris and Kiev made the false "representations and warranties" in the Offering Memorandum because they had ultimate authority over its content and publication.  ¶¶52-54; *see also, e.g., Javice,* 2023 WL 4546409, at *4 (quoting *Janus,* 564 U.S. at 142).  Defendants Boris and Kiev do not and cannot dispute responsibility for these misstatements.  B&K Br. at 18.  At the time of the Offering Memorandum, Defendants Boris and Kiev were Co-CEOs of the recently founded shell company and SPAC, FIII (¶¶25-26).

Defendants Boris and Kiev are also the makers of the misstatements alleged in the Complaint because both signed the Proxy as Co-CEOs of FIII.  *See* Ex. A at Annex A-1-56.  Corporate officers are generally makers of statements contained in the SEC filings they sign.  *See, e.g.*, *Energy Transfer*, 532 F. Supp. 3d at 228-31 (multiple corporate officers were makers of SEC filings because they signed them); *see also Steamfitters Loc. 449 Pension Fund v. Alter,* 2011 WL 4528385, at *9 (E.D. Pa. Sept. 30, 2011) ("[c]ourts assume that corporate officers have read the SEC filings they sign, and in signing attest to their accuracy and accept responsibility for the contents"); *see In re Stillwater Cap. Partners Inc. Litig.*, 858 F. Supp. 2d 277, 287-88 (S.D.N.Y. 2012).[7]

---

[7]    In addition, there is no reasonable dispute that Defendants Boris and Kiev had the statutory obligation to file the SEC filings at issue, and they are therefore also the makers of these statements under *Janus*. 54 U.S. at 147 (explaining that a Fund is the maker of statements in prospectuses because they "[had] the statutory obligation to file [them] with the SEC").

- 20 -

{FG-W0511971.}

Defendants Boris and Kiev nevertheless attempt to disclaim responsibility as the makers of the statements in their own SEC filings, arguing that ELM and its senior managers (*i.e.*, Defendants Luo, Taylor, and Li) made the statements concerning ELM's financials in the Proxy. B&K Br. at 18-19. Though Defendants Boris and Kiev are correct that ELM's managers are also responsible as the makers of those statements (as discussed below), this point does not absolve Defendants Boris and Kiev of responsibility because "[a] statement can have multiple makers." *Javice*, 2023 WL 4546409, at *4; *see also Universal,* 176 F. Supp. 3d at 393*; Glickenhause*, 787 F.3d at 427. Defendants Boris and Kiev also argue that they did not make the ELM-related statements in the Proxy (that they both signed), because they played no role in the preparation of ELM's financial statements. B&K Br. at 18. However, "[k]ey corporate officers should not be allowed to make important false financial statements . . . yet still shield themselves from liability . . . simply by failing to be involved in the preparation of those statements." *In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 503 (D. Del. 2001) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000)).

Defendants Luo, Taylor, and Li – as the senior managers of ELM – also had ultimate authority over the misstatements concerning ELM in the Complaint because this information was attributed to them.[8] A statement is attributed to an individual or entity if it explicitly names them as speaker or if the circumstances suggest they have ultimate authority over its content and publication. *See City of Warren*, 70 F.4th at 688; *see also Universal*, 176 F. Supp. 3d at 394 ("*Janus* does not insulate corporate officers from liability where the plaintiff 'can plead, and . . .

---

[8]    Defendants Luo, Taylor, and Li had ultimate authority for and are therefore the makers of misstatements alleged in the Complaint, *see* ¶¶55, 57-58, 60-61, 63, 68, 70(a) and 70(d). Defendant Taylor does not dispute he is the maker of the individual allegation against him in the Complaint. ¶70(c).

prove, that those officers . . . had 'ultimate authority' over the statement."). Here, the Proxy explicitly states that "all information contained in this proxy statement…relating to ELM has been supplied by ELM. Similarly, BDO's audit report in the Proxy specified that ELM's "financial statements are the responsibility of [ELM] management," Ex. A at F-89.[9] These specific attributions are sufficient to hold Defendants Luo, Taylor, and Li responsible as the makers of the statements concerning ELM. *See, e.g.*, *City of Warren*, 70 F.4th at 688 (statement attributed to the speaker identified in the statement as its source); *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2019 WL 4597518, at *5 (N.D. Ill. Sept. 23, 2019) (same). *See In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2011 WL 3444199, at *25-*26 (D.N.J. Aug. 8, 2011) (same, also finding defendant maker of SEC filings he signed).

It is also obvious that Defendants Luo, Taylor, and Li, serving respectively as Executive Chairman, CEO, and CFO of ELM, had authority to make the ELM-related statements in the Proxy by virtue of the authority associated with their positions. *See, e.g.*, *Javice,* 2023 WL 4546409, at *4 (statement attributed to the speaker based on his position). Their positions as ELM's senior managers thus lend further support to the inference that Defendants Luo, Taylor, and Li had ultimate authority over numerous alleged misstatements in the Complaint.

Also, the determination of whether someone is a maker of a statement is a question of fact. *S.E.C. v. Brown*, 878 F. Supp. 2d 109, 116 (D.D.C. 2012) ("Whether one is the 'maker' of a false statement turns on factual issues of scienter as well as 'ultimate control' over the statement."). And here, the fact that Defendants Boris and Kiev argue that Defendants Luo, Taylor, and Li made the statements (B&K Br. at 18-19), while Defendants Luo, Taylor, and Li argue that Defendants

---

[9]   There is no reasonable dispute – and no defendant has disputed – that Defendants Luo, Taylor, and Li constituted ELM's management. *See, e.g.*, Ex. A at 210-11. (Table sets forth information regarding ELM's management).

Boris and Kiev are the makers (Luo Br. at 12-13; Tay. Br. at 11; Li Br. at 3), only underscores that the question of authority for the statements is a fact question that must be resolved through discovery. *See, e.g.*, *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 171-72 (S.D.N.Y. 2008) (where co-defendants point at each other on motions to dismiss, the court, in viewing allegations in the light most favorable to plaintiffs, "[c]redit[s] [defendants'] mutual accusations" as confirmations that both engaged in deceptive conduct).[10]

### 3.   The Statements Are Not "Inactionable Opinions"

This case concerns objective misrepresentations of fact.  Whether Defendants Luo and Taylor received little or no compensation in 2020, when they actually received hundreds of millions of dollars-worth of stock, is a matter of objectively verifiable fact, not opinion.  *See Omnicare, Inc., v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. at 175, 183 (2015) ("A fact is 'a thing done or existing[.]'").  Objective financial metrics – such as the materially understated expenses and losses at issue here – are likewise not matters of opinion.  *See In re Lottery.com, Inc. Sec. Litig.*, 2024 WL 454298, at *24 (S.D.N.Y. Feb. 6, 2024) ("[A]pplying *Omnicare* . . . the Court first holds that the post-merger financial-performance-related statements were statements of fact, not statements of opinion.").  It is an undisputed fact that ELM did not record any expenses in connection with the 2020 Equity Transactions.  Likewise, it is a fact, not a matter of opinion, that ELM did not determine the fair market value of the shares issued in the

---

[10]   The Court should also reject the purported "group pleading" argument raised by Defendants Luo, Taylor, and Li.  Luo Br. at 12-13; Tay. Br. at 10, n.4; Li Br. at 2.  A complaint may "group certain plaintiffs together when alleging certain actions," and still "not rely on the group pleading doctrine."  *Universal*, 176 F. Supp. 3d at 396.  Here, the Complaint sets forth particularized allegations as to each of these Defendants.  Defendants Luo, Taylor, and Li only raise this issue in cursory fashion and the Court should reject it.  Luo Br. at 12-13; Tay. Br. at 10 n.4; Li Br. at 2.

{FG-W0511971.}

2020 Equity Transactions and did not record the difference between the purchase price and fair market value of the shares as expenses.[11]

Statements regarding ELM's historical financials complying with GAAP are also not opinions, but actionable misstatements of fact where, as here, the complaint identifies the specific GAAP provisions that have been violated and details the manner in which those provisions have been violated. ¶¶63-65, 77-88. *See Omanoff v. Patrizio & Zhao LLC,* 2015 WL 1472566, at *5 (D.N.J. Mar. 31, 2015) (rejecting argument that representation regarding company's financial statements complying with GAAP was an opinion); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 240 (S.D.N.Y. 2018) (finding GAAP violations properly alleged where plaintiff identified specific GAAP provisions and the manner in which those provisions were violated); *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 594 (S.D.N.Y. 2010) ("Plaintiffs' allegation— that defendants represented that their financial statements had been [] in compliance with GAAP when, in fact, [they] failed to comply with GAAP . . . identifies an untrue statement of material fact . . .").

BDO's misstatements are also statements of fact. BDO's statement that it conducted its audit "in accordance with the standards of the PCAOB," ¶66, is a statement of fact. *See Omanoff*, 2015 WL 1472566, at *5 (rejecting argument that auditor's representation regarding compliance

---

[11] The Court should reject Defendants' argument (and the cases cited in support thereof) that this case involves subjective accounting judgment. *See* Luo Br. at 9-11; Taylor Br. at 12-13; Li Br. at 2-3; and BDO Br. at 7. Rather, this case involves "straightforward" GAAP violations. *See Hacker*, 2023 WL 5266357, at *15; *comScore*, 268 F. Supp. 3d 526, 546 (S.D.N.Y. 2017). The GAAP provisions identified in the Complaint are mandatory financial reporting rules, not suggestions subject to discretionary judgments. *See, e.g.*, ¶77 ("ASC 718 requires a company to determine the fair value of stock at the time of issuance or sale."); ¶80 ("Under ASC 850, financial statements are required to include detailed disclosures regarding related-party transactions."). Even *Hertz*, a distinguishable case cited by Defendants, recognizes that "certain GAAP rules have objective application such that compliance would be a statement of fact." 2017 WL 1536223, at *11.

with PCAOB standards was an opinion); *Sun*, 2015 WL 9304542, at *9-*10 (rejecting auditor's assertion that statements regarding compliance with GAAP and PCAOB standards are opinions); *Yang v. Tibet Pharms.., Inc.*, 2015 WL 730036, at *3 n.7 (D.N.J. Feb. 20, 2015) (allegations of an auditor's conduct relative to professional standards "concern misrepresentations of fact").

Moreover, BDO could readily have verified that this factual representation was untrue based on information in its possession, including its lack of independence due to its work for Defendant Luo and his affiliates (¶¶117-118), its work on the 2020 Equity Transactions (¶¶119-123), its failure to provide written documentation concerning its independence (¶124), and its failure to develop and perform an audit to account for known risks, such as those created by the 2020 Equity Transactions (¶¶125-130).  For the same reasons, even if BDO's factual statement that it conducted a PCAOB-compliant audit is treated as an opinion – and it should not be – the Complaint demonstrates that BDO could not have subjectively believed its own statement in light of the other facts it knew.

BDO also stated its "opinion" that ELM's 2020 financial statements disclosed in the Proxy "present[ed] fairly, in all material respects" ELM's financial position and results of operations "in conformity with accounting principles generally accepted in the United States" – *i.e.*, GAAP. ¶¶64, 116.  This statement – even if treated as an opinion – is actionably misleading because it fits within all three categories of liability for opinion statements under *Omnicare*.

*First*, BDO's "opinion" regarding the financial statements' compliance with GAAP contains the embedded factual representation that BDO conducted a PCAOB-complaint audit.  As explained above, this embedded fact—BDO's compliance with PCAOB standards— was false. *See Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1119-20 (E.D. Cal. 2017) (finding allegations regarding falsity of embedded fact concerning

auditor's compliance with PCAOB standards sufficiently pled).   That the audited financial statements themselves were fair in all material respects and GAAP-compliant – are also facts embedded within an audit opinion.  *See In re Petrobras Sec. Litig.*, 2016 WL 1533553, at *3 (S.D.N.Y. Feb. 19, 2016) (financial statements embedded within auditor's audit opinion because it "rested on the underlying facts contained in the financial statements").

*Second*, BDO's "opinion" that ELM's 2020 financials complied with GAAP is actionable because BDO could not have reasonably believed it was true because BDO failed to conduct the PCAOB-complaint audit necessary to hold such an opinion in the first place.  *See, e.g.*, *New England Carpenters Guaranteed Annuity & Pension v. DeCarlo*, 80 F.4th 158, 181-82 (2d Cir. 2023) ("BDO's statement that it 'believe[d] [its] audits provide a reasonable basis for [its] opinion,' . . . would lead a reasonable investor to conclude that BDO had conducted 'some meaningful . . . inquiry' . . . when[,]" based on the complaint it had failed to do so); *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 156 (S.D.N.Y. 2021) ("[P]laintiff only needs to allege that the [auditor] ignored a sufficient number of red flags, which would permit the inference that the [auditor] did not believe that they conducted a compliant audit."); *In re Lehman Brothers Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 259 (S.D.N.Y. 2015) (same).  For example, conducting a PCAOB-compliant audit would have allowed BDO to determine that ELM had not performed the required fair market valuation of the shares issued in the 2020 Equity Transaction and had not properly expensed the difference between the purchase price and far greater fair value.  ¶¶117, 125-133.  Having failed to conduct such an audit, BDO lacked any reasonable basis for its "opinion" that ELM's financials for 2020 complied with GAAP.

*Finally*, BDO's "opinion" regarding compliance with GAAP is actionable because it "omit[s] context," including that BDO failed to perform numerous required independence and

- 26 -

audit risk assessments (*see, e.g.*, ¶¶118-124, 127-132, 135), that "call [the statement] into question." *See Omnicare*, 575 U.S. at 189 n.6, 194 ("[I]n the absence of the expected inquiry or in the face of known contradictory evidence," liability can arise from defendants' conduct regardless of their subjective belief in it.); *see also Se. Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2022 WL 3572474, at *57 (M.D. Pa. Aug. 18, 2022) (finding material omissions under *Omnicare*, including where auditor failed to disclose impaired loans in violation of GAAP); *Lehman Brothers*, 131 F. Supp. 3d at 259 ("[A]n auditor, like any other speaker, may omit matter from its opinions on a company's financial statements and its compliance with GAAS that would render those opinions materially misleading to an informed reader."); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *14 (D.N.J. Apr. 28, 2017) (plaintiffs adequately alleged material omissions under *Omnicare*).

## B.     Defendants Acted with Scienter

"Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud" and requires "a knowing or reckless state of mind." *See Avaya*, 564 F.3d at 252. To adequately plead scienter, the Third Circuit requires plaintiffs to allege facts giving rise to a "strong inference" of "either reckless or conscious behavior." *Id.* at 276 (quotation omitted). A plaintiff "must sufficiently plead defendants' knowledge of facts or access to information contradicting their public statements . . . [*i.e.*, that] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Papa*, 2018 WL 3601229, at *18. It "is unnecessary to read in an additional requirement that Plaintiffs must explicitly plead that Defendants examined or considered the information available to them." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *12 (E.D. Pa. Mar. 25, 2020). Thus "[t]he pertinent question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

- 27 -

standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (emphasis in original). The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Scienter will "ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.

### 1.   The Individual Defendants Acted with Scienter

The Complaint sets forth detailed allegations showing that the Individual Defendants knew "facts or [had] access to information contradicting their public statements," a classic indicator of scienter. *Papa*, 2018 WL 3601229, at *18. Further, the Complaint pleads a wealth of circumstantial evidence that, when considered in conjunction with the detailed allegations of direct knowledge, enhances the strong inference of scienter. Finally, although not required, the Complaint demonstrates that the Individual Defendants had overwhelming personal financial motives to conceal the 2020 Equity Transactions. As detailed below, the Complaint's allegations are more than sufficient to raise a strong inference of scienter as to the Individual Defendants.

### a.   Evidence of Conscious Misbehavior or Recklessness

The Complaint alleges with particularity that the Individual Defendants had knowledge of all the facts and circumstances concerning the 2020 Equity Transactions. As the senior managers and controllers of ELM and FIII, the Individual Defendants were necessarily aware of: (1) the September 18, 2020 letter of intent between ELM and FIII, establishing an enterprise value for the combined company of $1.3 billion, which was negotiated directly by Defendants Boris, Kiev, Luo, and Taylor;[12] (¶47); (2) the fact that shortly before announcing the Merger, ELM issued at least

---

[12]   *See* Ex. A at 128: "Following our IPO. . . . Our co-CEOs, Marshall Kiev and David Boris . . . submitted one non-binding Letter of Intent to a Potential Target — ELM.," and *id.* at 130 "[w]e

- 28 -

99,000 shares of common stock (84,477 of which went to Defendants Luo and Taylor) for $10 per share, which was drastically below fair market value (¶¶48, 50, 58, 81, 106);[13] (3) the fact that the Merger Agreement announced less than three months after the letter of intent valued ELMS stock at $10 per share and implied a pro forma equity value of approximately $1.4 billion (¶47); and (4) the fact that pursuant to the Merger Agreement and the letter of intent, after the closing of the Merger, each ELM share could be exchanged for 820 ELMS shares worth over $8,000 (¶¶47-50, 56, 59-60, 106).  Further, the Proxy explicitly stated that FIII management conducted due diligence concerning ELM and specified that this diligence continued even after the 2020 Equity Transactions had occurred, indicating that Defendants Boris and Kiev had access to the relevant facts (¶106).  The Individual Defendants' knowledge of and access to these facts demonstrates their scienter.  *See e.g.*, *McCullough v. Advest, Inc.*, 754 F. App'x 109, 113 (3d Cir. 2018) (scienter can be readily inferred where defendant "knew facts or had access to information suggesting that [her] public statements were not accurate"); *In re Great Atl. & Pac. Tea Co.*, *Inc. Sec. Litig.*, 103 F. App'x 465, 468-69 (3d Cir. 2004) ("evidence that the defendants had actual knowledge of the facts is sufficient to show scienter").[14]

---

discussed the terms of the initial draft with Mr. Luo and Mr. Taylor. . . .  From September 14, 2020 through September 17, 2020, the parties revised the Letter of Intent.  The Letter of Intent was executed on September 18, 2020."

[13]   Defendants Boris and Kiev were at the very least aware of the transfer of 84,477 shares to Luo and Taylor because that fact was disclosed (albeit misleadingly, *see supra* at 15) in the Proxy.  Of course, Defendants Luo and Taylor knew they had received those 84,477 shares.

[14]   *See also*, *In re Grand Canyon Educ., Inc. Sec. Litig.*, 2023 WL 2072227, at *22 (D. Del. Feb. 17, 2023) (pleading scienter by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements"); *Innocoll*, 2020 WL 1479128, at *12 ("[a] strong inference of scienter" can be established by allegations of "defendants' knowledge of facts or access to information contradicting their public statements"); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("access to information contradicting their public statements[,]" supports scienter); *In re Ikon Off. Sols., Inc. Sec. Litig.*, 66 F. Supp. 2d 622, 631-33 (E.D. Pa. 1999) (same).

- 29 -

Not only did Defendants Boris and Kiev have access to information that would necessarily alert them to the reality that the 2020 Equity Transactions constituted a massive compensation expense, but they were also specifically alerted to the same financial reporting issue by the SEC's comment letter concerning the Proxy, further compelling a strong inference of their scienter. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 286-87 (D.N.J. 2007) (holding that a strong inference of scienter can be inferred from "the panoply of such facts which could sufficiently indicate that defendants had clear reasons to doubt the validity of the issuer's financials but, nonetheless, kept turning a blind eye to all such factual 'red flags'"). As detailed in the Complaint, just two weeks before issuing the materially misleading Proxy, FIII received an SEC comment letter (addressed to Defendant Boris) explicitly challenging the preliminary proxy's accounting treatment of share-based payments, and questioning why such payments were not "accounted for as compensation expense for services rendered" – *i.e.*, the very same accounting issue concerning the share-based payments in the 2020 Equity Transactions. ¶134. Defendants Boris and Kiev were thus alerted to the improper accounting methods at issue, and at a minimum, acted recklessly by disclosing ELM's financials in SEC filings without assessing the sufficiency of the audit or compliance with GAAP. *Id.*

The Complaint also alleges an abundance of facts constituting circumstantial evidence of conscious misbehavior, including: (1) the Company announcing that it would need to restate the ELM financial statements disclosed in the Proxy and commencing a Special Committee investigation as a result (¶89); (2) GAAP violations amounting to hundreds of millions of dollars in unreported expenses (¶¶89-90), (3) the disclosure that Luo and Taylor lied to the Special Committee during the course of its investigation (¶90); (4) the resignations and settlement agreements of Defendants Luo and Taylor, compelling them to pay the company millions in both

stock and cash (¶111); (5) BDO's resignation letter stating that an "illegal act . . . has or may have occurred" (¶94); (6) the SEC launching an investigation concerning the 2020 Equity Transactions (¶96); and ultimately (7) the Company's own press release directly attributing their bankruptcy to the foregoing misconduct (¶103). These allegations further support a strong inference of scienter. For example, numerous courts in this Circuit have held that GAAP violations combined with auditor and/or executive resignations raise a strong inference of scienter. *See, e.g.*, *Vanderhoef v. China Auto Logistics Inc.*, 2021 WL 3260849, at *5 (D.N.J. July 30, 2021) ("while certain allegations—including those concerning [] GAAP violations, executive and auditor resignations, and . . . c-suite positions . . . may not alone support an inference that these Defendants acted with scienter, such allegations, in tandem, do support such an inference."); *Sun*, 2015 WL 9304542, at *15-*16 ("[All] of the facts alleged," including GAAP violations and outside auditor resignation, "taken collectively, give rise to a strong inference of scienter"). Lying to cover up misconduct is another factor supporting scienter. *See, e.g.*, *SEC v. Desai*, 145 F. Supp. 3d 329, 337 (D.N.J. 2015), aff'd, 672 F. App'x 201 (3d Cir. 2016) ("effort[s] to mask . . . violations of federal securities law demonstrate [ ] a high degree of scienter.").

The Court should reject Defendants Luo's and Taylor's attempts to undermine the significance of their resignations in establishing their scienter. Defendants Luo and Taylor argue that their resignations should only be considered evidence of scienter when accompanied by "extreme corporate punishment." *See* Luo Br. at 17; Tay. Br. at 16. But here the Complaint expressly alleges the swift and severe consequences faced by Defendants Luo and Taylor. *See supra* at 9-10; ¶111. Defendants Luo and Taylor also argue that their continued roles as "consultants" undermines the strong showing of their scienter. *See* Luo Br. at 17; Tay. Br. at 16. It is far more plausible to conclude that, given their pivotal roles in the business and extensive

background in the automotive industry, the Company simply depended to some extent on their continued involvement, especially in the aftermath of the sudden adverse revelations associated with their firing.

BDO's resignation – as well as its statement that an "illegal act…has or may have occurred" and that it was resigning because of ELMS's failure to take timely or appropriate remedial actions (¶94) – further supports a strong inference of scienter here.  *See, e.g., Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (finding that an outside auditor's resignation also "add[s] to the overall pleading of circumstantial evidence of fraud").  Moreover, the announcement of an SEC investigation into the 2020 Equity Transactions (¶¶13, 96, 99, 115, 119) also adds weight to the scienter allegations.  *See, e.g., In re ITT Educ. Servs. Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 309 (S.D.N.Y. 2014) ("pending investigations" are properly considered "as evidence of scienter").

Finally, the highly material GAAP violations at issue – including hundreds of millions of dollars in omitted expenses – lend even further support to the strong inference of scienter, particularly when viewed alongside the numerous other indicia of fraudulent intent present in this case, including the Individual Defendants' knowledge of and access to the true facts, the significant circumstantial evidence of intent, and the enormous personal financial motives, discussed below.  *See, e.g., In re Interpool, Inc. Sec. Litig.*, 2005 WL 2000237, at *15 (D.N.J. Aug. 17, 2005) ("GAAP violations, in conjunction with other evidence of fraudulent intent, may support a strong inference of scienter"); *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 608 (D.N.J. 2001) (same).[15]

---

[15]   *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636–37 (E.D. Va. 2000) ("[I]t cannot be gainsaid that some violations of GAAP and some restatements of financials are so significant

- 32 -

### b.        The Individual Defendants' Powerful Financial Motives

In addition to the substantial evidence establishing Defendants' conscious misbehavior or recklessness, the Complaint also shows that the Individual Defendants had highly material personal financial motives to conceal the 2020 Equity Transactions, because revealing the 2020 Equity Transactions (and the secret appropriation of over $800 million in assets from the soon to be merged company) right before the Merger would have obviously threatened the Merger, and with it the Individual Defendants' ability to realize massive personal financial gain.

"[P]ersonal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325*; see also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) (financial benefits are "persuasive when conducting a holistic review of the evidence"); *Loc. 731 I.B. v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) ("motive of personal financial gain . . . bolsters the inference of scienter"); *Universal*, 176 F. Supp. 3d at 396 (same).  Here, the Individual Defendants stood to reap huge financial gains from the Merger, while revealing the truth about the 2020 Equity Transactions could have – and likely would have – scuttled it.

Defendant Luo paid approximately $780,000 to receive 78,016 ELM shares worth over $640 million that he could only receive if the Merger closed.  ¶107.  Defendant Taylor paid approximately $64,000 to receive 6,461 ELM shares worth over $53 million that he could only receive if the Merger closed.  *Id.*  Defendants Luo and Taylor had every incentive to conceal these transactions because their revelation would have prevented the Merger from closing.  *Id.*

Defendants Boris and Kiev were likewise highly motivated to consummate the Merger because they stood to reap significant personal financial gain if the Merger closed.  If the Proxy

---

that they, at the very least, support the inference that conscious fraud or recklessness as to the danger of misleading the investing public was present.").

{FG-W0511971.}

had revealed the truth about the 2020 Equity Transactions, FIII shareholders were far more likely to oppose the Merger. On the other hand, Defendants Boris and Kiev stood to profit handsomely if the Merger was consummated. The Sponsor Managing Member, which Defendants Boris and Kiev controlled, invested only $25,000 to acquire 6.25 million founder shares, which if unrestricted and freely tradable, would be valued at approximately $64 million at the time of the Merger based on the price of $10.19 per share for ELMS stock on June 25, 2021. ¶¶108-109. Even if ELMS stock were to crash to $1 per share after the Merger and public shareholders lost approximately 90% of their investment, the Sponsor Managing Member could nevertheless rake in a profit of more than $6 million. *Id.*

These concrete motive allegations are compelling and further support the strong inference of scienter as to Defendants Boris, Kiev, Luo, and Taylor. *See, e.g.*, *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 705 (D. Del. 2010) ("[M]otive may be a factor in analyzing the defendant's state of mind"); *In re Viropharma Inc. Sec. Litig.,* 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014) (motive "may amplify an inference of scienter as part of the holistic information available to the court").[16]

The Individual Defendants neglect to address these detailed allegations of concrete personal financial motives, focusing instead on the arguments that general corporate motive is insufficient to establish scienter. *See* Tay. Br. at 14-15; B&K Br. at 14-15; Luo Br. at 14-16; Li Br. at 2-3. But, as set forth above, the allegations of the Complaint concern specific and concrete personal financial motives, not generic broadly applicable allegations that could apply to any

---

[16]    Defendants Boris and Kiev's reliance on *Starr Invs. Cayman II, Inc. v. China MediaExpress Holdings, Inc.*, 2014 WL 4180331, at *3 (D. Del. Aug. 21, 2014), is misplaced because in *Starr* there were only allegations of motive, whereas in this case the motive allegations support the extensive pleading of facts showing conscious misbehavior or recklessness.

{FG-W0511971.}

defendant. *See, e.g., Universal*, 176 F. Supp. 3d at 396 (emphasizing that defendants had "powerful motives to conceal the truth about APS's business," noting that defendants "would be able to exchange their illiquid and worthless APS shares for valuable, publicly traded shares of Universal . . . [and] would increase their personal compensation by as much as 40 percent"); *Swanson*, 2011 WL 2444675, at *12 ("a motive of personal financial gain that bolsters the inference of scienter").

The Court should also reject the argument of Defendants Boris and Kiev that their purchase of 500,000 additional shares negates scienter. B&K Br. at 16-17. Numerous courts have found scienter in such instances. *See In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *8 (D. Del. Feb. 7, 2020) ("courts have regularly found scienter even where insiders purchased shares during the class period."). Moreover, "there is no *per se* rule [stipulating] that stock purchases [categorically] negate any inference of scienter. *Id.* (quoting *In re Fannie Mae 2008 Sec. Litig.*, 2011 WL 13267340, at *3 (S.D.N.Y. Apr. 11, 2011)); *see also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (rejecting argument that share purchases negate inference of scienter); *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 WL 1365465, at *13 (D.N.J. June 7, 2005) (stock purchases did not undermine the inference of scienter). In rejecting a similar argument, the court in *MF Global* explained:

> To be sure, under some circumstances such purchases might suggest a lack of fraudulent intent. But this possibility alone cannot counteract the circumstantial evidence of fraudulent intent described above; such a rule would create incentive for corporate officers to insulate themselves from liability by purchasing stock merely to negate an inference of fraud. 982 F. Supp. 2d at 320.

As in *MF Global*, Defendants Boris and Kiev's purchase of shares cannot counteract the extensive evidence of fraudulent intent in this case.

Equally unavailing are the Individual Defendants' arguments that BDO's involvement absolves them of responsibility. B&K Br. at 11-12. *See, e.g., Papa*, 2018 WL 3601229, at *19-

- 35 -

*20 (rejecting defendants' argument that a clean audit opinion categorically insulates a defendant from liability); *Palladin Partners v. Gaon*, 2006 WL 2460650, at *10 (D.N.J. Aug. 22, 2006) (Martini, J.) (finding scienter despite clean audit opinion).[17]  Further, whether reliance on an auditor can excuse liability as to any of the Individual Defendants can only be resolved through discovery.  *See, e.g., New Oriental Educ. & Tech. Grp. Sec. Litig.,* 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013); *In re Winstar Commc'ns,* 2006 WL 473885, at *8 (S.D.N.Y. Feb. 27, 2006).[18]

In sum, the Complaint shows that the Individual Defendants had direct knowledge of and access to the true material facts concerning the 2020 Equity Transactions, sets forth substantial additional circumstantial evidence of fraudulent intent, and alleges concrete financial motives that underscore the Individual Defendants' scienter.  In contrast, the Individual Defendants fail to raise any inference of non-fraudulent intent, much less a reasonable one.  The only plausible inference here is a strong inference of scienter.

### 1.      BDO Acted with Scienter

The Complaint also raises a strong inference of BDO's scienter because it shows the existence of significant GAAP violations coupled with the fact that BDO was aware of and ignored major red flags.  *See Hacker*, 2023 WL 5266357, at *16-*17 (holding that BDO had scienter concerning its statements in the Proxy because of GAAP violations combined with BDO's ignoring red flags).  A plaintiff may plead an auditor's scienter by "showing that an auditor either

---

[17]    *See also*, *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (rejecting defense that independent accounting firm had audited the company's financial statements, because "[t]o hold otherwise would shift to accountants the responsibility that belongs to the courts").

[18]    *See also Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1365 n.183 (C.D. Cal. 2014) ("Plaintiffs also argue that, absent discovery, there is no way to know what communications transpired between PwC and Ixia, and accordingly that PwC's audit opinion cannot negate scienter for purposes of a motion to dismiss.  The court agrees . . . PwC's audit opinion does not, standing alone, negate any otherwise compelling inference of scienter plaintiffs' pleading raises.")

{FG-W0511971.}

lacked a genuine belief that its representations were supported by adequate information or engaged in auditing practices so shoddy that they amounted at best to a 'pretended audit' . . . even in the face of assertions of good faith." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006). Thus, "[a]t the pleading stage, courts have recognized that allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss." *Id.* at 279-81; *see also Hacker*, 2023 WL 5266357, at *4 (quoting and applying same standard); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2023 WL 3993740, at *4 (D.N.J. June 14, 2023) (quoting and applying same standard).[19]

As set forth *supra*, at 13-14, the Complaint provides detailed and particularized allegations of GAAP violations, including ASC 718, which required a fair market valuation of the 2020 Equity Transactions and the expensing of the excess value of the issued stock (none of which occurred) (*see* ¶¶61, 68, 77-79); and ASC 850, which required disclosure of "information deemed necessary to an understanding of the effects of the transaction on the financial statements" and "[t]he dollar amounts of transactions" (which also did not occur), *see* ¶¶80-82. No Defendant disputes these GAAP violations.[20]

There is also no reasonable dispute that BDO ignored a number of glaring red flags, including:

Share Price:    The discrepancy between the $10 per share price of the 2020 Equity Transactions and the value of those shares given the 820 to 1 exchange ratio was a major red flag. *See Hacker*, 2023 WL 5266357, at *7 ("In the context of the soon-to-be-signed merger agreement,

---

[19]    Notably, GAAS and GAAP are interchangeable for purposes of applying this standard. *See Hacker*, 2023 WL 5266357, at *4 n.11 (GAAS and GAAP "are closely related, and are often treated as synonyms by courts. That is how the Court will proceed here.").

[20]    The Complaint also identifies numerous additional SEC regulations that were undisputedly violated here. ¶¶83-88.

the combined effect of the 820:1 ratio and the $10 acquiring company share price was to throw up a red flag --- indicating the $10 operating company share valuation was much too low.").  This red flag indicated clearly that the ELM financial statements in the Proxy materially understated expenses.  *Id*. at *8 (the "startling[ly] low $10 price for operating company shares was a red flag --- and one that suggested the 2020 financial statements the Defendant offered its clean opinion on were materially inaccurate, because they greatly understated operating expenses.").  Moreover, BDO was aware of this red flag because, as alleged in the Complaint, BDO itself structured the 2020 Equity Transactions.  *See* ¶119; *see also Hacker*, 2023 WL 5266357, at *8 (BDO "was aware of the November 2020 stock sale when, in 2021, it audited the operating company's 2020 financial statements").  As the court in *Hacker* summarized, this red flag "suggested the financial statements audited by [BDO] were potentially erroneous, and by a material amount.  And this red flag was visible to [BDO] because it was aware of the November 2022 stock sale (and before it issued its clean opinion on the financial statements)."  2023 WL 5266357, at *10.

Share Valuation:  The fact that the 2020 Equity Transactions occurred without a fair market valuation was another significant red flag.  As detailed in the Complaint, ASC 718 required a fair market valuation of the shares issued in the 2020 Equity Transactions, which did not occur here.  ¶¶61, 68, 77-79.  "This was another red flag."  *Hacker*, 2023 WL 5266357, at *11.  Further, BDO "was aware of this red flag."  *Id*. at *12.  A fair market valuation was required under ASC 718 and BDO could not have conducted a proper audit without this information.  ¶133.  Indeed, because BDO knew about the 2020 Equity Transactions (that it had structured), "it is difficult to imagine a non-reckless auditor knowing of the stock sale but failing to ask management, as part of its audit of the financial statements, 'How did you come to this valuation?'"  *Hacker*, 2023 WL 5266357, at *12.

- 38 -

{FG-W0511971.}

The Court should reject BDO's argument that the impending Merger was still subject to various closing conditions, and that "consummation of the de-SPAC transaction was sufficiently uncertain," which in BDO's telling made it reasonable to concur with ELM's accounting for the 2020 Equity Transactions at the time of its audit. BDO Br. at 15-16. *Hacker* rejected this argument outright, explaining that even discounting the value of the 2020 Equity Transactions based on the slim possibility that the Merger would not close could never have reasonably justified the enormous discrepancy between the $10 per share price paid and the value of the shares given. *See* 2023 WL 5266357, at *5 ("For anyone doing (or reviewing) a valuation analysis in a context like this one, it could potentially make sense to consider discounting share value to reflect the possibility the merger would not in the end actually get done. Of course. But even if there was a 1/3 chance of the merger not getting there, or even a 2/3 chance --- $10 is still hard to fathom for a share that could soon be worth $8200.").

Finally, especially given the clear-cut accounting issues at play, the sheer magnitude of the accounting misrepresentations at issue – involving over $800 million in undisclosed expenses – itself supports a strong inference of BDO's scienter. *Hacker*, 2023 WL 5266357, at *15 ("GAAP violations on even roughly this alleged scale, especially when based on relatively straightforward issues, support a strong inference that [BDO] acted with . . . scienter.").

## C.    PIPE Investors Have Standing

PIPE investors have standing because this action arises from material misrepresentations and omissions made in connection with their purchase of common stock in the PIPE Offering.

Standing to assert claims under Section 10(b) requires that they arise "in connection with the purchase or sale of any security." 15 U.S.C. §78j(b); *see also Avaya*, 564 F.3d at 251 ("To state a claim for securities fraud under Rule 10b–5, plaintiffs must 'allege defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the

- 39 -

sale of a security[.]'"); *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir. 1988) ("a §10(b) action can be brought by a purchaser or seller of '*any* security' against '*any* person' who has used '*any* manipulative device or contrivance' in connection with the purchase or sale of a security.") (emphasis in original) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731 (1975) ("*Blue Chip*") ("Since both § 10(b) and Rule 10b-5 proscribed only fraud 'in connection with the purchase of sale' of securities, . . . [*Birnbaum*] concluded that the plaintiff class in a Rule 10b-5 action was limited to actual purchasers and sellers.") (citing *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463-64 (2d Cir. 1952)).   That a plaintiff must be an actual purchaser or seller is "[t]he only standing limitation recognized by the Supreme Court with respect to section 10(b) damage actions[.]" *Deutschman*, 841 F.2d at 506 (interpreting *Blue Chip*).   Further, where the misrepresentations at issue concern material information, "the 'in connection with' requirement may be satisfied simply by showing that [the statements] were publicly disseminated in a medium upon which investors tend to rely[.]" *Semerenko v. Cendant Corp.*, 223 F.3d 165, 177 (3d Cir. 2000); *see also Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 301 (3d Cir. 2005) ("We [] have addressed the 'in connection' requirement in the context of § 10(b) and Rule 10b–5 . . . [the] criteria is satisfied where material misrepresentations are 'disseminated to the public in a medium upon which a reasonable investor would rely.'" (quoting *Semerenko*, 223 F.3d at 176)); *In re Ikon Off. Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002) (citing *Semerenko*).

Here, there is no dispute that PIPE investors purchased common stock in the PIPE Offering. There is likewise no dispute that Defendants' misrepresentations and omissions concerned material information.   Indeed, no Defendant contests the materiality element here, conceding, as they must, that $800 million in secret compensation paid to insiders and concealed in false financial

- 40 -

{FG-W0511971.}

statements was important information to PIPE investors.  *See Innocoll*, 2020 WL 1479128, at *14 ("Information is material if it 'would be important to a reasonable investor in making his or her investment decision.'").   Further, all the misrepresentations at issue occurred in the Offering Memorandum, the Proxy, and other SEC filings concerning the Merger, and there is no question that each is a "medium upon which investors tend to rely."  *Semerenko*, 223 F.3d at 177.  Indeed, here the Offering Memorandum specified that PIPE investors "will rely" on the Offering Memorandum and its representations and warranties, including as to the truthfulness of the SEC filings at issue.    ¶¶38, 140.    PIPE investors' claims thus clearly arise from material misrepresentations "in connection with the purchase or sale of a security" and they have standing to pursue their claims.  *Semerenko*, 223 F.3d at 174.

Defendants Boris and Kiev ignore the governing precedents and ask the Court to embrace an out-of-circuit standing rule that is directly contrary to Third Circuit and Supreme Court case law.  B&K Br. at 8-10.[21]  The Court should reject this request.  Whereas, consistent with the language of the statute, the Third Circuit and Supreme Court hold that standing exists where the misstatements at issue occurred "*in connection with* the purchase or sale" of a security, in *Menora Mivtachim Insurance Ltd. v. Frutarom Industries Ltd.*, the Second Circuit articulated a substantially narrower definition of standing that is "limited to purchasers or sellers of securities about which a misstatement was made."  54 F.4th 82, 84 (2d Cir. 2022).

---

[21]   Defendants Taylor and Li each join in the standing argument made by Defendants Boris and Kiev.  Tay. Br. at 10 n.3; Li Br. at 2-3.  The analysis applies equally to all the Individual Defendants.  Because they each made misstatements (*see* Section I.A.2, above), and the misstatements were material and were made in a medium upon which investors tend to rely, PIPE Investors have standing to pursue their claims against each of the Individual Defendants. *Semerenko*, 223 F.3d at 174-77.

Numerous district courts have rejected this argument and declined to apply *Frutarom*.  In *In re Robinhood Order Flow Litigation*, the court explained that "*Blue Chip's* holding [is] clear" and "does not . . . require, as a standing requisite, that plaintiffs allege defendant made misrepresentations about the security plaintiffs purchased."  2023 WL 4543574, at *7 (N.D. Cal. Jan. 18, 2023) (noting that both the Supreme Court and Ninth Circuit read *Blue Chip* as "limit[ing] standing to purchasers and sellers of securities, nothing more") (collecting cases).  Likewise, in *In re Mullen Automotive Securities Litigation*, the court explained that *Frutarom* "provides little analysis" to support its conclusion that *Blue Chip* requires a plaintiff to have purchased the security 'about which' a misstatement was made, and held that "[t]he Court is not bound by [*Frutarom*] or *Nortel*, and the Court finds these decisions' extrapolations from *Blue Chip* unpersuasive."  2023 WL 8125447, at *6 (C.D. Cal. Sept. 28, 2023) (noting that *Frutarom* relies on statements from *Blue Chip* which "this Court reads . . . differently"); *see also In re CCIV/Lucid Motors Sec. Litig.*, 2023 WL 325251, at *9 (N.D. Cal. Jan. 11, 2023) (finding "the [Second Circuit's] rule regarding standing . . . inconsistent with Supreme Court precedent and the policy considerations with respect to standing, including the need to ensure confidence in the markets").  Notably, even the concurrence in *Frutarom* criticized the majority's departure from established law, explaining that the decision offered "no explanation as to why it is now necessary to alter the language that the Supreme Court and this Circuit have used for decades" and failed to "provide any clarifying guidance on how litigants should apply the new ['about which'] standard[.]"  54 F.4th at 91 (Pérez, J., Concurring).

In any event, PIPE investors have standing to sue Defendants even under the Second Circuit's standard because they purchased securities "about which" the statements were made.  *Frutarom*, 54 F.4th at 86.  Critically, the statements in the Offering Memorandum – which

- 42 -

represented and warranted that FIII's SEC filings were and would remain truthful through the Merger (¶¶52-53) – were squarely about FIII, not ELM. Thus, Plaintiff "dealt in the security to which the prospectus, representation, or omission relates." *Frutarom*, 54 F.4th at 88 (quoting *Blue Chip*, 421 U.S. at 747). Moreover, even material misrepresentations concerning ELM's financials were fundamentally statements *about FIII's securities* – made in FIII's SEC filings to inform investors about their investments in FIII and solicit their approval for the Merger. *See, e.g.*, *Robinhood*, 2023 WL 4543574, at *7 ("a representation or omission can 'relate' to more than one company").

Defendants argue further, applying *Frutarom* and quoting *Blue Chip*, that PIPE investors did not purchase the "stock in question" (B&K Br. at 8) but fail to "explain[] why . . . 'the stock in question' refers to the stock that is the subject of the alleged misrepresentation" when that phrase "is equally likely to mean the stock that is the subject of the plaintiff's claim." *Robinhood*, 2023 WL 4543574, at *7 (interpreting *Blue Chip*). This conclusion is particularly appropriate here, where FIII was otherwise an empty merger vehicle, whose only purpose was to acquire a target company, and statements about the target were therefore necessarily statements about FIII's securities. Indeed, in failing to challenge the "materiality" element in this case, Defendants concede that information concerning ELM's financials was part of the "total mix" of information pertinent to FIII investors, and was thus necessarily "about" FIII securities. *Innocoll*, 2020 WL 2020 WL 1479128, at *14 (information is material where it "would have been viewed by the reasonable investor as having significantly altered the total mix of information available").

D.    **The Complaint Pleads Reliance**

The Complaint is more than sufficient to allege "[r]eliance, or transaction causation, . . . that but for the fraudulent misrepresentation, the investor would not have purchased or sold the security." *Adams v. Klein*, 2021 WL 4439658, at *13 (D. Del. Sept. 28, 2021), *aff'd*, 2022 WL

- 43 -

1658700 (3d Cir. May 25, 2022); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir. 2007). To show reliance, the Complaint need only plead "a causal nexus between the misrepresentation and the plaintiff's injury as well as a demonstration that the plaintiff exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests." *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178 (3d Cir. 2003); *Rheault v. Halma Holdings Inc.*, 2023 WL 8005318, at *8 (D. Del. Nov. 7, 2023); *Adams*, 2021 WL 4439658, at *13; *Blattman v. Siebel*, 2016 WL 1450946, at *3 (D. Del. Apr. 12, 2016).

The Offering Memorandum specified that PIPE investors "will rely on" the "representations and warranties of [FIII] contained in this [Offering Memorandum.]" ¶38. Those representations and warranties included that "*all reports* required to be filed by [FIII] . . . complied in all material respects" with federal securities laws, and "*none of the SEC Reports*, when filed, contained any" material misstatement or omission. ¶148. The Offering Memorandum thus warranted the integrity and accuracy of the Company's pre-merger SEC filings – which included BDO's audit report – and specified investors '***will rely***' on the truthfulness of those reports. ¶¶38, 149. The accuracy of those SEC filings was also an express closing condition of the PIPE Offering. ¶39. Thus, "the PIPE Offering investors were therefore not obligated to and would never have purchased any of the $130 million of ELMS shares in the PIPE Offering at closing but for the material misrepresentations alleged" in the Complaint. ¶15. The Complaint clearly pleads a causal nexus between BDO's misstatements and PIPE investors' injury. *See Rheault*, 2023 WL 8005318, at *9 (plaintiff sufficiently alleged he "justifiably relied on the material omissions and would not have entered into the stock purchase agreement as written if he had known" the omitted information).

- 44 -

Only BDO challenges reliance.  BDO first argues that PIPE investors could not have relied on BDO's audit report because PIPE investors entered into the Offering Memorandum before BDO's misstatements were disclosed in the Proxy.  BDO Br. at 17-19.  This argument misreads the allegations of the Complaint, which show that PIPE investors in fact purchased their shares at the time of the Merger, *after* BDO's material misrepresentations were disclosed in the Proxy.  ¶36. Indeed, the Offering Memorandum, which was executed approximately six months before the Merger, specified that PIPE investors "will rely" on FIII's representations and warranties (¶140), which specifically included warranties as to the material accuracy of SEC filings (including BDO's fraudulent report).  ¶148.

BDO is also wrong that Plaintiffs were 'committed' to purchasing shares as of the signing of the Offering Memorandum.  BDO Br. at 17.  This "commitment" was expressly contingent on the truthfulness and accuracy of FIII's SEC filings at the time of closing, and the Offering Memorandum provided further that the agreement would "terminate and be void" if this closing condition was not satisfied at the time of closing.  ¶¶39-40.  BDO's misrepresentations obscured that the closing conditions had not been met, and PIPE investors would have otherwise known their obligation to purchase the shares was "void."  ¶40; *see In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1303 (E.D. Wash. 2007) (reliance "not grounds for dismissal" where "Plaintiffs allege that the misstatements were required for the securities to issue").

BDO also misconstrues language in the Offering Memorandum to argue that PIPE investors disclaimed reliance on BDO's audit report contained in the FIII SEC filings that PIPE investors were explicitly permitted to rely upon.  BDO Br. at 19-20.  As detailed above, the Offering Memorandum specified that PIPE investors were to rely on the integrity and accuracy of FIII's SEC Filing (¶¶37-38) which included BDO's audit opinion (¶64).  In contrast, BDO cites

- 45 -

irrelevant language in the Offering Memorandum which states that PIPE investors were not to rely on any statements "other than the statements, representations and warranties of the Company expressly *contained in Section 3 of this [Offering Memorandum]*, in making its investment or decision to invest in the Company." ¶150. Critically, the representations and warranties concerning the truthfulness of FIII's SEC filings, are *contained in Section 3 of the Offering Memorandum*. ¶148. In other words, the provision that BDO asserts disavowed reliance on their audit report in reality expressly carved out and acknowledged PIPE investors' reliance on FIII's SEC filings, including BDO's audit report.

In any event, "[f]ederal securities fraud claims cannot be dismissed based solely on the presence of a contractual anti-reliance provision." *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 61 F. Supp. 3d 391, 396 (D. Del. 2014).

In addition to pleading reliance based on the clear terms of the Offering Memorandum, PIPE investors are also entitled to the *Basic* presumption of reliance, as the Complaint pleads that Plaintiffs and class members purchased common stock in ELMS in reliance on the integrity of the market for ELMS stock, which throughout the Class Period traded on an efficient market. Shares of ELMS (formerly FIII) common stock traded on the NASDAQ at all relevant times. ¶142.[22] Plaintiffs purchased shares of ELMS common stock through the PIPE Offering – a private investment *in public equity*. ¶¶1-2, 41. PIPE investors' shares also came with registration rights, meaning that the entire premise of the investment relied on the existence of an efficient market to trade the securities. ¶41. And, at all times, shares of FIII/ELMS traded on an efficient national

---

[22] *See W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *12 (E.D. Pa. Aug. 4, 2016) ("the Third Circuit . . . has referred to the NASDAQ as 'open and developed' and therefore 'well suited for application of the fraud on the market theory.'") (quoting *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011)).

- 46 -

exchange (¶142) and reflected public information about the Company (¶¶143-144).   These allegations "are specific enough to survive a motion to dismiss." *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 675-77 (E.D. Pa. 2004) (refusing to dismiss "for failure to plead presumptive reliance," noting, "defendants will have ample opportunity to rebut the presumption").[23]  "[T]he question . . . is not whether plaintiff has proved an efficient market, but whether he has pleaded one." *Hull v. Glob. Digit. Sols., Inc.*, 2018 WL 4380999, at *6 (D.N.J. Sept. 14, 2018) (quoting *Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir. 1992)).

PIPE investors are entitled to the presumption of reliance even under BDO's standard: "(1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their *intrinsic value*." BDO Br. at 18 (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006)) (emphasis added).  This is precisely what the Complaint alleges: because the common stock of FIII/ELMS traded on an efficient market, Defendants' misstatements can be presumed to have affected its market price, and PIPE investors necessarily relied on the market price as an accurate measure of the intrinsic value of their investment in ELMS stock.  ¶¶142-144.  BDO argues that the presumption does not attach because the market did not set the purchase price for the PIPE, but the notion that the presumption of reliance functions "only through the setting of prices . . . is inaccurate."  *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 969 (N.D. Cal. 2005) (purchasers of debt security that paid out at maturity based on price of distinct equity security "must [] have been relying on the integrity of the price of [the underlying] stock."); *see also In re Shanda Games Ltd. Sec. Litig.*, 2022 WL 992794, at *5 (S.D.N.Y. Mar. 31, 2022) ("ADS holders,

---

[23]   *Robinhood*, only defines a PIPE transaction, it does not assess the applicability of the *Basic* presumption or efficient market hypothesis. 2023 WL 4543574, at *4.

such as Plaintiff, could have reasonably relied on the integrity of the market price when deciding whether to exercise dissenters' rights or sell shares at the negotiated price.").

The Complaint also successfully invokes the presumption of reliance articulated in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972).  BDO only argues (BDO Br. at 18 n.7) – incorrectly, and in a single footnote – that the Complaint does not allege material omissions such that *Affiliated Ute* could apply.  However, the Complaint alleges that BDO's statements "omitted material facts contradicting BDO's 'clean' audit opinion, including the fact that the 2020 Equity Transactions involved sales at prices materially below fair market value that were not accounted for on ELM's financial statements."  ¶116.  These are omissions "entitled to a presumption of reliance under *Affiliated Ute*."  *Skeway v. China Nat. Gas, Inc.*, 304 F.R.D. 467, 476 (D. Del. 2014) (failure to disclose bank loan and related party transactions on financial statements "constitute[d] omissions" warranting presumption of reliance.).

### E.    Defendants' Control Person Liability

The Complaint pleads the elements of Section 20(a) liability: (1) a primary violation of the securities laws, (2) a showing that the defendant controlled another person or entity, and (3) that the defendant was a culpable participant in the conduct.  *See Suprema Specialties*, 438 F.3d at 284 n.16.

The Complaint pleads a primary violation of Section 10(b) claim.  The Complaint also pleads control and culpable participation as to each of the Individual Defendants.[24] Control is "the possession, direct or indirect, of the power to direct or cause the direction of the management and

---

[24]    Defendant Luo cites to *Skeway v. China Nat. Gas, Inc.*, 2012 WL 2877645, at *1 (D. Del. July 6, 2012) and *Advance Auto Parts*, 2020 WL 599543, at *10.  Luo Br. at 20.  These cases do not apply to the control person claims alleged in this case, which are based on numerous allegations regarding the Individual Defendants' control.

policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 543 (D. Del. 2012); *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975). Control can be established where an individual is responsible for disseminating corporate information, signing of corporate documents, or participating in merger negotiations. *Suprema Specialties*, 438 F.3d at 266-67, *Heckmann*, 869 F. Supp. 2d at 543; *In re Chemours Co. Sec. Litig.*, 587 F. Supp. 3d 143, 170 (D. Del. 2022); *Javice*, 2023 WL 4546409, at *1. Culpable participation is "either knowing and substantial participation in the wrongdoing[,] or inaction with the intent to further the fraud." *In re Merck & Co.*, 2011 WL 3444199 at *36.

Defendant Luo, Taylor, and Li each controlled ELM. Defendant Luo was the sole owner of ELM at the time of the letter of intent. ¶33. Defendant Luo signed the Merger Agreement on behalf of ELM. Ex. A at Annex A1-56. Defendants Luo, Taylor, and Li each participated in negotiations related to the letter of intent and Merger. *See id*. at 129. As the senior members of ELM's management team, Defendants Luo (Executive Chairman), Taylor (CEO), and Li (CFO), each was responsible for the statements in the Proxy that are attributable ELM, including ELM's false financial statements and material misrepresentations concerning executive compensation. *See id*. at 243. The Proxy stated that "all such information relating to ELM has been supplied by ELM" and its management team. *Id.* Defendant Taylor participated in FIII investors calls following announcement of the Merger. ¶72(c). Defendants Luo and/or Taylor also participated directly in the 2020 Equity Transactions. ¶48.

Defendants Boris and Kiev were co-CEOs of FIII and each controlled FIII (which was renamed ELMS after the Merger). Defendants Boris and Kiev both signed the Merger Agreement and the Proxy on behalf of FIII. *See* Ex. A at Annex A-1-56. Defendants Boris and Kiev

- 49 -

participated in negotiations related to the letter of intent and Merger. *Id.* at 130. Defendants Boris and Kiev conducted due diligence on ELM prior to recommending the Merger and after the 2020 Equity Transactions. ¶¶106, 110. Thus, Plaintiffs have sufficiently pled control and culpable participation as to the Individual Defendants. *See, e.g.*, *Heckmann*, 869 F. Supp. 2d. at 528, 543; *Javice*, 2023 WL 4546409, at *1; *AdaptHealth*, 606 F. Supp. 3d at 141.

## CONCLUSION

The Court should deny the motions to dismiss.

DATED: March 12, 2024                     **FRIEDLANDER & GORRIS, P.A.**


                                          */s/ Jeffrey M. Gorris*
                                          JEFFREY M. GORRIS (Bar No. 5012)
                                          DAVID HAHN (Bar No. 6417)
                                          1201 N. Market Street, Suite 2200
                                          Wilmington, DE  19801
                                          (302) 573-3500
                                          jgorris@friedlandergorris.com
                                          dhahn@friedlandergorris.com

                                          *Liaison Counsel for the Class*


                                          **ROBBINS GELLER RUDMAN
                                            & DOWD LLP**
                                          CHAD JOHNSON (admitted *pro hac vice*)
                                          NOAM MANDEL (admitted *pro hac vice*)
                                          DESIREE CUMMINGS (admitted *pro hac vice*)
                                          JONATHAN ZWEIG (admitted *pro hac vice*)
                                          420 Lexington Avenue, Suite 1832
                                          New York, NY 10170
                                          (212) 432-5100
                                          chadj@rgrdlaw.com
                                          noam@rgrdlaw.com
                                          dcumming@rgrdlaw.com
                                          jzweig@rgrdlaw.com

                                          *Lead Counsel for the Class*

{FG-W0511971.}