# EXHIBIT A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

**Information Required in Proxy Statement**
**Schedule 14A Information**

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant        ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material Pursuant to §240.14a-12

# Forum Merger III Corporation

**(Name of Registrant as Specified In Its Charter)**

_____
**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☐ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(l) and 0-11.

   (1) Title of each class of securities to which transaction applies:

   (2) Aggregate number of securities to which transaction applies:

   (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

   (4) Proposed maximum aggregate value of transaction:

   (5) Total fee paid:

☒ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   (1) Amount Previously Paid:

   (2) Form, Schedule or Registration Statement No.:

   (3) Filing Party:

   (4) Date Filed:

Table of Contents

**FORUM MERGER III CORPORATION**
**1615 South Congress Avenue, Suite 103**
**Delray Beach, Florida 33445**

Dear Stockholders of Forum Merger III Corporation:

We cordially invite you to attend a special meeting in lieu of the 2021 annual meeting of the stockholders (the "special meeting") of Forum Merger III Corporation, a Delaware corporation ("Forum", "we," "us," "our" or the "Company"), which will be held on Thursday, June 24, 2021, at 9:00 a.m., Eastern time at *https://www.cstproxy.com/forummergeriii/sm2021* (the "special meeting"). In light of ongoing developments related to the novel coronavirus (COVID-19), after careful consideration, the Company has determined that the special meeting will be a virtual meeting conducted exclusively via live webcast in order to facilitate stockholder attendance and participation while safeguarding the health and safety of our stockholders, directors and management team. You or your proxyholder will be able to attend the virtual special meeting online, vote, view the list of stockholders entitled to vote at the special meeting and submit questions during the special meeting by visiting *https://www.cstproxy.com/forummergeriii/sm2021* and using a control number assigned by Continental Stock Transfer & Trust Company. To register and receive access to the virtual meeting, registered stockholders and beneficial stockholders (those holding shares through a stock brokerage account or by a bank or other holder of record) will need to follow the instructions applicable to them provided in the accompanying proxy statement.

On December 10, 2020, the Company, ELMS Merger Corp., a Delaware corporation and a wholly owned subsidiary of the Company ("Merger Sub"), Electric Last Mile, Inc., a Delaware corporation ("ELM"), and Jason Luo, in his capacity as the initial stockholder representative to ELM, entered into an Agreement and Plan of Merger, as amended by the First Amendment (as defined below), the "Merger Agreement", pursuant to which, subject to the satisfaction or waiver of certain conditions set forth therein (including the completion of the Carveout Transaction (as defined below)), Merger Sub will merge with and into ELM, with ELM surviving the merger in accordance with the Delaware General Corporation Law as a wholly owned subsidiary of the Company (the transactions contemplated by the Merger Agreement, the "business combination"). **You are being asked to vote on the business combination**.

At the special meeting, our stockholders will be asked to consider and vote upon a proposal (the "Business Combination Proposal") to adopt the Merger Agreement, as amended by the First Amendment, copies of which are attached to the accompanying proxy statement as Annex A-1 and Annex A-2, and approve the business combination. The aggregate consideration payable at the closing of the business combination (the "Closing") to the ELM securityholders (as that term is defined in the accompanying proxy statement) is payable solely in shares of common stock, par value $0.0001 per share, of the Company ("common stock") valued at $10.00 per share, and is calculated as follows (each term as defined in the Merger Agreement): $1,300,000,000, *plus* the amount of Estimated Closing Date Cash, *plus* the Pre-Paid Company Transaction Expense Amount, *minus* the Estimated Closing Date Indebtedness, *minus* the Convertible Note Adjustment Amount, *minus* $292,000,000, which represents the value of the 29,200,000 shares of common stock reserved for the Incentive Plan (as defined below) ($150,000,000 of which represents the value of restricted stock units with vesting terms substantially similar to the Earnout Shares (as defined below)), *minus* $2,500,000, which represents the value of the Adjustment Escrow Stock (as defined below), *minus* $50,000,000, which represents the value of the Earnout Shares, *minus* $50,000,000, which represents the value of the 5,000,000 shares of common stock to be issued to SF Motors Inc. (d/b/a SERES) ("SERES") in accordance with the First Amendment (the "Closing Merger Consideration"). On May 7, 2021, the Company, Merger Sub, ELM, and Jason Luo, in his capacity as the initial stockholder representative to ELM, entered into Amendment No. 1 to the Merger Agreement (the "First Amendment"), pursuant to which the Company will issue, at Closing, 5,000,000 shares of common stock to SERES in satisfaction of ELM's obligation under the SERES Asset Purchase Agreement (as defined below) to deliver shares of common stock to SERES as compensation for strategic cooperation, consulting services and technical support provided by SERES to ELM prior to the Closing. The Closing is expected to take place in the first half of 2021, subject to the satisfaction or waiver of the closing conditions in the Merger Agreement.

On April 9, 2021, ELM and SERES entered into (i) an agreement of purchase and sale (the "SERES Asset Purchase Agreement"), pursuant to which ELM has agreed to purchase the manufacturing facility in Mishawaka, Indiana, together with all buildings and improvements and all rights, benefits and privileges pertaining to the real property, and certain tangible and intangible personal property from SERES and (ii) an exclusive license agreement (the "SERES Exclusive Intellectual Property License Agreement"), pursuant to which SERES has agreed to exclusively

Table of Contents

license to ELM certain intellectual property related to the manufacture and design of certain electric urban utility and commercial vehicles, including skateboards used for urban utility truck, cargo van and open bed truck vehicles. In addition, ELM and Chongqing Sokon Motor (Group) Imp. & Exp. Co., Ltd. ("Sokon"), a subsidiary of SERES's majority stockholder, Chongqing Sokon Industry Group Stock Co. Ltd., have entered into a supply agreement (the "Sokon Supply Agreement" and together with the SERES Asset Purchase Agreement and the SERES Exclusive Intellectual Property License Agreement, the "Key Contracts") regarding the supply by Sokon of equipment, goods and components used in the manufacture of electric commercial vehicles.

The consummation of the business combination is subject to, among other conditions, (i) the effectiveness of the Key Contracts, which are attached hereto as Annex M, Annex N and Annex O, and that each such contract is valid and binding and in full force and effect, no written notice of intent to terminate any such contracts has been delivered and that the transactions contemplated by such contracts have been consummated; (ii) the acquisition by ELM of a leasehold interest in, or fee simple title to, the Mishawaka, Indiana manufacturing facility (provided that Forum has agreed that this condition will be waived upon delivery by ELM of evidence of the mutual written agreement of ELM and SERES as to the date and time of the transfer of possession of the facility to ELM in accordance with the SERES Asset Purchase Agreement, which date and time shall be no later than two business days following the Closing); and (iii) the receipt by ELM of key intellectual property rights related to its proposed business from SERES ((i), (ii) and (iii) collectively referred to as the "Carveout Transaction").

The facility owned by SERES in Mishawaka, Indiana comprises the Electric Vehicle Assembly Plant Operations, a wholly owned component of SERES ("EVAP Operations"). The Carveout Transaction is required to close immediately prior to the Closing and the Closing is subject to the satisfaction or waiver of all other closing conditions in the Merger Agreement, including the approval by our stockholders of the proposals set forth in the accompanying proxy statement. Prior to the Carveout Transaction, ELM is currently engaged in limited business activities only and its ability to carry out its business plans and strategies in the future are contingent upon the closing of the Carveout Transaction and the proposed business combination.

The Closing Merger Consideration is required to be paid in the form of common stock, valued at $10.00 per share at the Closing, and the contingent right to receive (1) the Earnout Shares (as defined below), if any, and (2) the Adjustment Escrow Stock (as defined below), if any, in each case, after the Closing, is subject to, and, if payable, will be payable in accordance with, the terms and conditions set forth in the Merger Agreement.

Five million shares of common stock (the "Earnout Shares") are payable after the Closing to the ELM securityholders upon satisfaction, during the 36-month period after the Closing (the "Earnout Period"), of the following conditions: (i) if the closing price of the common stock equals or exceeds $14.00 on any 20 trading days in any 30-consecutive day trading period, then 2,500,000 Earnout Shares will be released to the ELM securityholders, and (ii) if the closing price of the common stock equals or exceeds $16.00 on any 20 trading days in any 30-consecutive day trading period, then the remaining 2,500,000 Earnout Shares will be released to the ELM securityholders. Subject to the terms and conditions set forth in the Merger Agreement, if a qualifying Change in Control (as defined in the Merger Agreement) occurs during the Earnout Period, all Earnout Shares not previously released will be released to the ELM securityholders. Any Earnout Shares not released prior to the expiration of the Earnout Period will be forfeited and cancelled.

The Company has agreed that, at the Closing, the Company will place 250,000 shares of common stock into an adjustment escrow account (the "Adjustment Escrow Stock") to secure any downward post-closing purchase price adjustment. Following the date on which the Closing Merger Consideration is finally determined, all or a portion of those shares of common stock will either be released to the ELM securityholders or released to the Company in accordance with the adjustment mechanisms set forth in Section 2.7 of the Merger Agreement.

In connection with the transactions contemplated by the Merger Agreement, the Company has entered into subscription agreements, each dated December 10, 2020 (collectively, the "Subscription Agreements") with certain third-party investors (the "PIPE Investors") pursuant to which the Company agreed to issue and sell to the PIPE Investors in private placements to close immediately prior to the Closing, an aggregate of 13 million shares of common stock at $10.00 per share, for an aggregate purchase price of $130,000,000 (the "PIPE Investment"). At the Closing, the PIPE Investors and the Company shall consummate the PIPE Investment pursuant to and in accordance with the terms of the Subscription Agreements.

On December 10, 2020, ELM issued convertible promissory notes to certain investors in an aggregate principal amount of $25 million (the "ELM Convertible Notes"). The Company will enter into a joinder to the ELM Convertible Notes with the holders thereof, pursuant to which the outstanding principal and accrued interest on the ELM Convertible

Table of Contents

Notes will convert at Closing into shares of common stock, at a conversion price per share equal to the product of (i) the price per share paid by the PIPE Investors in the PIPE Investment multiplied by (ii) 0.90909, and the Company will provide registration rights to the holders of the ELM Convertible Notes.

At the special meeting, you will be asked to consider and vote upon:

1.   the Business Combination Proposal;

2.   a proposal to approve, for purposes of complying with applicable listing rules of the Nasdaq Stock Market ("Nasdaq"), the issuance of more than 20% of the Company's issued and outstanding common stock in connection with the business combination, consisting of the issuance of (v) shares of common stock to the ELM securityholders pursuant to the terms of the Merger Agreement, (w) shares of common stock to SERES pursuant to the terms of the Merger Agreement, (x) shares of common stock to certain institutional investors in connection with the PIPE Investment, (y) shares of common stock to the holders of the ELM Convertible Notes upon conversion of the ELM Convertible Notes and (z) shares of common stock reserved for the Incentive Plan (the "Nasdaq Proposal");

3.   a proposal to approve the Company's proposed third amended and restated certificate of incorporation (the "proposed charter"), substantially in the form attached to the accompanying proxy statement as Annex C, in connection with the business combination (the "Charter Proposal");

4.   proposals to approve and adopt, on a non-binding advisory basis, certain differences between the Company's second amended and restated certificate of incorporation (as amended through the date of the accompanying proxy statement, the "current charter") and the proposed charter, which are being presented in accordance with the requirements of the U.S. Securities and Exchange Commission (the "SEC") as eight separate sub-proposals (collectively, the "Advisory Charter Proposals"):

a.   to provide that any amendment to certain provisions of the proposed charter relating to director and bylaw matters, director personal liability to us and forum selection and proposed bylaws will require the approval of the holders of at least 66⅔% and a majority, respectively, of the Company's then-outstanding shares of capital stock entitled to vote generally at an election of directors ("Advisory Charter Proposal A");

b.   to provide that the federal district courts of the United States of America will be the sole and exclusive forum for resolving any complaint asserting a cause of action arising under the federal securities laws, including the Securities Act of 1933, as amended ("Advisory Charter Proposal B");

c.   to provide that, subject to the limitations imposed by applicable law, directors may be removed with cause by the affirmative vote of the holders of at least 66⅔% of the voting power of all then-outstanding shares of capital stock of the Company entitled to vote generally at an election of directors ("Advisory Charter Proposal C");

d.   to change the name of the new public entity to "Electric Last Mile Solutions, Inc." from "Forum Merger III Corporation" ("Advisory Charter Proposal D");

e.   to, upon completion of the business combination and the conversion of the Company's Class B common stock, par value $0.0001 per share ("Class B common stock"), into the Company's Class A common stock, par value $0.0001 per share ("Class A common stock"), increase the authorized capital stock from 111,000,000 shares, consisting of 100,000,000 shares of Class A common stock, 10,000,000 shares of Class B common stock and 1,000,000 shares of preferred stock, par value $0.0001 per share ("preferred stock"), to 1,100,000,000 shares, which would consist of 1,000,000,000 shares of common stock, and 100,000,000 shares of preferred stock, by, on the effective date of the filing of the proposed charter: (i) reclassifying all shares of Class B common stock as Class A common stock; (ii) immediately following the conversion of such Class B common stock into shares of Class A common stock, reclassifying all shares of Class A common stock as common stock; and (iii) creating an additional 890,000,000 shares of common stock and 99,000,000 shares of preferred stock ("Advisory Charter Proposal E");

Table of Contents

f.    to eliminate various provisions applicable only to blank check companies ("Advisory Charter Proposal F");

g.    to change the classification of the Board from two classes to three classes of directors, with each class elected for staggered terms and with each class consisting of one third of the total number of directors constituting the entire board of directors of the Company as nearly as possible ("Advisory Charter Proposal G"); and

h.    to provide that the Company renounces, to the fullest extent permitted by law, any interest or expectancy of the Company in, or in being offered an opportunity to participate in, any excluded opportunity pursuant to Section 122(17) of the General Corporation Law of the State of Delaware ("Advisory Charter Proposal H");

5.    a proposal to approve a new long-term equity incentive plan (the "Incentive Plan"), substantially in the form attached to the accompanying proxy statement as Annex E, including the authorization of the initial share reserve under the Incentive Plan (the "Incentive Plan Proposal");

6.    a proposal to elect seven directors to serve staggered terms on the Board until the 2022, 2023 and 2024 annual meetings of our stockholders, as applicable, or until their respective successors are duly elected and qualified, or until their earlier death, resignation, retirement or removal ("Direction Election Proposal A"); alternatively, in the event the condition precedent proposals, including the Business Combination Proposal and Charter Proposal, are not approved and our Board continues to have two classes of directors, to elect three directors to serve as Class I directors on the Board for a term of two years expiring at the annual meeting of stockholders to be held in 2023 or until each such director's successor has been duly elected and qualified, or until each such director's earlier death, resignation, retirement or removal ("Director Election Proposal B", and, collectively, with Director Election Proposal A, the "Director Election Proposal"); and

7.    a proposal to approve the adjournment of the special meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if there are insufficient votes for, or otherwise in connection with, the approval of the condition precedent proposals as defined below (the "Adjournment Proposal"). The Adjournment Proposal will only be presented at the special meeting if there are not sufficient votes to approve the condition precedent proposals.

Each of these proposals is more fully described in the accompanying proxy statement, which you are encouraged to read carefully. The Closing is conditioned upon the approval of the Business Combination Proposal, the Nasdaq Proposal, the Charter Proposal, the Incentive Plan Proposal and Director Election Proposal A (collectively, the "condition precedent proposals") and the consummation of the Carveout Transaction.

Our publicly-traded common stock, units and warrants are currently listed on The Nasdaq Capital Market under the symbols "FIII," "FIIIU" and "FIIIW," respectively. Upon the Closing, we intend to change our name from "Forum Merger III Corporation" to "Electric Last Mile Solutions, Inc." We have applied to continue the listing of our common stock and warrants on The Nasdaq Capital Market under the symbols "ELMS" and "ELMSW," respectively, upon the Closing. Our units will automatically separate into the component securities upon consummation of the business combination and, as a result, will no longer trade as a separate security.

Pursuant to the current charter, we are providing our public stockholders with the opportunity to redeem, upon the Closing, shares of Class A common stock then held by them ("public shares") for a per-share price, payable in cash, equal to the quotient obtained by dividing the aggregate amount then on deposit in the trust account (the "trust account") that holds the proceeds (including interest) of our initial public offering that closed on August 21, 2020 (our "IPO") as of two business days prior to the consummation of the business combination, including interest not previously released by us to pay our taxes, by the total number of then outstanding public shares, subject to the limitations described herein. The per-share amount we will distribute to public stockholders who properly redeem their shares will not be reduced by the deferred underwriting commission totaling $8,750,000 that we will pay to the underwriters of our IPO or transaction expenses incurred in connection with the business combination. For illustrative

Table of Contents

purposes, based on the fair value of marketable securities held in our trust account of $250,004,042 as of March 31, 2021, the estimated per share redemption price would have been approximately $10.00. **Public stockholders may elect to redeem their shares even if they vote for the business combination**.

You will be entitled to receive cash for any public shares to be redeemed only if you:

(i)    (a) hold public shares or (b) hold public shares through units and you elect to separate your units into the underlying public shares and warrants (the "public warrants") prior to exercising your redemption rights with respect to the public shares; and

(ii)    prior to 5:00 p.m., Eastern time, on June 22, 2021, (a) submit a written request to Continental Stock Transfer & Trust Company, our transfer agent (the "Transfer Agent"), that the Company redeem your public shares for cash and (b) deliver your public shares to the Transfer Agent, physically or electronically through the Depository Trust Company.

Holders of units must elect to separate the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. Any demand for redemption, once made, may be withdrawn at any time until the deadline for exercising redemption requests and thereafter, with our consent, until the Closing.

A public stockholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13 of the Securities Exchange Act of 1934, as amended), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 15% of the shares of Class A common stock included in the units sold in our IPO without the prior consent of the Company. We have no specified maximum redemption threshold under the current charter, other than the aforementioned 15% threshold and the limitation that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 upon consummation of the business combination. Every share of Class A common stock that is redeemed by our public stockholders will reduce the amount in our trust account, which held marketable securities with a fair value of $250,004,042 as of March 31, 2021. The Merger Agreement provides that ELM's obligation to consummate the business combination is conditioned on the Company having unrestricted cash on hand of at least $125,000,000. This condition to Closing in the Merger Agreement is for the sole benefit of the parties thereto and may be waived in writing by ELM. If, as a result of redemptions of public shares by our public stockholders, this condition is not met (or waived), then ELM may elect not to consummate the business combination. Holders of our outstanding public warrants do not have redemption rights in connection with the business combination. Unless otherwise specified, the information in the accompanying proxy statement assumes that none of our public stockholders exercise their redemption rights with respect to their public shares.

Forum Investors III LLC, a Delaware limited liability company, and the sponsor of Forum (the "Sponsor") and our officers and directors have agreed to waive their redemption rights with respect to any public shares they may hold in connection with the consummation of the business combination, and the Class B common stock (the "founder shares"), will be excluded from the pro rata calculation used to determine the per-share redemption price. Currently, the Sponsor beneficially owns approximately 21.5% of our issued and outstanding shares of common stock, including all of the founder shares. The Sponsor and our directors and officers have agreed to vote any shares of common stock owned by them in favor of the business combination. The founder shares are subject to transfer restrictions. The current charter includes a conversion adjustment that provides that the founder shares will automatically convert concurrently with or immediately following the business combination into a number of shares of Class A common stock at the Closing, in accordance with the terms of the current charter. As of the Closing, assuming no redemptions, the Sponsor will beneficially own approximately 5.4% of the total number of all shares of common stock outstanding after consummation of the business combination (excluding Earnout Shares, Adjustment Escrow Stock and the 15,000,000 shares underlying the Earnout RSUs (as defined in the accompanying proxy statement)).

We are providing the accompanying proxy statement and accompanying proxy card to our stockholders in connection with the solicitation of proxies to be voted at the special meeting and at any adjournments or postponements of the special meeting. Information about the special meeting, the business combination and other related business to be considered by the Company's stockholders at the special meeting is included in the accompanying proxy statement. **Whether or not you plan to attend the special meeting, we urge all of our stockholders to read the accompanying**

Table of Contents

proxy statement, including the Annexes and the accompanying financials statements of the Company and EVAP Operations, carefully and in their entirety. In particular, we urge you to read carefully the section entitled "*Risk Factors*" beginning on page 53 of the accompanying proxy statement.

After careful consideration, our Board has unanimously approved the Merger Agreement and the business combination, and unanimously recommends that our stockholders vote "FOR" the adoption of the Merger Agreement and approval of the business combination, "FOR" each of the director nominees and "FOR" all of the other proposals presented to our stockholders in the accompanying proxy statement. When you consider our Board's recommendation of these proposals, you should keep in mind that our directors and officers have interests in the business combination that may conflict with your interests as a stockholder. Please see the section entitled "*Proposal No. 1 — The Business Combination Proposal — Interests of Certain Persons in the Business Combination*" for additional information.

Approval of the Business Combination Proposal, the Nasdaq Proposal, the Advisory Charter Proposals (each of which is a non-binding vote), the Incentive Plan Proposal and the Adjournment Proposal each requires the affirmative vote of holders of a majority of the votes cast by our stockholders present in person (which would include presence at the virtual special meeting) or represented by proxy at the special meeting and entitled to vote thereon. Approval of the Charter Proposal requires the affirmative vote of a majority of our outstanding shares entitled to vote thereon at the special meeting.

The election of directors is decided by a plurality of the votes cast by the stockholders present in person (which would include presence at the virtual special meeting) or represented by proxy at the special meeting and entitled to vote on the election of directors. This means that the director nominees will be elected if they receive more affirmative votes than any other nominee for the same position. Stockholders may not cumulate their votes with respect to the election of directors. If the condition precedent proposals, including the Business Combination Proposal and Charter Proposal, are approved, we will elect seven directors to our Board, each to serve staggered terms until the 2022, 2023 and 2024 annual meetings of our stockholders, as applicable, commencing at the Closing of the transaction. If the condition precedent proposals are not approved, three directors will be elected to the Board, each to serve a two-year term.

A stockholder's failure to vote by proxy or to vote in person at the special meeting (which would include voting at the virtual special meeting) will not be counted towards the number of shares of common stock required to validly establish a quorum. Abstentions will be counted in connection with the determination of whether a valid quorum is established. Each of the failure to vote by proxy or to vote in person (which would include voting at the virtual special meeting) and an abstention from voting on any of the Business Combination Proposal, the Nasdaq Proposal, the Advisory Charter Proposals, the Incentive Plan Proposal, the Director Election Proposal and the Adjournment Proposal will have no effect on the outcome of any such proposal, but will have the effect of votes "**AGAINST**" the Charter Proposal.

**Your vote is very important.   Whether or not you plan to attend the special meeting, please vote as soon as possible by following the instructions in the accompanying proxy statement to make sure that your shares are represented at the special meeting. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the special meeting. Even if you have voted by proxy, you may still vote during the special meeting by visiting *https://www.cstproxy.com/forummergeriii/sm2021*. To participate in the special meeting, you will need the 12-digit control number assigned by Continental Stock Transfer & Trust Company included on your proxy card or obtained from them via email. Unless waived by the parties to the Merger Agreement, the Closing is conditioned upon the approval of the condition precedent proposals. The election of seven director nominees under the Director Election Proposal is conditioned on the approval of the other condition precedent proposals, including the Charter Proposal. The Advisory Charter Proposals are not conditioned on the approval of any other proposal set forth in the accompanying proxy statement.**

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted FOR each of the proposals presented at the special meeting. If you fail to return your proxy card, and do not attend the special meeting, the effect will be that your shares will not be counted for purposes of determining whether a quorum is present at the special meeting. If you are a stockholder of record and you attend the special meeting and wish to vote during the special meeting, you may withdraw your proxy and vote at the special meeting.

Table of Contents

TO EXERCISE YOUR REDEMPTION RIGHTS, YOU MUST DEMAND THAT THE COMPANY REDEEM YOUR SHARES FOR A PRO RATA PORTION OF THE FUNDS HELD IN THE TRUST ACCOUNT AND TENDER YOUR SHARES TO THE COMPANY'S TRANSFER AGENT AT LEAST TWO BUSINESS DAYS PRIOR TO THE SPECIAL MEETING. YOU MAY TENDER YOUR SHARES BY EITHER DELIVERING YOUR SHARE CERTIFICATE TO THE TRANSFER AGENT OR BY DELIVERING YOUR SHARES ELECTRONICALLY USING DEPOSITORY TRUST COMPANY'S DWAC (DEPOSIT WITHDRAWAL AT CUSTODIAN) SYSTEM. IF THE BUSINESS COMBINATION IS NOT COMPLETED, THEN THESE SHARES WILL NOT BE REDEEMED FOR CASH. IF YOU HOLD THE SHARES IN STREET NAME, YOU WILL NEED TO INSTRUCT THE ACCOUNT EXECUTIVE AT YOUR BANK OR BROKER TO WITHDRAW THE SHARES FROM YOUR ACCOUNT IN ORDER TO EXERCISE YOUR REDEMPTION RIGHTS.

On behalf of the Board, we would like to thank you for your support of Forum Merger III Corporation and look forward to a successful completion of the business combination.

June 9, 2021                    Sincerely,

/s/ Marshall Kiev                              /s/ David Boris

Marshall Kiev                                  David Boris
*Co-Chief Executive Officer,*                  *Co-Chief Executive Officer,*
*President and Director*                        *Chief Financial Officer and Director*

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTIONS DESCRIBED IN THE ACCOMPANYING PROXY STATEMENT, PASSED UPON THE MERITS OR FAIRNESS OF THE BUSINESS COMBINATION OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THE ACCOMPANYING PROXY STATEMENT. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.

The accompanying proxy statement is dated June 9, 2021, and is expected to be first mailed to our stockholders on or about June 9, 2021.

Table of Contents

**NOTICE OF SPECIAL MEETING IN LIEU OF THE 2021 ANNUAL MEETING OF STOCKHOLDERS OF FORUM MERGER III CORPORATION**

**TO BE HELD ON JUNE 24, 2021**

To the Stockholders of Forum Merger III Corporation:

NOTICE IS HEREBY GIVEN that a special meeting in lieu of the 2021 annual meeting of the stockholders of Forum Merger III Corporation, a Delaware corporation (the "Company"), will be held on Thursday, June 24, 2021, at 9:00 a.m., Eastern time at *https://www.cstproxy.com/forummergeriii/sm2021* (the "special meeting"). You are cordially invited to attend the special meeting to conduct the following items of business:

- **Proposal No. 1 — Business Combination Proposal** — To consider and vote upon a proposal to approve and adopt the Agreement and Plan of Merger, dated as of December 10, 2020 and amended as of May 7, 2021 (as amended, the "Merger Agreement"), by and among the Company, ELMS Merger Corp., a Delaware corporation and a wholly owned subsidiary of the Company ("Merger Sub"), Electric Last Mile, Inc., a Delaware corporation ("ELM"), and Jason Luo, in his capacity as the initial stockholder representative to ELM, pursuant to which, subject to the satisfaction or waiver of certain conditions set forth in the Merger Agreement including the completion of the Carveout Transaction (as defined in the accompanying proxy statement), Merger Sub will merge with and into ELM, with ELM surviving the merger in accordance with the Delaware General Corporation Law as a wholly owned subsidiary of the Company, and approve the other transactions contemplated thereby (the "business combination" and such proposal, the "Business Combination Proposal");

- **Proposal No. 2 — Nasdaq Proposal** — To consider and vote upon a proposal to approve, for purposes of complying with applicable Nasdaq listing rules, the issuance of more than 20% of the Company's issued and outstanding common stock in connection with the business combination, consisting of the issuance of (v) shares of common stock to the ELM securityholders (as defined in the accompanying proxy statement) pursuant to the terms of the Merger Agreement, (w) shares of common stock to SF Motors Inc. d/b/a SERES ("SERES") pursuant to the terms of the Merger Agreement, (x) shares of common stock to certain institutional investors in connection with the private placement, to close immediately prior to the closing of the business combination, of an aggregate of 13 million shares of common stock, at $10.00 per share, for an aggregate purchase price of $130,000,000, (y) shares of common stock to the holders of the convertible promissory notes, in an aggregate principal amount of $25 million, issued by ELM to certain investors (the "ELM Convertible Notes") upon the conversion of the ELM Convertible Notes and (z) shares of common stock reserved for a new long-term equity incentive plan (the "Nasdaq Proposal");

- **Proposal No. 3 — Charter Proposal** — To consider and vote upon a proposal to approve the Company's proposed third amended and restated certificate of incorporation (the "proposed charter"), substantially in the form attached to the accompanying proxy statement as <u>Annex C</u>, in connection with the business combination (the "Charter Proposal");

- **Proposal No. 4 — Advisory Charter Proposals** — To consider and act upon the following proposals to approve and adopt, on a non-binding advisory basis, certain differences between the Company's second amended and restated certificate of incorporation (as amended through the date of the accompanying proxy statement, the "current charter") and the proposed charter, which are being presented in accordance with the requirements of the U.S. Securities and Exchange Commission (the "SEC") as eight separate sub-proposals (collectively, the "Advisory Charter Proposals"):

  - **Advisory Charter Proposal A** — to provide that any amendment to certain provisions of the proposed charter relating to director and bylaw matters, director personal liability to us and forum selection and proposed bylaws will require the approval of the holders of at least 66⅔% and a majority, respectively, of the Company's then-outstanding shares of capital stock entitled to vote generally at an election of directors ("Advisory Charter Proposal A");

Table of Contents

- **Advisory Charter Proposal B** — to provide that the federal district courts of the United States of America will be the sole and exclusive forum for resolving any complaint asserting a cause of action arising under the federal securities laws, including the Securities Act of 1933, as amended ("Advisory Charter Proposal B");

- **Advisory Charter Proposal C** — to provide that, subject to the limitations imposed by applicable law, directors may be removed with cause by the affirmative vote of the holders of at least 66⅔% of the voting power of all then-outstanding shares of capital stock of the Company entitled to vote generally at an election of directors ("Advisory Charter Proposal C");

- **Advisory Charter Proposal D** — to change the name of the new public entity to "Electric Last Mile Solutions, Inc." from "Forum Merger III Corporation" ("Advisory Charter Proposal D");

- **Advisory Charter Proposal E** — to, upon completion of the business combination and the conversion of the Company's Class B common stock, par value $0.0001 per share ("Class B common stock"), into the Company's Class A common stock, par value $0.0001 per share ("Class A common stock"), increase the authorized capital stock from 111,000,000 shares, consisting of 100,000,000 shares of Class A common stock, 10,000,000 shares of Class B common stock and 1,000,000 shares of preferred stock, par value $0.0001 per share ("preferred stock"), to 1,100,000,000 shares, which would consist of 1,000,000,000 shares of common stock, and 100,000,000 shares of preferred stock, by, on the effective date of the filing of the proposed charter: (i) reclassifying all shares of Class B common stock as Class A common stock; (ii) immediately following the conversion of such Class B common stock into shares of Class A common stock, reclassifying all shares of Class A common stock as common stock; and (iii) creating an additional 890,000,000 shares of common stock and 99,000,000 shares of preferred stock ("Advisory Charter Proposal E");

- **Advisory Charter Proposal F** — to eliminate various provisions applicable only to blank check companies ("Advisory Charter Proposal F");

- **Advisory Charter Proposal G** — to change the classification of the Board from two classes to three classes of directors, with each class elected for staggered terms and with each class consisting of one third of the total number of directors constituting the entire board of directors of the Company as nearly as possible ("Advisory Charter Proposal G"); and

- **Advisory Charter Proposal H** — to provide that the Company renounces, to the fullest extent permitted by law, any interest or expectancy of the Company in, or in being offered an opportunity to participate in, any excluded opportunity pursuant to Section 122(17) of the General Corporation Law of the State of Delaware ("Advisory Charter Proposal H");

- **Proposal No. 5 — Incentive Plan Proposal** — To consider and vote upon a proposal to approve a new long-term equity incentive plan (the "Incentive Plan"), substantially in the form attached to the accompanying proxy statement as Annex E, including the authorization of the initial share reserve under the Incentive Plan (the "Incentive Plan Proposal");

- **Proposal No. 6 — Director Election Proposal** — to consider and vote upon a proposal to elect seven directors to serve staggered terms on the Board until the 2022, 2023 and 2024 annual meetings of our stockholders, as applicable, or until their respective successors are duly elected and qualified, or until their earlier death, resignation, retirement or removal ("Direction Election Proposal A", and, collectively with the Business Combination Proposal, the Nasdaq Proposal, the Charter Proposal and the Incentive Plan Proposal, the "condition precedent proposals"); alternatively, in the event the condition precedent proposals, including the Business Combination Proposal and Charter Proposal, are not approved and our Board continues to have two classes of directors, to elect three directors to serve as Class I directors on the Board for a term of two years expiring at the annual meeting of stockholders to be held in 2023 or until each such director's successor has been duly elected and qualified, or until each such director's earlier death, resignation, retirement or removal ("Director Election Proposal B", and, collectively, with Director Election Proposal A, the "Director Election Proposal"); and

Table of Contents

• **Proposal No. 7 — Adjournment Proposal** — To consider and vote upon a proposal to approve the adjournment of the special meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if there are insufficient votes for, or otherwise in connection with, the approval of the condition precedent proposals (the "Adjournment Proposal"). The Adjournment Proposal will only be presented at the special meeting if there are not sufficient votes to approve the condition precedent proposals.

The above matters are more fully described in the accompanying proxy statement, which also includes, as Annex A-1 and Annex A-2, copies of the Merger Agreement and the First Amendment (as defined in the accompanying proxy statement), respectively. **We urge you to read carefully the accompanying proxy statement in its entirety, including the Annexes and accompanying financial statements of the Company, ELM, and EVAP Operations.**

In light of ongoing developments related to the novel coronavirus (COVID-19), after careful consideration, the Company has determined that the special meeting will be a virtual meeting conducted exclusively via live webcast in order to facilitate stockholder attendance and participation while safeguarding the health and safety of our stockholders, directors and management team. You or your proxyholder will be able to attend the virtual special meeting online, vote, view the list of stockholders entitled to vote at the special meeting and submit questions during the special meeting by visiting *https://www.cstproxy.com/forummergeriii/sm2021* and using a control number assigned by Continental Stock Transfer & Trust Company. To register and receive access to the virtual meeting, registered stockholders and beneficial stockholders (those holding shares through a stock brokerage account or by a bank or other holder of record) will need to follow the instructions applicable to them provided in the accompanying proxy statement. The record date for the special meeting is May 20, 2021. Only stockholders of record at the close of business on that date may vote at the special meeting or any adjournment thereof. A complete list of our stockholders of record entitled to vote at the special meeting will be available for ten days before the special meeting at our principal executive offices for inspection by stockholders during ordinary business hours for any purpose germane to the special meeting.

Pursuant to the current charter, we are providing our public stockholders with the opportunity to redeem, upon the Closing, shares of Class A common stock then held by them ("public shares") for a per-share price, payable in cash, equal to the quotient obtained by dividing the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the business combination, including interest not previously released by us to pay our taxes, by the total number of then outstanding public shares, subject to the limitations described herein. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commission totaling $8,750,000 that we will pay to the underwriters of our initial public offering ("IPO") or transaction expenses incurred in connection with the business combination. For illustrative purposes, based on the fair value of marketable securities held in our trust account of $250,004,042 as of March 31, 2021, the estimated per share redemption price would have been approximately $10.00. **Public stockholders may elect to redeem their shares even if they vote for the business combination.**

You will be entitled to receive cash for any public shares to be redeemed only if you:

(i)    (a) hold public shares or (b) hold public shares through units and you elect to separate your units into the underlying public shares and warrants (the "public warrants") prior to exercising your redemption rights with respect to the public shares; and

(ii)    prior to 5:00 p.m., Eastern time, on June 22, 2021, (a) submit a written request to Continental Stock Transfer & Trust Company, our transfer agent (the "Transfer Agent"), that the Company redeem your public shares for cash and (b) deliver your public shares to the Transfer Agent, physically or electronically through the Depository Trust Company.

Holders of units must elect to separate the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. Any demand for redemption, once made, may be withdrawn at any time until the deadline for exercising redemption requests and thereafter, with our consent, until the Closing.

A public stockholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13 of the Securities Exchange Act of 1934, as amended), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 15% of the shares of Class A common stock included in the units sold in our IPO without the prior consent

Table of Contents

of the Company. We have no specified maximum redemption threshold under the current charter, other than the aforementioned 15% threshold and the limitation that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 upon consummation of the business combination. Every share of Class A common stock that is redeemed by our public stockholders will reduce the amount in our trust account, which held marketable securities with a fair value of $250,004,042 as of March 31, 2021. The Merger Agreement provides that ELM's obligation to consummate the business combination is conditioned on the Company having unrestricted cash on hand of at least $125,000,000. This condition to Closing in the Merger Agreement is for the sole benefit of the parties thereto and may be waived in writing by ELM. Holders of our outstanding public warrants do not have redemption rights in connection with the business combination. Unless otherwise specified, the information in the accompanying proxy statement assumes that none of our public stockholders exercise their redemption rights with respect to public shares.

The Sponsor and our officers and directors have agreed to waive their redemption rights with respect to any public shares they may hold in connection with the consummation of the business combination, and the Class B common stock (the "founder shares"), will be excluded from the pro rata calculation used to determine the per-share redemption price. Currently, the Sponsor beneficially owns approximately 21.5% of our issued and outstanding shares of common stock, including all of the founder shares. The Sponsor and our directors and officers have agreed to vote any shares of the common stock owned by them in favor of the business combination. The founder shares are subject to transfer restrictions. The current charter includes a conversion adjustment that provides that the founder shares will automatically convert at the time of the business combination into a number of shares of Class A common stock at the Closing, in accordance with the terms of the current charter. As of the Closing, assuming no redemptions, the Sponsor will beneficially own approximately 5.4% of the total number of all shares of common stock outstanding after consummation of the business combination (excluding the additional 5,000,000 shares of common stock that are payable after the closing of the business combination to the ELM securityholders upon satisfaction, during the 36-month period after the closing of the business combination, of certain conditions, 250,000 shares of common stock placed into an adjustment escrow account to secure any downward post-closing purchase price adjustment and the 15,000,000 shares underlying the Earnout RSUs (as defined in the accompanying proxy statement)).

Unless waived by the parties to the Merger Agreement, the Closing is conditioned upon the approval of the condition precedent proposals. The election of seven directors to staggered terms as part of the Director Election Proposal is conditioned on the approval of the condition precedent proposals, including the Charter Proposal. The Advisory Charter Proposals are not conditioned on the approval of any other proposal set forth in the accompanying proxy statement. The consummation of the Carveout Transaction is a condition to the closing of the business combination.

The issuance of 20% or more of our outstanding common stock in connection with the Merger Agreement requires stockholder approval of the Nasdaq Proposal.

Approval of the Business Combination Proposal, the Nasdaq Proposal, the Advisory Charter Proposals (each of which is a non-binding vote), the Incentive Plan Proposal and the Adjournment Proposal each requires the affirmative vote of holders of a majority of the votes cast by our stockholders present in person (which would include presence at the virtual special meeting) or represented by proxy at the special meeting and entitled to vote thereon. Approval of the Charter Proposal requires the affirmative vote of a majority of our outstanding shares entitled to vote thereon at the special meeting.

The election of directors is decided by a plurality of the votes cast by the stockholders present in person (which would include presence at the virtual special meeting) or represented by proxy at the special meeting and entitled to vote on the election of directors. This means that the director nominees will be elected if they receive more affirmative votes than any other nominee for the same position. Stockholders may not cumulate their votes with respect to the election of directors. If the condition precedent proposals, including the Business Combination Proposal and Charter Proposal, are approved, we will elect seven directors to our Board, each to serve staggered terms until the 2022, 2023 and 2024 annual meetings of our stockholders, as applicable, commencing at the Closing of the transaction. If the condition precedent proposals are not approved, three directors will be elected to the Board, each to serve a two-year term.

Table of Contents

A stockholder's failure to vote by proxy or to vote in person at the special meeting (which would include voting at the virtual special meeting) will not be counted towards the number of shares of common stock required to validly establish a quorum. Abstentions will be counted in connection with the determination of whether a valid quorum is established.

Each of the failure to vote by proxy or to vote in person (which would include voting at the virtual special meeting) and an abstention from voting on any of the Business Combination Proposal, the Nasdaq Proposal, the Advisory Charter Proposals, the Incentive Plan Proposal, the Director Election Proposal and the Adjournment Proposal will have no effect on the outcome of any such proposal, but will have the effect of votes "**AGAINST**" the Charter Proposal.

**Our Board unanimously recommends that you vote "FOR" each of these proposals and "FOR" each of the director nominees.**

| June 9, 2021 | By Order of the Board of Directors, | |
|---|---|---|
| | /s/ Marshall Kiev | /s/ David Boris |
| | Marshall Kiev<br>*Co-Chief Executive Officer, President and Director* | David Boris<br>*Co-Chief Executive Officer, Chief Financial Officer and Director* |

Table of Contents

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| CERTAIN DEFINED TERMS | 1 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 10 |
| SUMMARY TERM SHEET | 12 |
| QUESTIONS AND ANSWERS ABOUT THE PROPOSALS FOR STOCKHOLDERS | 18 |
| SUMMARY OF THE PROXY STATEMENT | 34 |
| SUMMARY HISTORICAL FINANCIAL INFORMATION OF THE COMPANY | 50 |
| SUMMARY HISTORICAL FINANCIAL INFORMATION OF EVAP OPERATIONS (A COMPONENT OF SERES) | 51 |
| SUMMARY HISTORICAL FINANCIAL INFORMATION OF ELM | 52 |
| RISK FACTORS | 53 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 90 |
| COMPARATIVE SHARE INFORMATION | 101 |
| SPECIAL MEETING OF STOCKHOLDERS | 103 |
| PROPOSAL NO. 1 — THE BUSINESS COMBINATION PROPOSAL | 111 |
| PROPOSAL NO. 2 — THE NASDAQ PROPOSAL | 152 |
| PROPOSAL NO. 3 — THE CHARTER PROPOSAL | 154 |
| PROPOSAL NO. 4 — ADVISORY CHARTER PROPOSALS | 156 |
| PROPOSAL NO. 5 — THE INCENTIVE PLAN PROPOSAL | 161 |
| PROPOSAL NO. 6 — THE DIRECTOR ELECTION PROPOSAL | 169 |
| PROPOSAL NO. 7 — THE ADJOURNMENT PROPOSAL | 171 |
| INFORMATION ABOUT THE COMPANY | 172 |
| THE COMPANY'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 182 |
| INFORMATION ABOUT ELM | 187 |
| ELM MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF ELM AND EVAP OPERATIONS | 199 |
| ELM MANAGEMENT | 210 |
| MANAGEMENT AFTER THE BUSINESS COMBINATION | 212 |
| EXECUTIVE COMPENSATION | 218 |
| DESCRIPTION OF SECURITIES | 220 |
| BENEFICIAL OWNERSHIP OF SECURITIES | 234 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 237 |
| MARKET PRICE, TICKER SYMBOL AND DIVIDEND INFORMATION | 241 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 241 |
| APPRAISAL RIGHTS | 241 |
| HOUSEHOLDING INFORMATION | 242 |
| TRANSFER AGENT AND REGISTRAR | 242 |
| SUBMISSION OF STOCKHOLDER PROPOSALS | 242 |
| FUTURE STOCKHOLDER PROPOSALS | 242 |
| WHERE YOU CAN FIND MORE INFORMATION | 243 |
| INDEX TO CONSOLIDATED FINANCIAL INFORMATION | F-1 |
| ANNEX A-1 — AGREEMENT AND PLAN OF MERGER | A-1 |
| ANNEX A-2 — AMENDMENT NO. 1 TO AGREEMENT AND PLAN OF MERGER | A-2 |
| ANNEX B — CURRENT CHARTER OF THE COMPANY | B-1 |
| ANNEX C — PROPOSED CHARTER OF THE COMPANY | C-1 |
| ANNEX D — PROPOSED BYLAWS OF THE COMPANY | D-1 |
| ANNEX E — PROPOSED INCENTIVE PLAN | E-1 |
| ANNEX F — FORM OF AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT | F-1 |

Table of Contents

|  | Page |
|---|---|
| ANNEX G — FORM OF EMPLOYMENT AGREEMENT | G-1 |
| ANNEX H — FORM OF RESTRICTIVE COVENANT AGREEMENT | H-1 |
| ANNEX I — FORM OF ESCROW AGREEMENT | I-1 |
| ANNEX J — FORM OF DIRECTOR NOMINATION AGREEMENT | J-1 |
| ANNEX K — FORM OF SPONSOR SUPPORT AGREEMENT | K-1 |
| ANNEX L — FORM OF SUPPORT AGREEMENT | L-1 |
| ANNEX M — SOKON SUPPLY AGREEMENT | M-1 |
| ANNEX N — SERES ASSET PURCHASE AGREEMENT | N-1 |
| ANNEX O — SERES EXCLUSIVE INTELLECTUAL PROPERTY LICENSE AGREEMENT | O-1 |
| ANNEX P — LETTER AGREEMENT BY FORUM IN FAVOR OF ELM | P-1 |

ii

Table of Contents

**SUMMARY HISTORICAL FINANCIAL INFORMATION OF ELM**

The following table contains summary historical financial data as of and for the period ended December 31, 2020 and as of and for the three months ended March 31, 2021. The statement of operations data for the period ended December 31, 2020, and the balance sheet data as of December 31, 2020, are derived from the audited financial statements of ELM, which are included elsewhere in this proxy statement. The summary historical financial information of ELM as of and for the three months ended March 31, 2021 are derived from ELM's unaudited condensed interim financial statements included elsewhere in this proxy statement. In the opinion of ELM's management, the unaudited condensed interim financial statements include all adjustments necessary to state fairly ELM's financial position and results of operations as of and for the three months ended March 31, 2021. ELM's results are not necessarily indicative of the results that may be expected in the future and the results for the three months ended March 31, 2021 are not necessarily indicative of the results that may be expected for the full year ended December 31, 2021 or any other period. The information below is only a summary and should be read in conjunction with the sections entitled "*ELM's Management's Discussion and Analysis of Financial Condition and Results of Operations of ELM and EVAP Operations*" and "*Information About ELM*" and ELM's financial statements, and the notes and schedules related thereto, which are included elsewhere in this proxy statement.

| | Three Months Ended March 31, 2021 | For the period from August 20, 2020 (inception) through December 31, 2020 |
|---|---|---|
| **Statement of Operations Data:** | | |
| **Operating expense** | | |
| General and administrative expense | 3,124,188 | 7,633,994 |
| Total operating expense | 3,124,188 | 7,633,994 |
| Interest expense and other (income) expense, net | 403,866 | 94,443 |
| **Loss before income taxes** | (3,528,054) | (7,728,437) |
| Income tax benefit | — | — |
| **Net loss and comprehensive loss** | $ (3,528,054) | $ (7,728,437) |
| **Basic and diluted loss per share** | $ (35.28) | $ (191.30) |

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| **Balance Sheet Data:** | | |
| Cash and cash equivalents | $ 16,388,316 | $ 25,204,728 |
| Total assets | 17,150,097 | 25,242,949 |
| Convertible promissory notes | 25,500,832 | 25,094,088 |
| Total liabilities | 27,406,588 | 31,971,386 |
| Total shareholders' deficit | (10,256,491) | (6,728,437) |

Table of Contents

stock at $10.00 per share, for an aggregate purchase price of $130,000,000. At the Closing, the PIPE Investors and the Company shall consummate the PIPE Investment pursuant to and in accordance with the terms of the Subscription Agreements.

**The ELM Convertible Notes**

On December 10, 2020, ELM issued convertible promissory notes to certain investors in an aggregate principal amount of $25 million. The Company will enter into a joinder to the ELM Convertible Notes with the holders thereof, pursuant to which the outstanding principal and accrued interest on the ELM Convertible Notes will convert at Closing into shares of common stock, at a conversion price per share equal to the product of (i) the price per share paid by the PIPE Investors in the PIPE Investment multiplied by (ii) 0.90909, and the Company will provide registration rights to the holders of the ELM Convertible Notes.

**Background of the Business Combination**

We are a blank check company that was incorporated in Delaware on June 25, 2019 formed for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, reorganization, recapitalization or other similar business combination with one or more businesses. The business combination was the result of an extensive search for a potential transaction utilizing the global network and investing and operating experience of our management team and board of directors. The terms of the business combination were the result of extensive negotiations between our management team, our legal advisors, ELM, ELM's legal advisors and Jefferies. The following is a brief description of the background of these negotiations, the business combination and related transactions.

Prior to the consummation of our IPO, neither we, nor anyone on our behalf, contacted any prospective target business or had any substantive discussions, formal or otherwise, with respect to a transaction with us.

The prospectus for our IPO states that we intended to use the following general criteria for potential target companies as guidelines:

- a middle market business with an enterprise value of approximately $500 million to $2 billion;

- strong public market comparables to establish that the valuation of our initial business combination is attractive relative to these public companies;

- an established company with a proven track record;

- proven revenue and earnings growth or the potential for revenue and earnings growth;

- an experienced management team;

- operations in a sector that was exhibiting secular growth or had the potential for a cyclical uptick; and

- an ability to benefit from becoming a public company by being able to effectively utilize the broader access to capital and the increased public profile associated with being a public company.

Following our IPO, we searched for business combination candidates. As part of the search process, we contacted and were contacted by a number of individuals and entities with respect to business combination opportunities and engaged with several possible target businesses in discussions with respect to potential transactions.

During that period, our co-CEOs, Marshall Kiev and David Boris:

- evaluated approximately 110 companies as possible targets (collectively, the "Potential Targets") to establish if the Potential Target fit the acquisition criteria stated above;

- entered into Confidentiality Agreements with 23 Potential Targets (including ELM), which included customary terms (and none of which included "don't-ask, don't-waive" or standstill provisions);

- submitted non-binding Indications of Interest to two Potential Targets (including ELM); and

- submitted one non-binding Letter of Intent to a Potential Target — ELM.

We ultimately decided to discontinue discussions with the Potential Targets other than ELM after conducting further due diligence on the Potential Targets and negotiating the terms of a potential business combination with them.

128

Table of Contents

In some circumstances, we did not agree with the desired valuations proposed by such Potential Targets' sellers. We most actively pursued one Potential Target other than ELM, which process included submitting valuations and/or engaging in discussions regarding the same. This Potential Target was in the consumer products sector. Following that process, ELM emerged as a frontrunner to pursue a business combination.

The substantial majority of Potential Targets we considered were located in the United States, consistent with our original intentions. We also evaluated Potential Targets in other sectors, including healthcare, business services, consumer financial, industrial and technology, media and telecom, amongst other opportunities.

Immediately after completion of our IPO on August 21, 2020, as discussed above, our Co-CEOs, Marshall Kiev and David Boris, began contacting owners of firms that could be potential partners in a business combination. This outreach included conversations and meetings with numerous private equity firms, family offices, investment banks, and business executives, including Jason Luo, Executive Chairman of ELM. Mr. Luo was introduced to Forum management by the investment banking department at Jefferies, the Sole Book-Running Manager of Forum's IPO, during their analysis of merger opportunities. Mr. Luo explained to Mr. Boris that he was involved in the "carve out" of an electric delivery vehicle business focused on the commercial delivery market. Mr. Boris felt this business could have many of the characteristics that the Company was seeking in a merger partner and expressed an interest in learning more about this opportunity.

From August 21, 2020 to August 24, 2020, we had multiple discussions with senior members of ELM management regarding a confidentiality agreement with ELM. We negotiated the terms of the confidentiality agreement and entered into the confidentially agreement with ELM on August 24, 2020 and received preliminary information about ELM and the EVAP Operations on August 27, 2020.

On August 30, 2020, we had discussions about ELM with Jefferies as a financial advisor in connection with the business combination. Other than with respect to Forum's IPO, and as disclosed below, Jefferies has not performed past services for any parties to the Merger Agreement or their affiliates or received compensation from any parties to the Merger Agreement or their affiliates over the past three years (and has currently received no compensation for its services as financial advisor in connection with the business combination). Jefferies served as Sole Book-Running Manager in Forum Merger II Corporation's initial public offering of 20,000,000 units at a price of $10.00 per unit, which closed on August 7, 2018. Jefferies served as Sole Book-Running Manager in Forum's initial public offering of 25,000,000 units at a price of $10.00 per unit, which closed on August 21, 2020. Jefferies served as Sole Book-Running Manager in Forum Merger IV Corporation's initial public offering of 30,000,000 units at a price of $10.00 per unit, which closed on March 22, 2021.

From September 1, 2020 to September 3, 2020, Mr. Boris and Mr. Kiev discussed the business strategy of ELM, the timing and structure of the proposed acquisition of the EVAP Operations by ELM and the possible structure of a business combination with representatives of Jefferies.

On September 3, 2020, Mr. Boris and Mr. Kiev had a video conference with their financial advisors at Jefferies and senior management from ELM including Mr. Jason Luo, Mr. James Taylor and Mr. Albert Li about the commercial delivery vehicle industry and the electric vehicle industry and the potential business combination. During this meeting, ELM presented an overview of their business plan, their outlook for the commercial electric vehicle market in the U.S. and preliminary financial projections.

After conferring with Jefferies, our management felt that ELM provided an attractive opportunity for our stockholders and decided to make a non-binding proposal to ELM. On September 9, 2020, Jefferies submitted an outline of a possible deal structure to us which we shared with ELM. According to this outline, the pro forma valuation of ELM was comprised of approximately $1.194 billion of enterprise value or, alternatively, approximately $1.370 billion of equity value. According to this outline, after estimated transaction fees and expenses, the ELM management team would have approximately $326 million of cash to fund operations and growth. According to this outline, revenue was projected to reach approximately $3.046 billion and EBITDA was projected to reach approximately $791 million by the end of 2025 based on transaction multiples of pro forma enterprise value over 2025 estimated revenue of 0.4x and pro forma enterprise value over 2025 estimated EBITDA of 1.5x, respectively. According to the outline that Jefferies submitted on October 16, 2020 that our management used to evaluate the deal, the pro forma valuation of ELM was comprised of approximately $1.196 billion of enterprise value or, alternatively, approximately $1.425 billion of equity value. According to this final outline, after estimated transaction fees and expenses, the ELM management team would have approximately $379 million of cash to fund operations and growth. According to this final outline, revenue was

Table of Contents

projected to reach approximately $3.046 billion and EBITDA was projected to reach approximately $791 million by the end of 2025 based on transaction multiples of pro forma enterprise value over 2025 estimated revenue of 0.4x and pro forma enterprise value over 2025 estimated EBITDA of 1.5x, respectively.

From August 27, 2020 through September 13, 2020, we had numerous discussions with Jefferies and our legal advisors at White & Case LLP ("White & Case"). On September 13, 2020, we submitted a Letter of Intent to ELM with respect to a business combination. We discussed the terms of the initial draft with Mr. Luo and Mr. Taylor. Among the issues discussed were the overall valuation of the business, the ability to arrange PIPE financing as part of the business combination and the desirability to have an equity pool for future key employees to allow the company to recruit and retain key talent. From September 14, 2020 through September 17, 2020, the parties revised the Letter of Intent. The Letter of Intent was executed on September 18, 2020. On October 13, 2020, we engaged Jefferies as a financial advisor in connection with the business combination and placement agent in the PIPE Investment. In connection with the business combination, Jefferies will receive its portion of the deferred underwriting fee, a mergers & acquisitions fee and a placement fee for the PIPE Investment, all of which are conditioned on the Closing.

Beginning October 21, 2020, we held investor meetings with certain potential investors in the private placement. Mr. Boris represented us, and Mr. Luo, Mr. Taylor and Mr. Li represented ELM in these meetings.

On October 8, 2020, we arranged for a digital data room to be established to provide certain materials to prospective PIPE Investment investors.

On October 17, 2020, White & Case sent ELM and, its counsel, Foley & Lardner LLP ("Foley"), an initial draft of the Merger Agreement. On October 28, 2020, Foley sent White & Case a revised version of the Merger Agreement. From November 2, 2020 to November 7, 2020, we, ELM, White & Case and Foley discussed open issues in the Merger Agreement, including the working capital adjustment, the post-closing purchase price adjustment, the earnout milestones, earnout amount release, earnout acceleration, company transaction expenses, interim operations and closing conditions. On November 7, 2020, White & Case sent Foley a revised version of the Merger Agreement. On November 18, 2020, Foley sent White & Case a revised version of the Merger Agreement.

On November 19, 2020, we engaged Papamarkou Wellner & Company, Inc. as a placement agent in connection with the PIPE Investment. Papamarkou Wellner & Company, Inc. will receive compensation for placing a portion of the PIPE Investment with its clients.

From November 22, 2020 to November 27, 2020, we, ELM, White & Case and Foley discussed open issues in the Merger Agreement. Among the issues discussed were the convertible note adjustment amount, merger consideration schedule, earnout acceleration, interim operations with respect to employee matters, exclusivity, closing conditions, financial statements and capital structure.

In September 2020, ELM and SERES entered into (i) an agreement of purchase and sale for the purchase of the manufacturing facility in Mishawaka, Indiana, together with all buildings and improvements and all rights, benefits and privileges pertaining to the real property, and certain tangible personal property, (ii) a license agreement pursuant to which ELM agreed to license certain intellectual property related to the manufacture and design of certain electric urban utility and commercial vehicles, including skateboards used for urban utility truck, cargo van and open bed truck vehicles from SERES, and (iii) an exclusive patent license agreement pursuant to which ELM agreed to license certain potential advance technologies related to the manufacture and design of certain electric urban utility and commercial vehicles. In addition, ELM and Sokon, a subsidiary of SERES's majority stockholder, Chongqing Sokon Industry Group Stock Co. Ltd., entered into a supply agreement regarding the supply by Sokon of equipment, goods and components used in the manufacture of electric commercial vehicles. These agreements are collectively referred to as the "SERES Agreements."

From September 18 to December 10, 2020, we had numerous discussions with ELM regarding the SERES Agreements and proposed changes and amendments to the SERES Agreements. To provide additional time for ELM to conduct discussions regarding certain proposed amendments to the SERES Agreements, the parties agreed to include a termination provision in the Merger Agreement providing that, in the event the Key Contracts (which, as of December 10, 2020, meant (i) an exclusive intellectual property license agreement between SERES and ELM, (ii) an exclusive patent license agreement between SERES and ELM, (iii) a capital lease agreement between SERES and ELM, (iv) a supply agreement between SERES and ELM, and (v) a transition services agreement between SERES and ELM) are not executed by ELM, each in form and substance that is acceptable to us by January 31, 2021, we may terminate the Merger Agreement in our sole discretion.

130

Table of Contents

From November 27, 2020 to December 10, 2020, White & Case and Foley negotiated the final terms of the Merger Agreement and the exhibits and ancillary agreements thereto. Also during this time, we, with the help of White & Case and our other advisors, finalized due diligence.

On December 2, 2020, via a telephonic meeting of the Board, the Board resolved that the form, terms and provisions of the Merger Agreement, substantially in the form presented to the Board, were in all respects adopted and approved, and each of the agreements, documents and certificates contemplated thereby to which the Company is a party, and the other transactions contemplated under the Merger Agreement, including the PIPE Investment, were in all respects authorized, approved and adopted.

On December 10, 2020, the sole member of the board of directors of ELM determined that the Merger Agreement was advisable, fair to and in the best interests of ELM and its stockholders and approved and adopted the Merger Agreement and recommended that the stockholders of ELM adopt the Merger Agreement and approve the business combination. On December 10, 2020, stockholders of ELM representing approximately 84% of the issued and outstanding capital stock of ELM delivered Support Agreements to the Company, whereby each such stockholder agreed to, among other things, (i) consent to, and vote to approve and adopt, the Merger Agreement and the business combination, (ii) waive any dissenters' or approval rights under applicable law in connection with the business combination, and (iii) not transfer, subject to certain permitted exceptions, any of such stockholder's shares until expiration of the Support Agreement.

On December 10, 2020, the Merger Agreement and the other ancillary transaction agreements were executed. In addition, the Subscription Agreements in connection with the PIPE Investment and the ELM Convertible Notes were executed on December 10, 2020.

On December 11, 2020, the Company and ELM issued a press release announcing the execution of the Merger Agreement, the Subscription Agreements and the ELM Convertible Notes. On December 11, 2020, we filed a Current Report on Form 8-K with the SEC attaching the Merger Agreement, related transaction agreements, the press release and investor presentation.

After December 10, 2020, and in order to satisfy the closing condition in the Merger Agreement that the Key Contracts be in a form and substance that is acceptable to us, ELM continued discussions with SERES regarding certain proposed amendments to certain of the SERES Agreements.

On February 9, 2021, ELM and SERES entered into a term sheet (which we acknowledged) outlining the principal terms of the proposed amendments to certain of the SERES Agreements. The term sheet did not outline terms to amend or replace the SERES Exclusive Patent License Agreement, which was executed in September 2020 and remains in its original form.

Between February 9, 2021 and April 9, 2021, ELM and SERES negotiated the terms of the Key Contracts (which, pursuant to the letter agreement dated as of May 7, 2021, include only the SERES Exclusive Intellectual Property License Agreement, the SERES Asset Purchase Agreement and the Sokon Supply Agreement), each in a form and substance that is acceptable to us (thus meeting the closing condition requiring such execution). ELM and SERES agreed to (1) reduce the purchase price of the ELM Facility by $5 million in exchange for the acceleration of the payment schedule for the ELM Facility; (2) deliver 5,000,000 shares of our common stock to SERES in consideration for its strategic cooperation, consulting services and technical support and (3) such other terms and conditions as outlined in this proxy statement. ELM and SERES entered into the Key Contracts on April 9, 2021.

In connection with the execution of the Key Contracts, on May 7, 2021, we executed a letter agreement in favor of ELM confirming that, for purposes of the Merger Agreement, (1) the term "Key Contract" is deemed to exclude reference to the Transition Services Agreement and the SERES Exclusive Patent License Agreement (in each case, as defined in the Merger Agreement), (2) each reference in the Merger Agreement to the "SERES Lease Agreement" is deemed to refer to the SERES Asset Purchase Agreement (as defined in this proxy statement), and (3) each reference in the Merger Agreement to the "Sokon Supply Agreement" is deemed to refer to the Sokon Supply Agreement (as defined in this proxy statement). In addition, we agreed in the letter agreement that the condition to closing in the Merger Agreement requiring ELM to acquire a leasehold interest in, or fee simple title to, the Mishawaka, Indiana manufacturing facility will be waived by us upon delivery by ELM of evidence of the mutual written agreement of ELM and SERES as to the date and time of the transfer of possession of the facility to ELM in accordance with the SERES Asset Purchase Agreement, which date and time shall be

131

Table of Contents

no later than two business days following the Closing. In the letter agreement, we also confirmed that the closing condition requiring that each of the Key Contracts be executed by each of the parties thereto, in form and substance acceptable to us (in our sole discretion), has been satisfied in full. This letter agreement is attached to this proxy statement as Annex P.

On May 7, 2021, we, ELM, and the other parties to the Merger Agreement entered into the First Amendment to the Merger Agreement, pursuant to which we will issue, at Closing, 5,000,000 shares of common stock to SERES in satisfaction of ELM's obligation under the SERES Asset Purchase Agreement to deliver shares of common stock to SERES as compensation for strategic cooperation, consulting services and technical support provided by SERES to ELM prior to the Closing. As a result of such issuance, there will be a corresponding reduction in the aggregate consideration to be paid to the ELM securityholders at Closing (as reflected in the definition of "Closing Merger Consideration" in this proxy statement) in an amount equal to the aggregate value of such issued shares. In addition, pursuant to the First Amendment, we, ELM, and the other parties to the Merger Agreement agreed to replace the form of Amended and Restated Registration Rights Agreement attached as an exhibit to the original Merger Agreement with a modified form of Amended and Restated Registration Rights Agreement that adds SERES as a party, provides SERES with certain registration rights and includes provisions pursuant to which SERES will agree not to transfer the shares of common stock to be issued to it pursuant to the Merger Agreement for certain specified time periods following the Closing (see "*Proposal No. 1 — The Business Combination Proposal — Ancillary Agreements — Amended and Restated Registration Rights Agreement*" above for additional information regarding such rights and restrictions). The modified form of Amended and Restated Registration Rights Agreement is included as an annex to the First Amendment and is attached hereto as Annex F. On May 7, 2021, we filed a Current Report on Form 8-K with the SEC attaching the First Amendment to the Merger Agreement and the letter agreement.

**Our Board's Reasons for the Approval of the Business Combination**

The Board, in evaluating the transaction with ELM, consulted with the Company's management and its legal counsel, financial advisors and other advisors. In reaching its unanimous resolution (i) that the terms and conditions of the Merger Agreement and the business combination are advisable, fair to and in the best interests of the Company and its stockholders and (ii) to recommend that the stockholders adopt the Merger Agreement and approve the business combination, the Board considered and evaluated a number of factors, including, but not limited to, the factors discussed below. In light of the number and wide variety of factors considered in connection with its evaluation of the business combination, the Board did not consider it practicable to, and did not attempt to, quantify or otherwise assign relative weights to the specific factors that it considered in reaching its determination and supporting its decision. The Board viewed its decision as being based on all of the information available and the factors presented to and considered by it. In addition, individual directors may have given different weight to different factors. This explanation of the Company's reasons for the business combination and all other information presented in this section is forward-looking in nature and, therefore, should be read in light of the factors discussed under the section entitled "*Cautionary Note Regarding Forward-Looking Statements*."

The Board considered a number of factors pertaining to the business combination as generally supporting its decision to enter into the Merger Agreement and the business combination, including but not limited to, the following material factors:

- *Anticipated "First Mover" Advantage in the Class 1 Electric Vehicle Segment*.   Based upon its current engineering program, homologation compliance plan, manufacturing processes, and production planning, ELM plans to launch its first vehicle, the Urban Delivery, by the end of the third quarter of 2021. ELM currently anticipates that the Urban Delivery would be the first electric Class 1 commercial vehicle in the U.S. market. By leveraging existing platforms, subsystems and components from its suppliers, it believes it will be able to bring its electric vehicles to market faster than competitors who are designing and engineering a completely new vehicle program. ELM believes that, if it is successful in offering the first electric Class 1 commercial vehicle in the U.S. market, this will place it in a position to build strong customer relationships and capture a significant market opportunity as the anticipated adoption of vehicle electrification expands.

- *Use of Existing Platforms, Subsystems and Components to Deliver Reliable, Low Cost Solutions*.   ELM believes that the key factors for customers in making a purchasing decision for commercial vehicles are initial investment, reliability and ongoing operating costs. By leveraging existing platforms, subsystems and components from its suppliers, it believes it will be able to produce its electric vehicles with a relatively low investment compared to competitors who are designing and engineering a completely new

Table of Contents

**ELM MANAGEMENT**

**Executive Officers**

The following table sets forth certain information regarding ELM's executive officers as of the date of this proxy statement. ELM expects that these executive officers will continue as executive officers following the business combination.

| Name | Age | Position(s) Held |
| --- | --- | --- |
| Jason Luo | 54 | Executive Chairman and President |
| James Taylor | 64 | Chief Executive Officer |
| Hailiang (Jerry) Hu | 48 | Chief Operating Officer |
| Justin Prann | 41 | Chief Revenue Officer |
| Kev Adjemian | 45 | Chief Technical Officer |
| Albert Li | 60 | Chief Financial Officer and Treasurer |
| Benjamin Wu | 49 | General Counsel and Secretary |

***Jason Luo.*** Mr. Luo co-founded ELM in August 2020 and has served as ELM's Executive Chairman and President since its inception. In addition to co-founding ELM, Mr. Luo is a senior advisor and operating executive of Crestview Partners, a private equity firm focused on industrials, media and financial services. Prior to ELM and Crestview Partners, Mr. Luo was the interim CEO of Accuride Corporation, a manufacturer of wheels, wheel end and braking components for commercial and passenger vehicles, from January 2019 until June 2020. Prior to Accuride Corporation, Mr. Luo served as a Corporate Vice President of the Ford Motor Company and the Global Vice President, Chairman and Chief Executive Officer of Ford Greater China, a business unit of the Ford Motor Company, from August 2017 until January 2018 where he oversaw all operations for the 1.2 million vehicle business and the company's joint venture partnership with Changan Automobile. Prior to joining the Ford Motor Company, Mr. Luo served in positions of increasing responsibility at Key Safety Systems, Inc. from June 1997 until August 2017, and ultimately served as President, Chief Executive Officer and Vice Chairman of the Board of Directors. Mr. Luo currently serves on the board of directors of Accuride Corporation, Elo Touch Solutions, Inc., ATC Drivetrain Inc. and Sybridge Technologies, Inc.

***James Taylor.*** Mr. Taylor co-founded ELM in August 2020 and has served as ELM's Chief Executive Officer since its inception. Prior to co-founding ELM, Mr. Taylor served as Chief Executive Officer of SERES from May 2019 until August 2020. Prior to SERES, Mr. Taylor served as Chief Sales and Marketing Officer of Karma Automotive, LLC, a luxury electric car manufacturer, from April 2014 until December 2018. Prior to Karma Automotive, LLC, Mr. Taylor served as Chief Executive Officer of AMP Electric Vehicles, Inc. that acquired Workhorse Group Incorporated from March 2010 until September 2016. Prior to Workhouse Group Incorporated, Mr. Taylor served in positions of increasing responsibility at Dura Automotive Systems, LLC and General Motors Company (including with General Motors' brands the Hummer and Cadillac).

***Hailiang (Jerry) Hu.*** Mr. Hu has served as ELM's Chief Operating Officer since its inception in August 2020. Prior to joining ELM, Mr. Hu served as Vice President, Asia at Accuride Corporation from February 2019 until April 2020. Prior to Accuride Corporation, Mr. Hu served as Vice President, Global Inflator at Key Safety Systems, Inc. from December 2017 until April 2020. Before being promoted to Vice President, Global Inflator, Mr. Hu served as Vice President, Global Manufacture at Key Safety Systems, Inc. from August 2016 until March 2017. Prior to serving as Vice President, Global Manufacture, Mr. Hu served as Vice President, Asia Operation & China General Manager at Key Safety Systems, Inc. from August 2013 until August 2016.

***Justin Prann.*** Mr. Prann has served as ELM's Chief Revenue Officer since its inception in August 2020. Prior to joining ELM, Mr. Prann served as Vice President of Sales, Service Aftersales Director, Sales Administration Director at Mahindra North America Technical Center, Inc. d/b/a Mahindra Automotive North America Manufacturing from September 2018 until August 2020. Prior to Mahindra Automotive North America Manufacturing, Mr. Prann served Dealer Principal at Pandora's European Motorsports from October 2009 until October 2018.

***Kev Adjemian.*** Dr. Adjemian has served as ELM's Chief Technical Officer since November 2020. Prior to joining ELM, Dr. Adjemian served as Global Head – Battery Cells, Modules and Packs at FCA US LLC from January 2020 until October 2020. Prior to FCA US LLC, Dr. Adjemian served as Vice President, Powertrain and EV Driveline Systems at Karma Automotive from August 2017 until October 2019. Prior to Karma Automotive,

210

Table of Contents

Dr. Adjemian served as Division Director, Clean Energy & Transportation at Idaho National Laboratory from August 2014 until August 2017. Prior to the Idaho National Laboratory, Dr. Adjemian served as Senior Manager of Zero Emission R&D at Nissan Motor Company from July 2005 until July 2014.

***Albert Li.***    Mr. Li has served as ELM's Chief Financial Officer and Treasurer since its inception in August 2020. Immediately prior to ELM, Mr. Li was retired from April 2019 until August 2020. Prior to entering retirement, Mr. Li served as the Chief Financial Officer at Future Mobility Corporation d/b/a Byton from February 2017 until April 2019. Prior to Byton, Mr. Li was retired from September 2014 until February 2017. Mr. Li served as Corporate Vice President of Bombardier Inc. and General Manager of China from April 2012 until September 2014.

***Benjamin Wu.***    Mr. Wu has served as ELM's General Counsel and Secretary since its inception in August 2020. Prior to joining ELM, Mr. Wu served as Chief Legal Officer of SERES from October 2019 until November 2020. Prior to SERES, Mr. Wu served as Chief Legal Officer at Meridian Lightweight Technologies Inc. from July 2014 until October 2019. Prior to Meridian Lightweight Technologies, Mr. Wu was the Director of the China Practice at Butzel Long from September 2011 until August 2014.

Table of Contents

**WHERE YOU CAN FIND MORE INFORMATION**

We file reports, proxy statements and other information with the SEC as required by the Exchange Act. You can read the Company's SEC filings, including this proxy statement, over the Internet at the SEC's website at *http://www.sec.gov.*

If you would like additional copies of this proxy statement or if you have questions about the business combination or the proposals to be presented at the special meeting, you should contact the Company at the following address and telephone number:

Forum Merger III Corporation
1615 South Congress Avenue, Suite 103
Delray Beach, Florida 33445
(212) 739-7860
Attention: David Boris

You may also obtain these documents by requesting them in writing or by telephone from the Company's proxy solicitation agent at the following address and telephone number:

Morrow Sodali LLC
470 West Avenue
Stamford, CT 06902
Telephone: (800) 662-5200
(Banks and brokers can call: (203) 658-9400)
Email: FIII.info@investor.morrowsodali.com

**If you are a stockholder of the Company and would like to request documents, please do so no later than five business days before the special meeting in order to receive them before the special meeting**. If you request any documents from us, we will mail them to you by first class mail, or another equally prompt means.

All information contained in this proxy statement relating to the Company has been supplied by the Company, and all such information relating to ELM has been supplied by ELM. Information provided by either the Company or ELM does not constitute any representation, estimate or projection of any other party.

This document is a proxy statement of the Company for the special meeting. We have not authorized anyone to give any information or make any representation about the business combination, the Company or ELM that is different from, or in addition to, that contained in this proxy statement. Therefore, if anyone does give you information of this sort, you should not rely on it. The information contained in this proxy statement speaks only as of the date of this proxy statement, unless the information specifically indicates that another date applies.

243

Table of Contents

**INDEX TO FINANCIAL INFORMATION**
**FORUM MERGER III CORPORATION**

| | Page |
|---|---|
| **Year Ended December 31, 2020 and Period Ended December 31, 2019** | |
| Report of Independent Registered Public Accounting Firm | F-3 |
| Financial Statements (As Restated): | |
| Consolidated Balance Sheets | F-4 |
| Consolidated Statements of Operations | F-5 |
| Consolidated Statements of Changes in Stockholders' Equity | F-6 |
| Consolidated Statements of Cash Flows | F-7 |
| Notes to Consolidated Financial Statements | F-8 |
| | |
| **Three Months Ended March 31, 2021 and 2020** | |
| Condensed Consolidated Balance Sheets as of March 31, 2021 (Unaudited) and December 31, 2020 | F-26 |
| Condensed Consolidated Statements of Operations for the Three Months Ended March 31, 2021 and 2020 (Unaudited) | F-27 |
| Condensed Consolidated Statements of Changes in Stockholders' Equity for the Three Months Ended March 31, 2021 and 2020 (Unaudited) | F-28 |
| Condensed Consolidated Statements of Cash Flows for the Three Months March 31, 2021 and 2020 (Unaudited) | F-29 |
| Notes to Condensed Consolidated Financial Statements (Unaudited) | F-30 |
| | |
| **EVAP OPERATIONS** | |
| **Three Months Ended March 31, 2021 and 2020** | |
| Unaudited Condensed Combined Carve-Out Balance Sheets as of March 31, 2021 and December 31, 2020 | F-45 |
| Unaudited Condensed Combined Carve-Out Statements of Operations and Comprehensive Loss for the three months ended March 31, 2021 and 2020 | F-46 |
| Unaudited Condensed Combined Carve-Out Statements of Parent's Net Investment for the three months ended March 31, 2021 and 2020 | F-47 |
| Unaudited Condensed Combined Carve-Out Statements of Cash Flows for the three months ended March 31, 2021 and 2020 | F-48 |
| Notes to the Unaudited Condensed Combined Carve-Out Financial Statements as of March 31, 2021 and December 31, 2020 and for the periods ended March 31, 2021 and 2020 | F-49 |
| | |
| **Years Ended December 31, 2020 and 2019** | |
| Report of Independent Registered Public Accounting Firm | F-59 |
| Combined Carve-Out Balance Sheets as of December 31, 2020 and 2019 | F-60 |
| Combined Carve-Out Statements of Operations and Comprehensive Loss for the years ended December 31, 2020 and 2019 | F-61 |
| Combined Carve-Out Statements of Parent's Net Investment for the years ended December 31, 2020 and 2019 | F-62 |
| Combined Carve-Out Statements of Cash Flows for the years ended December 31, 2020 and 2019 | F-63 |
| Notes to the Combined Carve-Out Financial Statements as of and for the years ended December 31, 2020 and 2019 | F-64 |
| | |
| **ELM** | |
| **Three Months Ended March 31, 2021** | |
| Unaudited Condensed Balance Sheet as of March 31, 2021 and December 31, 2020 | F-77 |
| Unaudited Condensed Statement of Operations and Comprehensive Loss for the three months ended March 31, 2021 | F-78 |
| Unaudited Condensed Statement of Changes in Shareholders' Deficit for the three months ended March 31, 2021 | F-79 |
| Unaudited Condensed Statement of Cash Flows for the three months ended March 31, 2021 | F-80 |
| Notes to Unaudited Condensed Financial Statements as of March 31, 2021 and December 31, 2020 and for the three months ended March 31, 2021 | F-81 |

Table of Contents

|  | **Page** |
|---|---|
| **Period Ended December 31, 2020** |  |
| Report of Independent Registered Public Accounting Firm | F-89 |
| Audited Balance Sheet as of December 31, 2020 | F-90 |
| Audited Statement of Operations and Comprehensive Loss for the period from August 20, 2020 (inception) through December 31, 2020 | F-91 |
| Audited Statement of Changes in Shareholders' Deficit for the period from August 20, 2020 (inception) through December 31, 2020 | F-92 |
| Audited Statement of Cash Flows for the period from August 20, 2020 (inception) through December 31, 2020 | F-93 |
| Notes to Financial Statements | F-94 |

F-2

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Shareholders and Board of Directors
Electric Last Mile, Inc.
Troy, Michigan

**Opinion on the Financial Statements**

We have audited the accompanying balance sheet of Electric Last Mile, Inc. (the "Company") as of December 31, 2020, the related statements of operations and comprehensive loss, shareholders' deficit, and cash flows for the period from August 20, 2020 (inception) through December 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020, and the results of its operations and its cash flows for the period from August 20, 2020 (inception) through December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

**Going Concern Uncertainty**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As described in Note 3 to the financial statements, the Company has experienced a net loss since its inception and has negative cash flows from operations and working capital deficiency as of December 31, 2020. These matters raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 3. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ BDO USA, LLP

We have served as the Company's auditor since 2020.

Troy, Michigan

May 06, 2021

BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

BDO is the brand name for the BDO network and for each of the BDO Member Firms.

Table of Contents

*EXECUTION VERSION*

**AGREEMENT AND PLAN OF MERGER**
**by and among**
**FORUM MERGER III CORPORATION,**
**ELMS MERGER CORP.,**
**ELECTRIC LAST MILE, INC.**
**and**
**JASON LUO, as the Stockholder Representative**
**Dated as of December 10, 2020**
**Table of Contents**

|  |  | Annex A Page |
|---|---|---|
| **Article I** | | |
| THE MERGER; CLOSING | | |
| Section 1.1 | The Merger | A-2 |
| Section 1.2 | Time and Place of Closing | A-2 |
| Section 1.3 | Effective Time | A-2 |
| Section 1.4 | The Certificate of Incorporation and Bylaws of Parent | A-2 |
| Section 1.5 | The Certificate of Incorporation and Bylaws of the Surviving Corporation | A-2 |
| Section 1.6 | Directors and Officers | A-2 |
| **Article II** | | |
| MERGER CONSIDERATION; EFFECT OF THE MERGER on capital stock | | |
| Section 2.1 | Conversion of Shares of Company Common Stock | A-3 |
| Section 2.2 | Merger Sub | A-3 |
| Section 2.3 | PIPE Investment | A-3 |
| Section 2.4 | Closing Date Statement and Merger Consideration Schedule | A-3 |
| Section 2.5 | Merger Consideration | A-4 |
| Section 2.6 | Exchange Procedures. | A-4 |
| Section 2.7 | Merger Consideration Adjustment | A-5 |
| Section 2.8 | Section 16 Matters | A-7 |
| Section 2.9 | Tax Consequences of the Merger | A-7 |
| Section 2.10 | Earnout | A-7 |
| Section 2.11 | Closing Deliverables. | A-8 |
| **Article III** | | |
| REPRESENTATIONS AND WARRANTIES OF THE COMPANY | | |
| Section 3.1 | Organization, Good Standing and Qualification | A-9 |
| Section 3.2 | Capital Structure | A-9 |
| Section 3.3 | Authority; Approval | A-10 |
| Section 3.4 | Governmental Filings; No Violation; Certain Contracts | A-10 |
| Section 3.5 | Financial Statements | A-11 |
| Section 3.6 | Absence of Certain Changes | A-12 |
| Section 3.7 | No Undisclosed Liabilities | A-12 |
| Section 3.8 | Litigation | A-12 |
| Section 3.9 | Employee Benefits | A-12 |
| Section 3.10 | Labor Matters | A-13 |
| Section 3.11 | Compliance with Laws; Licenses | A-14 |
| Section 3.12 | Material Contracts | A-14 |
| Section 3.13 | Real Property | A-16 |
| Section 3.14 | Environmental Matters | A-17 |
| Section 3.15 | Taxes | A-18 |

Annex A-1-i

Table of Contents

|  |  | Annex A Page |
|---|---|---|
| Section 3.16 | Intellectual Property | A-20 |
| Section 3.17 | Insurance | A-22 |
| Section 3.18 | Suppliers | A-22 |
| Section 3.19 | Related Party Transactions | A-22 |
| Section 3.20 | Brokers and Finders | A-22 |
| Section 3.21 | Information Supplied; Proxy Statement | A-22 |
| Section 3.22 | Anti-Corruption; Sanctions | A-23 |
| Section 3.23 | Accredited Investors | A-23 |
| Section 3.24 | Sufficiency of the Assets | A-23 |
| Section 3.25 | No Other Representations or Warranties | A-24 |

**Article IV**

**REPRESENTATIONS AND WARRANTIES OF PARENT**

|  |  |  |
|---|---|---|
| Section 4.1 | Organization, Good Standing and Qualification | A-24 |
| Section 4.2 | Capital Structure | A-25 |
| Section 4.3 | Authority; Approval | A-26 |
| Section 4.4 | Governmental Filings; No Violations; Certain Contracts | A-26 |
| Section 4.5 | Parent Reports; Financial Statements; Internal Controls | A-27 |
| Section 4.6 | Absence of Certain Changes | A-28 |
| Section 4.7 | Litigation and Liabilities | A-28 |
| Section 4.8 | Parent Trust Account | A-28 |
| Section 4.9 | PIPE Investments | A-29 |
| Section 4.10 | [RESERVED] | A-29 |
| Section 4.11 | Investment Intent | A-29 |
| Section 4.12 | Brokers and Finders | A-29 |
| Section 4.13 | Information Supplied; Proxy Statement | A-29 |
| Section 4.14 | Taxes | A-30 |
| Section 4.15 | Material Contracts | A-30 |
| Section 4.16 | Benefit Plans | A-30 |
| Section 4.17 | Compliance with Laws | A-30 |
| Section 4.18 | Investment Company Act | A-30 |
| Section 4.19 | Investigation and Reliance | A-31 |
| Section 4.20 | No Other Representations or Warranties | A-31 |

**Article V**

**COVENANTS**

|  |  |  |
|---|---|---|
| Section 5.1 | Interim Operations of the Company | A-31 |
| Section 5.2 | Conduct of Parent | A-34 |
| Section 5.3 | Parent Trust Account Matters | A-35 |
| Section 5.4 | [RESERVED] | A-36 |
| Section 5.5 | Proxy Filing; Information Supplied | A-36 |
| Section 5.6 | Parent Meeting | A-37 |
| Section 5.7 | Approval of Sole Stockholder of Merger Sub | A-37 |
| Section 5.8 | Required Stockholder Approval | A-37 |
| Section 5.9 | Information Statement | A-38 |
| Section 5.10 | Regulatory Filings/Approvals | A-38 |
| Section 5.11 | Cooperation and Efforts to Consummate Transactions; Status | A-39 |
| Section 5.12 | Third-Party Consents | A-39 |
| Section 5.13 | Access and Reports | A-40 |
| Section 5.14 | LTIP | A-40 |

Annex A-1-ii

Case 1:23-cv-00653-GBW-LDH    Document 52-1    Filed 03/12/24    Page 31 of 34 PageID
#: 1468

Annex A-1-ii

Table of Contents

| | | Annex A Page |
|---|---|---|
| Section 5.15 | Exclusivity | A-40 |
| Section 5.16 | Publicity | A-41 |
| Section 5.17 | Confidentiality | A-41 |
| Section 5.18 | Financing | A-41 |
| Section 5.19 | Subscription Agreements | A-42 |
| Section 5.20 | Takeover Statutes | A-42 |
| Section 5.21 | Further Assurances | A-42 |
| Section 5.22 | Tax Matters | A-42 |
| Section 5.23 | Financial Statements and Related Information | A-43 |
| Section 5.24 | Directors' and Officers' Insurance Policy | A-43 |
| Section 5.25 | Supplement to Company Disclosure Letter | A-44 |
| Section 5.26 | Mandatory Disclosure | A-45 |
| Section 5.27 | Code Section 280G | A-45 |
| Section 5.28 | Convertible Notes | A-45 |
| Section 5.29 | Key Contracts | A-45 |
| **Article VI** | | |
| CONDITIONS | | |
| Section 6.1 | Conditions to Each Party's Obligation to Consummate the Transactions | A-45 |
| Section 6.2 | Conditions to Obligation of Parent | A-46 |
| Section 6.3 | Conditions to Obligations of the Company | A-48 |
| Section 6.4 | Frustration of Closing Conditions | A-48 |
| **Article VII** | | |
| TERMINATION | | |
| Section 7.1 | Termination | A-49 |
| Section 7.2 | Effect of Termination and Abandonment | A-49 |
| **Article VIII** | | |
| STOCKHOLDER REPRESENTATIVE | | |
| Section 8.1 | Designation and Replacement of Stockholder Representative | A-50 |
| **Article IX** | | |
| MISCELLANEOUS AND GENERAL | | |
| Section 9.1 | Amendment; Waiver | A-51 |
| Section 9.2 | Expenses | A-51 |
| Section 9.3 | Counterparts | A-51 |
| Section 9.4 | GOVERNING LAW AND VENUE; WAIVER OF JURY TRIAL; SPECIFIC PERFORMANCE | A-51 |
| Section 9.5 | Notices | A-52 |
| Section 9.6 | Entire Agreement | A-53 |
| Section 9.7 | No Third-Party Beneficiaries | A-53 |
| Section 9.8 | Obligations of Parent | A-53 |
| Section 9.9 | Severability | A-53 |
| Section 9.10 | Interpretation; Construction | A-53 |
| Section 9.11 | Assignment | A-54 |
| Section 9.12 | Fulfillment of Obligations | A-54 |
| Section 9.13 | Obligations of Merger Sub | A-54 |
| Section 9.14 | Non-Survival of Representations, Warranties and Covenants | A-54 |
| Section 9.15 | Release of Claims | A-54 |

Annex A-1-iii

Table of Contents

**EXHIBITS AND SCHEDULES**

| Exhibits | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Form of Sponsor Support Agreement |
| Exhibit C | Form of Support Agreement |
| Exhibit D | Form of Amended and Restated Registration Rights Agreement |
| Exhibit E | Form of Restrictive Covenant Agreement |
| Exhibit F | Form(s) of Employment Agreement |
| Exhibit G | Form of Certificate of Merger |
| Exhibit H | Form of Amended and Restated Parent Charter |
| Exhibit I | Form of Amended and Restated Parent Bylaws |
| Exhibit J | Company Letter of Transmittal |
| Exhibit K | Form of Director Nomination Agreement |
| Exhibit L | Form of FIRPTA Certificate |
| Exhibit M–1 | Form of Forum III LTIP |
| Exhibit M–2 | Form of RSU Agreement for Earnout Shares |
| Exhibit M–3 | Form of RSU Agreement for Time-Vesting Shares |
| Exhibit M–4 | Form of RSU Agreement for Performance-Vesting Shares |
| Exhibit M–5 | Forum III LTIP Parties |
| Exhibit N | Form of Escrow Agreement |

| Schedules | |
|---|---|
| Schedule A–1 | Initial Stockholder Consent Parties |
| Schedule A–2 | Parties to Certain Ancillary Agreements |

Annex A-1-iv

Table of Contents

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

**FORUM MERGER III CORPORATION**

By        /s/ Marshall Kiev

Name:    Marshall Kiev

Title:      Co-CEO and President


**ELMS MERGER CORP.**

By        /s/ David Boris

Name:    David Boris

Title:      President and Treasurer


**ELECTRIC LAST MILE, INC.**

By        /s/ Benjamin Wu

Name:    Benjamin Wu

Title:      Secretary


**JASON LUO, solely in his capacity as the initial Stockholder Representative hereunder.**

By        /s/ Jason Luo

Name:    Jason Luo

Title:      Stockholder Representative


Annex A-1-56