**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SHMUEL LEVY, Individually and on )
Behalf of All others Similarly Situated, )
                               )
                Plaintiff, )
                               )      C.A. No. 23-653-GBW
                               )
      v.                       )
                               )
JASON LUO, JAMES TAYLOR, ALBERT )
LI, MARSHALL KIEV, DAVID BORIS, )
and BDO USA, LLP,              )
                               )
               Defendants. )
                               )

FILED

FEB  7 2025

U.S. DISTRICT COURT DISTRICT OF DELAWARE

## REPORT AND RECOMMENDATION

Plaintiff Shmuel Levy, individually and on behalf of all others similarly situated, sued Defendants Jason Luo ("Luo"), James Taylor ("Taylor"), Albert Li ("Li"), Marshall Kiev ("Kiev"), David Boris ("Boris") (collectively, the "Individual Defendants"), and BDO USA, LLP ("BDO") following the investment in a private investment in public entity ("PIPE") offering of Forum Merger III Corporation ("FIII").  Pending before the Court are five motions to dismiss: one by Taylor (D.I. 33), one by Li (D.I. 36), one by BDO (D.I. 38), one by Boris and Kiev jointly (D.I. 41), and one by Luo (D.I. 44).  The motions are fully briefed (D.I. 34, 37, 42, 45, 49, 51, 54–57, 59) and I heard argument on December 3, 2024.  For the following reasons, I recommend that Defendants' motions to dismiss be GRANTED.

## I.   BACKGROUND

This dispute arises out of Plaintiffs' $130 million participation and investment in a PIPE offering conducted in connection with the June 25, 2021, merger of FIII, a special purpose acquisition company ("SPAC"), and Electric Last Mile, Inc. ("ELM").  The post-merger company,

Electric Last Mile Solutions ("ELMS"), filed for bankruptcy and is not a defendant in this action. The Amended Class Action Complaint ("Amended Complaint")[1] asserts claims under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against all Defendants and SEC Rule 10b-5 (Count I) and § 20(a) of the Exchange Act against the Individual Defendants.

FIII was a SPAC created with the sole purpose of identifying and merging with a privately held business. Following an initial public offering in August of 2020, FIII identified ELM, a company created by Defendants Luo and Taylor to manufacture utility vehicles for "last mile" deliveries, as their target. (D.I. 23 ¶¶ 30, 32). On September 18, 2020, FIII and ELM executed a letter of intent to merge the two companies, estimating the value of the post-merger enterprise at $1.3 billion. (*Id.* ¶¶ 33, 47). On December 11, 2020, FIII announced that the two companies had executed a definitive merger agreement, subject to shareholder approval and provided that "[ELM would] ensure that none of the information supplied by or on its behalf for inclusion or incorporation . . . in the Proxy Statement [would] . . . contain any untrue statements of a material fact or omit to state any material fact." (*Id.* ¶ 34). On June 9, 2021, FIII issued a Proxy to solicit votes for the merger; on June 24, 2021, FIII shareholders voted to approve the merger and close the PIPE offering. (*Id.* ¶¶ 43, 44).

Prior to the announcement and the Proxy, on November 19, 2020, Luo and Taylor caused ELM to issue 99,000 shares of ELM common stock for $10 per share, of which approximately 79% went to entities owned and controlled by Luo and 6.5% went to entities owned and controlled by Taylor (the "November 2020 Equity Transaction"). (*Id.* ¶¶ 5, 48, 49). Each of the shares could be exchanged for over 800 shares of ELMS common stock that was also valued at $10 per share;

---

[1]     The parties stipulated to the filing of an amended complaint, which the Court entered. (D.I. 17).

thus, each ELM share purchased for $10 effectively became worth $8,000 post-merger when exchanged for ELMS common stock. (*Id.* ¶¶ 4, 60). On December 8, 2020, Luo sold 1,000 shares of ELM common stock to an entity owned and controlled by Hailiang (Jerry) Hu and Benjamin Wu, ELM's Chief Operating Officer and General Counsel respectively (the "December 2020 Equity Transaction" and, in combination with the November 2020 Equity Transaction, the "2020 Equity Transactions"). (*Id.* ¶ 50). The Proxy disclosed the fact of the 2020 Equity Transactions, but Plaintiffs allege that Defendants failed to properly record the share-based compensation at fair market value or disclose that the sale of shares was below fair market value. (*Id.* ¶¶ 4, 6, 9, 50, 59–60, 65, 77–82).

On December 10, 2020, FIII and the PIPE investors executed the Offering Memorandum—a private placement of $130 million worth of shares of unregistered common stock of FIII. (*Id.* ¶¶ 2, 35). The Offering Memorandum stated that PIPE investors were to rely exclusively on FIII's SEC filings, and that closing was contingent upon the accuracy and truthfulness of those filings. (*Id.* ¶¶ 38–40). The Offering Memorandum also represented and warranted that the SEC filings complied with all requirements of the Securities Act and Securities Exchange Act of 1934 and none of them "contained any untrue statement [or omission] of a material fact." (*Id.* ¶¶ 37, 52). The Offering Memorandum provided that the agreement with PIPE investors was subject to termination if, among other things, FIII's SEC filings were not true and correct in all material respects until the time of closing. (*Id.* ¶¶ 39–40). FIII was required to notify all PIPE investors if any representations contained therein were no longer accurate. (*Id.* ¶ 40).

Plaintiffs allege misrepresentations across several documents, most of which are related to the 2020 Equity Transactions. For example, Plaintiffs allege that the Proxy: (i) stated that ELM's senior executives received *de minimus* compensation in 2020, when in fact they received hundreds

of millions in equity compensation by virtue of the 2020 Equity Transactions (*id.* ¶¶ 55–56); (ii)

failed to disclose that the $10 per share price paid for shares from the November 2020 Equity

Transaction was substantially below market value and further failed to disclose the existence of

the December 2020 Equity Transaction (*id.* ¶¶ 55–62); and (iii) contained materially false and

misleading audited financial statements for ELM in 2020, provided by BDO. (*Id.* ¶¶ 54, 60–69).

BDO's audit opinion stated, in relevant part:

> "We have audited the accompanying balance sheet of E[LM] . . . as
> of December 31, 2020, the related statements of operations and
> comprehensive loss . . . for the period from August 20, 2020
> (inception) through December 31, 2020, and the related notes" and
> have determined that "the financial statements present fairly, in all
> material respects . . . the financial position of [ELM] at December
> 31, 2020 . . . in conformity with accounting principles generally
> accepted in the United States of America."

(*Id.* ¶ 64). BDO further represented that it conducted its audit of ELM's financial statements in

"conformity with accounting principles generally accepted" and "in accordance with the standards

of the PCAOB." (*Id.* ¶¶ 64, 65). Plaintiffs contend that BDO's statements misrepresented that

ELM's financials complied with Generally Accepted Accounting Principles ("GAAP") and,

further, that BDO's audit was not actually conducted in compliance with GAAP and Public

Company Accounting Oversight Board ("PCAOB") standards.[2] (*Id.* ¶¶ 63–65, 74–88, 116–136).

On February 1, 2022, ELMS announced the results of a special committee investigation

into "certain sales of equity securities made by and to individuals associated with the Company."

(*Id.* ¶ 89). The investigation concluded that certain ELM executives acquired ELM shares at a

"substantial discount to market value" without obtaining an "independent valuation to determine

---

[2]    The Public Company Accounting Oversight Board ("PCAOB") oversees the audits of
public companies and SEC-registered brokers and dealers. *See generally* Public Company
Accounting Oversight Board, https://pcaobus.org/.

the fair market value per share of its common stock." (*Id*). ELMS also disclosed that when the merger was consummated on June 25, 2021, each ELM share was exchanged for approximately 800 shares of ELMS. (*Id.* ¶ 9). ELMS further revealed that it had failed to "disclose any compensation associated with those transactions; or withhold or pay taxes in connection with that compensation" and, because of this, the previously issued financial statements for ELM in 2020 should not be relied upon and would require restatement. (*Id.* ¶¶ 9, 89).

ELMS also disclosed that Defendants Luo and Taylor were resigning and had "provided responses to the Special Committee that [were] believed to be inconsistent with documents [it had] reviewed." (*Id.* ¶¶ 90, 113). In connection with their resignations, both Luo and Taylor executed settlement agreements with ELMS where they agreed to surrender material amounts of ELMS common stock and to pay tens of millions in cash and stock. (*Id.* ¶ 111). Luo agreed to surrender 6 million shares of ELMS common stock and pay an additional $10 million in cash and stock. (*Id.*). Taylor agreed to surrender 1.8 million shares of ELMS common stock and pay an additional $3.3 million in cash and stock. (*Id.*). ELMS later disclosed that Taylor had violated the terms of his settlement agreement. (*Id.* ¶¶ 101–102). Plaintiffs claim that, as a direct result of the disclosures, ELMS common stock dropped by 51%, closing at $2.71 per share on February 2, 2022. (*Id.* ¶ 91). On February 14, 2022, ELMS disclosed that BDO was resigning as the auditor due to a disagreement between the two entities regarding ELMS' legal compliance and reporting obligations in addition to BDO's independence and direct participation in the events at issue. (*Id.* ¶ 94).

That same day, ELMS filed two letters with the SEC. The first letter, authored by its Audit Committee, stated that "BDO USA was aware of th[e] [2020 Equity] [T]ransactions well in advance and in connection with completion of the audit." (*Id.*). The other letter was from BDO

stating that an "illegal act . . . has or may have occurred" and that it was resigning due to ELMS's failure to take timely and appropriate remedial action. (*Id.*). On March 3, 2022, ELMS filed an amended current report on Form 8-K accusing BDO of continuing to refuse to provide them with an independence analysis as well as a responsive letter from BDO denying some of ELMS's allegations against it. (*Id.* ¶¶ 95, 123, 124). In its letter, BDO did not address ELMS's assertions regarding the independence analysis—specifically, the allegation that BDO had provided advice to Luo and his affiliates but failed to disclose those relationships. (*Id.* ¶ 123).

On March 11, 2022, ELMS announced that the SEC was investigating the 2020 Equity Transactions and the alleged accounting violations. It also announced it was withdrawing its previous financial guidance and needed to raise additional capital to continue its launch plan. (*Id.* ¶¶ 96, 115). ELMS's stock price fell to $1 per share. (*Id.* ¶¶ 96–98, 115). On April 1, 2022, ELMS revealed it was unable to file its Form 10-K for 2021. (*Id.* ¶ 100). On May 24, 2022, ELMS disclosed that it had received a notice from NASDAQ that it was no longer in compliance with listing requirements. (*Id.* ¶ 101). On June 13, 2022, ELMS announced it would be delisting from NASDAQ and would file for Chapter 7 bankruptcy. (*Id.* ¶ 103).

Plaintiffs allege that without the Defendants' material misrepresentations and omissions, Plaintiffs and the Class would not have purchased ELMS common stock through the PIPE offering and that they have suffered millions in damages because of Defendants' bad acts. (*Id.* ¶ 15). All Defendants have moved to dismiss. (D.I. 33, 36, 38, 41, 44).

## II.    LEGAL STANDARD

### a.    Motion to Dismiss

In reviewing a motion filed under Rule 12(b)(6), the Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff."

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted). A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). The complaint need not contain detailed factual allegations, but conclusory allegations and "formulaic recitation[s] of the elements of a cause of action" are insufficient to give the defendant fair notice of the nature of and grounds for the claim. *Twombly*, 550 U.S. at 555. The complaint must contain facts sufficient to show that a claim has "substantive plausibility." *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam). While this plausibility standard requires more of the complaint than allegations supporting the mere possibility that the defendant is liable as alleged, plausibility should not be taken to mean probability. *Twombly*, 550 U.S. at 545. A claim is facially plausible, and the standard is satisfied, when the claim's factual allegations, accepted as true, allow the court to reasonably infer that the defendant is liable as alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 1948 (2009).

### b. Securities Fraud

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b). Section 10(b) is supplemented by Rule 10b-5, which makes it unlawful to: "(a) [] employ any device, scheme, or artifice to defraud, (b) [] make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [] engage in any act, practice,

7

or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

A complaint alleging securities fraud must satisfy the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that "'[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.'" *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)). This particularity requirement is "rigorously applied in securities fraud cases." *Id.* In addition, the Exchange Act requires that the plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

As a result, a plaintiff's allegations must also meet the heightened pleading standard established the Private Securities Litigation Reform Act ("PSLRA"). *Institutional Investors Group v. Avaya, Inc.,* 564 F.3d 242,252 (3d Cir. 2009). The PSLRA requires that facts be plead with particularity and is, in most respects, comparable to the standard established by Rule 9(b). *Id.* at 253. Rule 9(b) and the PSLRA require a plaintiff to plead "the who, what, when, where, and how" when pleading fraud. *Id.* (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)). Importantly, while Rule 9(b) allows a plaintiff to plead scienter generally, the PSLRA does not. *Id.* Under the PSLRA, "any private securities complaint alleging that the defendant made a false or misleading statement must . . . 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). Alleged facts allow such an inference when, considering all allegations holistically,

8

"a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from [them]." *Id.* at 324, 326. "The absence of a motive allegation, though relevant, is not dispositive." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011).

Thus, "'unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from the inferences flowing from vague or unspecific allegations—inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis.'" *Cal. Pub. Employees' Ret. Sys.*, 394 F.3d at 145 (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002)).

## III.    DISCUSSION

Plaintiffs allege that all six Defendants engaged in violations of §10(b) of the Exchange Act and SEC Rule 10b-5, and that every defendant except for BDO violated §20(a) of the Exchange Act.

Before addressing Defendants' substantive arguments, I address the standing argument raised by Defendants Boris and Kiev, and incorporated by Defendants Taylor and Li. (D.I. 42 at 8–10; D.I. 34 at 10 n.3; D.I. 37 at 2–3). In short, Defendants argue that because Plaintiffs in this case did not buy the securities *about which a misstatement was made*, that they do not have standing to bring suit based on any alleged misstatements.

In support of their argument, Boris and Kiev rely on *Menora Mivtachim Insurance Ltd. v. Frutarom Industries Ltd.*, (D.I. 42 at 8) where the United States Court of Appeals for the Second Circuit articulated a definition of standing in securities fraud cases that limits such claims to "purchasers or sellers of securities *about which a misstatement [is] made*." 54 F.4th 82, 84 (2d Cir.

9

2022) (emphasis added).  Boris and Kiev also cite to *Lucid Motors*, a case from the United States Court of Appeals for the Ninth Circuit which cited to, and agreed with, *Menora*, adopting the rule that a plaintiff who does not purchase or sell the securities about which the alleged misrepresentations are made lacks standing to bring suit under Section 10(b).  (D.I. 59 at 2–3 (citing *In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181 (9th Cir. 2024) (holding that standing to bring a claim under §10(b) is limited to purchasers and sellers of the security *about which the representation is made*, and investors in a SPAC lacked standing to bring a claim based on the misrepresentations of the manufacturer which was acquired by the SPAC)).

I have considered Defendants' arguments regarding standing.  But I have also considered the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores*, which held that "§10(b) and Rule 10b-5 proscribed only fraud 'in connection with the purchase of sale' of securities[.]" 421 U.S. 723, 731 (1975) (citing *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463–64 (2d Cir. 1952).  Further, the Supreme Court recognized that plaintiffs do not need to have "privity of dealing or even personal contact" between themselves and the defendants as this is the "exception and not the rule."  *Blue Chip Stamps*, 421 U.S. at 745.  Moreover, the United States Court of Appeals for the Third Circuit has held that "[t]he *only* standing limitation recognized by the Supreme Court with respect to section 10(b) damage actions is the requirement that the plaintiff be a purchaser or seller of a security."  *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir. 1988) (emphasis added); *see also S.E.C. v. Zanford*, 535 U.S. 813, 814 (2002) ("To effectuate its remedial purposes, the [Exchange] Act should be construed flexibly, not technically and restrictively.  The SEC has consistently adopted a broad reading of 'in connection with the purchase or sale of any security'" (citing *United States v. Mead Corp.*, 533 U.S. 218, 229–30

(2001)).  The Third Circuit has not adopted the standard set forth in *Menora* or *Lucid Motors* and, thus, my analysis remains controlled by *Blue Chips* and *Deutschman*.

Accordingly, I decline Defendants' invitation to recommend a ruling in contravention of current controlling precedent.[3]

### a.  Violations of Section 10(b) and Rule 10b-5.

In Count I, Plaintiffs allege that all Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 by making knowingly false statements in connection with the PIPE Offering which, Plaintiffs contend, resulted in the purchase of ELMS common stock at an artificially inflated price.  (D.I. 23 ¶¶ 154–159).  To adequately plead a violation, the complaint must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Matrixx Initiatives*, 563 U.S. at 37–38 (quoting *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Plaintiffs allege that certain documents in connection with the merger, including the "Offering Memorandum" and the "Proxy" contained material misrepresentations, and that the Individual Defendants knew that the information disseminated in the name of ELM and the company pre-merger was materially false and misleading.  Specifically, Plaintiffs say that the Proxy, filed by FIII, contained an incorrect accounting determination of the sale of common shares of ELM stock prior to the merger.  (D.I. 23 ¶¶ 4–7).  Plaintiffs further allege that Defendants

---

[3]    *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 177 (3d Cir. 2000) ("So long as the alleged misrepresentations were material, the 'in connection with' requirement may be satisfied simply by showing that they were publicly disseminated in a medium upon which investors tend to rely"); *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 301 (3d Cir. 2005).

concealed and disguised the stock sales to Luo and Taylor because ELM should have classified the stock sales as compensation; as a result, Plaintiffs say, the financial health of ELM was artificially inflated and misrepresented to the shareholders. (*See, e.g.*, *id.* ¶¶ 6, 59–62, 69). Plaintiffs further allege that Boris and Kiev had access to the information that would have revealed the improper classification of the 2020 Equity Transactions. (*Id.* ¶¶ 102, 105–110).

The Proxy also contained BDO's audit report that ELM's financial statements were both accurate and GAAP compliant (the "ELM Audit Opinion") as well as its representation that the audit was conducted in compliance with PCAOB standards. (*Id.* ¶¶ 65–66). Plaintiffs say these statements were false because, in reality, ELM's financial statements should have differently classified the 2020 Equity Transactions and that BDO would have reached the same conclusion but for conducting either no audit or a sham audit. (*Id.* ¶¶ 38, 89, 138–139, 144).

Defendants moved to dismiss Plaintiffs' Amended Complaint for a number of reasons: (1) the Individual Defendants argue that the Amended Complaint fails to identify each as the "maker" of the alleged misrepresentations as required under Section 10-b (D.I. 34 at 10–11; D.I. 45 at 12–13; D.I. 37 at 3; D.I. 42 at 18–19); (2) that the accounting performed by BDO, upon which Plaintiffs claim reliance, is an inactionable statement of opinion (D.I. 34 at 12–13; D.I. 45 at 9–11; D.I. 39 at 6–11); (3) that Plaintiffs do not properly plead scheme liability (D.I. 45 at 13–14); and (4) that Plaintiffs do not plead scienter with the required level of particularity as to each defendant (D.I. 34 at 14–18; D.I. 45 at 13–19; D.I. 42 at 10–18; D.I. 39 at 11–17). As set forth below, I agree with Defendants Luo, Taylor, and Li that Plaintiffs failed to adequately allege that they were the "maker" of any of the false statements and, therefore, recommend dismissal. As for Defendant BDO, I agree that BDO's statements are not actionable opinions under *Omnicare*. And as to Defendants Boris and Kiev, I agree that Plaintiffs failed to allege scienter with particularity.

i. **Whether Each Individual Defendant is a "Maker" of the Alleged Misstatements.**

"The PSLRA requires [a plaintiff] to specify the role of each defendant, demonstrating each Defendant's involvement in misstatements and omissions." *Winer Family Tr. v. Queen*, 503 F.3d 319, 335–36 (3d Cir. 2007). In suits involving multiple defendants, "securities fraud plaintiffs [must] distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud." *In re MicroStrategy, Inc. Sec. Litig.,* 115 F. Supp. 2d 620, 649 n.57 (E.D. Va. 2000) (internal quotation marks omitted). As the Supreme Court in *Janus Capital Group, Inc. v. First Derivative Traders* explained, only the "maker" of a fraudulent statement may be held liable under Section 10(b). *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The maker of a statement is a "person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* "Nothing in *Janus* precludes a single statement from having multiple makers." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015); *see also City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012).

A "complaint should lay out, with particularity, each fraudulent statement or representation, its materiality, which specific defendant made the representation, when it was made, why it was false or misleading, scienter, and explain how [the plaintiff] relied on it." *Universal Am. Corp. v. Partners Healthcare Solutions Holdings, L.P.*, 61 F. Supp. 3d 391, 397 (D. Del. 2014).

Defendants argue that Plaintiffs failed to do this. Specifically, Defendants argue that by grouping certain Individual Defendants together in its Amended Complaint, Plaintiffs rely on "'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the

[PSLRA]." (*See, e.g.*, D.I. 34 at 9, citing *Rockefeller*, 311 F.3d at 224 n.19 (quoting *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001)).

As to Defendants Luo, Taylor and Li, I agree. Plaintiffs' Amended Complaint directs no individualized allegations at Luo, Taylor, or Li. Instead, the Amended Complaint eschews describing each Individual Defendant's role in making any of the alleged fraudulent statements in favor of stating that "the Proxy and FIII's other SEC filings materially misrepresented" important facts. (D.I. 23 ¶ 6). By way of example, the Amended Complaint is replete with allegations like the following:

> The Proxy stated that ELM's senior executives zero or *de minimus* compensation in 2020, when in fact these executives had received hundreds of millions [*sic*] dollars in stock-based compensation. The Proxy likewise concealed the massive expense associated with ELM's sale of 99,000 shares at prices well below fair market value, materially overstating ELM's 2020 financial performance by understating the Company's expenses and operating losses by over $800 million, all in violation of GAAP. The Proxy disclosed only the issuance of 99,000 shares at $10 per share, with no disclosure concerning the far-higher value of those shares. The Proxy also failed to disclose that this "sale" below fair value to defendants Luo and Taylor was in face a massive compensation award, and it did not disclose any associated expense by ELM. Nor did the Proxy disclose defendant Luo's further sale of 1,000 shares at $10 per share to two members of ELM's senior management in December 2020 . . . . The Proxy and other SEC filings likewise touted the value to the business of ELM's senior executives – particularly defendants' Luo and Taylor – without disclosing their involvement in and receipt of hundreds of millions of dollars in secret compensation from ELM, which threatened to, and ultimately did, force these executives out of the Company.

(*Id.* ¶¶ 6–7) (emphasis added).

As pled, the "maker" of those statements are the documents, not the Individual Defendants. Nowhere does the Amended Complaint allege that Luo, Taylor, or Li drafted the Proxy, which was filed by FIII. Plaintiffs neither allege that Luo, Taylor, or Li were officers or directors of FIII

nor that they had ultimate authority with respect to the Proxy.  So too with the SEC filings, Subscription Agreements, and other documents containing allegedly false statements: Plaintiffs fail to allege that Luo, Taylor, or Li were officers or directors or that they had any authority whatsoever over the contents of those documents.  *See Bartesch v. Cook,* 941 F. Supp. 2d 501, 511 (D. Del. 2013) ("no fraud liability can exist against any defendant who was not an officer or director [of the company] at the time of the challenged statement because they would not have had the required 'ultimate authority over the statement, including its content and whether and how to communicate it'") (quoting *Janus,* 564 U.S. at 142–43)).  Although "*Janus* recognized that attribution could be 'implicit from surrounding circumstances,'" the key question is whether a person or entity has authority over a statement.  *City of Roseville Emps. Ret. Sys. v. Energy Sols., Inc.,* 814 F. Supp. 2d 395, 418 (S.D.N.Y. 2011) (quoting *Janus,* 564 U.S. at 142).  Plaintiffs fail to allege any specific facts or "surrounding circumstances" that show Luo, Taylor, or Li were the "person or entity with ultimate authority over [any particular] statement, including its content and whether and how to communicate it." *Janus,* 546 U.S. at 142.

The closest Plaintiffs come is including the titles of the Individual Defendants, presumably to imply that, by virtue of their titles, these Individual Defendants *must* have had involved in the contents of these documents, specifically regarding the ELM financials included in the Proxy.  But merely pleading that a defendant is an officer or has a title within a company is not enough under Rule 9(b) or the PLSRA.  *See, e.g., City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.,* 70 F.4th 668, 686 (3d Cir. 2023) (finding allegations sufficient when statements were directly attributed to an individual, and contrasting such allegations with those in *Janus* where allegations that a person was "significantly involved" were insufficient); *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.,* Nos. 05-1151 (SRC), 05-2367 (SRC), 2011 WL 344419, at *25

15

(D.N.J. Aug. 8, 2011) (finding attribution sufficient where the defendant was a named officer, specific statements were attributed to him, and he signed the SEC filings at issue); *Washtenaw Cnty. Emps.' Ret. Sys. V. Walgreen Co.*, No. 15-3187, 2019 WL 4597518, at *5 (N.D. Ill. Sept. 23, 2019) (holding that generic allegations against "Walgreens" were insufficient to state a claim against the CFO, while specific allegations attributing statements directly to the CEO were sufficient). With one exception,[4] the Amended Complaint is devoid of any allegations that any of these Individual Defendants actually made or controlled any particular statement.

My recommendation comports with the Court's analysis in *Universal American v. Partners Healthcare Solutions Holdings, L.P.*, 176 F. Supp. 3d 387 (D. Del. 2016). In *Universal*, the Court cautioned that *Janus* does not insulate corporate officers from liability where the plaintiff "can plead, and ultimately prove, that those officers had ultimate authority over [the] statement." *Id.* at 395 (internal citations and quotation marks omitted). The difference between the allegations pled in *Universal* and those here is material, and those differences militate against finding the allegations here sufficient. In *Universal*, the operative complaint contained specific allegations regarding the individual corporate officers. *See* C.A. No. 13-1741-RGA, D.I. 39, ¶¶ 139, 147

---

[4]     Plaintiffs specifically allege that Taylor made a false statement regarding the importance and experience of ELM's management team. (D.I. 23 ¶¶ 70–73). The remaining statements are not attributable to Taylor or any other Individual Defendant with the required specificity. But, even if they were, these statements are insufficient to support a claim under Section 10(b) because, at least in part, Plaintiffs admitted at argument that, "we do not allege, Your Honor, that those statements were false in and of themselves, we don't allege [that] Mr. Luo doesn't have experience in the electric auto industry or whatever it may be." (Tr. 65:15–18). Plaintiffs actual gripe is not with experience, but again with the treatment and allegedly deficient disclosure of the 2020 Equity Transactions. *See City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 390 (D. Del. 2010), aff'd, 442 F. App'x 672 (3d Cir. 2011) (holding that statements that are unrelated to the alleged misstatement or omission are not misleading); *see also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (noting that a statement is not misleading if it does not "state nor imply anything regarding" the subject matter of the purported omission).

(alleging that a specific individual defendant made numerous oral misrepresentations at three specific meetings with the board of directors); 90–91, 107 (alleging that an individual defendant signed the merger agreement on behalf of the company and certified that the representations were correct when they were actually fraudulent, all while acting as the agent of the company). With respect to one individual defendant, the *Universal* court found the allegations insufficient because, rather than setting forth "individualized allegations," the complaint "lumps [defendant] together with [the other individual defendants], making only vague allegations about his participation in preparing certain documents and presentations." *Id.* at 394 (noting that allegations like "[Defendant 1], [Defendant 2], and [Defendant 3] collectively prepared and delivered a presentation," and "[Defendant 1], [Defendant 2], and [Defendant 3] created and delivered a presentation," were insufficient as against Defendant 2 under *Janus*). Here, the allegations as to Luo, Taylor, and Li are less specific than those found to be insufficient in *Universal*. Accordingly, I recommend dismissal of Count I as against Luo, Taylor, and Li.

On the issue of who made the statements, Boris and Kiev fare differently. Boris and Kiev assert that they should not be liable because ELM, and not them, was the maker of the statement in the Proxy regarding ELM's finances. (D.I. 43 Ex. 3 at 3; D.I. 42 at 4–5). However, as set forth above, *Janus* holds that the maker of a statement is the one with "ultimate authority" over the statement. 546 U.S. at 142. Here, the Proxy Statement was wholly, and entirely, within the direct control of FIII, and, by extension, Boris and Kiev, who were co-CEOs of FIII. (D.I. 23 ¶¶ 25–26, 52–54). I am mindful that Boris and Kiev have argued that the allegedly false information was provided by ELM, not FIII, and that they should not be the "makers" of statements that did not originate with them. *See, e.g.*, *In re Cognizant Tech. Sols. Corp. Secs. Litig.*, No. 16-cv-6509, 2020 WL 3026564, at *15–16 (D.N.J. June 5, 2020). But, here, all parties agree that Boris and

Kiev signed the Proxy. And coupled with the allegations that Boris and Kiev knew that the provided ELM financials were false, it seems to me that Plaintiffs have done just enough at the motion to dismiss stage to sufficiently allege that Boris and Kiev were the makers of certain of the allegedly false statements.

### ii.    Whether BDO's ELM Audit Opinion Contained in the Proxy Statement Is an Inactionable Statement of Opinion.

BDO effectively concedes that it was the "maker" of the allegedly false statements attributed to it. (*See generally* D.I. 49, 56). So, I turn to whether BDO's ELM Audit Opinion and corresponding certification that its audit was PCAOB compliant should be considered opinions and, if so, whether they are actionable under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund.* 575 U.S. 1318 (2015). *Omnicare* establishes that a fact is "a thing done or existing" and an opinion is "a belief [,] a view or a sentiment which the mind forms of persons or things." *Id.* at 183 (internal citations and quotation marks omitted). Under *Omnicare*, an opinion is actionable only if: (1) the speaker did not sincerely hold the stated belief at the time made; (2) the opinion contains embedded statements of fact that were untrue; or (3) the opinion reasonably implies untrue facts and omits qualifying language. *Id.* at 184–86, 188–89; *City of Warren*, 70 F.4th at 686 (holding that the *Omnicare* standard applies to Rule 10b-5 and § 10(b) claims, not just § 11 which was addressed in *Omnicare*).

Plaintiffs argue that BDO's ELM Audit Opinion that the ELM financial statements in the Proxy fairly represented ELM's financial position and were GAAP compliant, and further that such audit was conducted in compliance with PCAOB standards, are false factual statements, not opinions. (D.I. 51 at 24–25). BDO disagrees. (D.I. 56 at 2). It appears that there is no consensus among courts as to whether statements that financials were GAAP compliant or that an audit was conducted in accordance with PCAOB standards are fact or opinion. I did not locate any cases

18

that categorically hold that such statements are *always* fact, or *always* opinion, and neither side took such an absolute position.

While *Omanoff v. Patrizio & Zhao LLC*, *Sun v. Han*, and *Yang v. Tibet Pharmaceuticals, Inc.*, cited by Plaintiffs, concluded that such statements were fact, later decisions go the other way. *Compare Omanoff v. Patrizio & Zhao LLC*, No. 14-723, 2015 WL 1472566, at *5 (D.N.J. Mar. 31, 2015) ("Even if the Court accepts Defendants' contention that the alleged misrepresentations are statements of opinion, Plaintiffs have pled both objective and subjective falsity. Plaintiffs allege both that [the company's] financial statements were not GAAP compliant and Defendants knew these financial statements were not GAAP compliant. Similarly, Plaintiffs allege [the auditor's] audit did not comply with PCAOB standards and [the auditor] knew its audit did not comply with PCAOB standards. This is sufficient."); *Sun v. Han*, No. 15-703 (JLL), 2015 WL 9304542, at *9–10 (D.N.J. Dec. 21, 2015) (concluding under the circumstances plaintiff sufficiently alleged that CPA "made a material misrepresentation in its . . . Audit Reports, when it represented that [the Company's] reporting was 'in conformity with accounting principles generally accepted in the United States of America.'"); *Yang v. Tibet Pharmaceuticals, Inc.*, Nos. 14-3538 (FSH), 14-3620 (FSH), 2015 WL 730036, at *3 n.7 (D.N.J. Feb. 20, 2015) (finding plaintiffs' allegations sufficient to withstand motion to dismiss because they "concern misrepresentations of fact regarding [the company's] assets and debts and [the auditor's] conduct relative to professional standards in performing its audit. Plaintiffs' allegations do not concern 'opinions, predictions [or] other forward-looking statements'), *with Querub v. Moore Stephens Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016) ("Audit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the *Omnicare* standard . . . ."); *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL

19

4257110, at *31 (S.D.N.Y. Sept. 9, 2019), *rev'd in part on other grounds by New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 182 (2d Cir. 2023); *see also Johnson v. CBD Energy Ltd.*, No. H-15-1668, 2016 WL 3654657, at *10 (S.D. Tex. July 6, 2016) (finding that, under "the logic employed in *Omnicare*," a routine audit opinion containing a "statement regarding . . . PCAOB standards" is an "opinion").

I have reviewed the body of case law, and I am persuaded by the more recent decisions holding that such statements are opinions under *Omnicare*, for the reasons set forth in those cases. Indeed, as BDO points out, and Plaintiffs admit, its opinions were couched and labeled as exactly that—opinions. (*See, e.g.*, D.I. 23 ¶ 64–65, 68, 116, 131) (Plaintiff's Amended Complaint refers to BDO's audit as an "opinion" throughout). BDO provided an accounting of ELM's finances in a document titled "*Opinion* on the Financial Statements" which was included in FIII's Proxy to solicit votes for the Merger. (*Id.* ¶ 7; D.I. 39 at 4) (emphasis added). BDO's audit further stated, "[i]n our *opinion*, the financial statements present fairly, in all material respects, the financial position of the Company[.]" (D.I. 39 at 4) (emphasis added). *See Hunt v. Bloom Energy Corp.*, No. 19-2935-HSG, 2021 WL 4461171, at *14 (N.D. Cal. Sept. 29, 2021) ("It thus matters under *Omnicare* that PwC's audit report and statements in the Registration Statement were explicitly identified as opinions."); *Querub*, 649 F. App'x at 58 ("Audit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the *Omnicare* standard for Section 11 claims."); *see also Buttonwood Tree Value Partners, LP v. Sweeney*, No. 10-00537-CJC (MLGx), 2012 WL 2086607, at *2 (C.D. Cal. June 7, 2012) (finding "both GAAS and GAAP are a collection of broad standards that are couched in rather general and in some cases inherently subjective terms . . . to which reasonable professionals planning or conducting an audit reasonably and frequently could disagree."); *In re Hertz Holdings, Inc. Sec.*

*Litig.*, No. 13-7050, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017) (confirming that statements regarding auditing compliance are opinions). As the Supreme Court confirmed, a reasonable person "recognizes the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty as to the statement's content." *Omnicare*, 575 U.S. at 187.

I therefore turn to *Omnicare* to determine whether BDO's opinions are actionable. Plaintiffs argue that BDO's "opinion" that the ELM financial statements in the Proxy fairly represented ELM's financial position and were GAAP compliant, and further that such audit was conducted in compliance with PCAOB standards, is actionably misleading and falls within all three exceptions under *Omnicare*. I disagree.

The first *Omnicare* category requires Plaintiffs to plead facts showing that BDO disbelieved its ELM Audit Opinion or the certification that its audit complied with PCAOB standards. There are no facts in the Amended Complaint that do so. Instead, the Amended Complaint asks the Court to draw inferences and conclusions that because BDO was allegedly aware of the 2020 Equity Transactions then it must not have believed its statements. The Amended Complaint asserts that BDO "should have identified" the 2020 Equity Transactions and "should have understood" that ELM's financial statements in the Proxy presented "a significant audit risk" (D.I. 23 ¶¶ 131–133), and further that the SEC Comment Letter "should have" caused BDO to assess whether it had sufficient audit evidence regarding the cheap stock sale under the PCAOB standards. (*Id.* ¶¶ 134–135). But none of those assertions address the conclusion that Plaintiffs ask this Court to draw: that BDO did not believe the ELM Audit Opinion or the Certification with respect to the stock sale. "Should have" does not establish that BDO's opinion "falsely describe[d it's] state of mind . . . ." *Omnicare*, 575 U.S. at 184.

The second exception under *Omnicare* provides that a defendant can be liable for an opinion—even if the defendant honestly believed the opinion—if the opinion contains "embedded statements of fact" that are untrue. *Id.* at 185. Plaintiffs argue that BDO's ELM Audit Opinion regarding ELM's financial statement compliance with GAAP contains the embedded factual representation that BDO conducted a PCAOB-compliant audit. In support, Plaintiffs cite *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.* and *In re Petrobas Sec. Litig.* (D.I. 51 at 25-26, *citing Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F.Supp.3d 1109, 1119–20 (E.D. Cal. 2017); *In re Petrobas Sec. Litig.*, No. 14-cv-9662 (JSR), 2016 WL 1533553, at *3 (S.D.N.Y. Feb. 19, 2016)). But the court in *Johnson v. CBD Energy Limited*, No. H-15-1668, 2016 WL 3654657, at *11–12 (S.C. Tex. July 6, 2016), grappled directly with the rationale from *Petrobas* and found it premised on a misunderstanding of *Omnicare*. *Johnson* pointed out the example from *Omnicare* of an embedded fact which involved a CEO stating, "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access." *Johnson*, 2016 WL 3654657, at *12 (citing *Omnicare*, 575 U.S. at 185). In that example, the "conclusion of the CEO rested on an underlying, verifiable fact: that the company uses a patented technology that its competitors do not have access to." *Johnson*, 2016 WL 3654657, at *12. *Johnson* then contrasted the *Omnicare* example that contained a verifiable fact with the language included in the auditor opinion before it like, "[i]n our opinion … [the accompany financial statements] … present fairly, in all material respects, the financial position [of the company], that "[w]e conducted our audit of these statements in accordance with standards of the Public Company Accounting Oversight Board . . . " *Id.* The *Johnson* court concluded that such a statement does not actually contain an objectively verifiable fact.

The language included in BDO's audit opinion mirrors that in *Johnson*: "In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company," (D.I. 23 ¶ 64) and that BDO "conducted our audit in accordance with the standards of the PCAOB . . . ." (*Id.* ¶ 66). I find the reasoning in *Johnson*, as adopted by other courts (*see, e.g., Hunt v. Bloom Energy Corp.*, No. 19-cv-02935-HSG, 2021 WL 4461171, at *15 (N.D. Cal. Sep. 29, 2021)), persuasive and I adopt it here. Given the inherent subjectivity involved, merely stating that a PCAOB complaint audit was conducted does not mean that an audit contains an embedded and verifiable statement of fact.

As to the third *Omnicare* exception, BDO argues that there are no facts in the Amended Complaint that imply untrue facts or omit material facts. Plaintiffs respond that BDO's opinion regarding compliance with GAAP is actionably because it omits context, including "that BDO failed to perform numerous required independence audit risk assessments . . . . that 'call [the statement] into question.'" (D.I. 51. at 26–27 (citing *Omnicare*, 575 U.S. at 189 n.6) (citing D.I. 23 ¶¶ 118–24, 127–32, 135)). But under *Johnson* and similar cases, simply stating that an audit was conducted pursuant to PCAOB is not actionable. Although Plaintiffs point to a different reason why for the third exception—that BDO failed to disclose independence risk assessments (D.I. 51 at 26–27)—the gravamen remains the same: that BDO said it completed a PCAOB audit when Plaintiffs believe that BDO did not. For the reasons set forth above, this remains insufficient to bring such statements within the *Omnicare* exception.[5]

---

[5]    I further note that Plaintiffs did not cite a single case in their 50-page brief where a court found that an *Omnicare* exception applied when an audit company claimed that it conducted a PCAOB-compliant audit but failed to disclose an alleged relationship conflict.

Plaintiffs do not plead facts which would allow me to determine that BDO's audit is either not an opinion or falls under one of the three categorical exceptions for liability.[6] Accordingly, I recommend that the Amended Complaint as to BDO be dismissed.

### iii.    Whether Plaintiffs Have Plausibly Plead Scheme Liability.

Defendant Luo moved to dismiss the Amended Complaint on the basis that Plaintiffs failed to plausibly plead scheme liability as to Defendants. (D.I. 45 at 13). Plaintiffs did not respond to this argument in their Answering Brief. Accordingly, any argument in opposition is waived and I recommend dismissal as to Luo on this basis as well. *See Shaw v. New Castle Cnty.,* No. 20-950-CFC, 2021 WL 4125648, at *2 (D. Del. Sept. 9, 2021) (the "failure to address [] arguments for dismissal of the remaining claims constitutes abandonment of those claims"); *Blakeman v. Freedom Rides, Inc.,* No. 12-416-LPS-CJB, 2013 WL 3503165, at *13 (D. Del. July 10, 2013) ("where a party responds to a dispositive motion, but only attempts to defend some subset of the claims that are subject to the motion, courts have consistently held that the claims that are not defended are deemed abandoned.").

### iv.    Whether Plaintiffs Have Adequately Plead Scienter as to Boris or Kiev.

To survive dismissal as against Defendants Boris and Kiev, Plaintiffs must also adequately plead scienter, which is "the defendant's intention to deceive, manipulate, or defraud," *Tellabs,* 551 U.S. at 313, (internal citation and quotations omitted), requiring "a knowing or reckless state of mind," *Avaya,* 564 F.3d at 267 (citing *Advanta,* 180 F.3d at 534–35). "Under the PSLRA's second pleading requirement, a plaintiff must 'state with particularity facts giving rise to a strong

---

[6]    I note that the court in *Hacker v. Electric Last Mile Solutions, Inc.,* C.A. No. 22-545-MEF-LDW, D.I. 137 (D.N.J. July 19, 2024), on which Plaintiffs rely in part, agreed that BDO's statements were opinions but determined that they were nevertheless actionably pled under *Omnicare.* I have carefully considered the court's holding regarding the *Omnicare* exceptions but, for the reasons set forth herein, I disagree.

inference that the defendant acted with the required state of mind.'" *Id.* at 267 (quoting 15 U.S.C. § 78u–4(b)(2)). This standard is met "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The Court conducts this analysis "holistically to determine whether [the complaint's] allegations, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *Tellabs*, 551 U.S. at 323). "[O]missions and ambiguities count against inferring scienter." *Tellabs*, 551 U.S. at 323.

I start with Plaintiffs' allegations of "reckless or conscious behavior." *Avaya*, 564 F.3d at 267. "Conscious misbehavior involves 'intentional fraud or other deliberate illegal behavior.'" *In re Radian Sec. Litig.,* 612 F. Supp. 2d 594, 613 (E.D. Pa. 2009) (quoting *Advanta*, 180 F.3d at 535). "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42 (quoting *Advanta*, 180 F.3d at 535).

The Amended Complaint does not contain facts to show that Boris or Kiev made any reckless statements. Instead, Plaintiffs appear to argue that Boris and Kiev had access to or should have discovered information that should have indicated to them that ELM's financials were incorrect. (D.I. 51 at 29). More is required. First, Plaintiffs' argument appears to group Boris and Kiev with ELM officers without any specific allegations to explain Boris or Kiev's individual involvement with any misstatements or omissions. (*See, e.g.*, D.I. 23 ¶¶ 51–63); *Bartesch*, 941 F. Supp. 2d at 510 ("The Third Circuit has explicitly rejected [] 'group pleading' as incompatible

with the PSLRA's requirement that plaintiffs 'specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions.'") (quoting *Winer Family Trust v. Queen*, 503 F.3d 319, 335–37 (3d Cir. 2007). The Amended Complaint does not set forth facts that Boris and Kiev had information at their disposal that ELM engaged in a fraudulent transaction. Plaintiffs' allegation that had Boris and Kiev conducted robust due diligence they would have uncovered the alleged deception falls short of the requirement for recklessness. (D.I. 23 ¶¶ 108–110); *see Starr Investments` Cayman II, Inc. v. China MediaExpress Holdings, Inc*, No. 11-233-RGA, 2014 WL 4180331 at, *3 (D. Del. Aug. 21, 2014). In *Starr*, the court rejected an argument by plaintiff that if the defendants had only performed proper due diligence, they would have uncovered the alleged deception, finding those allegations insufficient to establish scienter. *Id.*

Plaintiff argues that *Starr* does not apply because there the plaintiff only alleged motive without recklessness. (D.I. 59 at 34 n.16). I am not sure that is correct (*see* D.I. 42 at 13–14, 15, 19; D.I. 59 at 6–7, 7 n.9 ) but, in any event, the *Starr* court cited to and explicitly agreed with a case from the United States District Court for the Southern District of New York which held that "'[a]llegations that [management] should have known that [another company's] financial information was fraudulent is insufficient to plead recklessness under § 10(b) and Rule 10b-5.'" *Id.* (Citing *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 129 (S.D.N.Y. 2013)).[7] The allegations contained within the Amended Complaint, at least as relating to Boris and Kiev, assert a similar theory. (D.I. 23 ¶¶ 105, 110).

In addition, Plaintiffs claim to have adequately alleged scienter because Boris and Kiev were "highly motivated to consummate the Merger because they stood to reap significant personal

---

[7]    *See also In re Hertz*, 905 F.3d at 116 ("significant accounting errors [are] insufficient by [themselves] to give rise to a strong inference of scienter") (internal quotation marks and citation omitted).

financial gain if the Merger closed." (D.I. 51 at 33). As an initial matter, the Third Circuit has made clear that "motive and opportunity" allegations are not sufficient as a means of independently establishing scienter. *Avaya*, 564 F.3d at 276. At best, motive and opportunity can be "considered along with all other allegations in the complaint," but even then, "[m]otives that are generally possessed by most corporate directors and officers do not suffice . . . ." *Id.* at 277–78. All that Plaintiffs have done here is put forth generalized motives attributable to any interested person; that is insufficient under the law. *See GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d. Cir. 2004) ("[i]n every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction.").

For these reasons, I find that the Amended Complaint does not adequately allege scienter for Boris and Kiev, especially considering that they also were provided with a clean audit by BDO. Accordingly, I recommend that Count I as to Boris and Kiev be dismissed.

### b. Violation of Section 20(a).

Because I recommend dismissal for failure to state a Rule 10b-5 and § 10(b) claim, I similarly recommend that Count II be dismissed as to Luo, Taylor, Li, Boris, and Kiev because liability under § 20(a) is derivative. *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159 (3d Cir. 2014) ("[s]ection 20(a) of the Exchange Act creates a cause of action against individuals . . . who ha[ve] committed a section 10(b) violation . . . . Because [Plaintiffs] have failed to adequately plead a predicate section 10(b) violation, their section 20(a) claim must be dismissed.") (citing 15 U.S.C. § 78t(a); *Avaya*, 564 F.3d at 252); *see also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013) ("liability under Section 20(a) is derivative of an underlying violation of Section 10(b)[.]"

## IV.    CONCLUSION

For the foregoing reasons, I recommend that Jason Luo's, James Taylor's, Albert Li's, Marshall Kiev's, David Boris', and BDO USA, LLP's Motions to Dismiss be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), (C), Federal Rule of Civil Procedure 72(b)(1), and D. Del. LR 72.1.  Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages.  Any response shall be filed within fourteen days thereafter and limited to ten pages.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which can be found on the Court's website.


Dated: February 7, 2025

_____
Laura D. Hatcher
United States Magistrate Judge
